No. 25-1908

# In the United States Court of Appeals for the First Circuit

NOVARTIS PHARMACEUTICALS CORPORATION,

*Plaintiff-Appellant,*

v.

AARON M. FREY,
in his official capacity as Attorney General of Maine,

*Defendant-Appellee.*

On Appeal from the United States District Court for the District of Maine,
No. 1:25-CV-407, Magistrate Judge John C. Nivison

## APPELLANT'S OPENING BRIEF

Matthew Warner
Alexandra A. Harriman
PRETIFLAHERTY
One City Center,
Portland, ME 04101
mwarner@preti.com

Jessica L. Ellsworth
Susan Cook
Jacob T. Young
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.,
Washington, D.C. 20004
jessica.ellsworth@hoganlovells.com

November 17, 2025

*Counsel for Plaintiff-Appellant*

# RULE 26.1 DISCLOSURE STATEMENT

Novartis Pharmaceuticals Corporation is a wholly owned indirect subsidiary of Novartis AG, a multinational pharmaceutical corporation incorporated and headquartered in Switzerland. Novartis AG trades publicly on the New York Stock Exchange. No person or entity has a 10 percent or greater ownership interest in Novartis AG's outstanding stock.

**TABLE OF CONTENTS**

**Page**

RULE 26.1 DISCLOSURE STATEMENT........................................................i

TABLE OF AUTHORITIES...........................................................................v

STATEMENT REGARDING ORAL ARGUMENT ............................xiii

INTRODUCTION ........................................................................................ 1

JURISDICTIONAL STATEMENT ..............................................................6

STATEMENT OF THE CASE ......................................................................7

    A. Legal and Factual Background........................................................7

        1. The 340B Program and Medicaid.............................................7

        2. 340B's Nationwide Enforcement Mechanisms......................11

        3. Contract Pharmacies .............................................................13

        4. Novartis's Contract Pharmacy Policy ...................................18

        5. Maine's Modification of the 340B Program to Expand the Subsidy Covered Entities Receive Through This Federal Program ..................................................................................21

    B. Procedural History .......................................................................24

SUMMARY OF ARGUMENT ...................................................................25

ARGUMENT ..............................................................................................27

I. NOVARTIS IS LIKELY TO SUCCEED ON THE MERITS..............28

    A. Chapter 103 Is Federally Preempted............................................28

        1. Federal Law Occupies the Field..............................................29

i. Congress created a uniform, nationwide 340B Program. .... 30

ii. The district court defined the field incorrectly. .................... 32

iii. Federal 340B regulation is pervasive. ................................. 36

2. Chapter 103 Conflicts with Federal Law. ................................. 40

i. Chapter 103 forbids conduct that Congress intended to permit. ......................................................................... 41

ii. Chapter 103 upends Congress's careful balancing of interests. ........................................................................ 46

iii. Chapter 103 invites conflicting adjudications. ..................... 50

iv. Chapter 103 introduces novel penalties. .............................. 56

3. No Presumption Against Preemption Applies. .......................... 57

B. Chapter 103 Violates the Dormant Commerce Clause. ................ 58

1. Chapter 103 Targets Out-of-State Conduct. ............................. 59

2. The District Court Erred in Its Dormant Commerce Clause Analysis. ................................................................... 61

II. THE REMAINING PRELIMINARY-INJUNCTION FACTORS FAVOR NOVARTIS. ............................................................... 62

A. Novartis Established Irreparable Harm. ..................................... 63

B. The Balance of Equities and the Public Interest Favor Enjoining Chapter 103's Enforcement. .......................................... 65

CONCLUSION ............................................................................. 67

## TABLE OF CONTENTS—Continued

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

Page(s)

**CASES:**

*Abbott v. Perez,*
585 U.S. 579 (2018) ................................................................. 65

*AbbVie Inc. v. Drummond,*
2025 WL 3048929 (W.D. Okla. Oct. 31, 2025).................. 22, 45, 49, 57

*Arizona v. United States,*
567 U.S. 387 (2012) .............................. 29, 30, 34, 36, 38, 40, 47, 48, 56

*Association for Accessible Meds. v. Ellison,*
140 F.4th 957 (8th Cir. 2025) ..................................................... 60-61

*Association for Accessible Meds. v. Frosh,*
887 F.3d 664 (4th Cir. 2018) ......................................................... 61

*Astra USA, Inc. v. Santa Clara County,*
563 U.S. 110 (2011) ...................... 2, 4, 11, 13, 31-32, 36, 50-51, 54, 55

*Bauer v. Elrich,*
8 F.4th 291 (4th Cir. 2021) ........................................................... 32

*Bessette v. Avco Fin. Servs., Inc.,*
230 F.3d 439 (1st Cir. 2000) ............................................. 29, 30, 37-38

*Buckman Co. v. Plaintiffs' Legal Comm.,*
531 U.S. 341 (2001) ................................................................. 32, 58

*Capron v. Attorney Gen.,*
944 F.3d 9 (1st Cir. 2019) ............................................................. 58

*Comcast of Me./N.H., Inc. v. Mills,*
988 F.3d 607 (1st Cir. 2021) ......................................................... 28

# TABLE OF AUTHORITIES—Continued

Page(s)

*Crosby v. National Foreign Trade Council,*
530 U.S. 363 (2000) ................................................................ 56

*Cummings v. Premier Rehab Keller, P.L.L.C.,*
596 U.S. 212 (2022) ........................................................ 10, 48

*Does 1-6 v. Mills,*
16 F.4th 20 (1st Cir. 2021) .................................................. 28

*French v. Pan Am Exp., Inc.,*
869 F.2d 1 (1st Cir. 1989) ................................. 29, 30, 32, 35, 36, 37

*Gade v. National Solid Wastes Mgmt. Ass'n,*
505 U.S. 88 (1992) ............................................................... 33

*Geier v. American Honda Motor Co.,*
529 U.S. 861 (2000) ............................................................. 44

*Healy v. Beer Inst., Inc.,*
491 U.S. 324 (1989) ............................................................. 60

*Hyde Park Partners, L.P. v. Connolly,*
839 F.2d 837 (1st Cir. 1988) ................................. 49, 65, 66

*In re Pharm. Indus. Average Wholesale Price Litig.,*
582 F.3d 156 (1st Cir. 2009) .............................................. 57

*International Paper Co. v. Ouellette,*
479 U.S. 481 (1987) ........................................................ 40, 48

*KKW Enters., Inc. v. Gloria Jean's Gourmet Coffees Franchising Corp.,*
184 F.3d 42 (1st Cir. 1999) ............................................ 28-29

*Kurns v. Railroad Friction Prods. Corp.,*
565 U.S. 625 (2012) ............................................................. 33

Page(s)

*Maine Forest Prods. Council v. Cormier,*
51 F.4th 1 (1st Cir. 2022)..................................... 43, 44, 45, 48, 49, 65

*Morales v. Trans World Airlines, Inc.,*
504 U.S. 374 (1992)...................................................................63

*National Pork Producers Council v. Ross,*
598 U.S. 356 (2023)..................................................... 59, 61, 62

*New York State Dep't of Soc. Servs. v. Dublino,*
413 U.S. 405 (1973)....................................................................50

*Norris ex rel. A.M. v. Cape Elizabeth Sch. Dist.,*
969 F.3d 12 (1st Cir. 2020) ......................................................28

*Novartis Pharms. Corp. v. Espinosa,*
2021 WL 5161783 (D.D.C. Nov. 5, 2021).........................................18-19

*Novartis Pharms. Corp. v. Johnson,*
102 F.4th 452 (D.C. Cir. 2024)............................ 4, 14, 16, 19, 36, 39,
41, 42, 43, 45, 47, 48

*Penobscot Nation v. Fellencer,*
164 F.3d 706 (1st Cir. 1999) ....................................................28

*Pharmaceutical Research & Mfrs. of Am. v. Walsh,*
538 U.S. 644 (2003)...................................................... 49-50, 62

*Public Int. Legal Found., Inc. v. Bellows,*
92 F.4th 36 (1st Cir. 2024).......................................................46

*Rodriguez v. United States,*
480 U.S. 522 (1987).................................................................47

*Rosario-Urdaz v. Rivera-Hernández,*
350 F.3d 219 (1st Cir. 2003) ....................................................64

Page(s)

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
  102 F.3d 12 (1st Cir. 1996) ........................................................62

*Sanofi Aventis U.S. LLC v. HHS*,
  58 F.4th 696 (3d Cir. 2023)............................. 4, 14, 19-20, 39, 42, 43

*Securities Indus. Ass'n v. Connolly*,
  883 F.2d 1114 (1st Cir. 1989) ...................................................40

*Starlight Sugar, Inc. v. Soto*,
  114 F.3d 330 (1st Cir. 1997) .....................................................64

*Stephen D. DeVito, Jr. Trucking, Inc. v. Rhode Island*
  *Solid Waste Mgmt. Corp.*,
  770 F. Supp. 775 (D.R.I. 1991) ................................................65
  947 F.2d 1004 (1st Cir. 1991) ..................................................65

*United States v. Alabama*,
  691 F.3d 1269 (11th Cir. 2012)..............................................66-67

*United States v. Locke*,
  529 U.S. 89 (2000)....................................................................57

*Verizon New Eng., Inc. v. Maine Pub. Utils. Comm'n*,
  509 F.3d 1 (1st Cir. 2007) ........................................................44

*Weaver's Cove Energy, LLC v. Rhode Island*
  *Coastal Res. Mgmt. Council*,
  589 F.3d 458 (1st Cir. 2009) ...............................................55-56

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008).................................................................27-28

*Wisconsin Dep't of Indus., Lab. & Hum. Rels. v. Gould Inc.*,
  475 U.S. 282 (1986)..................................................................56

Page(s)

*Wood v. General Motors Corp.*,
 865 F.2d 395 (1st Cir. 1988) ........................................................55

**CONSTITUTIONAL PROVISION:**

Maine Const. art. IV, § 16. ..........................................................24

**STATUTES:**

5 M.R.S. § 209................................................................. 23, 51, 56

24-A M.R.S. § 7752(5)..................................................... 21, 33, 58

24-A M.R.S. § 7752(6)................................21, 22, 33, 51, 53, 55, 58

24-A M.R.S. § 7752(7)................................................ 21, 33, 43, 51, 58

24-A M.R.S. § 7753(1).............................................. 22, 42, 51, 60, 64

24-A M.R.S. § 7753(2)...................................................... 23, 43, 51

24-A M.R.S. § 7753(3)...........................................................51

24-A M.R.S. § 7757(1)...................................................... 23, 62, 64

42 U.S.C. § 256b(a)(1)..........................................................8, 36

42 U.S.C. § 256b(a)(2)..........................................................8, 36

42 U.S.C. § 256b(a)(3)........................................................36, 51

42 U.S.C. § 256b(a)(4)..........................................................8, 36

42 U.S.C. § 256b(a)(5)...........................................................37

42 U.S.C. § 256b(a)(5)(A).........................................................8

Page(s)

42 U.S.C. § 256b(a)(5)(B) ...................................................... 9, 47, 52

42 U.S.C. § 256b(a)(5)(C) ........................................................ 12, 47

42 U.S.C. § 256b(a)(5)(D) ............................................................. 47

42 U.S.C. § 256b(a)(8) ............................................................ 37, 38

42 U.S.C. § 256b(d)(1)(A)(vi) ........................................................ 50

42 U.S.C. § 256b(d)(1)(B)(vi) .................................................... 11, 56

42 U.S.C. § 256b(d)(1)(B)(vi)(II) .................................................... 11

42 U.S.C. § 256b(d)(1)(B)(vi)(III) ................................................... 11

42 U.S.C. § 256b(d)(2)(B)(iv) .................................................... 37, 38

42 U.S.C. § 256b(d)(2)(B)(v) ......................................................... 37

42 U.S.C. § 256b(d)(2)(B)(v)(I) ...................................................... 47

42 U.S.C. § 256b(d)(3) ............................................................... 12

42 U.S.C. § 256b(d)(3)(A) ............................................................ 37

42 U.S.C. § 256b(d)(3)(B)(iv) ........................................................ 12

42 U.S.C. § 1292(a)(1) ................................................................. 6

42 U.S.C. § 1331 ....................................................................... 6

42 U.S.C. § 1396d(*l*)(2)(B) .......................................................... 20

42 U.S.C. § 1396r-8(a)(1) .............................................................. 8

42 U.S.C. § 1396r-8(a)(5)(A) ........................................................... 8

Page(s)

42 U.S.C. § 1396r-8(d)(1)(A) ...................................................... 50

**REGULATIONS:**

42 C.F.R. §§ 10.1-10.25 .............................................................. 37

42 C.F.R. § 10.21(a) .................................................................. 53

42 C.F.R. § 10.21(a)(1) ......................................................... 12, 54

45 C.F.R. § 102.3 ..................................................................... 11

61 Fed. Reg. 43,549 (Aug. 23, 1996) ........................................ 14

61 Fed. Reg. 55,156 (Oct. 24, 1996) ......................................... 52

61 Fed. Reg. 65,406 (Dec. 12, 1996) ........................................ 12

75 Fed. Reg. 10,272 (Mar. 5, 2010) ......................................... 14

77 Fed. Reg. 28,643 (Apr. 19, 2025) ........................................ 45

82 Fed. Reg. 1,210 (Jan. 5, 2017) ............................................. 8

89 Fed. Reg. 28,643 (Apr. 19, 2024) .................................... 13, 41

**EXECUTIVE MATERIALS:**

Department of Health & Hum. Servs., Example Pharmaceutical
  Pricing Agreement (PPA), OMB No. 0915-0327 ........................ 10, 38

HRSA, 340B ADR Decision Summaries
  (last updated May 15, 2025) .................................................. 41, 54-55

**LEGISLATIVE MATERIALS:**

H.R. Rep. No. 102-384, pt. II (1992) ....................................... 7-8

Page(s)

Maine Legislature, H.P. 132, L.D. 2010, pt. P-5 (June 20, 2025) .......... 21

Senate Comm. on Health, Educ., Lab. & Pensions,
*Congress Must Act to Bring Needed Reforms
to the 340B Drug Pricing Program* (Apr. 2025) ................................. 17

**OTHER AUTHORITIES:**

Apexus, *About Apexus* (last visited Nov. 17, 2025).......................... 37, 38

Emily Donaldson et al., *Impacts of 340B on State Medicaid Programs
& Patient OOP Costs*, Avalere (Feb. 12, 2025)................................. 8-9

Editorial, *A Good Idea to Cut Drug Costs*,
WALL ST. J. (Sep. 21, 2025) ....................................................... 18, 66

Milt Freudenheim, *Big Costs Imposed on Drug Makers*,
N.Y. TIMES (Nov. 6, 1990) ........................................................... 7-8

Ellen Gabler, *How a Company Makes Millions off a Hospital Program
Meant to Help the Poor*, N.Y. TIMES (Jan. 15, 2025) ......................... 66

MACPAC, *The 340B Drug Pricing Program & Medicaid Drug Rebate
Program: How They Interact* (May 2018)........................................ 7, 9

Katie Thomas & Jessica Silver-Greenberg, *How a Hospital Chain
Used a Poor Neighborhood to Turn Huge Profits*,
N.Y. TIMES (Sep. 24, 2022)............................................................ 66

Janet Weiner, *Community Health Centers & Value-Based Payment*,
Penn LDI (Apr. 2024) ................................................................... 20

## STATEMENT REGARDING ORAL ARGUMENT

Novartis requests oral argument. This appeal presents constitutional questions of first impression in this circuit regarding a state law that purports to modify a complex federal regulatory scheme. Given the nuanced factual and legal issues involved, Novartis believes oral argument would assist the Court.

## INTRODUCTION

This case is about a new Maine law that purports to vastly expand the scope of a federal drug-pricing program. Federal law purposely limits the program's scope, including by allowing manufacturers to impose reasonable conditions on access to discounted prices—conditions that are now prohibited by the new state law. Maine's new law violates the Supremacy Clause and the dormant Commerce Clause because it intrudes on an exclusively federal scheme, overrides Congress's intentional policy choices, and regulates beyond the State's borders. The district court incorrectly declined to preliminarily enjoin the law. This Court should reverse.

Congress decided that drug manufacturers, in exchange for having their drugs reimbursed by Medicaid and Medicare Part B, must offer to sell their drugs at deeply discounted prices to select non-profit hospitals and clinics called "covered entities." The rules, compliance obligations, and enforcement mechanisms for the federal statutory requirement constitute the 340B Drug Pricing Program. The 340B Program subsidizes covered entities by allowing them to buy drugs cheaply—as low as a penny per unit—while charging patients the drug's full commercial price.

1

Because covered entities can pocket the difference, they have unsurprisingly sought to maximize the 340B Program; every additional transaction completed at the 340B price boosts their bottom line.

As Congress knew when it enacted the program through its Spending Clause authority, each discounted sale means lost revenue for drug manufacturers. Thus, Congress balanced two goals: subsidizing covered entities while not making the subsidy so large that it dissuades manufacturers from participating. Because a manufacturer's participation in Medicaid and Medicare Part B is contingent on its participation in the 340B Program, getting the balance correct was important to all these federal health-care programs. Congress therefore gave one federal agency centralized oversight of both Medicaid and the 340B Program to ensure uniform administration nationwide, allowing for careful balancing of both programs' goals. *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110, 119-120 (2011).

In recent years, covered entities have contracted with third-party pharmacies located all over the country—often large, for-profit chain pharmacies like CVS or Walgreens—to help increase the number of units of a drug for which the covered entity might claim a discount. Covered

entities hire data-crunchers called "third-party administrators" to retro-actively analyze prescriptions previously filled at contract pharmacies, looking for pharmacy customers who they claim were treated by a covered entity at some point in the past. For each such connection the third-party administrator purports to find, the covered entity (or one of its for-profit partners) arranges for the pharmacy to acquire a discounted drug—which it then dispenses to the next customer who walks in the door. The covered entity, third-party administrator, and pharmacy all split the resulting profit.

Four years after the 340B statute was enacted, the federal agency responsible for the 340B Program started allowing covered entities to use one contract pharmacy—primarily so entities without an in-house pharmacy could participate. After lobbying by covered entities, the agency eliminated the one-contract-pharmacy limitation, and the volume of 340B discount claims skyrocketed. Several drug manufacturers, including Novartis, imposed limits on covered entities' use of contract pharmacies and litigated the permissibility of those limitations under federal law. Two courts of appeals confirmed that Congress chose to allow manufacturers to impose reasonable conditions on 340B purchases. Those

courts specifically endorsed a one-contract-pharmacy limitation and a requirement to provide claims data. *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 460 (D.C. Cir. 2024); *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696, 704-706 (3d Cir. 2023).

Maine's new law—Chapter 103 of the Insurance Code—eliminates the discretion Congress preserved for manufacturers to impose reasonable commercial limits on covered entity purchases. Chapter 103 prohibits the same limits endorsed by *Novartis* and *Sanofi*: (1) restricting the number of contract pharmacy arrangements manufacturers recognize; and (2) requiring claims data about the specific units for which 340B discounts are sought. It also authorizes state enforcement of supposed 340B requirements, destroying the federal government's ability to administer the program "on a uniform, nationwide basis." *Astra*, 563 U.S. at 120.

Federal law preempts Chapter 103. The federal government has overriding interests in regulating the circumstances that trigger 340B discounts and in preserving the uniformity of 340B enforcement. The 340B statute's pervasive regulation of the program leaves no room for state supplementation. Chapter 103 also frustrates Congress's goals, not

least because it outlaws conduct Congress chose to allow as part of its balancing of objectives.

Chapter 103 also violates the dormant Commerce Clause. The statute caps the price manufacturers may charge for drugs that end up at contract pharmacies in Maine. But manufacturers sell drugs to wholesalers outside of Maine, who independently resell those drugs to pharmacies. When Maine covered entities demand 340B pricing for contract-pharmacy sales, the wholesaler provides the discount and then asks the manufacturer for reimbursement in a distinct, back-end transaction. Chapter 103 applies to manufacturers, which means it reaches transactions that take place wholly outside the state. Such extraterritorial regulation is impermissible.

The district court found Novartis unlikely to prevail on the merits because it mistakenly concluded the federal statute's "silence" on contract pharmacies means Congress left room for states to regulate. But in the Spending Clause context, statutory silence carries a different meaning. The federal 340B statute is effectively a list of conditions manufacturers must meet to access Medicaid and Medicare Part B. Conditions not on that list reflect Congress's judgment not to impose them.

5

The remaining preliminary-injunction factors—irreparable injury, the balance of equities, and the public interest—all favor Novartis. Chapter 103 inflicts unrecoverable financial harms in pursuit of an unconstitutional attempt to refashion federal policy. And enjoining Chapter 103 will do *nothing* to harm access to drugs in Maine: The same drugs are already available at Maine pharmacies, where they are being dispensed to the same customers at the same prices regardless of Chapter 103. This Court should reverse the district court's order and remand for entry of a preliminary injunction.

## JURISDICTIONAL STATEMENT

The district court has federal-question jurisdiction over this case under 28 U.S.C. § 1331. The district court denied Novartis's motion for a preliminary injunction on September 23, 2025. Add.37. Novartis filed a notice of appeal the same day. App.200. This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

**1.** Whether Novartis is likely to prevail on its claim that Chapter 103 is preempted—under a theory of field preemption, conflict preemption, or both—because it impairs the dominant federal interests

6

implicated by the 340B Program, disregards the pervasiveness of federal 340B regulation, and creates multiple insurmountable obstacles to achieving the full purposes and objectives of Congress.

**2.** Whether Novartis is likely to prevail on its claim that Chapter 103 violates the dormant Commerce Clause by purporting to cap the prices of drug sales that occur wholly outside Maine.

**3.** Whether the remaining preliminary-injunction factors favor enjoining Chapter 103's enforcement.

**STATEMENT OF THE CASE**

**A.   Legal and Factual Background**

**1.     The 340B Program and Medicaid**

Congress created the Medicaid Drug Rebate Program (MDRP) in 1990 as a bargain between drug manufacturers, states, and the federal government.[1]   Under the MDRP, manufacturers must offer state Medicaid plans the "best price" given to any other purchaser.   H.R. Rep. No. 102-384, pt. 2, at *9-10 (1992).   This design inadvertently punished drug manufacturers for their longstanding practices of offering discounts

---

[1]  Medicaid & CHIP Payment & Access Comm'n (MACPAC), *The 340B Drug Pricing Program & Medicaid Drug Rebate Program: How They Interact* 1-2 (May 2018), https://tinyurl.com/43uum74c.

to charitable hospitals.  *Id.*; *see also* Milt Freudenheim, *Big Costs Imposed on Drug Makers*, N.Y. TIMES (Nov. 6, 1990) at D2, https://tinyurl.com/368umt5y.

Congress created the 340B Program in 1992 to address that disincentive.  H.R. Rep. No. 102-384, pt. 2, at *12 (1992).  As a condition of having their drugs covered by Medicaid and Medicare Part B, manufacturers must offer to sell their products to certain healthcare providers at rock-bottom prices.  42 U.S.C. § 256b(a)(1); *id.* §§ 1396r-8(a)(1), (a)(5)(A).  The select providers entitled to these discounts—called "covered entities"—are carefully delineated in the 340B statute.  *Id.* § 256b(a)(4).  340B prices, too, are set by a federal statutory formula that references MDRP pricing.  *Id.* §§ 256b(a)(1)-(2).  340B prices can be as low as a penny per unit.  82 Fed. Reg. 1,210, 1,215 (Jan. 5, 2017).  Because the program is intended to subsidize covered entities, covered entities do not need to—and rarely do—pass on these discounts to patients.  App.30.

The 340B Program and the MDRP are deeply intertwined.  Manufacturers need not pay Medicaid rebates on drugs for which a covered entity paid the 340B price.  42 U.S.C. § 256b(a)(5)(A).  Thus, Medicaid forgoes revenue on 340B-priced sales.  Emily Donaldson et al., *Impacts of*

8

*340B on State Medicaid Programs & Patient OOP Costs*, Avalere (Feb. 12, 2025) (noting that the 340B Program reduced Medicaid rebates by "approximately $2 billion" in 2023 alone), https://tinyurl.com/54p2vnf7. States and the federal government share Medicaid rebates, MACPAC, *supra* n.1, at 2, so Congress has a direct financial interest in limiting 340B discounts.

One limit on 340B-priced transactions is the prohibition on "diversion." Covered entities cannot "resell or otherwise transfer" a 340B-priced drug "to a person who is not a patient of the entity." 42 U.S.C. § 256b(a)(5)(B). Whether someone is "a patient of the entity" can be a significant question of federal law—for example, what if the individual was treated at the covered entity several years ago, or for a different condition?—but regardless of the exact scope of the term, it is intended as a limit on covered entities buying drugs at 340B prices and selling them to third parties, including pharmacies.

Setting out the limits of the 340B Program was important because the program is an exercise of Congress's spending power. This means manufacturers may choose whether to participate; such legislation "is much in the nature of a contract." *Pennhurst State Sch. & Hosp. v.*

*Halderman*, 451 U.S. 1, 17 (1981).  Congress must spell out program conditions in a way that enables participants to understand in advance what they are agreeing to do.  *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 219 (2022).  If Congress made the required 340B subsidy to covered entities too high, manufacturers might abstain from participating—which would make that manufacturer's drugs unavailable to patients enrolled in Medicaid and Medicare Part B.

Manufacturers memorialize their participation in the 340B Program by entering into a Pharmaceutical Pricing Agreement (PPA) with the federal government.  The PPA lists seven discrete "responsibilities" that a manufacturer accepts in signing it.  *See* Department of Health & Hum. Servs. (HHS), *Example Pharmaceutical Pricing Agreement (PPA)*, OMB No. 0915-0327, § II, https://tinyurl.com/4nshe96y.  The only parties to the PPA are the drug manufacturer and the HHS Secretary, and the agreements are "construed in accordance with Federal common law." *Id.* § VII(g).  The manufacturer's signature on the PPA indicates that it "voluntarily and knowingly accepts the terms" reflected in the 340B statute. *Cummings*, 596 U.S. at 219 (quotation omitted).

### 2. 340B's Nationwide Enforcement Mechanisms

Congress vested HHS with exclusive oversight authority for the 340B Program. This centralization is critical to both the 340B Program and the MDRP. "The interdependent nature of the two programs' requirements" means, as HHS has explained, that governance of "one program must proceed with an eye towards any implications for the other."[2] For this reason, Congress directed HHS to "administer both Medicaid and § 340B harmoniously and on a uniform, nationwide basis." *Astra*, 563 U.S. at 120. HHS currently administers 340B through its subagency the Health Resources and Services Administration (HRSA).

HHS has direct enforcement power created by the 340B statute. If a manufacturer fails to provide 340B pricing when due, HHS may impose "civil monetary penalties." 42 U.S.C. § 256b(d)(1)(B)(vi). These penalties are carefully circumscribed: They apply only to "knowing[ ] and intentional[ ]" violations, and fines "shall not exceed $5,000" per violation. *Id.* §§ 256b(d)(1)(B)(vi)(II)-(III).[3]

---

[2] Brief for the United States as Amicus Curiae Supporting Petitioners at 34, *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110 (2011) (No. 09-1273) (HHS Amicus Brief), https://tinyurl.com/bdeah9c4.

[3] HHS adjusts this amount annually for inflation. 45 C.F.R. § 102.3.

HRSA runs the Administrative Dispute Resolution (ADR) system. Congress instructed HHS to create this system to adjudicate specific categories of 340B disputes between covered entities and manufacturers. 42 U.S.C. § 256b(d)(3). Manufacturers may bring ADR claims alleging that a covered entity has diverted 340B-priced drugs to non-patients or claimed discounts that duplicate MDRP rebates. *Id.* And covered entities may bring claims alleging that a manufacturer has either overcharged the entity or unduly "limited the covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price." 42 C.F.R. § 10.21(a)(1).

By statute, manufacturers must complete an audit process before bringing an ADR claim against a covered entity. 42 U.S.C. § 256b (d)(3)(B)(iv). Manufacturers may audit a covered entity's "records … that directly pertain to the entity's compliance." *Id.* § 256b(a)(5)(C). But to get permission from HRSA to conduct an audit, manufacturers must show "reasonable cause" to believe a covered entity has violated the statute. 61 Fed. Reg. 65,406, 65,410 (Dec. 12, 1996).

A manufacturer's pathway to seeking redress from a covered entity is thus: First, gather enough data to show "reasonable cause" and

convince HRSA to authorize an audit plan. Second, complete the audit. Finally, submit an ADR claim against the covered entity and litigate that claim through HRSA's panel-decision and reconsideration processes, as well as potential judicial review of the final agency decision. *See generally* 42 C.F.R. §§ 10.23-10.24.

Manufacturers rarely succeed in completing that pathway. According to a HRSA official, in the "decade-plus" preceding 2024, the agency approved just 37 audits—total—and only 18 were successfully completed.[4] HRSA's recent ADR rule thus noted the "infrequency of finalized manufacturer audit reports," identifying only *two* between November 2022 and April 2024. 89 Fed. Reg. 28,643, 28,644 (Apr. 19, 2024). Yet the Supreme Court has made clear that ADR proceedings are the sole method of adjudicating covered entities' and manufacturers' 340B obligations. *Astra,* 563 U.S. at 121-122.

### 3.    Contract Pharmacies

Covered entities' profits from the 340B Program are directly correlated to the number of units they buy at the discounted price. *Supra* p.8.

---

[4] Declaration of Chantelle Britton, *University of Wash. Med. Ctr. v. Kennedy,* No. 24-CV-2998 (D.D.C. Dec. 20, 2024), ECF No. 22-1 ¶ 15.

This dynamic has "left the section 340B program vulnerable to abuse—at great cost to the manufacturers." *Novartis*, 102 F.4th at 455.

Although the 340B statute's text suggests Congress "had in mind one-to-one transactions between a covered entity and a drug maker," *Sanofi*, 58 F.4th at 704, contract pharmacies originated as a way for covered entities that lacked an in-house pharmacy to nevertheless participate in the 340B Program. A 1996 HRSA guidance document allowed a covered entity to have a single contract pharmacy, to avoid excluding covered entities without in-house pharmacies from the 340B Program entirely. 61 Fed. Reg. 43,549, 43,555 (Aug. 23, 1996). Covered entities could contract with *one* third-party pharmacy that would act as the covered entity's agent in dispensing 340B-priced drugs, with the covered entity maintaining title until the drug was dispensed. *Id.* at 43,553-54.

That system persisted until 2010, when "HRSA swerved" by opining that covered entities "may contract with an unlimited number of outside pharmacies ... regardless of whether the entities have in-house pharmacies." *Novartis,* 102 F.4th at 457 (citing 75 Fed. Reg. 10,272, 10,272-73 (Mar. 5, 2010)). Contract pharmacies proliferated, as did the number of discounted purchases by covered entities. App.26-27. Many covered

entities began to have hundreds of contract pharmacies across the country. Covered entities and those contract pharmacies morphed to using a "replenishment model" for 340B purchases that is completely untethered to the earlier version of a contract pharmacy—where title stayed with covered entities and 340B-priced drugs were dispensed only to customers deemed patients of a covered entity at the time of dispensing. App.24-25.

The replenishment model works as follows: *First*, a pharmacy buys drugs at commercial prices. *Second*, a customer arrives at a pharmacy seeking to fill a prescription. *Third*, the pharmacy dispenses the drug to its customer at full price, and the pharmacy does not try to determine whether the customer is any covered entity's patient. Instead, the replenishment model effectuates 340B pricing by *retroactively* identifying a customer as a covered entity's supposed patient. To do that, the covered entity often hires a third-party administrator to sift through oceans of data. *Fourth*—and much later—this third-party administrator uses that data to try to match the customer who bought the drug to purported patients of covered entities the pharmacy contracts with. *Finally*, when a purported match is found, the covered entity claims 340B pricing for the unit previously dispensed by the pharmacy, which often involves sending

a 340B-priced "replenishment" drug to the pharmacy. App. 23-24. Because of these retroactive pricing methods, contract pharmacy arrangements do not change the number of drugs dispensed to purported "patients" of the covered entity; they just change the percentage of those dispenses for which covered entities seek to retroactively claim discounts.

Remember: A covered entity need not give its "patient" any discount on the drug she received from the pharmacy. App.20. Instead, "[t]he covered entity, the pharmacy, and the third-party administrator often divvy up the spread between the discounted price and the higher insurance reimbursement rate." *Novartis*, 102 F.4th at 457. So the covered entity and its for-profit partners all have "a financial incentive to catalog as many prescriptions as possible as eligible for the discount." *Id.* at 457-458. And these self-interested parties almost never reveal to manufacturers why they have claimed 340B pricing, or even identify the specific drug sales or patients that prompted the claim. App.78.

As a result of this backward-looking pricing method—and the fact that covered entities keep 340B discounts for themselves—contract pharmacies do not affect drug availability or the prices consumers pay. App.24. The same drugs are delivered to the same pharmacies and sold

to their customers at the same prices whether or not a covered entity later shoehorns itself into the transaction. App.78. These "patients" often have no idea they were ever part of the 340B Program. App.26.

HRSA's 2010 contract pharmacy guidance had dramatic consequences. Since 2010, the volume of 340B-priced sales has rocketed to over *ten times* its former size—going from about $6.6 billion to $66.3 billion. App.26-27. In just the last five years of available data, the 340B Program has grown by over 129 percent. App.27. It is now the second-largest federal drug-pricing program (behind only Medicare Part D). *Id.* At the same time, the number of contract pharmacy arrangements exploded from about 1,300 in 2010 to about 35,000 today. *Id.* The increase in the number of contract pharmacy arrangements has undoubtedly driven the growth in 340B discounts: A Senate committee recently examined the data and found "significant increases in 340B sales to contract pharmacies compared to direct sales to [covered entities]." Senate Comm. on Health, Educ., Lab. & Pensions, *Congress Must Act to Bring Needed Reforms to the 340B Drug Pricing Program* 32-33 (Apr. 2025), https://tinyurl.com/bdd24yd4.

Patients have felt little (if any) benefit from this growth. Covered entities have used 340B revenue for "deals with minor-league and college sports teams for naming rights," to launch "a film company," and to fuel industry consolidation that "has increased prices and insurance premiums." Editorial, *A Good Idea to Cut Drug Costs*, WALL ST. J. (Sep. 21, 2025), https://tinyurl.com/y3k63v3z. Middlemen take their cut, too—about 16 percent of all 340B revenue now fills the coffers of for-profit contract pharmacies and third-party administrators. App.25.

### 4. Novartis's Contract Pharmacy Policy

Concerned about this seemingly endless expansion, Novartis notified HRSA in 2020 that it would begin limiting the contract pharmacy arrangements it would recognize. App.31. HRSA issued a violation letter, claiming the 340B statute required Novartis to recognize unlimited contract pharmacy arrangements for any covered entity. *Id.* Novartis challenged that position in federal court as unlawful under the Administrative Procedure Act. *Id.* The district court agreed and vacated HRSA's violation letter, concluding the agency's argument "rest[ed] upon an erroneous reading of Section 340B." *Novartis Pharms. Corp. v. Espinosa*, No. 21-CV-1479, 2021 WL 5161783, at *9 (D.D.C. Nov. 5, 2021). "The

18

statute's plain language, purpose, and structure do not prohibit drug manufacturers from attaching any conditions to the sales of covered drugs through contract pharmacies." *Id.*

The D.C. Circuit affirmed. It pointed out that the federal statute says nothing about contract pharmacies, concluding that this "silence preserves—rather than abrogates—the ability of sellers to impose at least some delivery conditions." *Novartis*, 102 F.4th at 460. Drug manufacturers are merely required to make a "bona fide offer" to sell covered entities 340B-priced drugs, which may include reasonable limits on the circumstances in which they will do so. *Id.* at 462-463. The court also held that limiting covered entities to one contract pharmacy and requiring that pharmacy to share data explaining the basis for claiming 340B pricing was reasonable, lawful, and "consistent with historic practices under the section 340B program." *Id.* at 463-464.

The Third Circuit reached a similar conclusion regarding other manufacturers' policies. Surveying the text, context, and history of the 340B statute, it concluded that federal law does not "require[e] delivery of discounted drugs to an unlimited number of contract pharmacies." *Sanofi*, 58 F.4th at 704-706. The court pointed out, for example, that

19

Congress had rejected a bill that would have required manufacturers to provide discounts at contract pharmacies, and that "Section 340B's statutory neighbor" contains a similar requirement, showing that Congress purposely rejected the requirement HRSA advocated. *Id.* at 704-705.

Novartis has since updated its contract pharmacy policy to reflect these decisions. App.33. Three aspects of that policy are most relevant here: *First,* consistent with the HRSA policy that governed for decades, Novartis recognizes that a covered entity without an in-house pharmacy may use one contract pharmacy, but otherwise provides 340B pricing only on covered entities' direct purchases. *Id. Second,* to receive 340B pricing on a replenishment unit shipped to a contract pharmacy, a covered entity must provide basic claims data—such as the specific transaction for which the discount is claimed, the drug dispensed, the pharmacy name, and the prescriber name—showing that the pharmacy customer was a patient of the covered entity. App.33-34. *Third,* these conditions do not apply to federal grantees. App.34.[5]

---

[5] Federal grantees comprise federally qualified health centers (FQHCs) and FQHC lookalikes. *See generally* 42 U.S.C. § 1396d(*l*)(2)(B); Janet Weiner, *Community Health Centers & Value-Based Payment*, Penn LDI 2 (Apr. 2024), https://tinyurl.com/bdd5zb78.

### 5. Maine's Modification of the 340B Program to Expand the Subsidy Covered Entities Receive Through This Federal Program

Maine recently enacted Chapter 103 of its Insurance Code, which purports to directly alter the terms of the federal 340B Program. It does so principally by eliminating the discretion Congress retained for manufacturers to impose reasonable limits on the circumstances triggering 340B discounts. Maine Legislature, H.P. 132 - L.D. 2010, pt. P-5 (June 20, 2025), https://tinyurl.com/47syb59t. Chapter 103 is upfront about the fact that Maine wants the 340B Program to operate differently in Maine from the nationwide terms that Congress enacted. The Maine law defines its key terms solely by reference to "Section 340B of the federal Public Health Service Act, 42 United States Code, Section 256b." *See* 24-A M.R.S. §§ 7752(5)-(7). In short, Chapter 103 attempts to outlaw contract pharmacy policies like Novartis's that Congress allowed manufacturers to implement as part of their participation in this federal program, as *Novartis* and *Sanofi* held.

Chapter 103 is primarily a requirement to sell additional quantities of a manufacturer's drugs to covered entities at 340B pricing, by spreading delivery of those discounted units across large numbers of contract

pharmacies. The law's key language forbids manufacturers to "deny, restrict, prohibit, or otherwise interfere with … the acquisition of a *340B drug* by, or delivery of a *340B drug* to, a 340B contract pharmacy." 24-A M.R.S. § 7753(1) (emphasis added). The substance of this provision comes from the statutory definition of a "340B drug": "a drug that is purchased or eligible for purchase under Section 340B of the federal Public Health Service Act." *Id.* § 7752(6). That is, manufacturers must provide a *discounted* version of a drug to a covered entity's contract pharmacies on demand, even though Congress purposely chose not to make this requirement a condition of 340B participation.

The Maine law's use of the term "340B drug" is revealing because a 340B drug is just the same drug at a highly discounted price. *AbbVie Inc. v. Drummond*, __ F. Supp. 3d __, 2025 WL 3048929, at *6 (W.D. Okla. Oct. 31, 2025). By requiring "delivery" of a 340B discounted drug to an unlimited number of contract pharmacies, Chapter 103 increases the number of units of Novartis's drugs that Novartis must sell at the 340B discounted price. App.41. That is exactly what the State said before the district court: It submitted declarations from covered entities explaining that restrictions on the number of contract pharmacy arrangements

22

meant that covered entities made less revenue from the 340B Program. App.86-87, 90.

Chapter 103 also impedes manufacturers' efforts to make the 340B Program more transparent. The law forbids manufacturers to "directly or indirectly" "require a 340B entity to submit any claims or utilization data as a condition" receiving 340B discounts. 24-A M.R.S. § 7753(2). This provision of Chapter 103 targets the part of Novartis's contract pharmacy policy—informed by the D.C. Circuit and D.D.C. *Novartis* decisions—that "requir[es] that all non-grantee covered entities upload their claims data" to an electronic platform. App.65.

Finally, Chapter 103 introduces novel enforcement mechanisms into the 340B ecosystem. The law defines each "prohibited act" as a separate violation, and each violation may be punished with "any of the remedies" available under Maine's Unfair Trade Practices Act. 24-A M.R.S. § 7757(1). That means the Maine Attorney General can "restrain by temporary or permanent injunction" any conduct deemed to violate Chapter 103, 5 M.R.S. § 209—a form of direct control over manufacturers' 340B practices that not even *HRSA* possesses. In addition, each violation

deemed both "intentional" and "unfair or deceptive" is subject to a "civil penalty of not more than $10,000." *Id.*

### B. Procedural History

Chapter 103 was enacted in late June 2025, App.34, giving the law an effective date of September 24, 2025. Maine Const. art. IV, § 16. Novartis promptly challenged the law's constitutionality, seeking a preliminary injunction before September 24. App.17-18. Days later, another manufacturer also challenged Chapter 103's constitutionality. *AbbVie, Inc. v. Frey*, No. 1:25-CV-416 (D. Me.).

The district court[6] held a joint preliminary-injunction hearing, *see* App.92-199, but did not otherwise consolidate the two cases. On September 23, the district court denied Novartis's preliminary-injunction motion. Add.37. Novartis timely appealed. App.200. Proceedings in the district court have been stayed pending resolution of this appeal. No. 25-CV-407, ECF No. 51.

---

[6] Novartis's case was assigned to Judge Woodcock, who recused himself. App.82. To secure a prompt preliminary-injunction decision, Novartis consented to the jurisdiction of Magistrate Judge Nivison. *See* App.83. The State and the *AbbVie* plaintiffs consented as well, and Judge Nivison oversaw the remaining proceedings.

## SUMMARY OF ARGUMENT

The district court erred in not enjoining Chapter 103 as preempted and in violation of the dormant Commerce Clause.

**I.A.1.** Chapter 103 is field preempted. Federal law occupies a field to the exclusion of state law where there is a dominant federal interest or where federal law in an area is already pervasive. Both are true of the 340B Program. Chapter 103 harms overriding federal interests by increasing the volume of drugs sold at 340B discounts and by fracturing the uniform, nationwide system Congress created to jointly administer 340B and Medicaid. Federal law in this area is also pervasive; Congress created the 340B Program from whole cloth and regulates its every detail, leaving no room for state supplementation.

**I.A.2.** Chapter 103 is conflict preempted, too. It generates four distinct obstacles to achieving Congress's goals and effectuating Congress's design for the 340B Program. *First*, the state law outlaws reasonable limitations on the use of contract pharmacies, even though federal law purposely preserves manufacturers' discretion to implement such policies. *Second*, Chapter 103 undoes Congress's careful balancing of interests by forcing manufacturers to sell additional units of drugs at 340B

discounted prices beyond those required by federal law—creating further disincentives for manufacturers to participate in Medicaid and Medicare Part B. *Third*, Chapter 103 invites conflicting adjudications regarding manufacturers' 340B obligations by making state-law violations turn on interpretations of federal standards for which state regulators and HRSA may have divergent views. *Fourth*, state law threatens manufacturers with severe and novel penalties that impermissibly raise the stakes of a potential finding of 340B noncompliance.

**I.A.3.** The presumption against preemption does not apply here. That presumption applies only to state laws of general applicability that govern subjects historically regulated by states. Chapter 103 is not a state law of general applicability; it applies only to the 340B Program. And Chapter 103 does not address a subject historically regulated by Maine. Federal law created the rights and obligations of manufacturers and covered entities with regard to the discounted price made available through the 340B Program.

**I.B.** Chapter 103 violates the dormant Commerce Clause by setting the price of out-of-state transactions. Per the state law's plain text, manufacturers must ensure Maine contract pharmacies can acquire heavily

discounted drugs. But manufacturers sell their drugs to wholesalers, who independently resell those drugs to pharmacies. The only way for a manufacturer to obey Chapter 103's directives is to provide massive discounts to wholesalers—thus enabling the 340B-priced acquisition Maine law explicitly requires. These manufacturer-to-wholesaler transactions occur wholly outside Maine, which puts them beyond the territorial limits of the State's power.

**II.** The remaining factors favor injunctive relief. The state law has already begun irreparably harming Novartis by forcing it to give discounts not required by federal law—on pain of serious sanctions. Novartis can neither recover these compliance costs nor measure their true impact on its mission of innovating new drugs. And the public's interest is best served by upholding the Constitution. Here, that means deferring to Congress's judgment about how the federal 340B Program should function and what discretion participating manufacturers should have.

## ARGUMENT

A preliminary injunction should issue where (1) the movant is "likely to succeed on the merits" and (2) "is likely to suffer irreparable harm" absent the injunction, (3) "the balance of equities" favors an

27

injunction, and (4) "an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  The first factor is the most important.  *Norris ex rel. A.M. v. Cape Elizabeth Sch. Dist.*, 969 F.3d 12, 22 (1st Cir. 2020).  Where the non-moving party is a state official, the third and fourth factors merge into a single consideration of where the public interest lies.  *Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021).  All these factors favor injunctive relief.

Although the overall standard of review is for abuse of discretion, this Court considers the district court's "conclusions of law de novo." *Comcast of Me./N.H., Inc. v. Mills*, 988 F.3d 607, 611 (1st Cir. 2021).  A "district court's denial of [a] preliminary injunction can be reversed where there has been a misapplication of the law to particular facts or an application of the wrong legal standard." *Penobscot Nation v. Fellencer*, 164 F.3d 706, 707 (1st Cir. 1999) (quotation omitted).  Here, the district court misapplied the law, and its order should be reversed.

## I.    Novartis Is Likely to Succeed on the Merits.

### A.    Chapter 103 Is Federally Preempted.

The Supremacy Clause "prevents the states from impinging on federal law and policy." *KKW Enters., Inc. v. Gloria Jean's Gourmet Coffees*

*Franchising Corp.*, 184 F.3d 42, 49 (1st Cir. 1999). As relevant here, Congress may preempt state regulation implicitly by enacting "pervasive" legislation that is "clearly intended to 'occupy the field' to the exclusion of state law." *Bessette v. Avco Fin. Servs., Inc.*, 230 F.3d 439, 447 (1st Cir. 2000). State laws are also "preempted when they conflict with federal law," including by posing "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. United States*, 567 U.S. 387, 399 (2012) (quotation omitted).

Field and conflict preemption are not mutually exclusive categories, but "analytic approaches which may be mixed and matched." *French v. Pan Am Exp., Inc.*, 869 F.2d 1, 2 (1st Cir. 1989). "Either way, the question of whether federal law preempts a state statute is one of congressional intent." *Id.* Here, both approaches show that Chapter 103 intrudes on Congress's nationally uniform design for the 340B Program.

### 1. Federal Law Occupies the Field.

State law is field-preempted where a "federal interest [is] so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Arizona*, 567 U.S. at 399 (quotation omitted). The field here is the scope of manufacturers' 340B obligations,

which implicates the federal government's interest in maintaining the nationwide uniformity of the 340B Program. The Supreme Court's *Astra* decision is built on the profound importance of nationwide uniformity in this context.

i. *Congress created a uniform, nationwide 340B Program.*

When Congress intends federal law to operate the same way nationwide, state law cannot disrupt that national uniformity. In *French*, for example, this Court found that Congress created "a single uniform system of regulation." 869 F.2d at 5. "Preemption may, of course, be inferred from" that goal because "a patchwork of state laws … would create a crazyquilt effect"—the antithesis of nationwide uniformity. *Id.* at 5-6. Likewise, the Supreme Court in *Arizona* pointed to the "comprehensive and unified" nature of federal alien-registration requirements in finding the field "occupied by federal law." 567 U.S. at 401-402. And in *Bessette*, this Court concluded that allowing "an alternative state court remedy" would subvert the uniformity of the Bankruptcy Code, which Congress intended to be enforced through one remedial provision nationwide. *See* 230 F.3d at 447.

There can be no doubt that Congress intended the 340B Program to operate uniformly nationwide—that is exactly what the Supreme Court held in *Astra.* There, a county had sued drug manufacturers claiming its covered entities had not received required 340B pricing. 563 U.S. at 116. Although the 340B statute does not authorize enforcement outside HHS, the county argued its private suit would help HRSA by "spreading the enforcement burden." *Id.* at 119. The Court disagreed. Congress intended "centralized enforcement in the government," which is the polar opposite of spreading the enforcement burden among different entities and forums. *Id.* at 119 (quoting HHS Amicus Brief, *supra* n.2, at 32). Because of 340B's connections to Medicaid, "an adjudication of rights under one program must proceed with an eye towards any implications for the other." *Id.* at 120 (quotation omitted). HHS must therefore "administer both Medicaid and § 340B harmoniously and on a uniform, nationwide basis." *Id.*

*Astra* was not a preemption case; the county claimed to be enforcing manufacturers' federal PPAs rather than a state law. *See* 563 U.S. at 117. But *Astra*'s analysis cuts to the heart of the preemption inquiry because it shows Congress did not intend to permit any outside influence

on the 340B Program that would leave "HHS unable to hold the control rein." *Id.* at 120. Or in other words, the Court's "holding evoked the legal concepts underlying federal preemption." *Bauer v. Elrich*, 8 F.4th 291, 306 (4th Cir. 2021) (Quattlebaum, J., dissenting). That conclusion is confirmed by the federal government's brief in *Astra*, which relied on a key preemption case to demonstrate that its enforcement power is exclusive. HHS Amicus Brief, *supra* n.2, at 34-35 (citing *Buckman Co. v. Plaintiff's Legal Comm.*, 531 U.S. 341 (2001)).

Put another way, *Astra* answers the legal question that determines whether field preemption applies: Congress created a "unitary administrative and enforcement scheme," in which HHS must implement the 340B Program "on a uniform, nationwide basis." 563 U.S. at 120; *see also French*, 869 F.2d at 5 (asking whether Congress intended to create "a single uniform system of regulation"). That should end the matter.

    *ii.    The district court defined the field incorrectly.*

The district court's preemption analysis ignored *Astra*. Add.14-28. The court instead considered broader and narrower potential "fields" and rejected that preemption applied to either. Starting with very broad potential fields, the court invoked sweeping concepts like the "practice of

32

pharmacy" or the "provision of discounted drugs for needy patients." Add.16 (quotations omitted). If the field were defined so abstractly, the court reasoned, federal law would not be sufficiently "comprehensive or pervasive" to occupy it. *Id.* Turning to narrower possibilities, the district court considered defining the field as "the terms by which manufacturers must offer discounted drugs under the 340B program." Add.17. But it concluded Chapter 103 would lie outside this field because it creates entirely new conditions of 340B participation not found in federal law. Add.17-18.

Both conclusions were mistaken. For starters, the field must be defined by what the laws in question actually *do*. *See Kurns v. Railroad Friction Prods. Corp.*, 565 U.S. 625, 636 (2012) (defining the field "on the basis of the physical elements regulated"); *Gade v. National Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 105 (1992) (looking "to the effects of the law"). The field here is the scope of manufacturers' obligations to offer to sell their drugs to covered entities at 340B discounted prices, because that is what both laws cover. *See* 24-A M.R.S. §§ 7752(5)-(7) (defining the state law's key terms by incorporating federal law). The appropriate field for a preemption analysis cannot be "the practice of pharmacy" or the

"provision of discounted drugs for needy patients" because neither law addresses those topics. The federal and state law are both focused on the circumstances under which manufacturers must offer discounted prices to covered entities. The analysis in *Arizona* provides a useful comparison; the Supreme Court defined the field as "alien registration," not immigration more broadly, because registration is what both federal law and the relevant provision of state law regulated. 567 U.S. at 400.

The field also cannot be defined without considering the interdependent nature of federal drug-pricing programs. *See Arizona*, 567 U.S. at 401 (noting that federal law was supposed to work as "a harmonious whole" (quotation omitted)). The power to expand manufacturers' obligations to offer additional 340B discounted sales to covered entities is the power to disincentivize participation in Medicaid and Medicare Part B. *Supra* pp.9-10. That is why "the Federal Government has reserved for itself" the ability to control this area—it affects uniquely federal interests. *See Arizona*, 567 U.S. at 402.

The district court further erred by concluding Chapter 103 lies outside the exclusively federal field because federal law does not address contract pharmacies. Add.18. This approach cannot be correct. It would

all but eliminate implied field preemption from ever applying by empowering states to augment federal regulatory schemes with additional, state-specific requirements as long as federal law does not expressly prohibit them.  It is precisely *because* Chapter 103 adds novel requirements to the 340B Program that it derogates vital federal interests:  Chapter 103 mandates that manufacturers sell larger numbers of their drugs at 340B discounted pricing, effectively renegotiating a longstanding Spending Clause bargain and putting three drug-pricing programs at risk of losing participants.  *Supra* pp.9-10, 21-22.

*French* also refutes the district court's approach.  In that case, this Court addressed a federal law regulating the qualifications of airline pilots, including prohibiting "drug dependency" and authorizing drug testing upon reasonable suspicion.  869 F.2d at 4.  Rhode Island purported to add a novel requirement to the drug-testing component of federal law: that it be "conducted in conjunction with a bona fide rehabilitation program."  *Id.* at 2 (quotation omitted).  Despite federal law's silence about whether any drug testing had to be connected to a rehabilitation program, this Court readily located the novel state condition inside the exclusively federal field.  Federal law had already provided a complete list

of the conditions for "pilot qualification," and extra state requirements "would make impossible the attainment of the centralized control and uniformity of design so plainly coveted by the Congress." *Id.* at 5.

So too here. Federal law already determines the extent to which manufacturers must subsidize covered entities—the contours of a "bona fide offer" to provide 340B pricing. *Novartis*, 102 F.4th at 462-464. HHS adjudicates the boundaries of that obligation "on a uniform, nationwide basis." *Astra*, 563 U.S. at 120. Allowing states to redraw those boundaries would create the very "patchwork of state laws" Congress set out to avoid. *French*, 869 F.2d at 6.

### iii. *Federal 340B regulation is pervasive.*

There is also a separate basis for field preemption here. Courts infer field preemption from "a framework of regulation so pervasive … that Congress left no room for the States to supplement it." *Arizona*, 567 U.S. at 399 (quotation omitted). Federal 340B law amply qualifies.

Federal law governs the 340B Program from soup to nuts. The statute starts by defining the prices of drugs purchased under the program, 42 U.S.C. §§ 256b(a)(1)-(2), the drugs eligible for that pricing, *id.* § 256b(a)(3), the entities entitled to receive that pricing, *id.* § 256b(a)(4),

36

and the compliance obligations those entities accept, *id.* § 256b(a)(5). From there, the statute directs HHS to create a program to effectuate "distribution" of 340B-priced drugs, *id.* § 256b(a)(8), and a "single, universal, and standardized" system for "facilitating the ordering, purchasing, and delivery" of 340B-priced drugs, *id.* § 256b(d)(2)(B)(iv). HHS has done so via the Prime Vendor Program, intended to be a "central source overseeing distribution" under HRSA's ultimate oversight.[7] On the back end, federal law creates a comprehensive enforcement system, including direct enforcement by HHS, 42 U.S.C. § 256b(d)(2)(B)(v), and adjudications of both "claims by covered entities" and "claims by manufacturers" in the ADR process, *id.* § 256b(d)(3)(A). HHS has expanded on these statutory requirements by regulation. 42 C.F.R. §§ 10.1-10.25.

That regulatory suite includes all the hallmarks of field preemption. It comprises an "intricate web of statutory provisions," *French*, 869 F.2d at 4—intricate enough to create a federal program from scratch and to run it without state assistance for three decades. The statute confers "broad enforcement power" on the federal government. *Bessette*, 230 F.3d

---

[7] Apexus, *About Apexus* (last visited Nov. 17, 2025), https://tinyurl.com/yck4v9aj.

at 447. And federal 340B regulation "provide[s] a full set of standards … [,] including the punishment for noncompliance." *Arizona*, 567 U.S. at 401. Congress has thereby "equipped [HHS] adequately to address the precise concerns [Chapter 103] purports to manage." *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 309 (1988). Field preemption follows directly from that conclusion. *Id.*

In holding otherwise, the district court mistakenly perceived a gap in federal law. Because the 340B statute does not address "delivery or distribution" of 340B-priced drugs *to contract pharmacies*, the court thought the statute was entirely agnostic as to these concepts. Add.18. But the statute *does* address delivery and distribution, just not to contract pharmacies: It assigns authority over distribution and delivery to HHS, which HHS has exercised through HRSA's creation of the Prime Vendor Program—a "central source overseeing distribution" between manufacturers and wholesalers. *About Apexus*, *supra* n.7; *see also* 42 U.S.C. §§ 256b(a)(8), (d)(2)(B)(iv). Participation in the Prime Vendor Program is one of the seven responsibilities manufacturers accept when they sign a PPA. *Example PPA*, *supra* p.10, § II(g). And manufacturers must give covered entities *some* way to purchase drugs at the 340B Program's

discounted pricing. That is what it means to make "a bona fide offer" to covered entities. *See Novartis*, 102 F.4th at 462. A bona fide offer necessarily includes delivery terms; Congress simply left it to manufacturers' discretion to set those terms within the limits of commercial reasonableness. *Id.* at 462-464.

True, federal law does not mention contract pharmacies, or specifically require manufacturers to deliver discounted drugs anywhere covered entities demand. Add.18. But that silence is not an opening for states to act. It reflects Congress's intentional choice not to impose an additional condition of 340B participation. *Novartis*, 102 F.4th at 460; *Sanofi*, 58 F.4th at 704-706. The 340B statute gives manufacturers notice of the entirety of what they must do to fulfill this precondition to accessing Medicaid and Medicare Part B, thereby allowing manufacturers to make an informed decision to participate or not participate in this Spending Clause program. That Congress decided not to require manufacturers to recognize unlimited contract pharmacy arrangements shows "that this particular form of regulation simply should not be employed." *Schneidewind*, 485 U.S. at 306. Chapter 103's addition of that regulatory

requirement is incompatible with the fact that states cannot revisit Congress's determination "in any respect." *Arizona*, 567 U.S. at 402.

### 2. Chapter 103 Conflicts with Federal Law.

Chapter 103 is also preempted under conflict-preemption principles. It squarely implicates obstacle preemption: Maine's law impedes "the full purposes and objectives of Congress" and "interferes with the methods by which the federal statute was designed to reach [its] goal[s]." *International Paper Co. v. Ouellette*, 479 U.S. 481, 492, 494 (1987) (quotation omitted). Chapter 103 "need not clash head on with a federal enactment" because conflict preemption applies so long as state law is "at odds with the policy which infuses" federal law, or "erode[s] the goals" chosen by Congress. *Securities Indus. Ass'n v. Connolly*, 883 F.2d 1114, 1123-24 (1st Cir. 1989).

Chapter 103 obstructs federal policy in four main ways: (1) forbidding what federal law allows; (2) altering Congress's balance of benefits and burdens among 340B, Medicaid, and Medicare Part B; (3) inviting inconsistent adjudications regarding 340B obligations; and (4) heightening the penalties associated with 340B compliance.

> ### i. *Chapter 103 forbids conduct that Congress intended to permit.*

There is no dispute that federal law, which established the 340B Program, permits Novartis's contract pharmacy policy. Two circuit courts have already held as much, as has HRSA, the agency responsible for nationwide enforcement of the program. *See* HRSA, 340B ADR Decision Summaries (last updated May 15, 2025) (noting that HRSA has rejected an ADR claim challenging a manufacturer's contract pharmacy policy in order to be "consistent with the rulings" of federal courts), https://tinyurl.com/2b9e24ec.[8]

In *Novartis*, the D.C. Circuit explained that manufacturers may restrict 340B pricing to drugs dispensed at "a covered entity's in-house pharmacy or [at] a single contract pharmacy designated by the covered entity." 102 F.4th at 463-464. The court also confirmed that manufacturers may condition 340B pricing at contract pharmacies on the receipt of claims data, which is consistent with longstanding record-retention

---

[8] HRSA has also rejected an ADR claim challenging Novartis's contract pharmacy policy for the same reason. App.43. Although HRSA is supposed to publish its final ADR decisions to its website within 120 days of issuance, 89 Fed. Reg. at 28,654, that decision has not yet been posted. Novartis will thus file a separate motion requesting that this Court take judicial notice of HRSA's ADR decision involving Novartis.

policies governing the 340B Program. *Id.* at 463. The Third Circuit approved the same requirements. *See Sanofi*, 58 F.4th at 701. HRSA has now adopted the same understanding of federal law. App.43.

Congress intentionally gave manufacturers discretion to select such policies. After observing that federal law does not require delivery of 340B-priced drugs to unlimited contract pharmacies, the D.C. Circuit concluded "that this silence preserves—rather than abrogates—the ability of sellers to impose at least some delivery conditions." *Novartis*, 102 F.4th at 460. The Third Circuit likewise held that federal law "leav[es] drug makers discretion on delivery" of 340B-priced drugs. *Sanofi*, 58 F.4th at 705. The court reached that conclusion after noting that Congress *has* required the sale of "discounted drugs through contract pharmacies" in a related context, and expressly rejected a bill that would have adopted that requirement for the 340B Program. *Id.* at 704-706.

Chapter 103 purports to make the opposite policy choice on both counts. By ordering manufacturers not to "deny, restrict, or otherwise interfere with" any contract pharmacy's acquisition of 340B-priced drugs, the state law prohibits a one-contract-pharmacy condition on manufacturers' offers to covered entities. 24-A M.R.S. § 7753(1). And it directly

outlaws any requirement that a covered entity "submit any claims or utilization data as a condition" of receiving 340B pricing. *Id.* § 7753(2).

"It is difficult to envision a more perfect collision of purposes" than for "state law … to forbid" what "federal law authorizes." *Maine Forest Prods. Council v. Cormier*, 51 F.4th 1, 10 (1st Cir. 2022). This case closely resembles *Maine Forest Products*. At issue there was a Maine law forbidding large agricultural employers from hiring foreign workers under any circumstances. *Id.* at 3. That law "specifically target[ed]" a federal visa program reflecting "Congress's considered judgment that agricultural employers … should be able to hire foreign laborers when specified criteria are satisfied." *Id.* at 9, 11. But states cannot countermand Congress's policy judgment, so the Maine law was preempted. *Id.* at 11.

Chapter 103 works the same way. The federal 340B statute reflects Congress's considered judgment that manufacturers should retain discretion to set reasonable conditions on 340B pricing. *Novartis*, 102 F.4th at 460; *Sanofi*, 58 F.4th at 704-706. Chapter 103 specifically targets "the federal 340B drug discount program." *E.g.*, 24-A M.R.S. § 7752(7). And it purports to "nullify the implicit federal right" to impose reasonable conditions on 340B pricing. *Maine Forest Prods.*, 51 F.4th at 10.

The district court rejected this argument based on an erroneous legal standard. It held Novartis must establish a federal "right to be free from *all state law requirements*," not merely a right to engage in the conduct at issue. Add.27 (emphasis added). But that is the standard for *express* preemption, not implied obstacle preemption. In *Maine Forest Products* itself, federal law did not establish a right to be free from all state regulation—quite the opposite. *See* 51 F.4th at 10 (pointing out that the visa program "incorporates state employment law" regarding working conditions). That is why the court found an "*implicit* federal right" to hire foreign workers in some circumstances. *Id.* (emphasis added). When federal law authorizes conduct, it creates an implicit right that states cannot abridge. *See, e.g.*, *Geier v. American Honda Motor Co.*, 529 U.S. 861, 881 (2000) (state could not mandate airbags where federal law permitted a "variety and mix of [passive-restraint] devices"); *Verizon New Eng., Inc. v. Maine Pub. Utils. Comm'n*, 509 F.3d 1, 9 (1st Cir. 2007) (state requirement preempted where federal action "was intended to free the [regulated parties] from [the same] compulsion").

The district court's holding that Maine can outlaw policies requiring covered entities to submit claims data—another condition allowed by

44

federal law—went even further. Claims data help manufacturers establish reasonable cause for an audit, which is a prerequisite to accessing the statutory audit and ADR processes. *Supra* pp.12-13. The district court's concern that it was "speculative" whether these "data are necessary to obtain an audit" is doubly mistaken. Add.26. At a threshold level, the extent of Novartis's "need" for these data to access its statutory remedies is beside the point. Federal law purposely permits Novartis to require claims data as a condition of 340B pricing. *Novartis*, 102 F.4th at 460, 463. To engage in some free-floating inquiry about the soundness of this policy is to assert a "veto power over the federal program." *Maine Forest Prods.*, 51 F.4th at 11.

Regardless, Novartis *has* shown that manufacturers need claims data to reliably access the audit and ADR processes. *Supra* p.13; *Drummond*, 2025 WL 3048929, at *7 (explaining that claims data are "*the* way to detect possible [compliance problems]"). HRSA itself has noted "the infrequency of finalized manufacturer audit reports," which it correctly predicted would lead to few "manufacturer ADR claims." 77 Fed. Reg. 28,643, 28,644-45 (Apr. 19, 2024). That is despite widespread compliance failures in the 340B Program, repeatedly documented by the federal

government and private analysts alike. App.26-29. Novartis's claims-data policy is an attempt "to increase transparency" in the program so it can pinpoint the sources of this misuse and persuade HRSA that it has identified reasonable cause to audit. App.46. Congress created the statutory audit and ADR processes and the requirements for accessing them, and states cannot "impose their own set of restrictions" that impede those processes. *Public Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 55 (1st Cir. 2024).

> ii. *Chapter 103 upends Congress's careful balancing of interests.*

Every year, a certain number of Novartis's drugs will be distributed and dispensed in Maine. Chapter 103 changes nothing about the total amount of Novartis's drugs that Maine pharmacies stock and dispense to customers. Instead, the law's primary purpose and effect is to make Novartis (and other manufacturers) provide 340B discounts to covered entities on additional units of drugs in those pharmacies' inventories. App.35-36. The district court acknowledged this fact, explaining that the state law would "increase … the number of 340B claims" in Maine. Add.24. The court nevertheless found no conflict because it thought this expanded number of 340B-priced sales was not "inconsistent with the

objectives of the 340B program." *Id.* That conclusion was mistaken several times over.

No doubt, *one* of the 340B Program's objectives is to subsidize covered entities—to the carefully crafted extent the federal statute requires. But federal law also intentionally limits the volume of 340B discounts. That is one reason why manufacturers may place reasonable constraints on the use of contract pharmacies. *See Novartis*, 102 F.4th at 462 ("[W]ider distribution is not necessarily better."). The federal statute also forbids covered entities to sell 340B-priced drugs to anyone other than their patients, even though covered entities could earn additional revenue on such sales. 42 U.S.C. § 256b(a)(5)(B). And the 340B statute has other goals, including limiting burdens on manufacturers and creating a uniform compliance mechanism. *See, e.g., id.* §§ 256b(a)(5)(C)-(D), (d)(2)(B)(v)(I). No state can unilaterally amplify one of these goals at the expense of the others. *Arizona*, 567 U.S. at 406, 410.

The district court's reasoning amounts to the idea that if some of a thing is good, more must be better (or at least equally good). But "no legislation pursues its purposes at all costs." *Rodriguez v. United States*, 480 U.S. 522, 525-526 (1987) (per curiam). The district court erred by

supposing the "objectives of the 340B program" include subsidizing covered entities as much as possible, rather than subsidizing covered entities to the extent required in the balance struck by Congress. Add.24.

That mistaken reasoning also runs headlong into repeated admonitions by this Court and the Supreme Court: "[I]t is not enough to say that the ultimate goal of both federal and state law" is the same because state law can also "interfere[ ] with the methods by which the federal statute was designed to reach this goal." *International Paper*, 479 U.S. at 494; *accord Arizona*, 567 U.S. at 406; *Maine Forest Prods.*, 51 F.4th at 11. Correct analysis of the 340B Program's methods and objectives accounts for its Spending Clause origins: It must "operate[ ] based on consent" to terms clearly defined in advance. *Cummings*, 596 U.S. at 219. Congress's choice to give manufacturers freedom to put reasonable conditions on access to 340B pricing was a key part of that bargain. It enticed manufacturers to participate by assuring them they would not be overwhelmed by an unforeseen volume of discounts claimed through contract pharmacies. *See Novartis*, 102 F.4th at 460. Chapter 103 eliminates that assurance, purporting to renegotiate an agreement to which Maine was not—and could never be—a party.

That is a classic "conflict in the method of execution." *Maine Forest Prods.*, 51 F.4th at 11 (quotation omitted). What Congress has done by inducement, Maine has tried to undo by force. But no state can change the fact that manufacturers may choose not to participate in the 340B Program. For that reason, Chapter 103 jeopardizes the program's goals, too. The program cannot achieve anything if manufacturers are dissuaded from participating. And that risk is especially serious because it extends to Medicaid and Medicare Part B. *Drummond*, 2025 WL 3048929, at *6. In this context, states are bound to respect the "delicate balance" Congress struck in "limit[ing] the scope of the 340B Program to ensure that the price of admission wasn't too high." *Id.* Chapter 103's intentional disruption of that balance is preempted because 340B requirements were not "randomly or uncarefully chosen by Congress." *Hyde Park Partners, L.P. v. Connolly*, 839 F.2d 837, 852 (1st Cir. 1988).

Compare this with cases where Congress invited or ratified state involvement. *Pharmaceutical Research & Manufacturers of America v. Walsh*, for instance, was about a state's administration of its Medicaid program. 538 U.S. 644 (2003). Not only does the Medicaid statute *require* state involvement, but it expressly allows states to create a "prior

authorization program," 42 U.S.C. § 1396r-8(d)(1)(A)—the type of program at issue in *Walsh*, 538 U.S. at 653. So the question was not whether the state had the power to alter its Medicaid plan, but whether it had used that power for a legitimate purpose. *Id.* at 662-668. And in *New York State Department of Social Services v. Dublino*, Congress had created the federal program against the backdrop of widespread state programs covering the same subject, about which "Congress presumably knew" and decided to leave intact. 413 U.S. 405, 420-421 (1973). The 340B Program, by contrast, arose in a context where states had neither a historical nor a statutory governing role. The district court was therefore wrong to treat *Walsh* and *Dublino* as governing here. Add.23.

### iii. *Chapter 103 invites conflicting adjudications.*

When a manufacturer's 340B compliance is questioned, federal law channels the claim down one of two paths: HHS may assess the appropriateness of sanctions, or a covered entity may bring an ADR claim. 42 U.S.C. §§ 256b(d)(1)(A)(vi), (d)(3)(A). Those are the only paths available to enforce 340B. *Astra*, 563 U.S. at 121-122. Yet Chapter 103 purports to create a third path: The Maine Attorney General can surmise that a manufacturer should have provided 340B pricing on a particular drug

50

and seek to enforce that view with an injunction or civil penalty. 5 M.R.S. § 209. Such proceedings are exactly the kind of "dispersed and uncoordinated lawsuits" *Astra* rejected for fear of producing "conflicting adjudications." 563 U.S. at 120.

The problem comes from the state law's definitions of a "340B drug" and a "340B entity." The former term means "a drug that is purchased or eligible for purchase under [42 U.S.C. § 256b(a)(3)]." 24-A M.R.S. § 7752(6). The latter means "an entity participating in or authorized to participate in the [340B Program]" under federal law. *Id.* § 7752(7). Both terms, then, incorporate federal standards to decide when manufacturers must provide 340B pricing. And these terms shape all of Chapter 103's mandates to manufacturers. *Id.* §§ 7753(1)-(3). For *every* alleged violation of Chapter 103 by a manufacturer, the State must prove that *every* federal 340B condition was satisfied, but no discount was given.

The ultimate question is one of pricing—should the drug unit that was purchased by the pharmacy at commercial prices and dispensed to a pharmacy customer have triggered a retroactive discount for the covered entity? Before Chapter 103 existed, the same Novartis drugs were already being purchased by and delivered to the same pharmacies—just at

commercial prices.  App.41.  Whether a given pharmacy could obtain the product is therefore not at issue; the dispute would be whether covered entities should later be able to claim a discount under the pretense that the transaction could have triggered the 340B discount if it had been a sale to the covered entity, not the pharmacy.

This question is far from straightforward.  Federal law is riddled with nuanced eligibility issues implicating HRSA's unique expertise.  For just one example, consider the patient definition.  Recall that a covered entity may not divert 340B-priced drugs to anyone "who is not [its] patient."  42 U.S.C. § 256b(a)(5)(B).  The federal statute, however, does not define a "patient."  HRSA deems a person an entity's patient if

> [1] the covered entity has established a relationship with the individual, such that the covered entity maintains records of the individual's health care; and [2] the individual receives health care services from a health care professional who is either employed by the covered entity or provides health care under contractual or other arrangements … such that responsibility for the care provided remains with the covered entity; and [3] [for federal grantees,] the individual receives a health care service or range of services from the covered entity which is consistent with the … range of services for which … funding … has been provided to the entity.

61 Fed. Reg. 55,156, 55,157-58 (Oct. 24, 1996).

Needless to say, two decisionmakers could apply that standard differently to the same facts. Yet to enforce Chapter 103, the State must prove—transaction by transaction—that a commercially priced drug was dispensed by a contract pharmacy to a person meeting that standard vis-à-vis the covered entity that claimed 340B pricing. If the standard is not met, the drug is not a "340B drug" because it was not "eligible for purchase" under the 340B Program. 24-A M.R.S. § 7752(6). How will Maine handle a pharmacy customer who had an appendectomy at a covered entity hospital two years ago, and who is now filling an antibiotic prescription for a sinus infection at a third-party pharmacy? What if that customer also gave birth at a different covered entity hospital five years ago? And if both covered entities claim the discount on that sale? There is no telling what position Maine will take on questions like these—but the state-law remedies would require the State to answer these questions of federal law.

HRSA, meanwhile, is already answering such questions. Both covered entities and manufacturers may file ADR claims asserting 340B pricing was or was not required to be offered on a given unit. 42 C.F.R. § 10.21(a). And these ADR claims may involve exactly the same units at

issue in Chapter 103's enforcement proceedings.  Where that is so, will the State await the outcome of the federal process before imposing sanctions?  And what will Maine do if it punishes a violation, but HRSA later finds the manufacturer was *not* required to offer 340B pricing on the same unit?  The State has ignored these issues.  But one thing is certain: HRSA will no longer "hold the control rein."  *Astra*, 563 U.S. at 120.

These concerns are not "speculative," as the district court held. Add.26.  The district court did not address the fact that federal questions committed to HRSA's sole oversight are baked into every application of Chapter 103 via the definitions of a "340B drug" and a "340B entity."  Nor did it grapple with the fact that adjudications under Maine law are *guaranteed* to conflict with those under federal law.  HRSA's ADR jurisdiction includes exactly the type of claims covered by Chapter 103's remedies: "claims that a manufacturer has *limited* the covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price."  42 C.F.R. § 10.21(a)(1) (emphasis added).  Under that provision, HRSA has heard—and rejected—ADR claims challenging the same limitations on contract pharmacy usage targeted by Chapter 103.  *Supra* n.8; HRSA,

340B ADR Decision Summaries (last updated May 15, 2025), https://ti-nyurl.com/2b9e24ec.

The district court appeared to mistakenly believe HRSA has disclaimed power to hear such claims. Add.26 ("HRSA … has adopted a contrary view"). Just the opposite is true. HRSA hears such claims *on the merits* and rejects those claims because policies like Novartis's are *allowed by federal law*. The same facts that currently produce no sanctions under federal law will be punishable under Chapter 103. Those *are* the conflicting adjudications because they will reach opposite outcomes while attempting to answer the same question: Was the drug "eligible for purchase under Section 340B?" *See* 24-A M.R.S. § 7752(6).

All this will "destroy the uniformity of the federal standard." *Wood v. General Motors Corp.*, 865 F.2d 395, 412 (1st Cir. 1988). The question whether a transaction qualifies for 340B pricing is so technical and fact-intensive that the only way to ensure consistency is to empower one entity to make the calls. Congress did just that. *Astra*, 563 U.S. at 120. Chapter 103 eschews Congress's centralization for the express purpose of changing 340B policy, and that "two bites at the apple approach" to 340B

enforcement is preempted. *Weaver's Cove Energy, LLC v. Rhode Island Coastal Res. Mgmt. Council*, 589 F.3d 458, 474 (1st Cir. 2009).

> iv. *Chapter 103 introduces novel penalties.*

Chapter 103's heightened penalties exacerbate its overlapping-enforcement problem. Congress carefully calibrated the consequences of 340B noncompliance: penalties that "shall not exceed $5,000"—and only for a manufacturer that "knowingly and intentionally" overcharges a covered entity. 42 U.S.C. § 256b(d)(1)(B)(vi). Chapter 103 dramatically raises the stakes: penalties up to $10,000 per violation, and the unprecedented power to *order* manufacturers to change their policies through the Attorney General's injunction power. 5 M.R.S. § 209.

The Supreme Court has repeatedly warned that "conflict is imminent whenever two separate remedies are brought to bear on the same activity." *Wisconsin Dep't of Indus., Lab. & Hum. Rels. v. Gould Inc.*, 475 U.S. 282, 286 (1986) (quotation omitted); *see also Crosby v. National Foreign Trade Council*, 530 U.S. 363, 380 (2000). When Congress selects a penalty, it has necessarily determined that a higher penalty "would be inappropriate." *Arizona*, 567 U.S. at 406. Yet again, Chapter 103 second-guesses Congress's judgment. This added disincentive to 340B

participation puts Medicaid and Medicare Part B at further risk. *See Drummond*, 2025 WL 3048929, at *6.

### 3. No Presumption Against Preemption Applies.

The district court's analysis was incorrect from the beginning because it started by applying the presumption against preemption. Add.15. That presumption has no application here, and the district court's approach was legally erroneous. The presumption against preemption puts a thumb on the scale against preemption when a state enacts a generally applicable law on a topic that has been traditionally regulated by states. Chapter 103 is not such a law.

For starters, there is no "history of state law regulation" in the 340B Program. *Contra, e.g.*, *In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d 156, 178 (1st Cir. 2009) (applying the presumption to "state consumer protection law"). The 340B Program operated in Maine for 33 years without any state interference. And the program has a "history of significant federal presence"—to say the least—because Congress created it from scratch, rather than stepping in to regulate a preexisting activity. *United States v. Locke*, 529 U.S. 89, 108 (2000). The Maine law addresses concepts like a "340B contract pharmacy" that could not even

57

*exist* without federal law. *See* 24-A M.R.S. §§ 7752(5)-(7). The relation-ships between manufacturers, covered entities, and contract pharmacies "originate[ ] from, [are] governed by, and terminate[ ] according to federal law," making them "inherently federal." *Buckman*, 531 U.S. at 347.

The presumption's inapplicability is further underscored by Chapter 103's parasitic attachment to federal law. This state law does not regulate all drug sales or all pharmacies. It applies only inside "the federal 340B drug discount program." 24-A M.R.S. § 7752(7). This is exactly the situation this Court distinguished in *Capron v. Attorney General*: Chapter 103 is not "generally applicable," but instead "predicated on the existence of the federal … program regulations." 944 F.3d 9, 23 (1st Cir. 2019). Where state law seeks to control only the scope of federal law itself, the presumption does not apply. *See id.*

**B.    Chapter 103 Violates the Dormant Commerce Clause.**

Chapter 103 is also an unlawful extraterritorial regulation. The Commerce Clause "precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State." *Edgar v. MITE Corp.*, 457 U.S. 624, 642-643 (1982). This rule reflects "the territorial limits of

state authority under the Constitution's horizontal separation of powers." *National Pork Producers Council v. Ross*, 598 U.S. 356, 376 n.1 (2023). For this reason as well, Novartis is likely to prevail on the merits.[9]

### 1.    Chapter 103 Targets Out-of-State Conduct.

Chapter 103 operates to cap the prices of out-of-state transactions between drug manufacturers and their wholesalers.  Manufacturers do not do business directly with pharmacies; they sell their drugs to a handful of wholesale distributors.  App.49-50.  Wholesalers resell those drugs to pharmacies at commercial prices, where they are dispensed to customers.  App.50  As relevant here, covered entities using the replenishment model claim to identify a pharmacy customer as the covered entity's supposed patient long after the drug has been dispensed by a pharmacy, the covered entity (or one of its for-profit partners) then tells the wholesaler, and the wholesaler provides an after-the-fact discount.  *Id.*  The wholesaler later seeks a refund from the manufacturer for having provided the discount.  *Id.*

---

[9] Novartis pleaded two other dormant Commerce Clause claims. App.60-61.  Novartis does not appeal the district court's rulings on those portions of its motion for a preliminary injunction, but it reserves the right to further press those claims on the merits.

Chapter 103 compels manufacturers to cap prices for wholesalers by issuing those refunds on demand. If a manufacturer refuses, its wholesalers cannot provide 340B-priced drugs to pharmacies—or the wholesalers would lose money on each sale. App.50. And in Chapter 103's terms, that would mean indirectly "restrict[ing] … or otherwise interfer[ing] with" the contract pharmacy's acquisition of a "340B drug." 24-A M.R.S. § 7753(1).

These transactions between manufacturers and wholesalers occur wholly outside Maine. It is undisputed that neither Novartis nor its wholesalers are located in the state. App.49. By purporting to set the terms of transactions between those parties, Chapter 103 impermissibly tries to control prices charged "beyond the boundaries of the State." *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989).

Two circuit courts have invalided state laws structured the same way. Most recently, in *Association for Accessible Medicines v. Ellison*, the Eighth Circuit confronted a state law prohibiting manufacturers from setting certain prices on drugs provided to in-state consumers. 140 F.4th 957, 959-960 (8th Cir. 2025). Because of the unique nature of drug distribution, this law effectively "insist[ed] that out-of-state manufacturers

sell their drugs to wholesalers for a certain price." *Id.* at 961. But that is "the specific extraterritorial effect of controlling the price of wholly out-of-state transactions" forbidden by the dormant Commerce Clause. *Id.* The court therefore affirmed an order preliminarily enjoining the law's enforcement, and in doing so, it adopted the Fourth Circuit's reasoning in a similar case. *Id.* at 960 (citing *Association for Accessible Meds. v. Frosh*, 887 F.3d 664 (4th Cir. 2018)). This case is no different.

### 2. The District Court Erred in Its Dormant Commerce Clause Analysis.

The district court's extraterritoriality analysis disregarded *Ellison* and *Frosh*, and it did not grapple with the unique nature of drug distribution. Add.29-30. It relied solely on two premises: (1) that extraterritoriality claims are "arguably limited" after the Supreme Court's decision in *Pork Producers*, and (2) that the Supreme Court's decision in *Walsh* forecloses Novartis's claim. *Id.* Both premises are incorrect.

*Pork Producers* explicitly preserved the kind of claim Novartis brings. Citing *Edgar* as an example, the Court reaffirmed the rule against "*directly* regulat[ing] out-of-state transactions by those with *no* connection to the State." 598 U.S. at 376 n.1. By contrast, the Court rejected any "*per se* rule" against state laws with only the "practical effect

of controlling commerce outside the State." *Id.* at 371 (quotation omitted). Chapter 103 is the former kind of law because it changes the prices of transactions that were already occurring—changes that can be made *only* through out-of-state transactions. App.49-50. That is confirmed by the *Ellison* court's analysis of *Pork Producers*, 140 F.4th at 960, and by the Supreme Court's favorable citation to *Frosh*, 598 U.S. at 374.

Nor can *Walsh* save this law. *Walsh* was about direct—and voluntary—negotiations between a state Medicaid plan and drug manufacturers. 538 U.S. at 644-645. The state law at issue therefore did "not insist that manufacturers sell their drugs to a wholesaler for a certain price." *Id.* at 669. But that is exactly what Chapter 103 does, App.50, and there is nothing voluntary about it, 24-A M.R.S. § 7757(1). Neither the State nor the district court has tried to explain how Novartis could comply with Chapter 103 without selling drugs to "wholesaler[s] for a certain price." *Walsh*, 538 U.S. at 669. Yet that compulsion is beyond Maine's power.

## II.    The Remaining Preliminary-Injunction Factors Favor Novartis.

Novartis's prospect of success on the merits "is the main bearing wall of the four-factor framework." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir. 1996). Because of the district court's

mistaken merits analysis, it did not analyze the remaining preliminary-injunction factors.  Add.36.  Those factors also favor injunctive relief.

### A.    Novartis Established Irreparable Harm.

Chapter 103 put Novartis between a rock and a hard place:  Novartis could either violate the law and "expose [itself] to potentially huge liability," or "suffer the injury of obeying the law during the pendency of the proceedings."  *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992).  This forced choice between unrecoverable sanctions or unrecoverable compliance costs works irreparable harm that will plague Novartis until the law's enforcement is enjoined.  *Id.* at 381-382.

To avoid Chapter 103's draconian penalties, Novartis has come into compliance with the now-effective state law.[10]  In other words, Novartis now offers 340B discounts to Maine covered entities that federal law does not require it to provide.  App.56.  This amounts to "millions of dollars lost annually," App.79, all backed by the threat that if it does not accede, Novartis could be fined as much as $10,000 "each time" one of its drugs

---

[10]  Novartis Policy at 8, 340B ESP Resources (last updated Oct. 9, 2025), https://340besp.com/resources.

is deemed by the Maine Attorney General to be a "340B drug" dispensed by a "340B contract pharmacy," *see* 24-A M.R.S. §§ 7753(1), 7757(1).

Novartis's lost revenue cannot be recovered even if Chapter 103 is later deemed unconstitutional. Where "money damages are unavailable" against a state, "irreparable harm exists." *Rosario-Urdaz v. Rivera-Hernández*, 350 F.3d 219, 222 (1st Cir. 2003) (plaintiff could not recover damages from Puerto Rico). Novartis is thus experiencing "a substantial injury that is not … adequately compensable by money damages." *Ross-Simons*, 102 F.3d at 19. Chapter 103's seven-figure-plus annual impact more than qualifies as "substantial." App.79.

These losses hurt Novartis in subtler ways, too. Chapter 103's forced discounts drain funds Novartis would otherwise invest in innovating new drug products and improving existing ones. App.80. And it is "impossible to recoup" those opportunity costs once incurred. *Id.* Because this harm is "extremely difficult to measure," it supports injunctive relief. *Starlight Sugar, Inc. v. Soto*, 114 F.3d 330, 332 (1st Cir. 1997); *see also Ross-Simons*, 103 F.3d at 19 (recognizing as irreparable "a cognizable threat" of harm that "is not accurately measurable").

## B. The Balance of Equities and the Public Interest Favor Enjoining Chapter 103's Enforcement.

Finally, the combined balance-of-equities and public-interest analysis tips decidedly toward an injunction. Chapter 103's unconstitutionality means that neither the State nor the public has a valid interest in enforcing it. *See Abbott v. Perez*, 585 U.S. 579, 602 (2018). Instead, the overriding public interest is in "ensuring that the Constitution is upheld and that unjustifiable restrictions are not placed on the free flow of interstate commerce." *Stephen D. DeVito, Jr. Trucking, Inc. v. Rhode Island Solid Waste Mgmt. Corp.*, 770 F. Supp. 775, 779 (D.R.I. 1991), *aff'd*, 947 F.2d 1004 (1st Cir. 1991) (per curiam). This Court has repeatedly applied that principle to both the Supremacy and Commerce Clauses. *E.g.*, *id.*; *Hyde Park Partners*, 839 F.2d at 854; *Maine Forest Products*, 51 F.4th at 11-12, *aff'g*, 586 F. Supp. 3d 22, 64 (D. Me. 2022) (finding a "stronger [public] interest in ensuring the constitutionality of state laws").

This conclusion is reinforced by Chapter 103's questionable policy benefits. Most importantly, the law will not help Maine patients access cheaper drugs because it affects only the prices *covered entities* pay, usually long after the patient has already paid full price. App.78. Nor is it clear that covered entities will use windfalls to help patients indirectly.

In fact, Chapter 103 may have the *opposite* effect: encouraging hospitals to "prescribe higher-priced drugs" in order to "reap bigger discounts on them." *A Good Idea to Cut Drug Costs*, *supra* p.18. Public reporting has also revealed abuses arising from efforts to maximize 340B revenue, such as "slashing services" at a covered entity location "while investing in the city's wealthier, white neighborhoods" and "building a luxury apartment and office complex"[11] or charging "the state health plan far more than [non-340B] hospitals" while passing extra costs "along to patients."[12]

That is not to suggest the Court must independently assess whether Chapter 103 is good policy, or determine the optimal scope of the 340B Program. Just the opposite: Congress has already resolved these issues by deciding the extent to which drug manufacturers must subsidize covered entities. Enjoining Chapter 103 would promote the public interest because it would respect Congress's policy judgment—as the Supremacy Clause requires. *See Hyde Park Partners*, 839 F.2d at 854; *United States*

---

[11] Katie Thomas & Jessica Silver-Greenberg, *How a Hospital Chain Used a Poor Neighborhood to Turn Huge Profits*, N.Y. TIMES (Sep. 24, 2022), https://tinyurl.com/4cxjukf4.

[12] Ellen Gabler, *How a Company Makes Millions off a Hospital Program Meant to Help the Poor*, N.Y. TIMES (Jan. 15, 2025), https://tinyurl.com/yv7akn6t.

*v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012) ("Frustration of federal statutes and prerogatives are not in the public interest.").

## CONCLUSION

This Court should reverse the district court's order and direct entry of a preliminary injunction.

Dated:  November 17, 2025

Respectfully submitted,

/s/ Jessica L. Ellsworth
Jessica L. Ellsworth
Susan Cook
Jacob T. Young
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.,
Washington, D.C. 20004
(202) 637-5600
jessica.ellsworth@hoganlovells.com

Matthew Warner
Alexandra A. Harriman
PRETIFLAHERTY
One City Center,
Portland, ME 04101
mwarner@preti.com

*Counsel for Plaintiff-Appellant*
*Novartis Pharmaceuticals Corp.*

# CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32 because it contains 12,932 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f).

2.  This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office 365 in Century Schoolbook 14-point font.

3.  The electronic version of this brief has been scanned for viruses and has been found to be virus free.

/s/ Jessica L. Ellsworth
Jessica L. Ellsworth

## CERTIFICATE OF SERVICE

I hereby certify that on November 17, 2025, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the First Circuit by using the CM/ECF system. All counsel of record are registered CM/ECF users, and service will therefore be accomplished by the CM/ECF system.

/s/ Jessica L. Ellsworth
Jessica L. Ellsworth

# ADDENDUM

# TABLE OF CONTENTS

Order Denying Motion for Preliminary Injunction
(Sep. 23, 2025) (ECF No. 44) .................................................... Add.1

42 U.S.C. § 256b .......................................................... Add.38

H.P. 132 - L.D. 2010 Part P (June 20, 2025) .................................. Add.49

42 C.F.R. § 10.21 ......................................................... Add.55

61 Fed. Reg. 43,549 (Aug. 23, 1996) ............................................ Add.58

61 Fed. Reg. 55,156 (Oct. 24, 1996) ............................................ Add.66

61 Fed. Reg. 65,406 (Dec. 12, 1996) ............................................ Add.69

75 Fed. Reg. 10,272 (Mar. 5, 2010) ............................................. Add.77

89 Fed. Reg. 28,643 (Apr. 19, 2024) ............................................ Add.85

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| NOVARTIS PHARMACEUTICALS CORP., | ) ) ) | |
| Plaintiff | ) ) | |
| v. | ) ) | 1:25-cv-00407-JCN |
| AARON FREY, | ) ) | |
| Defendant | ) | |

| | | |
|---|---|---|
| ABBVIE INC., et al., | ) ) | |
| Plaintiffs | ) ) | |
| v. | ) ) | 1:25-cv-00416-JCN |
| AARON FREY, et al., | ) ) | |
| Defendants | ) | |

**ORDER ON MOTIONS FOR PRELIMINARY INJUNCTION**

In two related cases, Plaintiffs, two pharmaceutical manufacturers and affiliated entities, challenge a Maine statute regarding the role of contract pharmacies within a federal drug discount program.  (Complaints, 1:25-cv-00407-JCN, ECF No. 1; 1:25-cv-00416-JCN, ECF No. 1.)[1]  Plaintiffs contend that the Maine statute is unconstitutional on multiple grounds: the statute is preempted by federal law, violates the commerce clause, constitutes an improper taking, and is impermissibly vague.

---

[1] Plaintiffs in case no. 1:25-cv-00416-JCN are AbbVie, Inc., Allergan, Inc., Durata Therapeutics, AbbVie Products LLC, Pharmacyclics LLC, and Allergan Sales, LLC (collectively, "Plaintiff AbbVie or AbbVie").

**Add.1**

The matter is before the Court on Plaintiffs' motions for a preliminary injunction. (Motions, 1:25-cv-00407-JCN, ECF No. 17; 1:25-cv-00416-JCN, ECF No. 14.)  The State opposes the motions.  (Responses, 1:25-cv-00407-JCN, ECF No. 28; 1:25-cv-00416-JCN, ECF No. 27.)

After consideration of the parties' oral and written arguments, and following a review of the record, the Court denies the motions.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

### A.    The 340B Statute

In 1992, Congress created a drug discount program referred to as the 340B program. 42 U.S.C. § 256b.  All drug manufacturers who want their drugs to be covered under Medicaid and Medicare Part B must enter into an agreement with the Secretary of Health and Human Services (HHS) to comply with 340B program requirements, including that drug manufacturers must sell covered outpatient drugs to covered entities at or below a ceiling price.  *Id.* § 256b(a)(1).  Among other provisions, the statute establishes a formula for calculating ceiling prices, *id.* § 256b(a)(2), defines covered drugs, *id.* § 256b(a)(3), (b)(2), and lists the types of healthcare facilities qualifying as covered entities, *id.* § 256(a)(4).  The discounts in the program are significant, "typically knocking 20–50% off the drug's sticker price."  *Amgen, Inc. v. Kennedy*, No. CV 24-3571 (JEB), 2025 WL 2206948, at *1 (D. D.C. Aug. 4, 2025).

---

[2] The following facts are derived primarily from public documents amenable to judicial notice and the affidavits and exhibits filed in connection with Plaintiffs' pleadings and motions.

Covered entities are types of facilities that generally provide care to underserved communities. *See Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110, 113 (2011). "The discounts help uninsured patients, who can get cheaper drugs from covered entities. They also help covered entities themselves. The entities can buy drugs at a discount, get reimbursed by insurers for the drug's full price, and pocket the difference." *Amgen*, 2025 WL 2206948, at *1 (citations omitted).[3] Covered entities are prohibited from requesting the 340B discount for drugs that also qualify for a Medicaid rebate (referred to as a double discount), 42 U.S.C. § 256b(a)(5)(A), may not resell or otherwise transfer the discounted drugs to anyone who is not a patient of the covered entity (referred to as diversion), *id.* § 256b(a)(5)(B), and must allow the Secretary and manufacturers to audit their records according to procedures established by the Secretary, *id.* § 256b(a)(5)(C).

If the Secretary finds that a covered entity has engaged in double-discounting or diversion, the entity shall be liable to the manufacturer for the discounts it received improperly. *Id.* § 256b(a)(5)(D). In appropriate cases, the Secretary may also impose sanctions on a covered entity, which sanctions could include interest penalties,

---

[3] There may be some dispute about the extent to which insured patients benefit from the discount or whether the entire discount is retained by covered entities and others, like third-party administrators, who coordinate with covered entities. An insured patient may not benefit directly from the lower price if their out-of-pocket cost is the same, regardless of whether the drug is eligible for the discount, but there is evidently little or no dispute that some uninsured patients benefit directly and both uninsured and insured patients likely benefit indirectly because one purpose of allowing the covered entity to retain the amount of the discount is that they are able to use the extra funds in service of their patients. *See American Hospital Association v. HHS*, No. 4:20-CV-08806-YGR, 2021 WL 616323, at *1 (N.D. Cal. Feb. 17, 2021) ("covered entities . . . use the discounts to stretch scarce federal resources and serve a greater number of uninsured and under-insured patients"). The expert opinions in the record suggest the parties would dispute the extent of indirect benefits through charitable spending and other services. In any event, resolution of the dispute is not central to Plaintiffs' requests for a preliminary injunction.

disqualification of the entity for a period, and/or reference of the matter to other federal authorities. *Id.* § 256b(d)(2)(B)(v). The Secretary can also impose monetary sanctions on manufacturers for charging more than the ceiling price. *Id.* § 256b(d)(1)(B)(vi).

The 340B program "is superintended by the Health Resources and Services Administration (HRSA)," a sub-agency within HHS. *Astra USA*, 563 U.S. at 113. Several courts, however, have noted that Congress did not grant HHS broad authority to issue regulations. *See, e.g., American Hospital Association v. HHS*, No. 4:20-CV-08806-YGR, 2021 WL 616323, at *7 (N.D. Cal. Feb. 17, 2021). Rather, rulemaking authority is currently limited to "(1) establishment of [an administrative dispute resolution process (ADR)]; (2) drug-pricing methodology; and (3) imposition of monetary sanctions for violations." *Id.* (citing *Pharmaceutical Research & Manufacturers of America v. HHS*, 43 F. Supp. 3d 28, 41-45 (D. D.C. 2014).

**B.    The Role of Contract Pharmacies**

In December 1993, HRSA proposed a guidance notice regarding the 340B program which, as relevant here, specified that a covered entity may enter into a written agreement with a purchasing agent to negotiate contracts or receive drug shipments for distribution to the entity. 58 Fed. Reg. 68922, 68925. In May 1994, HRSA issued a similar final guidance notice. 59 Fed. Reg. 25110, 25113. In response to comments requesting that manufacturers not be required to sell to intermediaries, HRSA advised that covered entities often use purchasing agents or contract pharmacies, and that by placing limitations on sales transactions, manufacturers could be discouraging covered entities from participating in the program.

**Add.4**

In November 1995, HRSA proposed a guidance notice regarding the 340B program and contract pharmacy services. 60 Fed. Reg. 55586. In August 1996, HRSA issued a substantially similar final guidance notice. 61 Fed. Reg. 43,549. 43,555–56. The notices encouraged covered entities to sign a contract pharmacy service agreement with a contractor based on model agreement terms to facilitate participation in the 340B program by covered entities that lacked access to in-house pharmacy services. The model agreement terms included a limit for one contractor site and a procedure where the covered entity would purchase the drug, the manufacturer would bill the covered entity, but the drug would be shipped directly to the contract pharmacy. Other terms in the model agreement included a commitment not to divert drugs to individuals who are not patients of a covered entity and to be subject to audits.

In 2001, HRSA established Alternate Methods Demonstration Projects, which, among other things, allowed some covered entities to apply and be approved to use a contract pharmacy to supplement an in-house pharmacy and to use multiple contract pharmacy service sites instead of a single site. 72 Fed. Reg. 1540. In January 2007, HRSA proposed new guidance that would permit all covered entities to use multiple contract pharmacy sites and to use contract pharmacies to supplement an in-house pharmacy. *Id.* at 1541. In March 2010, HRSA issued final guidelines stating that covered entities are not limited to providing in-house or contract pharmacy services at one location. 75 Fed. Red. 10272, 10277–79. In the same month, as part of the Patient Protection and Affordable Care Act, Pub. L. 111–148, 124 Stat. 119 (2010), Congress expanded the 340B program, which expansion provided that "covered entities" would also include hospitals serving isolated

5

**Add.5**

rural areas and added some of the enforcement provisions found in the current version of the statute.

Since 2010, the 340B program has grown significantly. According to Plaintiffs, the number of participating contract pharmacy sites increased from 1,300 in 2010 to more than 33,000 in 2024. Plaintiff AbbVie (AbbVie) asserts that the number of covered entities increased from 15,000 in 2010 to more than 50,000 by 2020. Plaintiffs attribute much of the growth to the unlimited use of contract pharmacies and suggest that some of the growth is a result of improper discount claims.[4]

Covered entities and pharmacies have also shifted away from segregated inventories for 340B drugs and other drugs and toward retroactive methods of claiming and tracking 340B discounts, including a method known as the replenishment model. Plaintiffs contend that the use of multiple contract pharmacies and retroactive accounting methods makes it more difficult to detect diversion and double discounting and increases the risk that diversion, double discounting, and wrongful discount requests will occur.

---

[4] There is likely some dispute about the extent and causes of this growth. For example, Plaintiff Novartis (Novartis) asserts that total spending in the 340B program was $6.6 billion in 2010 and increased by more than a factor of 10 by 2023, reaching $66.3 billion. AbbVie asserts that by 2024, 340B spending totaled $124 billion. Plaintiffs, however, do not state whether the figures account for other relevant factors, such as changes in the average price of drugs over time, inflation overall during the period, and other changes since 2010, namely the additional categories of covered entities and thus additional patients using drugs obtained through the program. Also, by way of example, AbbVie notes that in some cases covered entities have drugs delivered to pharmacies located more than 100 miles from the covered entity's location, which it evidently believes reflects claims that were not contemplated to be within the scope of the 340B program when it was enacted. Other courts have noted, however, that "some covered entities service large geographic areas and that contract pharmacies assist those providers in serving a dispersed population." *Pharmaceutical Research & Manufacturers of America v. Murrill,* No. 6:23-CV-00997, 2024 WL 4361597, at *1 (W.D. La. Sept. 30, 2024). As with some other matters that might be in dispute, the Court need not resolve the issue at this stage of the litigation.

The replenishment model works as follows: (1) The pharmacy purchases a quantity of a drug at market price and maintains it in common inventory; (2) the pharmacy dispenses drugs from the common inventory whenever a customer arrives with a prescription without regard to whether the customer is a patient of a covered entity; (3) an administrator later reviews claims data to analyze which transactions were for covered drugs to a patient of a covered entity and thus eligible for the discount; and (4) after enough qualifying transactions have occurred, the covered entity orders more units of the drug at the discounted price to replenish the units dispensed to patients of the covered entity.

## C.    HRSA Prohibition of Manufacturer Limits

In 2020, some manufacturers, including Novartis, began to limit both the number of pharmacies to which they would deliver drugs and the maximum distance between the covered entity and the pharmacy site. Some manufacturers also required covered entities to provide claims data to use contract pharmacies. Novartis initially requested but did not require that covered entities provide claims data.[5]

In December 2020, the HHS Office of the General Counsel issued an advisory opinion stating that the statute unambiguously obligated manufacturers to deliver drugs to contract pharmacies because the statute only required that drugs be purchased by a covered entity and set no other requirements for eligibility. Several manufacturers filed suit challenging the opinion. One district court struck down the advisory opinion under the Administrative Procedure Act, and the Office of the General Counsel withdrew the

---

[5] AbbVie evidently implemented similar policies later, in 2023.

**Add.7**

advisory opinion in June 2021.  *See AstraZeneca Pharmaceuticals LP v. Becerra*, 543 F. Supp. 3d 47 (D. Del. 2021); *see also*, *Eli Lilly & Co. v. HHS*, No. 1:21-CV-00081-SEB-MJD, 2021 WL 5039566, at *9 (S.D. Ind. Oct. 29, 2021).

HRSA also sent letters to the manufacturers in May 2021 notifying them that by placing contract pharmacy and claims data limitations on covered entities, the manufacturers were in violation of the 340B program.  HRSA ordered the manufacturers to sell discounted drugs to covered entities without contractual conditions, including by delivering the drugs to the pharmacies with which the covered entities contracted.  The manufacturers again filed suit in several courts to challenge the alleged violations.

Most of the district courts to consider the legality of the violation letters vacated the letters, and two circuit courts ruled in favor of the manufacturers.  In *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696 (3d Cir. 2023), the Third Circuit reasoned that because HRSA had not been granted broad rulemaking authority, because the statute did not mention contract pharmacies or delivery locations, and because the statute "imposes only a price term for drug sales to covered entities, leaving all other terms blank," HRSA could not establish that the manufacturers violated 340B by imposing conditions on requests for delivery to contract pharmacies, which meant "the Violation Letters and Advisory Opinion are unlawful."  *Id.* at 703–04, 706.  In *Novartis Pharmaceuticals Corp. v. Johnson*, 102 F.4th 452 (D.C. Cir. 2024), the D.C. Circuit determined that the district court properly set aside the violation letters because the statute merely requires that a manufacturer offer to sell drugs "at or below a specified monetary amount" and because the statute is "silent about delivery conditions," and "statutory silence implies that private parties may act

8

**Add.8**

freely." *Id.* at 369, 373.  The court noted that a manufacturer would likely violate the statute by imposing terms that are "unreasonable" or "onerous enough" to effectively increase the price above the statutory ceiling or fall short of a "bona fide offer," but the manufacturer's conditions were not so burdensome as to violate the statute on its face. *Id.* at 371–73.

## D.    State Statutes Prohibiting Manufacturer Limits

Approximately twenty states have enacted laws in response to the court decisions finding that HRSA lacked statutory authority to prohibit the manufacturers' policies. While differences exist among the state statutes, they share certain features, including prohibitions on certain manufacturer limits on covered entities and contract pharmacies, as well as alternative remedies for violations of the prohibitions. (*See* Complaint at 42–43, 1:25-cv-00416-JCN, ECF No. 1.)  Drug manufacturers filed lawsuits challenging the state statutes and seeking injunctive relief.  At least five district courts, either on a motion for preliminary injunction or a motion for summary judgment, largely or entirely denied injunctive relief against the enforcement of the relevant state statute after addressing similar legal claims to those Plaintiffs assert here; on appeal, the Eighth Circuit and Fifth Circuit upheld two of those decisions.[6]  At least one district court enjoined enforcement of

---

[6] *See Pharmaceutical Research & Manufacturers of America v. McClain,* 645 F. Supp. 3d 890 (E.D. Ark. 2022) (denying plaintiff's motion for summary judgment on preemption); *Pharmaceutical Research & Manufacturers of America v. McClain,* 95 F.4th 1136 (8th Cir. 2024) (affirming conclusion that Arkansas statute is not preempted), cert. denied, 145 S. Ct. 768 (2024); *Novartis Pharmaceuticals Corp. v. Fitch*, 738 F. Supp. 3d 737 (S.D. Miss. 2024) (denying plaintiff's motion for preliminary injunction); *AbbVie, Inc., v. Fitch*, No. 24-60375, 2025 WL 2630900 (5th Cir. Sept. 12, 2025) (affirming denial of preliminary injunction); *Pharmaceutical Research & Manufacturers of America v. Murrill*, No. 6:23-CV-00997, 2024 WL 4361597 (W.D. La. Sept. 30, 2024) (denying plaintiffs' motions for summary judgment); *Astrazenca Pharmaceuticals LP v. Bailey*, No. 2:24-CV-04143-MDH, 2025 WL 644285 (W.D. Mo. Feb. 27, 2025) (granting in part defendant's motion to dismiss plaintiff's complaint); *AbbVie Inc. v. Skrmetti*, No. 3:25-

a state statute based on similar arguments to those Plaintiffs raise here.[7]  Many other similar

cases are pending in other district courts.[8]

On June 20, 2025, Maine enacted a statute entitled the "Protect Health Care for

Rural and Underserved Communities Act," which statute goes into effect on September

24, 2025.  L.D. 210, Sec. P-5 (132nd Legis. 2025).  The statute creates a new "Chapter

103" within the Maine Insurance Code, and includes the following provision:

> **§7753. Prohibition of certain discriminatory actions by manufacturer or agent related to 340B entities**
>
> **1. Interference with acquisition or delivery of 340B drugs prohibited.** A manufacturer or its agent may not deny, restrict, prohibit or otherwise interfere with, either directly or indirectly, the acquisition of a 340B drug by, or delivery of a 340B drug to, a 340B contract pharmacy on behalf of a 340B entity unless receipt of that 340B drug is prohibited by the United States Department of Health and Human Services.
>
> **2. Submission of claims or utilization data prohibited.** A manufacturer or its agent may not, either directly or indirectly, require a 340B entity to submit any claims or utilization data as a condition for allowing the acquisition of a 340B drug by, or delivery of a 340B drug to, a 340B entity

---

CV-00519, 2025 WL 1805271 (M.D. Tenn. June 30, 2025) (denying plaintiffs' motion for preliminary injunction).

[7] *See Pharmaceutical Research & Manufacturers of America v. Morrisey*, 760 F. Supp. 3d 439 (S.D.W. Va. 2024).

[8] *See AbbVie, Inc. v. Weiser*, 1:25-cv-01847 (D. Co.); *AbbVie v. Lopez*, 1:25-cv-00230 (D. Haw.); *AbbVie, Inc. v. Kobach*, 6:24-cv-01111 (D. Kan.); *Novartis Pharmaceuticals Corp. v. Brown*, 1:24-cv-01557 (D. Md.); *AbbVie, Inc. v. Bailey*, 4:24-cv-00996 (E.D. Mo.); *AbbVie, Inc. v. Wrigley*, 1:25-cv-00081 (D. N.D.); *AbbVie, Inc. v. Hilgers*, 4:25-cv-03089 (D. Neb.); *AbbVie, Inc. v. Jackley*,  3:25-cv-03006 (D. S.D.); *Novartis Pharmaceuticals v. Brown*, 2:25-cv-00284 (D. Utah).

**Add.10**

unless the claims or utilization data sharing is required by the United States Department of Health and Human Services.

**3. Other interference prohibited.** A manufacturer may not otherwise interfere directly or indirectly with a 340B entity unless expressly authorized by the United States Department of Health and Human Services.

The statute defines a "340B entity" as "an entity participating or authorized to participate in the federal 340B drug discount program, as described in 42 United States Code, Section 256b, including its pharmacy, or any pharmacy contracted with the participating entity to dispense drugs purchased through the federal 340B drug discount program." 24-A M.R.S.A. § 7752(7) (effective Sept. 24, 2025). A "340B drug" is defined as "a drug that is purchased or eligible for purchase under Section 340B of the federal Public Health Service Act, 42 United States Code, Section 256b(a)(3)." 24-A M.R.S.A. § 7752(6) (eff. Sept. 24, 2025). A "340B contract pharmacy" is defined as "a pharmacy that has a contract with a 340B entity to receive and dispense 340B drugs to the 340B entity's patients on behalf of the 340B entity." 24-A M.R.S.A. § 7752(5) (effective Sept. 24, 2025).

Each violation of Chapter 103 is "subject to enforcement under the Maine Unfair Trade Practices Act." 24-A M.R.S.A. §7757(1) (effective Sept. 24, 2025). The Maine Unfair Trade Practices Act permits the Attorney General to "bring an action in the name of the State," to seek an injunction and restitution for any person who has suffered an ascertainable loss, and the Act provides that one who violates an injunction can incur a civil penalty up to $10,000 per violation. 5 M.R.S.A. § 209.

Plaintiffs filed suit in this court in August 2025 and sought a preliminary injunction enjoining enforcement of the state statute. In September 2025, amici curiae the American

11

**Add.11**

Hospital Association, 340B Health, the Maine Hospital Association, and the American Society of Health-System Pharmacists, filed briefs in opposition to Plaintiffs' motions for preliminary injunctions.  (Amici Briefs, 1:25-cv-00407-JCN, ECF No. 35; 1:25-cv-00416-JCN, ECF No. 34.)

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. NRDC*, 555 U.S. 7, 24 (2008).  A district court must decide whether the party seeking a preliminary injunction has carried the burden of establishing that the balance of four factors weighs in its favor:

> (1) the movant's likelihood of success on the merits, (2) whether and to what extent the movant will suffer irreparable harm in the absence of injunctive relief, (3) the balance of relative hardships, and (4) the effect, if any, that an injunction or the lack of one may have on the public interest.

*Becky's Broncos, LLC v. Town of Nantucket*, 138 F.4th 73, 77 (1st Cir. 2025) (quotation marks omitted).  "[T]he four factors are not entitled to equal weight in the decisional calculus; rather, likelihood of success is the main bearing wall of the four-factor framework."  *Corporate Technologies, Inc. v. Harnett*, 731 F.3d 6, 9–10 (1st Cir. 2013) (quotation marks and modifications omitted).

## DISCUSSION

**A.    Likelihood of Success**

**1.    Standing**

The United States Constitution's limitation on the federal courts' jurisdiction to "Cases" and "Controversies" requires that a party invoking federal jurisdiction establish:

**Add.12**

(1) an injury in fact that is concrete and particularized, and actual or imminent, not conjectural or hypothetical; (2) a causal connection between the injury and conduct complained of; and (3) a likelihood that the injury could be redressed with a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). "The plaintiff bears the burden of establishing standing" at the time of filing "and maintaining it thereafter" and must "support each element of standing with the manner and degree of evidence required at the successive stages of the litigation." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (quotation marks omitted).

The State argues that Plaintiffs have not established that they have standing to pursue their claims because they are allegedly harmed only when a covered entity claims entitlement to more discount drugs than were dispensed to patients of the covered entity, which conduct is not caused by the enforcement of Maine's law. The State contends this harm would be the result of a violation of the provisions of 340B and not a consequence of Maine law.

"[A] plaintiff satisfies the injury-in-fact requirement where he [or she] alleges an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). While pre-enforcement standing is ordinarily invoked in the face of criminal penalties, courts generally note that civil punitive statutes have a lesser but similar risk of harm and thus apply a similar inquiry for establishing standing in a pre-enforcement challenge. *See e.g.*, *New York Bankers Association, Inc. v. City of New York*, No. 13 CIV. 7212 KPF, 2014 WL 4435427, at *12

**Add.13**

(S.D.N.Y. Sept. 9, 2014); *Ostergren v. McDonnell*, No. 3:08CV362, 2008 WL 3895593, at *4 (E.D. Va. Aug. 22, 2008) ("it is not also the case that pre-enforcement challenges are limited to criminal statutes") (collecting cases).

Here, Plaintiffs have demonstrated an intent to follow their policies restricting delivery to contract pharmacies and that following the policies would likely result in state sanctions, as the State has not represented that it would not enforce the Maine statute with its attendant penalties if Plaintiffs followed their policies after the effective date of the statute. *See New York Bankers Association*, 2014 WL 4435427, at *12 (noting presumption, in pre-enforcement context, that a government will enforce punitive statutes, civil or criminal). Plaintiffs need not show more at this stage of the litigation to establish that they have standing to assert their constitutional claims. *See Defenders of Wildlife*, 504 U.S. at 561–62 ("When the suit is one challenging the legality of government action or inaction, the nature and extent of facts that must be averred . . . in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue. If he is, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.").

### 2.    Preemption Claims

Under the Supremacy Clause, the Constitution, treaties, federal statutes, and federal regulations preempt contrary state law because federal law is the "supreme Law of the Land[.]" U.S. Const. art. VI, cl. 2. "Express preemption occurs when congressional intent to preempt state law is made explicit in the language of a federal statute." *Tobin v. Federal*

**Add.14**

*Express Corp.*, 775 F.3d 448, 452 (1st Cir. 2014). There are also two types of implied preemption, "field preemption and conflict preemption." *Capron v. Office of Attorney General of Massachusetts*, 944 F.3d 9, 21 (1st Cir. 2019).

A "presumption against preemption" ordinarily applies to implied preemption claims, *id.*, because courts have long assumed that Congress is reluctant to displace the broad police powers of the states, *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). The presumption does not apply to express preemption claims, where courts instead "use the usual tools of statutory interpretation, focusing on the plain wording of the [preemption] clause, which necessarily contains the best evidence of Congress's preemptive intent." *Northwestern Selecta, Inc. v. Gonzalez-Beiro*, 145 F.4th 9, 15 (1st Cir. 2025) (quotation marks and modifications omitted). "[T]he purpose of Congress is the ultimate touchstone in every pre-emption case." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (quotation marks and modifications omitted).

### a. Field Preemption

Field preemption "can be inferred from a framework of regulation so pervasive that Congress left no room for the States to supplement it or where there is a federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Arizona v. United States*, 567 U.S. 387, 399 (2012) (quotation marks and modifications omitted). "Implied field preemption analysis has two parts: (1) defining the relevant regulatory field; and (2) evaluating the scope of federal regulation in that field." *Hall v. Delta Air Lines, Inc.*, No. 2:16-CV-00417-JAW, 2018 WL 1570788, at *19 (D. Me. Mar. 30, 2018).

15

**Add.15**

Defining the relevant field at the proper level of generality can be challenging. Some level of specificity is required, *see Basiliali v. Allegiant Air, LLC*, No. 2:18-CV-03888-RGK-MRW, 2018 WL 6219951, at *2 (C.D. Cal. Aug. 30, 2018), but defining the field too narrowly "result[s] in an analysis that resembles conventional conflict preemption." *Sikkelee v. Precision Airmotive Corp.*, 822 F.3d 680, 705 n.22 (3d Cir. 2016).

Assessing the 340B statute at the highest level of generality, courts and parties have examined proposed fields such as the "practice of pharmacy," (Defendant's Responses at 16; *Pharmaceutical Research and Manufacturers of America v. McClain*, 95 F.4th 1136, 1143 (8th Cir. 2024), the "regulation of contract pharmacies," *Pharmaceutical Research & Manufacturers of America v. Murrill*, No. 6:23-CV-00997, 2024 WL 4361597, at *6 (W.D. La. Sept. 30, 2024), and (somewhat more specifically) the provision of "discounted drugs for needy patients." *AbbVie, Inc., v. Fitch*, No. 24-60375, 2025 WL 2630900 at *6 (5th Cir. Sept. 12, 2025). The Maine law would fall within with the broadly defined fields, but as the other courts have found, there can be no inference of preemptive intent because there is no dominant federal interest in such broad fields and the scope and extent of the regulations found in the 340B statute cannot reasonably be characterized as comprehensive or pervasive relative to the breadth of the fields.

Assessing the 340B statute at a lower level of generality, some courts and parties have examined proposed fields such as "340B pricing or entity eligibility to access manufacturers' drugs at 340B discounted prices." *AbbVie Inc. v. Skrmetti*, No. 3:25-CV-00519, 2025 WL 1805271, at *12 (M.D. Tenn. June 30, 2025). Consistent with this view, Plaintiffs argue that the relevant field is defined by 340B, which focuses on the drug

**Add.16**

manufacturers' principal obligation under 340B—to offer to provide discount drugs to covered entities. (*See e.g.*, AbbVie's Reply at 3, 1:25-cv-00416-JCN, ECF No. 37.) If the field were defined in this way (i.e., the terms by which manufacturers must offer discounted drugs under the 340B program), there would be no field preemption. As with the broader proposals of the relevant field, because 340B does not dictate many of the terms regarding manufacturers' obligation to offer and provide the drugs, the language of 340B is insufficient to imply a congressional intent to preclude all state regulation in the field. *See Sanofi Aventis*, 58 F.4th at 704 (regarding the terms of an offer, the 340B statute "imposes only a price term for drug sales to covered entities, leaving all other terms blank"); *Fitch*, 2025 WL 2630900 at *6 ("Congress chose not to regulate distribution to patients, indicating that it did not intend to occupy the entire field in this area. As the Supreme Court has held, matters left unaddressed in an otherwise comprehensive and detailed federal regulatory scheme are presumably left subject to the disposition provided by state law.") (quotation marks omitted).

The state law addresses covered entities' "distribution of drugs to patients and the role of pharmacies in such distribution," a subject that does not fall within a specific field that Congress manifested an intent occupy exclusively. *Fitch*, 2025 WL 2630900 at *7. There are evidently no cases where a court has found field preemption of a similar state statute.[9] Courts have consistently concluded that similar state laws are not within the more

---

[9] The one case in which a court found preemption involving a similar state statute, the court appears to have based the determination on a form of conflict preemption. *Pharmaceutical Research & Manufacturers of America v. Morrisey*, 760 F. Supp. 3d 439, 452, 458 (S.D.W. Va. 2024) (concluding that "[m]ost germane

narrowly defined field.  *See e.g., Skrmetti*, 2025 WL 1805271, at *12 ("The primary problem with the plaintiffs' position is that" the state law does not "say[ ] anything about the pricing of 340B drugs" and only "concern[s] the delivery of 340B drugs.").  While the silence in 340B as to delivery or distribution has been interpreted by some courts to permit drug manufacturers to impose "at least some delivery conditions" and not to require manufacturers to deliver to multiple contract pharmacies as a matter of federal law, *see Johnson*, 102 F.4th at 460, the silence has also been viewed by two circuit courts as reflecting that Congress did not intend to preclude state involvement.  *Fitch*, 2025 WL 2630900 at *6; *McClain*, 95 F.4th at 1144.[10]

Given 340B's silence regarding the acts and transactions required to accomplish the objectives of the 340B program (e.g., the distribution of prescription medication at a discounted rate to covered entities), and given the sound reasoning of other courts on the field preemption issue presented here, the Court concludes that Plaintiffs have not established that they are likely to succeed on their field preemption claim.

> b.    *Conflict Preemption*

Conflict preemption occurs "where compliance with both federal and state regulations is a physical impossibility," *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43 (1963), or where the state statute "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby*

---

to the No-Audits Provision is obstacle preemption" and "the Enforcement Provisions present an obstacle to this centralized purpose").

[10] The D.C. Circuit in *Johnson* did not address whether state involvement was permissible.

**Add.18**

*v. National Foreign Trade Council*, 530 U.S. 363, 373 (2000).  Plaintiffs do not argue that it is impossible to comply with both the federal and state obligations.  This is not a case where "federal law forbids an action that state law requires," or vice versa.  *Mutual Pharmaceutical Co. v. Bartlett*, 570 U.S. 472, 486 (2013).

When analyzing whether a state statute presents an obstacle to the objectives of Congress in the enactment of a statute, a court must identify the relevant purposes, goals, or objectives of the federal law, and weigh the magnitude of the burden or the degree of the interference resulting from the state law.  *See Maine Forest Products Council v. Cormier*, 51 F.4th 1, 8 (1st Cir. 2022) (noting judicial concerns about "ascrib[ing] unenacted purposes and objectives to a federal statute" because "hidden legislative wishes" can be "difficult to discern" and the task "risks displacing the legislative compromises") (quotation marks omitted) (discussing *Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 778 (2019) (lead opinion of Gorsuch, J.); *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 373 (2000) ("What is a sufficient obstacle is a matter of judgment").

The core congressional objective in this case is not difficult to discern.  The program is designed to use two other large federal spending programs to incentivize manufacturers to provide a subsidy to healthcare entities caring for underserved patients.[11]  *See Novartis*

---

[11] Plaintiffs contend that providing covered entities with discounted drugs is not the sole objective of the program. Congress placed some specific limitations on discount claims—a formula to calculate the amount of the discount, prohibitions on diversion and double discounting, and auditing requirements and penalties for violations.  Plaintiffs maintain that the limitations and enforcement provisions demonstrate an intent to limit to some degree the number of claims that would be made by covered entities and to prevent covered entities from claiming more discounts than they are entitled to receive.  Plaintiffs contend that 340B reflects Congress' intent to achieve an appropriate balance between providing discounted drugs to the covered entities and incentivizing manufacturers to participate in the program.  In support of this view, Plaintiffs cite one court's conclusion that the 340B statute has "twin federal purposes" of providing discounts and

*Pharms. Corp. v. Espinosa*, No. 21-CV-1479-DLF, 2021 WL 5161783, at *7 (D.D.C. Nov. 5, 2021) ("The purpose of Section 340B is clear—it provides discounts on drugs to certain kinds of healthcare facilities").  As the State argues, at least as an initial matter, there is little or no tension between the effect of the state law and the central objective of 340B. The effect of the state statute is to prevent limits on and preserve flexibility in the methods of distribution for covered entities, which is in harmony with the 340B goal of providing the entities with prescription drugs at the discounted price for the benefit (directly or indirectly) of underserved patients.

Plaintiffs argue that states have no role in implementing the 340B program and that Maine is categorically prohibited from adopting rules that add any requirements regarding a manufacturer's participation in the 340B program.  In other words, Plaintiffs argue that any state rule related to the 340B program presents an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby*, 530 U.S. at 373.

Courts might be less inclined to find implied preemption when the federal statute contemplates a state implementation role within the federal program and are more likely to find implied preemption when a federal statute does not specifically provide a role for states. *See Fresenius Medical Care Holdings, Inc. v. Francois*, 832 F. Supp. 2d 1364, 1368

---

protecting manufacturers or preventing fraud. *Morrisey*, 760 F. Supp. 3d at 452.  Prevention of excess claims and fraud by covered entities is a discernible goal of the 340B statute, but the "twin federal purposes" suggests that the objectives are unrelated to or of equivalent importance as each other.  In the crafting of most, if not all, federal legislation establishing a program with eligibility requirements, fraud prevention is a consideration. Ensuring that the program serves only those who are eligible is an ancillary goal of any such program. Here, protecting manufacturers against duplicate claims and otherwise preventing fraud are subsidiary goals to the objective of the 340B program, which is to subsidize the cost of drugs to underserved populations.

**Add.20**

(N.D. Fla. 2011) (indicating that when a federal statute "has been recognized as a cooperative state-federal program . . . the case for federal preemption is less persuasive and difficult to establish"). Courts also might be more inclined to find preemption when a state law directly targets a federal program and be less inclined to infer congressional intent to preempt generally applicable state laws that impact federal programs incidentally. *Pedraza v. Shell Oil Co.*, 942 F.2d 48, 53–54 (1st Cir. 1991) (noting that federal law preempts state laws addressing occupational safety standards but finding no basis for preemption "in the workplace of private rights and remedies traditionally afforded by state laws of general application" or "state criminal laws of general application"); *compare Planned Parenthood of Houston & Southeast Tex. v. Sanchez*, 403 F.3d 324, 341 (5th Cir. 2005) (finding preemption more likely because "[the state] is attempting to impose regulations that restrict the scope of a federal program"), *with Deanda v. Becerra*, 96 F.4th 750, 762 n.9 (5th Cir. 2024) (finding preemption less likely because the state law did not target eligibility requirements of a federal program but was instead "a generally applicable state law").

The Supreme Court, however, has never adopted a categorical rule that requires a finding of preemption whenever a state law is addressed directly to those participating in a federal program where the federal statute does not rely on the state to implement the program. Instead, courts must determine whether the alleged obstacle presented by the state law is significant enough to compel preemption. The case of *Pharmaceutical Research & Manufacturers of America v. Walsh*, 538 U.S. 644 (2003) is particularly instructive.

21

**Add.21**

In 2000, the Maine state legislature created the Maine Rx Program, which was intended to authorize anyone in the state to purchase prescription drugs at the lower prices negotiated on behalf of and available to those who purchase drugs through the Medicaid program. *Id.* at 649. Maine used the prospect of imposing prior authorization requirements on nonparticipating manufacturers selling drugs through the Medicaid program to convince drug manufacturers to participate in the state program and provide similar lower prices to the public. *Id.* at 649–50. The district court granted a preliminary injunction in favor of the drug manufacturers, precluding implementation of the program. *Pharmaceutical Research & Manufacturers of America v. Commissioner, Maine DHS*, No. CIV. 00-157-B-H, 2000 WL 34290605, at \*6 (D. Me. Oct. 26, 2000). The district court found obstacle preemption because although the federal Medicaid statute allowed states to impose restrictions on drug distribution as necessary to assure that care and services would be provided in a manner consistent with the best interests of Medicaid's requirements, the federal law did not specifically permit the federal Medicaid program to be used to further the interests of non-Medicaid recipients. *Id.* at \*5. The district court reasoned:

> No matter how modest an obstacle the new prior authorization amounts to (the parties disagree on the severity of the obstacle), it is an obstacle—drugs on the list must be approved by the state Medicaid Medical Director before they can be dispensed or prescribed—and therefore an obstacle to the accomplishment and execution of the Congressional objectives of federal Medicaid.

*Id.* (quotation marks omitted).

"[P]erceiv[ing] no conflict between the [Maine Rx statute] and Medicaid's structure and purpose," the First Circuit reversed. *Pharmaceutical Research & Manufacturers of*

*America v. Concannon*, 249 F.3d 66, 75 (1st Cir. 2001). The First Circuit noted that nothing in the text of the federal statute "prevents states from imposing prior authorization requirements; indeed, they are explicitly permitted," and after entertaining the argument that there were federal legislative purposes in "preventing abuse or overprescription of certain expensive medications," and in "achieving the best interests of the Medicaid recipient," the court expressed concerns about the possibility of obstruction but found an "insufficient basis" on the record of competing affidavits at that point in the proceedings to conclude that the statute presented more than a *de minimis* obstacle to achieving the goals that the plaintiff had identified. *Id.* at 75–78.

The Supreme Court affirmed the First Circuit's decision. *Pharmaceutical Research & Manufacturers of America v. Walsh*, 538 U.S. 644, 670 (2003). Reasoning that the district court erred when it observed that it was sufficient to show any impediment to a discernable federal goal, a plurality of justices concluded that obstacle preemption required a showing of more than a "modest" impediment or harm to a federal statutory goal. *Id.* at 665, 667 (opinion of Stevens, J.), 671 (Breyer, J., concurring); *compare Townsend v. Swank*, 404 U.S. 282, 286 (1971) (finding preempted an additional "state eligibility standard" that had the effect of excluding from welfare benefits a whole category of persons the federal program deemed eligible for assistance), *with New York State Department of Social Services v. Dublino*, 413 U.S. 405, 421–22 (1973) (not finding complimentary state law work requirements for welfare benefits preempted simply because they might become conditions for continued assistance for some individuals but remanding for further analysis of the eligibility implications of each specific work rule).

**Add.23**

Plaintiffs contend that the impediment is sufficient to support a preemption finding because the use of the replenishment model, multiple pharmacies, and pharmacies located a considerable distance from a covered entity combine to expand the program beyond that contemplated by Congress, resulting in an unreasonable burden on manufacturers and a greater potential for fraud, which factors could limit manufacturers' involvement in the program. At this time on this record, the Court is not persuaded that the increase in the number of 340B claims with the use of multiple pharmacies is inconsistent with the objectives of the 340B program, provided the claims are made for drugs distributed to patients of covered entities.

Under the reasoning of the Third and D.C. Circuits, congressional silence regarding the conditions that drug manufacturers can include in their offers to sell the drugs to covered entities precludes HRSA from dictating the number of pharmacies to which the manufacturers must deliver on behalf of a covered entity. *Sanofi Aventis*, 58 F.4th 696; *Johnson*, 102 F.4th 452. The silence, however, does not necessarily reflect that Congress intended to prevent state involvement or somehow limit the number of legitimate discounted claims. *See Planned Parenthood of Indiana, Inc. v. Commissioner of Indiana State Department of Health*, 699 F.3d 962, 985 (7th Cir. 2012) ("The question is not whether [the federal law] expressly allows a recipient state to impose its own subgrant conditions . . . [i]nstead, the pertinent question is whether [the federal law] prohibits state-imposed eligibility conditions, either expressly or by necessary implication. As we have noted, congressional and regulatory silence usually defeats a claim of preemption, not the other way around"). The Court discerns nothing in 340B to suggest that Congress intended

24
**Add.24**

to limit the number of patients for whom covered entities may prescribe drugs at the discounted rate. For instance, there is no persuasive evidence to suggest that Congress intended to limit the number of legitimate discounted claims to a subset of a covered entity's eligible patients that corresponds to patients living in the immediate vicinity of a single in-house or designated contract pharmacy. Rather than limit eligibility and participation, in 2010, Congress significantly increased the healthcare facilities that are considered covered entities.

Plaintiffs also assert there is a direct conflict because the state law remedy overlaps with the federal remedy—namely the ADR process to be followed by a judicial proceeding—and provides an additional enforcement mechanism beyond the federal remedy. Courts have recognized that state efforts to impose additional remedies for the same violations are more likely to be preempted. *See e.g.*, *Idaho Building & Construction Trades Council, AFL-CIO v. Inland Pacific Chapter of Associated Builders & Contractors, Inc.*, 801 F.3d 950, 961 (9th Cir. 2015) (finding preemption when a state added a criminal penalty for violating a federal program enforced by federal civil and administrative remedies); *Bessette v. Avco Financial Services, Inc.*, 230 F.3d 439, 447 (1st Cir. 2000), *amended on denial of rehearing* (Dec. 15, 2000) ("[T]he broad enforcement power under the Bankruptcy Code preempts virtually all alternative mechanisms for remedying violations of the Code."). The State argues there is no overlap because potential violations of the state statute would not involve the overcharging, diversion-related, and price disputes, all of which would be subject to the ADR process under the federal statute.

The ADR rule provides that ADR is available to a covered entity that "claims that a manufacturer has limited the covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price." 42 C.F.R. § 10.21(a)(1). Plaintiffs argue that their contractual limitations on a covered entity's distribution of the drugs to patients through contract pharmacies, which is the subject of the Maine statute, could be challenged as a limitation on the ability to purchase drugs at or below the ceiling price under the federal law. The Court is not persuaded that such an interpretation presents a conflict because HRSA, the governing agency, has adopted a contrary view—a view consistent with the decisions of the Third and D.C. Circuits that 340B does not address distribution. At this stage, therefore, the alleged conflict is too speculative to support a finding that Plaintiffs are likely to prevail on the claim.

Plaintiffs further argue that the state law's requirement that manufacturers cannot condition participation in the program on the covered entities providing claims data impermissibly conflicts with 340B. A discernible secondary goal of 340B is to prevent excess claims and fraud, and the ADR process is evidently intended to assist in that objective. Plaintiffs submit that they need claims data to prevent fraud and meet the "reasonable cause" level of suspicion necessary to initiate an audit. Plaintiffs' concern regarding access to evidence of possible violations is not unreasonable. Plaintiffs, however, have not demonstrated that claims data are necessary to obtain an audit or that the proof necessary to obtain an audit is particularly onerous. For instance, Plaintiffs have not shown that the trends upon which they rely to support their injury-in-fact standing argument would be insufficient to obtain an audit. The 340B program and the audit process

**Add.26**

have existed for many years, but Plaintiffs have not identified cases where a manufacturer had requested but been denied an audit due to a lack of relevant claims data. On the current record, the alleged impediment is too speculative to support a finding that Plaintiffs are likely to prevail on their claim.

Finally, the "subtle refram[ing]" of the obstacle preemption inquiry, which the First Circuit has identified in more recent Supreme Court opinions, does not assist Plaintiffs. *Maine Forest Products Council v. Cormier*, 51 F.4th 1, 8 (1st Cir. 2022). According to the First Circuit, the Supreme Court has asked whether the federal statute "implicitly confer[s] a right" to engage in certain conduct subject only to certain federal standards and be free from the state law regulation. *Id.* (discussing *Kansas v. Garcia*, 589 U.S. 191, 210 (2020) and *Murphy v. National Collegiate Athletic Association*, 584 U.S. 453, 479 (2018)). As discussed above, the limited specified requirements of the 340B program and Congress's silence on all other aspects of the transactions necessary to accomplish the objectives of 340B do not imply that Congress intended to confer on manufacturers a right to be free from all state law requirements regarding drug distribution to patients, contract pharmacies, and claims data.

In sum, at this stage of the proceedings on the current record, which includes competing affidavits, the Court is not convinced that it is more likely than not that Plaintiffs will establish that Maine's statute represents more than a modest impediment to drug manufacturers' participation in and the goals of 340B. As related to obstacle conflict preemption, the Court is not persuaded that there is a significant risk that the state law is likely to cause manufacturers to withdraw from or not participate in the 340B program such

that the core objectives of the program would be compromised.  Plaintiffs, therefore, have failed to establish a likelihood of success on their obstacle preemption claim.

### 3.    Dormant Commerce Claim

"The Commerce Clause provides that Congress shall have power to regulate commerce with foreign Nations, and among the several States, and with the Indian Tribes." *Association To Preserve & Protect Local Livelihoods v. Sidman*, 147 F.4th 40, 55 (1st Cir. 2025) (quotation marks and modifications omitted) (quoting U.S. Const. art. I, § 8, cl. 3). Although the text is framed as a grant of power to Congress, the Supreme Court has long "held this language to contain a further, negative command, known as the dormant Commerce Clause, prohibiting certain state [regulation] even when Congress has failed to legislate on the subject." *Oklahoma Tax Commission v. Jefferson Lines, Inc.*, 514 U.S. 175, 179 (1995).

The doctrine primarily "bars states and localities from pursuing economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Becky's Broncos, LLC v. Town of Nantucket*, 138 F.4th 73, 78 (1st Cir. 2025) (quotation marks omitted). "To ascertain whether a regulatory measure is so designed, we look for evidence of either discriminatory purpose or discriminatory effect, recognizing the primacy of the latter in the dormant Commerce Clause analysis of facially neutral legislation." *Id.* (quotation marks and modifications omitted).

Plaintiffs argue that the state statute discriminates against out-of-state manufacturers for the benefit of in-state providers and pharmacies.  Even assuming the

burdens and benefits are as Plaintiffs assert, Plaintiffs are not likely to prevail on their claim. The question "is not whether a statute discriminates at all, but whether it discriminates between substantially similar entities in a single market. Indeed, the principle that any notion of discrimination assumes a comparison of substantially similar entities is a fundamental element of dormant Commerce Clause jurisprudence." *American Trucking Associations, Inc. v. Rhode Island Turnpike & Bridge Authority*, 123 F.4th 27, 37 (1st Cir. 2024) (quotation marks and citations omitted). Although Plaintiffs contend that contract pharmacies and manufacturers compete for customers "vertically" in a single market, they do not explain why they are substantially similar. In practice, the manufacturers create the drugs and sell them to covered entities for patients, the covered entities buy drugs from the manufacturers and distribute them to patients at an equivalent or reduced cost, and pharmacies act as the conduit for distribution. The roles are meaningfully different and cannot be viewed as similar entities.

Plaintiffs cite *Healy v. Beer Institute*, 491 U.S. 324, 336 (1989), for the proposition that states may not regulate transactions occurring wholly outside their borders. The Supreme Court, however, has arguably limited the concerns about extraterritorial price impacts identified in *Beer Institute*. *See National Pork Producers Council v. Ross*, 598 U.S. 356, 143 (2023) (rejecting "'almost per se' rule against laws that have the 'practical effect' of 'controlling' extraterritorial commerce").

In addition, in *Walsh*, the First Circuit and the Supreme Court rejected the argument that requiring certain discounts for in-state drug transactions had extraterritorial impacts

based on the series of upstream transactions involving out of state middlepersons before a

drug is finally distributed to the consumer.

> [A]s the Court of Appeals correctly stated, unlike price control or price affirmation statutes, "the Maine Act does not regulate the price of any out-of-state transaction, either by its express terms or by its inevitable effect. Maine does not insist that manufacturers sell their drugs to a wholesaler for a certain price. Similarly, Maine is not tying the price of its in-state products to out-of-state prices." 249 F.3d, at 81–82 (footnote omitted). The rule that was applied in *Baldwin* and *Healy* accordingly is not applicable to this case.

*Walsh*, 538 U.S. at 669. The Court is not convinced that a different analysis applies in this

case.

Plaintiffs also invoke the balancing test of *Pike v. Bruce Church, Inc.*, 397 U.S. 137,

142 (1970) to support the commerce clause claim. Under *Pike*, a court is asked "to

determine whether a facially non-discriminatory local measure violates the Dormant

Commerce Clause" by inquiring "whether the burdens (if any) that the measure imposes

on interstate commerce are clearly excessive in relation to the claimed local benefits that it

secures." *Sidman*, 147 F.4th at 64. Plaintiffs, however, have not demonstrated that they

are likely to establish that the Maine statute imposes an excessive burden on interstate

commerce. As Plaintiffs correctly note, despite the language of the Maine statute, there

are no 340B drugs. Rather, the drugs that are covered by the 340B program are the same

drugs that Plaintiffs manufacture and sell for patients of all healthcare providers. The 340B

program simply contemplates that a portion of the drugs that Plaintiffs manufacture and

sell would be sold at a discounted rate to covered entities. The Maine statute, therefore, is

unlikely to affect significantly the quantity of drugs that will be sold in interstate

commerce. Plaintiffs' principal concern is that under the Maine statute, their

**Add.30**

administrative costs will increase, and they will be required to sell more drugs at a discounted rate.  In other words, Plaintiffs would be harmed in the form of a reduction in their profits.   A reduction in Plaintiffs' profitability, if proven, would not constitute an excessive burden on interstate commerce. *See Construction Materials Recycling Association Issues & Education Fund, Inc. v. Burack*, 686 F. Supp. 2d 162, 172 (D.N.H. 2010) ("A dormant Commerce Clause claim, however, cannot be based merely on a showing that a challenged statute will cause individual out-of-state businesses to lose profits").  In short, Plaintiffs have not established that they are likely to succeed on their dormant commerce claims.

### 4.    Takings Claim

AbbVie contends that "Maine's law effects a physical taking of AbbVie's property by forcing AbbVie to transfer its pharmaceutical products to private third parties for discounted prices." (AbbVie Motion at 18.)

The Fifth Amendment prohibits "private property" from being "taken for public use, without just compensation."  U.S. Const. amend. V.  The Fifth Amendment applies to the federal government, but "[t]hat prohibition . . . applies against the States through the Fourteenth Amendment." *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 160 (1980).  "When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner, regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof." *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 322 (2002) (citation omitted).

**Add.31**

"When an entity voluntarily participates in a federal program, it forecloses the possibility that the statute could result in an imposed taking of private property which would give rise to the constitutional right of just compensation." *Astrazenca Pharmaceuticals LP v. Bailey*, No. 2:24-CV-04143-MDH, 2025 WL 644285, at *4 (W.D. Mo. Feb. 27, 2025). A government does not take property by creating a "financial inducement" to comply voluntarily. *See Pharmaceutical Research & Manufacturers of America v. Murrill*, No. 6:23-CV-00997, 2024 WL 4361597, at *14 (W.D. La. Sept. 30, 2024); *see also, Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1007 (1984) ("as long as Monsanto is aware of the conditions under which the data are submitted, and the conditions are rationally related to a legitimate Government interest, a voluntary submission of data by an applicant in exchange for the economic advantages of a registration can hardly be called a taking").

The voluntary nature of the 340B program, therefore, would appear to present an impediment to AbbVie's takings claim. AbbVie asserts that the voluntariness of the federal program does not impact the analysis at least in part because there was no independent state law benefit offered with the state requirements. AbbVie relies on cases finding that alleged benefit was illusory and thus the program was not truly voluntary, *see Valancourt Books, LLC v. Garland*, 82 F.4th 1222, 1232 (D.C. Cir. 2023) (discussing *Horne v. Department of Agriculture*, 576 U.S. 350 (2015)), but AbbVie does not provide any persuasive authority to support the contention that each new regulatory condition must be accompanied by a separate benefit to maintain the voluntary nature of the program for

**Add.32**

purposes of a takings claim.  Because AbbVie can choose not to participate in the 340B program, AbbVie has not demonstrated a likelihood of success on its takings claim.[12]

### 5.    Vagueness Claim

AbbVie maintains that Maine's statute is impermissibly vague because there is little or no guidance for what it means to "interfere" with covered entities and the delivery of covered drugs to contract pharmacies on behalf of covered entities.  Under the Due Process Clauses of the Fifth and Fourteenth Amendments, "[a] statute is impermissibly vague if (1) 'it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits' or (2) 'it authorizes or even encourages arbitrary and discriminatory enforcement.'" *March v. Frey*, 458 F. Supp. 3d 16, 39 (D. Me. 2020) (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000)).  However, legislatures need not attempt to achieve "semantic certainty," *Draper v. Healey*, 827 F.3d 1, 4 (1st Cir. 2016), because "words are rough-hewn tools, not surgically precise instruments." *URI Student Senate v. Town of Narragansett*, 631 F.3d 1, 14 (1st Cir. 2011).

---

[12] AbbVie primarily argues the state law effects a physical taking rather than a regulatory taking.  The Supreme Court has also recognized that even without taking physical possession, "if regulation goes too far it will be recognized as a taking." *Id.* at 326 (quoting *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922)). A regulatory taking occurs "where government requires an owner to suffer a permanent physical invasion of her property," or "completely deprive[s] an owner of all economically beneficial use of her property," or demands an exaction as a condition to approving development, such as a public easement, that is disproportionate to the impact of the proposed development. *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538–39, 546–48 (2005) (quotation omitted).  When presented with a regulatory takings claim that does not implicate one of the situations identified in *Lingle*, courts employ a "more nuanced, three-pronged inquiry into (1) the extent to which the regulation interferes with the claimant's reasonable investment-backed expectations; (2) the regulation's economic impact on the property owner; and (3) the character of the government action." *Maine Education Association Benefits Trust v. Cioppa*, 695 F.3d 145, 153 (1st Cir. 2012) (citing *Penn Central Transportation Co. v. City of New York,* 438 U.S. 104, 124 (1978)). To the extent that AbbVie asserted during oral argument that under a regulatory takings analysis, Maine's law constitutes a taking, the voluntariness issue likely still bars the claim, and even if it did not, the Court is not persuaded that AbbVie is likely to satisfy the stringent requirements of a regulatory takings claim.

**Add.33**

While courts have acknowledged that terms like "interfere with" can be indefinite enough to create vagueness concerns if read in a vacuum, *see Carolina Youth Action Project v. Wilson*, 60 F.4th 770, 786 (4th Cir. 2023), "[h]ere . . . the challenged [terms] do not appear in a vacuum" because the statute "contains additional terms that supply concrete guidance," at least to some degree, "as to the behavior that it prohibits and the circumstances in which it can be enforced." *URI Student Senate*, 631 F.3d at 14. The statute's language that manufacturers "may not deny, restrict, [or] prohibit" the "acquisition" or "delivery" of certain drugs, and the title of the provision addressing "discriminatory actions by manufacturer or agent related to 340B entities" narrow the scope of the term "interfere" considerably. Nearby provisions in Chapter 103 also use the word "interfere" in the context of discriminatory policies that impose conditions on 340B participants that are not imposed on comparable nonparticipants. *See* 24-A M.R.S.A. §7754(4)–(5) (effective Sept. 24, 2025). The statute itself, therefore, provides reasonable guidance and notice to AbbVie and those similarly situated.

Several other important factors undermine the void-for-vagueness claim here. First, perhaps because imprecise terms can "take on definiteness and clarity" when "directed to a discrete professional group," *In re Bithoney*, 486 F.2d 319, 324 (1st Cir. 1973), "the doctrine is applied more leniently in the sphere of economic regulation of sophisticated parties." *FERC v. Silkman*, 177 F. Supp. 3d 683, 702 (D. Mass. 2016) (citing *U.S. v. Lachman*, 387 F.3d 42, 56–57 (1st Cir. 2004)). AbbVie certainly qualifies. Second, the harm resulting from a lack of specificity is lessened "by the scienter requirement" that must be satisfied before drug manufacturers would face civil penalties. *Id.*; *March*, 458 F. Supp.

34
**Add.34**

3d at 39.[13]  Third, statutory imprecision is less likely to offend due process when there is a method "to allow private parties to obtain an official government answer on whether [the conduct] is covered" before facing penalties, *United States v. Zhen Zhou Wu*, 711 F.3d 1, 15 (1st Cir. 2013), and the enforcement mechanism contains that opportunity before it creates a risk of financial penalties.  Fourth, federal courts are less likely to find a state statute to be unconstitutionally vague in a pre-enforcement context where a plaintiff brings the case before the state court had the opportunity to interpret the state law. *See Donovan v. City of Haverhill*, 311 F.3d 74, 78 (1st Cir. 2002) (courts should "presume that state courts will give [challenged provision] a limiting construction that will preserve its facial constitutionality"); *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450 (2008) (treading carefully when the state courts "have had no occasion to construe the law in the context of actual disputes . . . or to accord the law a limiting construction").  Fifth, "the [Supreme] Court has expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Sessions v. Dimaya*, 584 U.S. 148, 156 (2018) (quotation marks omitted).

Finally, except in the First Amendment context, a plaintiff is not generally permitted to pursue facial pre-enforcement vagueness challenges and courts instead "consider

---

[13] It appears that state enforcement of the Maine statute effectively requires a willful violation before the imposition of monetary penalties.  As the Court reads the statute, to enforce the statute, the state attorney general would initiate a state court proceeding after first providing notice and conferring with the manufacturer, which lawsuit might then lead to an injunction from the state court against the offending practice, and the manufacturer would only face monetary penalties if it continued the offending conduct in violation of the injunction.

**Add.35**

whether a statute is vague as applied to the particular facts at issue, for a plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18–19 (2010) (quotation marks omitted). AbbVie asserts an as applied argument. Notably, AbbVie has not argued that it is uncertain whether the state statute prohibits the policies it has implemented in recent years. All parties acknowledge that the Maine statute and similar statutes enacted in other states are designed to prevent manufacturers from maintaining the restrictive policies employed by AbbVie.

In sum, the word "interfere" is not so indefinite in the context of the state statute and the 340B program that it presents constitutional concerns at this stage. All the relevant factors suggest that AbbVie is not likely to succeed on its void-for-vagueness claim.

## B.    Other Factors

Because Plaintiffs have failed to establish that they will likely succeed on the merits of their preemption, commerce clause, takings, or vagueness claims, the Court need not dwell on the remaining preliminary injunction factors. Where Plaintiffs have failed to demonstrate a likelihood of success on their claims, irreparable harm, the balance of hardships, and the public interest are inconsequential. *See New Comm Wireless Services, Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002) ("The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity").

**Add.36**

## CONCLUSION

After an assessment of the factors relevant to Plaintiffs' requests for a preliminary injunction, the Court concludes that Plaintiffs are not entitled to preliminary injunctive relief. Accordingly, the Court denies Plaintiffs' motions for a preliminary injunction.


/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 23rd day of September, 2025.

**Add.37**

**42 U.S.C. § 256b**

**(a) Requirements for agreement with Secretary**

**(1) In general**

The Secretary shall enter into an agreement with each manufacturer of covered outpatient drugs under which the amount required to be paid (taking into account any rebate or discount, as provided by the Secretary) to the manufacturer for covered outpatient drugs (other than drugs described in paragraph (3)) purchased by a covered entity on or after the first day of the first month that begins after November 4, 1992, does not exceed an amount equal to the average manufacturer price for the drug under title XIX of the Social Security Act in the preceding calendar quarter, reduced by the rebate percentage described in paragraph (2). Each such agreement shall require that the manufacturer furnish the Secretary with reports, on a quarterly basis, of the price for each covered outpatient drug subject to the agreement that, according to the manufacturer, represents the maximum price that covered entities may permissibly be required to pay for the drug (referred to in this section as the "ceiling price"), and shall require that the manufacturer offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling price if such drug is made available to any other purchaser at any price.

**(2) "Rebate percentage" defined**

**(A) In general**

For a covered outpatient drug purchased in a calendar quarter, the "rebate percentage" is the amount (expressed as a percentage) equal to--

**(i)** the average total rebate required under section 1927(c) of the Social Security Act with respect to the drug (for a unit of the dosage form and strength involved) during the preceding calendar quarter; divided by

**(ii)** the average manufacturer price for such a unit of the drug during such quarter.

**(B) Over the counter drugs**

**(i) In general**

For purposes of subparagraph (A), in the case of over the counter drugs, the "rebate percentage" shall be determined as if the rebate required under section 1927(c) of the Social Security Act is based on the applicable percentage provided under section 1927(c)(3) of such Act.

**Add.38**

### (ii) "Over the counter drug" defined

The term "over the counter drug" means a drug that may be sold without a prescription and which is prescribed by a physician (or other persons authorized to prescribe such drug under State law).

### (3) Drugs provided under State Medicaid plans

Drugs described in this paragraph are drugs purchased by the entity for which payment is made by the State under the State plan for medical assistance under title XIX of the Social Security Act.

### (4) "Covered entity" defined

In this section, the term "covered entity" means an entity that meets the requirements described in paragraph (5) and is one of the following:

**(A)** A Federally-qualified health center (as defined in section 1905(l)(2)(B) of the Social Security Act).

**(B)** An entity receiving a grant under section 256a of this title.

**(C)** A family planning project receiving a grant or contract under section 300 of this title.

**(D)** An entity receiving a grant under subpart II of part C of subchapter XXIV (relating to categorical grants for outpatient early intervention services for HIV disease).

**(E)** A State-operated AIDS drug purchasing assistance program receiving financial assistance under subchapter XXIV.

**(F)** A black lung clinic receiving funds under section 937(a) of title 30.

**(G)** A comprehensive hemophilia diagnostic treatment center receiving a grant under section 501(a)(2) of the Social Security Act.

**(H)** A Native Hawaiian Health Center receiving funds under the Native Hawaiian Health Care Act of 1988.

**(I)** An urban Indian organization receiving funds under title V of the Indian Health Care Improvement Act.

**(J)** Any entity receiving assistance under subchapter XXIV (other than a State or unit of local government or an entity described in subparagraph (D)), but only if the entity is certified by the Secretary pursuant to paragraph (7).

**(K)** An entity receiving funds under section 247c of this title (relating to treatment of sexually transmitted diseases) or section 247b(j)(2) of this title

(relating to treatment of tuberculosis) through a State or unit of local government, but only if the entity is certified by the Secretary pursuant to paragraph (7).

**(L)** A subsection (d) hospital (as defined in section 1886(d)(1)(B) of the Social Security Act) that--

**(i)** is owned or operated by a unit of State or local government, is a public or private non-profit corporation which is formally granted governmental powers by a unit of State or local government, or is a private non-profit hospital which has a contract with a State or local government to provide health care services to low income individuals who are not entitled to benefits under title XVIII of the Social Security Act or eligible for assistance under the State plan under this subchapter;

**(ii)** for the most recent cost reporting period that ended before the calendar quarter involved, had a disproportionate share adjustment percentage (as determined under section 1886(d)(5)(F) of the Social Security Act) greater than 11.75 percent or was described in section 1886(d)(5)(F)(i)(II) of such Act; and

**(iii)** does not obtain covered outpatient drugs through a group purchasing organization or other group purchasing arrangement.

**(M)** A children's hospital excluded from the Medicare prospective payment system pursuant to section 1886(d)(1)(B)(iii) of the Social Security Act, or a free-standing cancer hospital excluded from the Medicare prospective payment system pursuant to section 1886(d)(1)(B)(v) of the Social Security Act, that would meet the requirements of subparagraph (L), including the disproportionate share adjustment percentage requirement under clause (ii) of such subparagraph, if the hospital were a subsection (d) hospital as defined by section 1886(d)(1)(B) of the Social Security Act.

**(N)** An entity that is a critical access hospital (as determined under section 1820(c)(2) of the Social Security Act), and that meets the requirements of subparagraph (L)(i).

**(O)** An entity that is a rural referral center, as defined by section 1886(d)(5)(C)(i) of the Social Security Act, or a sole community hospital, as defined by section 1886(d)(5)(C)(iii) of such Act, and that both meets the requirements of subparagraph (L)(i) and has a disproportionate share adjustment percentage equal to or greater than 8 percent.

**(5) Requirements for covered entities**

**(A) Prohibiting duplicate discounts or rebates**

**(i) In general**

A covered entity shall not request payment under title XIX of the Social Security Act for medical assistance described in section 1905(a)(12) of such Act with respect to a drug that is subject to an agreement under this section if the drug is subject to the payment of a rebate to the State under section 1927 of such Act.

**(ii) Establishment of mechanism**

The Secretary shall establish a mechanism to ensure that covered entities comply with clause (i). If the Secretary does not establish a mechanism within 12 months under the previous sentence, the requirements of section 1927(a)(5)(C) of the Social Security Act shall apply.

**(B) Prohibiting resale of drugs**

With respect to any covered outpatient drug that is subject to an agreement under this subsection, a covered entity shall not resell or otherwise transfer the drug to a person who is not a patient of the entity.

**(C) Auditing**

A covered entity shall permit the Secretary and the manufacturer of a covered outpatient drug that is subject to an agreement under this subsection with the entity (acting in accordance with procedures established by the Secretary relating to the number, duration, and scope of audits) to audit at the Secretary's or the manufacturer's expense the records of the entity that directly pertain to the entity's compliance with the requirements described in subparagraphs[1] (A) or (B) with respect to drugs of the manufacturer.

**(D) Additional sanction for noncompliance**

If the Secretary finds, after audit as described in subparagraph (C) and after notice and hearing, that a covered entity is in violation of a requirement described in subparagraphs[1] (A) or (B), the covered entity shall be liable to the manufacturer of the covered outpatient drug that is the subject of the violation in an amount equal to the reduction in the price of the drug (as described in subparagraph (A)) provided under the agreement between the entity and the manufacturer under this paragraph.

**(6) Treatment of distinct units of hospitals**

In the case of a covered entity that is a distinct part of a hospital, the hospital shall not be considered a covered entity under this paragraph unless the hospital is otherwise a covered entity under this subsection.

**(7) Certification of certain covered entities**

### (A) Development of process

Not later than 60 days after November 4, 1992, the Secretary shall develop and implement a process for the certification of entities described in subparagraphs (J) and (K) of paragraph (4).

### (B) Inclusion of purchase information

The process developed under subparagraph (A) shall include a requirement that an entity applying for certification under this paragraph submit information to the Secretary concerning the amount such entity expended for covered outpatient drugs in the preceding year so as to assist the Secretary in evaluating the validity of the entity's subsequent purchases of covered outpatient drugs at discounted prices.

### (C) Criteria

The Secretary shall make available to all manufacturers of covered outpatient drugs a description of the criteria for certification under this paragraph.

### (D) List of purchasers and dispensers

The certification process developed by the Secretary under subparagraph (A) shall include procedures under which each State shall, not later than 30 days after the submission of the descriptions under subparagraph (C), prepare and submit a report to the Secretary that contains a list of entities described in subparagraphs (J) and (K) of paragraph (4) that are located in the State.

### (E) Recertification

The Secretary shall require the recertification of entities certified pursuant to this paragraph on a not more frequent than annual basis, and shall require that such entities submit information to the Secretary to permit the Secretary to evaluate the validity of subsequent purchases by such entities in the same manner as that required under subparagraph (B).

**(8) Development of prime vendor program**

The Secretary shall establish a prime vendor program under which covered entities may enter into contracts with prime vendors for the distribution of

covered outpatient drugs. If a covered entity obtains drugs directly from a manufacturer, the manufacturer shall be responsible for the costs of distribution.

**(9) Notice to manufacturers**

The Secretary shall notify manufacturers of covered outpatient drugs and single State agencies under section 1902(a)(5) of the Social Security Act of the identities of covered entities under this paragraph, and of entities that no longer meet the requirements of paragraph (5) or that are no longer certified pursuant to paragraph (7).

**(10) No prohibition on larger discount**

Nothing in this subsection shall prohibit a manufacturer from charging a price for a drug that is lower than the maximum price that may be charged under paragraph (1).

**(b) Other definitions**

**(1) In general**

In this section, the terms "average manufacturer price", "covered outpatient drug", and "manufacturer" have the meaning given such terms in section 1927(k) of the Social Security Act.

**(2) Covered drug**

In this section, the term "covered drug"--

**(A)** means a covered outpatient drug (as defined in section 1927(k) (2) of the Social Security Act); and

**(B)** includes, notwithstanding paragraph (3)(A) of section 1927(k) of such Act, a drug used in connection with an inpatient or outpatient service provided by a hospital described in subparagraph (L), (M), (N), or (O) of subsection (a)(4) that is enrolled to participate in the drug discount program under this section.

**(c) Repealed. Pub.L. 111-152, Title II, § 2302(2), Mar. 30, 2010, 124 Stat. 1083**

**(d) Improvements in program integrity**

**(1) Manufacturer compliance**

**(A) In general**

From amounts appropriated under paragraph (4), the Secretary shall provide for improvements in compliance by manufacturers with the requirements of this section in order to prevent overcharges and other violations of the discounted pricing requirements specified in this section.

**(B) Improvements**

The improvements described in subparagraph (A) shall include the following:

**(i)** The development of a system to enable the Secretary to verify the accuracy of ceiling prices calculated by manufacturers under subsection (a)(1) and charged to covered entities, which shall include the following:

**(I)** Developing and publishing through an appropriate policy or regulatory issuance, precisely defined standards and methodology for the calculation of ceiling prices under such subsection.

**(II)** Comparing regularly the ceiling prices calculated by the Secretary with the quarterly pricing data that is reported by manufacturers to the Secretary.

**(III)** Performing spot checks of sales transactions by covered entities.

**(IV)** Inquiring into the cause of any pricing discrepancies that may be identified and either taking, or requiring manufacturers to take, such corrective action as is appropriate in response to such price discrepancies.

**(ii)** The establishment of procedures for manufacturers to issue refunds to covered entities in the event that there is an overcharge by the manufacturers, including the following:

**(I)** Providing the Secretary with an explanation of why and how the overcharge occurred, how the refunds will be calculated, and to whom the refunds will be issued.

**(II)** Oversight by the Secretary to ensure that the refunds are issued accurately and within a reasonable period of time, both in routine instances of retroactive adjustment to relevant pricing data and exceptional circumstances such as erroneous or intentional overcharging for covered outpatient drugs.

**(iii)** The provision of access through the Internet website of the Department of Health and Human Services to the applicable ceiling prices for covered outpatient drugs as calculated and verified by the Secretary in accordance with this section, in a manner (such as through the use of password protection) that limits such access to covered entities and adequately assures security and protection of privileged pricing data from unauthorized re-disclosure.

**(iv)** The development of a mechanism by which--

**(I)** rebates and other discounts provided by manufacturers to other purchasers subsequent to the sale of covered outpatient drugs to covered entities are reported to the Secretary; and

**(II)** appropriate credits and refunds are issued to covered entities if such discounts or rebates have the effect of lowering the applicable ceiling price for the relevant quarter for the drugs involved.

**(v)** Selective auditing of manufacturers and wholesalers to ensure the integrity of the drug discount program under this section.

**(vi)** The imposition of sanctions in the form of civil monetary penalties, which--

**(I)** shall be assessed according to standards established in regulations to be promulgated by the Secretary not later than 180 days after March 23, 2010;

**(II)** shall not exceed $5,000 for each instance of overcharging a covered entity that may have occurred; and

**(III)** shall apply to any manufacturer with an agreement under this section that knowingly and intentionally charges a covered entity a price for purchase of a drug that exceeds the maximum applicable price under subsection (a)(1).

**(2) Covered entity compliance**

**(A) In general**

From amounts appropriated under paragraph (4), the Secretary shall provide for improvements in compliance by covered entities with the requirements of this section in order to prevent diversion and violations of the duplicate discount provision and other requirements specified under subsection (a)(5).

**(B) Improvements**

The improvements described in subparagraph (A) shall include the following:

**(i)** The development of procedures to enable and require covered entities to regularly update (at least annually) the information on the Internet website of the Department of Health and Human Services relating to this section.

**(ii)** The development of a system for the Secretary to verify the accuracy of information regarding covered entities that is listed on the website described in clause (i).

**(iii)** The development of more detailed guidance describing methodologies and options available to covered entities for billing covered outpatient drugs to State Medicaid agencies in a manner that avoids duplicate discounts pursuant to subsection (a)(5)(A).

**(iv)** The establishment of a single, universal, and standardized identification system by which each covered entity site can be identified by manufacturers, distributors, covered entities, and the Secretary for purposes of facilitating the ordering, purchasing, and delivery of covered outpatient drugs under this section, including the processing of chargebacks for such drugs.

**(v)** The imposition of sanctions, in appropriate cases as determined by the Secretary, additional to those to which covered entities are subject under subsection (a)(5)(D), through one or more of the following actions:

**(I)** Where a covered entity knowingly and intentionally violates subsection (a)(5)(B), the covered entity shall be required to pay a monetary penalty to a manufacturer or manufacturers in the form of interest on sums for which the covered entity is found liable under subsection (a)(5)(D), such interest to be compounded monthly and equal to the current short term interest rate as determined by the Federal Reserve for the time period for which the covered entity is liable.

**(II)** Where the Secretary determines a violation of subsection (a)(5)(B) was systematic and egregious as well as knowing and intentional, removing the covered entity from the drug discount program under this section and disqualifying the entity from re-entry into such program for a reasonable period of time to be determined by the Secretary.

**(III)** Referring matters to appropriate Federal authorities within the Food and Drug Administration, the Office of Inspector General of Department of Health and Human Services, or other Federal agencies for consideration of appropriate action under other Federal statutes, such as the Prescription Drug Marketing Act (21 U.S.C. 353).

## (3) Administrative dispute resolution process

### (A) In general

Not later than 180 days after March 23, 2010, the Secretary shall promulgate regulations to establish and implement an administrative process for the resolution of claims by covered entities that they have been overcharged for

drugs purchased under this section, and claims by manufacturers, after the conduct of audits as authorized by subsection (a)(5)(C), of violations of subsections[2] (a)(5)(A) or (a)(5)(B), including appropriate procedures for the provision of remedies and enforcement of determinations made pursuant to such process through mechanisms and sanctions described in paragraphs (1)(B) and (2)(B).

**(B) Deadlines and procedures**

Regulations promulgated by the Secretary under subparagraph (A) shall--

**(i)** designate or establish a decision-making official or decision-making body within the Department of Health and Human Services to be responsible for reviewing and finally resolving claims by covered entities that they have been charged prices for covered outpatient drugs in excess of the ceiling price described in subsection (a)(1), and claims by manufacturers that violations of subsection (a)(5)(A) or (a)(5)(B) have occurred;

**(ii)** establish such deadlines and procedures as may be necessary to ensure that claims shall be resolved fairly, efficiently, and expeditiously;

**(iii)** establish procedures by which a covered entity may discover and obtain such information and documents from manufacturers and third parties as may be relevant to demonstrate the merits of a claim that charges for a manufacturer's product have exceeded the applicable ceiling price under this section, and may submit such documents and information to the administrative official or body responsible for adjudicating such claim;

**(iv)** require that a manufacturer conduct an audit of a covered entity pursuant to subsection (a)(5)(C) as a prerequisite to initiating administrative dispute resolution proceedings against a covered entity;

**(v)** permit the official or body designated under clause (i), at the request of a manufacturer or manufacturers, to consolidate claims brought by more than one manufacturer against the same covered entity where, in the judgment of such official or body, consolidation is appropriate and consistent with the goals of fairness and economy of resources; and

**(vi)** include provisions and procedures to permit multiple covered entities to jointly assert claims of overcharges by the same manufacturer for the same drug or drugs in one administrative proceeding, and permit such claims to be asserted on behalf of covered entities by associations or

organizations representing the interests of such covered entities and of which the covered entities are members.

### (C) Finality of administrative resolution

The administrative resolution of a claim or claims under the regulations promulgated under subparagraph (A) shall be a final agency decision and shall be binding upon the parties involved, unless invalidated by an order of a court of competent jurisdiction.

### (4) Authorization of appropriations

There are authorized to be appropriated to carry out this subsection, such sums as may be necessary for fiscal year 2010 and each succeeding fiscal year.

## (e) Exclusion of orphan drugs for certain covered entities

For covered entities described in subparagraph (M) (other than a children's hospital described in subparagraph (M)), (N), or (O) of subsection (a)(4), the term "covered outpatient drug" shall not include a drug designated by the Secretary under section 360bb of Title 21 for a rare disease or condition.

A. Any balance remaining in the Salary Plan program in the Department of Administrative and Financial Services at the end of any fiscal year to be carried forward for the next fiscal year; ~~and~~

B. Any balance remaining in the General Fund Capital, Construction, Repairs, Improvements - Administrative program in the Department of Administrative and Financial Services at the end of any fiscal year to be carried forward for the next fiscal year~~.~~;

C. Any balance remaining in the Debt Service - Government Facilities Authority program, General Fund account in the Department of Administrative and Financial Services at the end of any fiscal year to be carried forward for the next fiscal year; and

D. Any balance remaining in the Central Administrative Applications program, General Fund account in the Department of Administrative and Financial Services at the end of any fiscal year to be carried forward for the next fiscal year.

## PART O

**Sec. O-1. State Controller; post-closing.** The State Controller is authorized to keep open the official system of general accounts of State Government for fiscal year 2024-25 in order to make post-closing entries and adjustments to carry out the provisions of this Act.

**Sec. O-2. Retroactivity.** This Part applies retroactively to June 30, 2025.

## PART P

**Sec. P-1. 22 MRSA §1728, sub-§1,** as enacted by PL 2023, c. 276, §1, is repealed.

**Sec. P-2. 22 MRSA §1728, sub-§1-A** is enacted to read:

**1-A. Definitions.** As used in this section, unless the context otherwise indicates, the following terms have the following meanings.

A. "Hospital" means:

(1) An acute care institution licensed and operating in this State as a hospital under section 1811 or the parent of such an institution; or

(2) A hospital subsidiary or hospital affiliate in the State that provides medical services or medically related diagnostic and laboratory services or engages in ancillary activities supporting those services.

B. "340B contract pharmacy" has the same meaning as in Title 24-A, section 7752, subsection 5.

C. "340B drug" has the same meaning as in Title 24-A, section 7752, subsection 6.

D. "340B entity" has the same meaning as in Title 24-A, section 7752, subsection 7.

**Sec. P-3. 22 MRSA §1728, sub-§2-A** is enacted to read:

**2-A. Additional reporting by hospitals on participation in federal 340B drug program.** In addition to any report required pursuant to subsection 2, beginning July 1, 2026, each hospital participating in the 340B program shall provide an annual report to the Maine Health Data Organization. The Maine Health Data Organization shall post the report on its publicly accessible website. Each hospital shall report in a standardized format, as

agreed upon by the Maine Health Data Organization and the hospital, and include, at a minimum, the following information in the report:

A. The hospital's national provider identification number;

B. The name of the hospital;

C. The address of the hospital for the purpose of accepting service of process;

D. The classification of the hospital;

E. The aggregated acquisition cost for the prescription drugs obtained under the 340B program;

F. The aggregated payment amount received for the prescription drugs obtained under the 340B program and dispensed to patients;

G. The number of pricing units dispensed or administered for prescription drugs described in paragraph F;

H. The aggregated payments made:

(1) To 340B contract pharmacies to dispense 340B drugs;

(2) To any other entity that is not the 340B entity and is not a 340B contract pharmacy for managing any aspect of the hospital's 340B program; and

(3) For all other expenses related to administering the 340B program; and

I. The number of claims for prescription drugs described in paragraph H.

The information required under this subsection must be reported by payor type, including commercial insurance, medical assistance, the MaineCare program and Medicare as required by the Maine Health Data Organization. The information for paragraphs E to G must also be reported at the National Drug Code level for the 50 most frequently dispensed prescription drugs by the hospital under the 340B program. The information must include all physician-administered and physician-dispensed prescription drugs.

Data submitted must also include prescription drugs dispensed by outpatient facilities that are identified as child facilities under the 340B program based on their inclusion on a hospital's Medicare cost report.

**Sec. P-4. 22 MRSA §1728, sub-§3,** as enacted by PL 2023, c. 276, §1, is amended to read:

**3. Reporting.** The Maine Health Data Organization shall produce and post on its publicly accessible website a report that includes a summary of the aggregate information received from hospitals required to report under subsection 2 and subsection 2-A. The Maine Health Data Organization shall submit the report required by this subsection to the Office of Affordable Health Care, as established in Title 5, section 3122, the Maine Prescription Drug Affordability Board, as established in Title 5, section 12004-G, subsection 14-I, and the joint standing committee of the Legislature having jurisdiction over health data reporting and prescription drug matters.

**Sec. P-5. 24-A MRSA c. 103** is enacted to read:

## CHAPTER 103

## PROTECT HEALTH CARE FOR RURAL AND UNDERSERVED COMMUNITIES ACT

### §7751. Short title

This chapter may be known and cited as "the Protect Health Care for Rural and Underserved Communities Act."

### §7752. Definitions

As used in this chapter, unless the context otherwise indicates, the following terms have the following meanings.

**1. Health insurance issuer.** "Health insurance issuer" has the same meaning as "carrier" as defined in section 4301-A, subsection 3.

**2. Manufacturer.** "Manufacturer" has the same meaning as in Title 32, section 13702-A, subsection 19.

**3. Pharmacy.** "Pharmacy" has the same meaning as in Title 32, section 13702-A, subsection 24.

**4. Pharmacy benefits manager.** "Pharmacy benefits manager" has the same meaning as in section 4347, subsection 17.

**5. 340B contract pharmacy.** "340B contract pharmacy" means a pharmacy that has a contract with a 340B entity to receive and dispense 340B drugs to the 340B entity's patients on behalf of the 340B entity. For the purposes of this chapter, a record of a current 340B contract pharmacy relationship between the 340B entity and the 340B contract pharmacy that is on the 340B United States Department of Health and Human Services, Health Resources and Services Administration, Office of Pharmacy Affairs 340B Information System website, or such publicly accessible successor website maintained by the United States Department of Health and Human Services, is prima facie evidence of such a contract.

**6. 340B drug.** "340B drug" means a drug that is purchased or eligible for purchase under Section 340B of the federal Public Health Service Act, 42 United States Code, Section 256b(a)(3).

**7. 340B entity.** "340B entity" means an entity participating or authorized to participate in the federal 340B drug discount program, as described in 42 United States Code, Section 256b, including its pharmacy, or any pharmacy contracted with the participating entity to dispense drugs purchased through the federal 340B drug discount program.

### §7753. Prohibition of certain discriminatory actions by manufacturer or agent related to 340B entities

**1. Interference with acquisition or delivery of 340B drugs prohibited.** A manufacturer or its agent may not deny, restrict, prohibit or otherwise interfere with, either directly or indirectly, the acquisition of a 340B drug by, or delivery of a 340B drug to, a 340B contract pharmacy on behalf of a 340B entity unless receipt of that 340B drug is prohibited by the United States Department of Health and Human Services.

**2. Submission of claims or utilization data prohibited.** A manufacturer or its agent may not, either directly or indirectly, require a 340B entity to submit any claims or

utilization data as a condition for allowing the acquisition of a 340B drug by, or delivery of a 340B drug to, a 340B entity unless the claims or utilization data sharing is required by the United States Department of Health and Human Services.

**3. Other interference prohibited.** A manufacturer may not otherwise interfere directly or indirectly with a 340B entity unless expressly authorized by the United States Department of Health and Human Services.

**§7754. Prohibition of certain discriminatory actions with respect to reimbursement of 340B entities**

With respect to reimbursement of a 340B entity for 340B drugs, a health insurance issuer, pharmacy benefits manager or other 3rd-party payor or agent may not:

**1. Reimbursement at lower rate prohibited.** Reimburse a 340B entity for 340B drugs at a rate lower than that paid for the same drug to entities that are not 340B entities or lower the reimbursement amount for a claim on the basis that the claim is for a 340B drug;

**2. Imposition of different terms and conditions prohibited.** Impose any terms or conditions on any 340B entity that differ from such terms or conditions applied to entities that are not 340B entities or pharmacies that are not 340B contract pharmacies because it is a 340B entity including, without limitation:

A. Fees, charges, clawbacks or other adjustments or assessments. For purposes of this paragraph, "other adjustment or assessment" includes, without limitation, placing any additional requirements, restrictions or burdens upon the 340B entity that result in administrative costs or fees to the 340B entity that are not placed upon entities that are not 340B entities, including affiliate pharmacies of the health insurance issuer, pharmacy benefits manager or other 3rd-party payor;

B. Dispensing fees that are less than the dispensing fees for entities that are not 340B entities or pharmacies that are not 340B contract pharmacies;

C. Restrictions or requirements regarding participation in standard or preferred pharmacy networks;

D. Requirements relating to inventory management systems or to the frequency or scope of audits;

E. Requirements that a claim for a drug dispensed by a pharmacy include any identification, billing modifier, attestation or other indication that a drug is a 340B drug in order to be processed or submitted or reimbursed unless it is required by the United States Department of Health and Human Services, Centers for Medicare and Medicaid Services or the Department of Health and Human Services for the administration of the MaineCare program; or

F. Any other restrictions, conditions, practices or policies that are not imposed on entities that are not 340B entities;

**3. Reversal, resubmission or clarification of claims prohibited.** Require a 340B entity to reverse, resubmit or clarify a claim after the initial adjudication unless these actions are in the normal course of pharmacy business and are not related to 340B drug pricing;

**4. Discrimination against 340B entity that interferes with patient choice.** Discriminate against a 340B entity in a manner that prevents or interferes with a patient's choice to receive 340B drugs from the 340B entity, including the administration of the drugs. For purposes of this subsection, it is considered a discriminatory practice that prevents or interferes with a patient's choice to receive drugs at a 340B entity if a health insurance issuer, pharmacy benefits manager or other 3rd-party payor places any additional requirements, restrictions or burdens upon the 340B entity that differ from the terms and conditions applied to entities that are not 340B entities that result in administrative costs or fees to the 340B entity, including, but not limited to, requiring a claim for a drug dispensed by a pharmacy to include any identification, billing modifier, attestation or other indication that a drug is a 340B drug in order to be processed or resubmitted unless it is required by the United States Department of Health and Human Services, Centers for Medicare and Medicaid Services or the Department of Health and Human Services for the administration of the MaineCare program;

**5. Discrimination against 340B entity that interferes with patient choice of delivery method.** Include any other provision in a contract between a health insurance issuer, pharmacy benefits manager or other 3rd-party payor and a 340B entity that differs from the terms and conditions applied to entities that are not 340B entities that discriminates against the 340B entity that participates in the 340B program or prevents or interferes with a patient's choice to receive a 340B drug from a 340B entity, whether by direct administration, in-person dispensing, direct delivery, mail or other form of shipment;

**6. Restrictions or additional charges prohibited.** Place a restriction or additional charge on a patient who chooses to receive 340B drugs from a 340B entity if the restriction or additional charge differs from the terms and conditions applied when patients choose to receive drugs that are not 340B drugs from an entity that is not a 340B entity or from a pharmacy that is not a 340B contract pharmacy;

**7. Submission of data pertaining to ingredient costs or pricing of 340B drugs prohibited.** Require or compel the submission of ingredient costs or pricing data pertaining to 340B drugs from a 340B entity to any health insurance issuer, pharmacy benefits manager or other 3rd-party payor; or

**8. Exclusion from pharmacy network prohibited.** Exclude any 340B entity from the health insurance issuer, pharmacy benefits manager or other 3rd-party payor network on the basis that the 340B entity dispenses 340B drugs or refuse to contract with a 340B entity for reasons other than those that apply equally to entities that are not 340B entities.

This section may not be construed to limit a health insurance issuer's ability to use certain preferred pharmacies or develop networks of preferred pharmacies as long as a health insurance issuer's decision is not based on an entity's status as a 340B entity.

## §7755. MaineCare program not affected

This chapter does not apply to the MaineCare program as a payor when the MaineCare program provides reimbursement for covered outpatient drugs as defined in 42 United States Code, Section 1396r-8(k)(2).

## §7756. Contracting under 340B program

As permitted under federal law and regulation, a 340B entity shall, to the extent possible, contract with a 340B contract pharmacy that is located in this State.

## §7757. Enforcement

**1. Enforcement; violation.** Notwithstanding section 12-A, a violation of this chapter is subject to enforcement under the Maine Unfair Trade Practices Act, including any of the remedies provided for in that Act. A violation is committed each time a prohibited act under this chapter occurs. An investigation of a violation by a manufacturer may include a wholesaler or 3rd party that may possess evidence supporting that investigation.

**2. Exemption from enforcement.** The limited distribution of a drug required under 21 United States Code, Section 355-1 is not a violation of this chapter.

## §7758. Federal preemption; statutory construction

**1. No less restrictive than federal law.** This chapter may not be construed or applied to be less restrictive than federal law for a person or entity regulated by this chapter.

**2. No conflict with federal law and regulation or other laws of this State.** This chapter may not be construed or applied in any manner that conflicts with:

A. Applicable federal law and related regulations; or

B. Other laws of this State if the law is compatible with applicable federal law.

## PART Q

**Sec. Q-1. 36 MRSA §5219-SS, sub-§4,** as amended by PL 2023, c. 412, Pt. ZZZ, §6, is further amended to read:

**4. Refundability; phase-out.** For tax years beginning before January 1, 2024, the credit allowed by this section may not reduce the tax otherwise due under this Part to less than zero. For tax years beginning on or after January 1, 2024, the credit allowed under subsections 1, 1-A, 3 and 3-A, as increased by subsection 5 for tax years beginning on or after January 1, 2025, is refundable. ~~The amount of the credit allowed by this section must be reduced, but not below zero, by $7.50 for each $1,000 or fraction thereof by which the taxpayer's Maine adjusted gross income exceeds $400,000 in the case of a joint return and $200,000 in any other case.~~

For tax years beginning before January 1, 2025, the amount of the credit allowed by this section must be reduced, but not below zero, by $7.50 for each $1,000 or fraction thereof by which the taxpayer's Maine adjusted gross income exceeds $400,000 in the case of a joint return and $200,000 in any other case.

For tax years beginning on or after January 1, 2025, the amount of the credit allowed by this section, as increased by subsection 5, must be reduced, but not below zero, by $20 for each $500 or fraction thereof by which the taxpayer's Maine adjusted gross income exceeds:

A. For a single individual, $100,000;

B. For an individual filing as a head of household, $125,000;

C. For individuals filing married joint returns or surviving spouses, $150,000; and

D. For a married individual filing a separate return, 1/2 of the applicable amount under paragraph C.

**Sec. Q-2. 36 MRSA §5219-SS, sub-§5** is enacted to read:

This content is from the eCFR and is authoritative but unofficial.

# Title 42 —Public Health
# Chapter I —Public Health Service, Department of Health and Human Services
# Subchapter A —General Provisions
# Part 10 —340B Drug Pricing Program
# Subpart C —Administrative Dispute Resolution

**Source:** 89 FR 28657, Apr. 19, 2024, unless otherwise noted.
**Authority:** Sec. 340B of the Public Health Service Act (42 U.S.C. 256b) (PHSA), as amended.
**Source:** 82 FR 1229, Jan. 5, 2017, unless otherwise noted.

## § 10.21 Claims.

(a) *Claims permitted.* All claims must be specific to the parties identified in the claims and are limited to the following:

  (1) Claims by a covered entity that it has been overcharged by a manufacturer for a covered outpatient drug, including claims that a manufacturer has limited the covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price; and

  (2) Claims by a manufacturer, after it has conducted an audit of a covered entity pursuant to section 340B(a)(5)(C) of the PHS Act, that the covered entity has violated section 340B(a)(5)(A) of the PHS Act, regarding the prohibition of duplicate discounts, or section 340B(a)(5)(B) of the PHS Act, regarding the prohibition of the resale or transfer of covered outpatient drugs to a person who is not a patient of the covered entity.

(b) *Requirements for filing a claim.*

  (1) Absent extenuating circumstances, a covered entity or manufacturer must file a claim under this section in writing to OPA within 3 years of the date of the alleged violation. Any file, document, or record associated with the claim that is the subject of a dispute must be maintained by the covered entity and manufacturer until the date of the final agency decision.

  (2) A covered entity filing a claim described in paragraph (a)(1) of this section must provide the basis, including all available supporting documentation, for its belief that it has been overcharged by a manufacturer, in addition to any other documentation as may be requested by OPA. A covered entity claim against multiple manufacturers is not permitted.

  (3) A manufacturer filing a claim under paragraph (a)(2) of this section must provide documents sufficient to support its claim that a covered entity has violated the prohibition on diversion and/or duplicate discounts, in addition to any other documentation as may be requested by OPA.

  (4) A covered entity or manufacturer filing a claim must provide documentation of good faith efforts, including for example, documentation demonstrating that the initiating party has made attempts to contact the opposing party regarding the specific issues cited in the ADR claim.

(c) *Combining claims.*

  (1) Two or more covered entities may jointly file claims of overcharges by the same manufacturer for the same drug or drugs if each covered entity consents to the jointly filed claim and meets the filing requirements.

**Add.55**

(i) For covered entity joint claims, the claim must list each covered entity, its 340B ID and include documentation as described in paragraph (b) of this section, which demonstrates that each covered entity meets all of the requirements for filing the ADR claim.

(ii) For covered entity joint claims, a letter requesting the combining of claims must accompany the claim at the time of filing and must document that each covered entity consents to the combining of the claims, including signatures of individuals representing each covered entity and a point of contact for each covered entity.

(2) An association or organization may file on behalf of one or more covered entities representing their interests if:

(i) Each covered entity is a member of the association or the organization representing it and each covered entity meets the requirements for filing a claim;

(ii) The joint claim filed by the association or organization must assert overcharging by a single manufacturer for the same drug(s); and

(iii) The claim includes a letter from the association or organization attesting that each covered entity agrees to the organization or association asserting a claim on its behalf, including a point of contact for each covered entity.

(3) A manufacturer or manufacturers may request to consolidate claims brought by more than one manufacturer against the same covered entity if each manufacturer could individually file a claim against the covered entity, consents to the consolidated claim, meets the requirements for filing a claim, and the 340B ADR Panel determines that such consolidation is appropriate and consistent with the goals of fairness and economy of resources. Consolidated claims filed on behalf of manufacturers by associations or organizations representing their interests are not permitted.

(d) *Deadlines and procedures for filing a claim.*

(1) Covered entities and manufacturers must file claims in writing with OPA, in the manner set forth by OPA.

(2) OPA will conduct an initial review of all information submitted by the party filing the claim and will make a determination as to whether the requirements in paragraph (b) of this section are met. The OPA staff conducting the initial review of a claim may not be appointed to serve on the 340B ADR Panel reviewing that specific claim.

(3) Additional information to substantiate a claim may be submitted by the initiating party and may be requested by OPA. If additional information is requested, the initiating party will have 20 business days from the receipt of OPA's request to respond. If the initiating party does not respond to a request for additional information within the specified time frame or request and receive an extension, the claim will not move forward to the 340B ADR Panel for review.

(4) OPA will provide written notification to the initiating party that the claim is complete. Once the claim is complete, OPA will also provide written notification to the opposing party that the claim was submitted. This written notification will provide a copy of the initiating party's claim, and additional instructions regarding the 340B ADR process, including timelines and information on how to submit their response in accordance with the procedures for responding to a claim as outlined in paragraph (e) of this section.

**Add.56**

(5) If OPA finds that the claim meets the requirements described in paragraph (b) of this section, and once OPA receives the opposing party's response in accordance with the procedures outlined in paragraph (e) of this section, additional written notification will be sent to both parties advising that the claim will be forwarded to the 340B ADR Panel for review.

(6) If OPA finds that the claim does not meet the requirements described in paragraph (b) of this section, written notification will be sent to both parties stating the reasons that the claim did not move forward.

(7) For any claim that does not move forward for review by the 340B ADR Panel, the claim may be revised and refiled if there is new information to support the alleged statutory violation and the claim meets the criteria set forth in this section.

(e) *Responding to a submitted claim.*

(1) Upon receipt of notification by OPA that a claim is deemed complete and has met the requirements in paragraph (b) of this section, the opposing party in alleged violation will have 30 business days to submit a written response to OPA.

(2) A party may submit a request for an extension of the initial 30 business days response period and OPA will make a determination to approve or disapprove such request and notify both parties.

(3) OPA will provide a copy of the opposing party's response to the initiating party and will notify both parties that the claim has moved forward for review by the 340B ADR Panel.

(4) If an opposing party does not respond or elects not to participate in the 340B ADR process, OPA will notify both parties that the claim has moved forward for review by the 340B ADR Panel and the 340B ADR Panel will render its decision after review of the information submitted in the claim.

**Add.57**

businesses and organizations receiving grants from HHS; *Total Number of Respondents:* 25; *Frequency of Response:* monthly; *Average Burden per Response:* 15 minutes; *Estimated Annual Burden:* 75 hours.

The PMS–272, Federal Cash Transactions Report, is used to monitor Federal cash advances to grantees and obtain Federal cash disbursement data. It serves in place of the SF–272. *Respondents:* State and local governments, profit and nonprofit businesses and institutions receiving grants from HHS; *Total Number of Respondents:* 11,050; *Frequency of Response:* Quarterly; *Average Burden per Response:* 4 hours; *Estimated Annual Burden:* 176,800 hours.

*Total Burden:* 176,875 hours.

Send comments to Douglas F. Mortl, PSC Reports Clearance Officer, Room 17A08, Parklawn Building, 5600 Fishers Lane, Rockville, MD 20857. Written comments should be received within 60 days of this notice.

Dated: August 19, 1996.

Lynnda M. Regan,

*Director, Program Support Center.*

[FR Doc. 96–21530 Filed 8–22–96; 8:45 am]

**BILLING CODE 4160–17–M**

---

**Health Resources and Services Administration**

**RIN 0905–ZA96**

**Notice Regarding Section 602 of the Veterans Health Care Act of 1992; Contract Pharmacy Services**

**AGENCY:** Health Resources and Services Administration, HHS.

**ACTION:** Final notice.

---

**SUMMARY:** Section 602 of Public Law 102–585, the ``Veterans Health Care Act of 1992'' (the ``Act''), enacted section 340B of the Public Health Service Act (``PHS Act''), ``Limitation on Prices of Drugs Purchased by Covered Entities.'' Section 340B provides that a manufacturer who sells covered outpatient drugs to eligible (covered) entities must sign a pharmaceutical pricing agreement with the Secretary of Health and Human Services (HHS) in which the manufacturer agrees to charge a price for covered outpatient drugs that will not exceed an amount determined under a statutory formula.

The purpose of this notice is to inform interested parties of final guidelines regarding contract pharmacy services.

**FOR FURTHER INFORMATION CONTACT:** Annette Byrne, R. Ph., M.S., Director, Drug Pricing Program, Bureau of Primary Health Care, Health Resources and Services Administration, 4350 East West Highway, 10th Floor, Bethesda, MD 20814, Phone (301) 594–4353, FAX (301) 594–4982.

**EFFECTIVE DATE:** August 23, 1996.

**SUPPLEMENTARY INFORMATION:**

(A) Background

Proposed guidelines for contract pharmacy services were announced in the Federal Register at 60 FR 55586 on November 1, 1995. A comment period of 30 days was established to allow interested parties to submit comments. The Health Resources and Services Administration, Bureau of Primary Health Care, acting through the Office of Drug Pricing (ODP), received eleven letters including comments concerning the scope of the 340B Program, contractor certification, contractor and entity penalties for drug diversion, creation of an agency relationship between the entity and the contractor, entity responsibilities including price establishment, reimbursement, inventory control, and the like.

Although some manufacturers expressed concerns regarding the potential for drug diversion, the Department has received no evidence of diversion that has required an official Departmental investigation. This includes the various drug distribution systems, among them those using contract pharmacy services. However, in response to manufacturers' concerns, the Department intends to study the use of contracted pharmacy services for accessing 340B drugs to determine if there is evidence of drug diversion. In particular, the Department will examine closely documented complaints, including the results of manufacturers' audits, will use other analyses as deemed appropriate, and will consider whether additional safeguards are necessary.

We received some very positive comments in support of the mechanism. These comments discussed the many covered entities which do not operate their own licensed pharmacies; therefore, the guidelines encourage these entities to participate in the program. Because these covered entities provide medical care for many individuals and families with incomes well below 200% of the Federal poverty level and subsidize prescription drugs for many of their patients, it was essential for them to access 340B pricing. Covered entities could then use savings realized from participation in the program to help subsidize prescriptions for their lower income patients, increase the number of patients whom they can subsidize and expand services and formularies. One commenter described the guidelines as straightforward, clear and consistent with section 340B. Another commenter stated that the ``use of contract pharmacies by covered entities is fundamental to the success of the VHCA [Veterans Health Care Act] drug pricing program.'' The commenter supported the guidelines and urged the Department to expedite their completion, as the importance of the contract pharmacy option to their members could not be overstated.

The following section presents a summary of all major comments, grouped by subject, and a response to each comment. All comments were considered in developing this final notice, with changes made to increase clarity and readability. In addition, to provide further technical assistance and guidance to covered entities interested in using this mechanism, examples of report contents, a suggested system to ensure an adequate drug tracking system, and a method to ensure patient eligibility are included. Various commenters, and in particular drug manufacturers, suggested the need for detailed systems. The National Association of Community Health Centers suggested some of the specific examples.

(B) Comments and Responses

*(1) General*

*Comment:* The use of contract pharmacy services is inconsistent with section 340B of the PHS Act and results in an unauthorized expansion of the program.

*Response:* Section 340B, which established the Drug Pricing Program, requires manufacturers to sell to covered entities at or below a ceiling price determined by a statutory formula. The statute is silent as to permissible drug distribution systems. There is no requirement for a covered entity to purchase drugs directly from the manufacturer or to dispense drugs itself. It is clear that Congress envisioned that various types of drug delivery systems would be used to meet the needs of the very diversified group of 340B covered entities.

It has been the Department's position that if a covered entity using contract pharmacy services requests to purchase a covered drug from a participating manufacturer, the statute directs the manufacturer to sell the drug at the discounted price. If the entity directs the drug shipment to its contract pharmacy, we see no basis on which to conclude that section 340B precludes this type of transaction or otherwise

exempts the manufacturer from statutory compliance. However, the entity must comply, under any distribution mechanism, with the statutory prohibition on drug diversion.

During the early period of program implementation, it became apparent that only a very small number of the 11,500 covered entities used in-house pharmacies (approximately 500), although additional entities participated by buying drugs for their physician dispensing activities. In addition, many of the larger groups of covered entities, including community and migrant health centers, hemophilia clinics and most of the Ryan White HIV service programs (e.g., State AIDS Drug Assistance Programs) depend upon outside pharmacy services. Yet, because the delivery of pharmacy services is central to the mission of (and a legal mandate in some instances for) these providers, they rely on outside pharmacies to fill the need. It would defeat the purpose of the 340B program if these covered entities could not use their affiliated pharmacies in order to participate in the 340B program. Otherwise, they would be faced with the untenable dilemma of having either to expend precious resources to develop their own in-house pharmacies (which for many would be impossible) or forego participation in the program altogether. Neither option is within the interest of the covered entities, the patients they serve, or is consistent with the intent of the law.

As early as 1993, several covered entity groups and a home care company came forward to assist the Department in developing a workable mechanism to use outside pharmacies under arrangements which would decrease the drug diversion potential. The result was the November 1 proposed notice, which articulates a voluntary model agreement. Currently, contract pharmacies are used by a number of large organizations, such as the American Red Cross, several community health centers, and the New York Blood Consortium.

It must be understood that the use of contract services is *only* providing those covered entities (which would otherwise be unable to participate in the program) a process for accessing 340B pricing. The mechanism does not in any way extend this pricing to entities which do not meet program eligibility. However, it has permitted more eligible entities to participate in the program with a reasonable assurance that the potential for drug diversion is eliminated.

*Comment:* The guidelines were proposed without a comprehensive notice and comment period.

*Response:* During the early months following enactment, it became clear that there were many gaps in the legislation and some form of program structure was necessary to move the program forward. There were approximately 11,500 eligible entities, 500 participating manufacturers, numerous wholesalers and many Federal programs affected by this legislation and all seeking guidance. It was incumbent upon the Department to implement this difficult Congressional mandate in an expeditious manner.

Interpretive rules and statements of policy were developed to provide necessary program guidance. The Department has published these guidelines in the Federal Register, used a Federal clearance process (including the Office of Management and Budget's clearance) and provided a public comment period to obtain both Federal as well as public input into guideline development. The Department considered all comments in developing these final guidelines.

The guidelines explain how the Department intends to administer the 340B, further explain the statutory language by clarifying the meaning given by the Department to particular words or phrases, and do not exceed the purpose of 340B or conflict with any of its provisions. We believe that these guidelines create no new law and create no new rights or duties; therefore, they are not subject to the Administrative Procedure Act's requirement of notice and comment. Nevertheless, the Department chose to solicit and respond to public comment.

*Comment:* As a matter of State law, entities possess the right to hire retail pharmacies to act as their agents in providing pharmaceutical care to their patients. As a general rule, a person or entity privileged to perform an act may appoint an agent to perform the act unless contrary to public policy or an agreement requiring personal performance. Restatement of Agency 2d § 17 (1995). Hence, even in the absence of Federal guidelines, covered entities have the right to contract with retail pharmacies for the purpose of dispensing 340B drugs. By issuing guidelines in this area, ODP is not seeking to create a new right but rather is simply recognizing an existing right that covered entities enjoy under State law.

*Response:* We agree. However, entities, under any distribution system, must comply with the statutory prohibition against diversion of 340B drugs to individuals who are not patients of the covered entities. Further, the dispensing of drugs, purchased with a 340B discount, must not result in the generation of a Medicaid rebate.

*Comment:* Participation in the contract pharmacy mechanism by hemophilia treatment centers funded under the Maternal and Child Health Block Grant Program would contravene the central goals of that program and could result in grant termination or non-renewal.

*Response:* Block grant funds are designed for formula allocation to the States to meet specific defined needs in the legislation. Congress recognized that the Maternal and Child Health Bureau (MCHB) had other needs that should be met more flexibly; therefore, fifteen percent of the appropriation is a discretionary set-aside. These funds are not subject to the specific parameters of block grant funds but instead are used to fulfill other goals within the MCHB mission. This includes the provision of services (including pharmaceuticals) to individuals with hemophilia disorders and their families. Therefore, the purchase of pharmaceuticals by hemophilia centers does not contravene grant principles.

*Comment:* The contract pharmacy mechanism contravenes Federal and State laws and regulations (e.g., Prescription Drug Marketing Act and the Anti-kickback Statute).

*Response:* We found no indication that the guidelines contravene Federal or State law. Regarding allegations that the guidelines contravene the Prescription Drug Marketing Act (PDMA), it is clear that the guidelines fall squarely within the PDMA resale exception that allows the dispensing of a prescription drug purchased by a health care entity when dispensing is pursuant to a prescription. See 21 U.S.C. 353(c)(3)(B)(v). Under the guidelines, the contract pharmacy would dispense 340B drugs to patients of the covered entity pursuant to a prescription. The contract pharmacy would act as an agent of the covered entity, in that it would not resell a prescription drug but rather distribute the drug on behalf of the covered entity. This situation is akin to a covered entity having its own pharmacy. Moreover, the guidelines include controls intended to prevent diversion and provide for accountability of drug stocks. For these reasons, the guidelines are consistent with both the letter and the spirit of the PDMA.

We believe it necessary to ensure that covered entities contracting with pharmacies to dispense 340B drugs are aware of the requirements of the Federal anti-kickback statute and the way in

which such requirements could apply to their arrangements with contracting pharmacies. To this end, we inserted into the guidelines a discussion of the statute's requirements and its potential application in this type of contracting situation.

In addition, provision (e) of the guidelines provides that the ``contractor and the covered entity will adhere to all Federal, State, and local laws and requirements.'' As a general matter, we found it impossible to discuss each State's laws and regulations regarding drug purchase, distribution, and dispensing in relation to the many different types of entities and their individual needs. We believe it appropriate that the guidelines include a provision that requires each entity and contractor to be responsible for ensuring that their particular contracting arrangements and operations conform to the requirements of all applicable laws and regulations.

*Comment:* The ODP should develop a uniform contractual agreement and distribute this agreement to covered entities for use without modification.

*Response:* The guidelines propose a model format only. The Department has included in the guidelines provisions necessary to ensure that covered entities and contract pharmacies understand and agree not to violate 340B provisions. Because of the wide diversity of covered entities (including hemophilia clinics, large hospitals, migrant health clinics, family planning service programs and State AIDS drug assistance programs), it would be impossible to include provisions responsive to the needs of all entities.

*Comment:* ODP should keep a list of all acceptable contract pharmacies.

*Response:* Any pharmacy licensed by a State Board of Pharmacy is acceptable.

*Comment:* Some State laws require that manufacturers ensure that a buyer is licensed to purchase pharmaceuticals. Covered entities that do not have pharmacy operations would not be licensed, and thus, in some States, manufacturers could not receive from the covered entity the assurance required by State law.

*Response:* Provision (e) provides that the covered entity will adhere to all Federal, State and local laws and requirements. Accordingly, if State X requires an entity to be licensed to purchase drugs and a covered entity subject to the laws of State X does not have a pharmacy license, it may not be able to purchase drugs. However, if State X permits a covered entity to use contract pharmacy services to purchase drugs on its behalf, the entity could presumably use this mechanism. To the

extent the guidelines may be inconsistent with a State's distributor licensing requirements, this same reasoning would apply.

*Comment:* Covered entities may bill insurers for 340B drugs at the usual price, resulting in the savings not being passed on to the patients.

*Response:* Section 340B does not limit the pricing behavior of covered entities. It is our understanding that covered entities have a variety of drug pricing approaches. While some may pass all or a significant part of the discount to their patients, others may set the price slightly higher than the actual acquisition cost plus a reasonable dispensing fee, using the savings to reach more eligible patients and provide more comprehensive services. The Department intends to examine the section 340B drug pricing activities of covered entities to determine the various approaches used and the rationale for these approaches. However, until it completes its examination of this issue, the Department notes that a modest section 340B price markup, with saving realized from the discounts used by covered entities only for purposes of the federal program (including certain disproportionate share hospitals) which provides its section 340B eligibility does not appear to be inconsistent with the drug pricing program.

*Comment:* There should be a limitation to only those covered entities that do not have the capability under State pharmacy law to purchase and dispense prescription drugs.

*Response:* The guidelines have been revised to read that the ``mechanism is designed to facilitate program participation for those eligible covered entities that do not have access to an appropriate `in-house' pharmacy services.'' However, this is not a bar to the use of the mechanism by any covered entity.

*Comment:* A covered entity should use only one form of participation, and if it purchases in its own right for some patients, it should not use a contractor for others.

*Response:* Some covered entities may receive nominal pricing directly from a manufacturer (e.g., family planning) for specific drugs, may obtain certain drugs through promotional discounts, or have a manufacturer-specific indigent free drug program which could necessitate the procurement of other pharmaceuticals from a retail pharmacy. The statute does not limit the covered entities' access to these avenues of drug purchasing.

*Comment:* The Department should establish criteria that a contractor and a

covered entity must meet in order to be in compliance with section 340B provisions and receive 340B pricing.

*Response:* The contracted pharmacy mechanism does establish these criteria in that it includes provisions for purchasing only by the entity and not contractor, identifies customary and adequate records that can provide an audit trail, preclusion of the filling of Medicaid prescriptions (thus preventing duplicate discounting), and three provisions related to the potential for drug diversion (agreement not to divert with specified penalties, customary drug tracking systems, and an agreement to permit manufacturer and HHS audits).

*Comment:* The reference to ``facility'' in provision (b) should be changed to ``entity'' for clarification.

*Response:* The guidelines were revised accordingly.

*Comment:* The Department should review all contracts between covered entities and pharmacies or develop a procedure for certifying that each contract pharmacy arrangement meets the mechanism criteria.

*Response:* The Department has added a provision to the guidelines which suggests that covered entities utilizing contract pharmacy services submit to the ODP a certification that they have signed and have in effect an agreement with the pharmacy contractor containing provisions (a) through (k) as outlined in the guidelines. For the convenience of participating drug manufacturers, the names of covered entities which submit a certification, or have submitted an alternate mechanism to reduce the potential for drug diversion which has been approved by ODP, will be placed on the program electronic bulletin board (EDRS) for public access.

*Comment:* Covered entities should be permitted to contract with more than one site and contractor. Although we understand that the limitation of one contractor (with multiple sites) was intended to address drug diversion concerns, covered entities will have the incentive of directing their patients to the contract pharmacy site participating in the program, even though there may be several nonparticipating sites of contractors that would be more convenient for the patients.

*Response:* Covered entities are unlikely to select a contract pharmacy that is not convenient for their patients. See also the discussion of patient choice, below.

*Comment:* PHS is moving from a direct purchase discount program to an indirect charge-back contracting system.

**Add.60**

*Response:* All 340B drugs will be sold to covered entities; therefore, there are no additional charge backs involved.

*(2) Patient Choice*

*Comment:* Provision (c) provides that the patient may obtain the prescription from the pharmacy provider of his or her choice. Pharmacy providers cannot provide prescriptions, as only a physician can write a prescription. The guidelines should permit the patient to obtain the prescription from the covered entity physician and then be able to fill that prescription at the pharmacy of his or her choice. Further, the covered entity physician should inform each patient that he or she has the freedom to choose any pharmacy to fill the prescription.

*Response:* The use of the word ``prescription'' may be somewhat confusing. We have revised this provision to read ``may obtain the prescription from the covered entity and then obtain the drug(s) from the pharmacy provider of his or her choice.'' In addition, a provision is added to address the responsibility of the covered entity physician to inform the patient of his or her freedom of choice.

*Comment:* Wording should be added to provision (c) to make it clear that when a patient obtains a drug from a retail pharmacy other than the entity's contract pharmacy, the manufacturer does not have to offer this drug at 340B pricing.

*Response:* The guidelines were revised accordingly.

*(3) Bill to/Ship to*

*Comment:* The type of ``bill to, ship to'' arrangement proposed in the notice is not a ``purchase'' by the covered entity.

*Response:* Please note provision (a) of the notice which states ``the covered entity will purchase the drug.'' The contract pharmacy does not purchase the drug. Title to the drugs passes to the covered entity.

*Comment:* A ``ship to, bill to'' arrangement may not be lawful in many States (e.g., state distributor licensing requirements).

*Response:* The Department obtained information from both the American Pharmaceutical Association and the National Association of Boards of Pharmacy which suggests that no State would consider this type of activity unlawful.

*Comment:* If the ``ship to, bill to'' procedure is implemented through wholesalers, there are no procedures in place that can enable a manufacturer to conduct an adequate audit.

*Response:* The guidelines provide that the covered entity will verify, using the contractor's (readily retrievable) customary business records, that a tracking system exists which will ensure that drugs purchased under the Act are not diverted to individuals who are not patients of the covered entity. These records will be maintained for the period of time required by the State law and regulations. The guidelines provide that the contractor will provide the covered entity with reports consistent with normal business practices as well as maintain records separate from it's own operation. In addition, the contractor will agree to be subject to audits by both the manufacturers and the Department. In light of these provisions, audits will be possible, regardless of whether drugs are shipped by manufacturers or wholesalers.

*Comment:* A ``ship to, bill to'' procedure could interfere with marketing arrangements that an individual manufacturer may have established as part of its usual business practices.

*Response:* Because the manufacturer is still selling to the covered entities, we can see no interference with marketing arrangements. The manufacturer will be using its usual business practices. Only the delivery of the drug will be altered.

*Comment:* The covered entity (not its contractor) will place all orders for drugs based upon its projections of the needs of its patients.

*Response:* Because the covered entity will have no knowledge of the inventory levels of the pharmacy, it would be unrealistic to include a provision that the covered entity will order 340B drugs.

*Comment:* The covered entity, consistent with customary business practices in wholesale purchases, should make timely payment of invoices for drugs shipped to the contractor pursuant to the entity's order.

*Response:* We have included this concept in the guidelines, Section 1 of Appendix.

*(4) Penalties*

*Comment:* The penalty for the contract pharmacy which violates the agreement not to resell or transfer a drug purchased at 340B pricing is inadequate. Knowing violators should be fined beyond their unjust profit and criminal and fraud penalties should be imposed.

*Response:* The Department has no statutory authority to assess additional penalties beyond the authority provided in section 340B. However, to the extent the Department is aware that improper action by an entity or a contract

pharmacy may be a violation of law, we will refer such cases to appropriate authorities.

*(5) Potential Drug Diversion*

*Comment:* PHS should conduct an annual audit of each contract pharmacy to ensure compliance with all Departmental rules and regulations.

*Response:* Subject to the availability of funds, the Department intends to conduct a study of the contract pharmacy mechanism. Depending upon the results of this analysis and the availability of funds, further study may result. Annual audits of each contract pharmacy situation would be burdensome and are not feasible.

*Comment:* Contract pharmacies will be motivated to identify patients other than those of the covered entity whose drug usage can afford the contractor a profit opportunity. The covered entity should be responsible to the manufacturer for any diversion by the contractor of 340B drugs to individuals who are not patients of the covered entity.

*Response:* The guidelines contains provision (h), in which both parties agree to not ``resell or transfer a drug purchased at section 340B prices to an individual who is not a patient of the covered entity.'' In addition, this provision provides that if diversion has occurred, the contractor will pay the amount of the discount in question so that the covered entity can reimburse the manufacturer, as required by section 340B(a)(5)(D).

*Comment:* The mechanism should include provisions for ensuring that the agreement will, in fact, be enforced.

*Response:* The Department does have the authority to remove a covered entity from the eligibility list if it (or its contract pharmacy) is found to have diverted 340B drugs to individuals who are not patients of the entity. To this end, the Department has developed a mechanism to receive and investigate complaints concerning drug diversion. This mechanism was published in the Federal Register for notice and comment on June 10, 1994 (59 FR 30021). In addition, the Department, at various public meetings concerning the implementation of 340B, has requested documentation of any covered entity drug diversion. To date, the Department has received no indication of drug diversion in relation to drugs purchased at 340B discount pricing that has required an official Departmental investigation.

*Comment:* The manufacturer appears to bear the sole risk arising from abuses of the program and has no recourse if such abuse occurs. The manufacturer

**Add.61**

has limited ability to verify an arrangement between the covered entity and the contract pharmacy. Under the statute, the manufacturer's only remedy is to demand an audit; however, the lack of final audit guidelines has effectively prevented manufacturers from undertaking this type of activity. PHS should make arrangements for injunctive relief to prevent damages from ongoing violations of the statute, or provisions for terminating the participation of covered entities or their contractors.

*Response:* The manufacturer has sufficient remedies available to detect and eliminate abuse of the program. First, the manufacturer may audit the entity. Although the audit guidelines were not published in final form, we consider the proposed guidelines, published in the Federal Register, a sufficient statement of Department guidelines to allow manufacturers to proceed with an entity audit. Second, the Department has developed a dispute resolution process to provide parties with an informal mechanism to bring before the Department allegations of behavior that is in violation of 340B. Third, the contract pharmacy guidelines provide that if the covered entity or its contractor is found to have violated the 340B prohibition against drug diversion (and duplicate discounting), the covered entity could be removed from the list of covered entities and could no longer access 340B pricing.

*Comment:* The covered entity should establish a process for a quarterly reconciliation of its prescribing records with the contractor's inventory and dispensing records to provide for early detection of diversion and remediation of irregularities.

*Response:* We have included a provision that covered entity will establish a process for a quarterly random (sample) comparison of its prescribing records with the contractor's dispensing records to detect potential irregularities.

*Comment:* The covered entity should establish prior authorization protocol, assuring that the individual's status as a patient of the entity is confirmed by the entity in advance of product dispensing.

*Response:* The contractor should have some type of assurance that the patient to whom the contractor is dispensing the 340B drug is a patient of a covered entity participating in the 340B Program. To that end, we have added a provision to the guidelines stating that the covered entity and the contractor will develop a system to verify patient eligibility (e.g., eligible patient list or a validated prescription). Additionally,

we have included a suggested contract provision which states, ``(pharmacy) will dispense covered drugs only in the following circumstances: (1) Upon presentation of a prescription bearing the (covered entity's) name, the eligible patient's name, a designation that the patient is an eligible patient, and the signature of a legally qualified health care provider affiliated with the (covered entity); or (2) receipt of a prescription ordered by telephone on behalf of an eligible patient by a legally qualified health care provider affiliated with the (covered entity) who states that the prescription is for an eligible patient. The (covered entity) should provide a list to the (pharmacy) of all such qualified health care providers and will update the list of providers to reflect any changes, which is consistent with customary business practice.''

*Comment:* The contract agreement should restrict pharmacy services to only those patients who receive their medical care from the covered entity.

*Response:* Provision (g) of the guidelines provides that the contractor will not resell or transfer a 340B drug to an individual who is not a patient of the entity. The Department issued proposed guidelines to define the word ``patient'' in a Federal Register notice on August 3, 1995. See 60 FR 39762. Provision (2) of the definition provides that an individual is a patient of a covered entity if, among other requirements, the ``individual receives health care services from a health care professional who is either employed by the covered entity or provides health care under contractual or other arrangements (e.g., referral for consultation) such that the responsibility for the care provided remains with the covered entity.'' Currently, the Department is analyzing the comments received in response to that notice and is developing final guidelines.

It must be noted that the covered entity is responsible for any diversion of its drugs to ineligible individuals; therefore, it must make every effort to thoroughly scrutinize the contractor's dispensing records, to determine if the 340B drugs were dispensed to only eligible recipients. If a manufacturer believes that a covered entity contractor is diverting 340B drugs to ineligible recipients, the manufacturer should immediately contact the Department with this information and submit all supporting documentation so that a thorough investigation can be initiated.

*Comment:* PHS should oversee contractors' compliance with the contracts regarding the 340B prohibition

against drug diversion and duplicate discounting.

*Response:* Because the covered entity purchases the drug, retaining title, and directs shipment to its contractor, it retains responsibility for the drug. If the drug generates a Medicaid rebate or is diverted to an individual who is not a patient of the covered entity, the entity will be responsible for such activity. The Department and a participating manufacturer have the authority to audit the records of the covered entity and the contractor that directly relate to that manufacturer's drugs and to the 340B prohibitions against drug diversion and duplicate discounting. See proposed Audit Guidelines, 59 FR 30021, June 10, 1994. Further, the Department has proposed a dispute resolution process in which a manufacturer may bring a claim against an entity for drug diversion or duplicate discounting. See Dispute Resolution, 59 FR 30023. If the entity (or its contractor) is found to have violated such prohibitions, the entity is required by 340B(a)(5)(D) to pay the manufacturer the amount of the discount in dispute, and, pursuant to 340B(a)(4), the Department may determine that the entity is no longer a ``covered entity'' eligible to access 340B pricing.

We have added several suggested contract provisions that are consistent with normal business practices to the guidelines (Appendix) to provide further technical assistance in this area. One provision concerning potential discrepancies in ordering and shipping states, ``the pharmacy will compare all shipments received to the orders and inform the covered entity of any discrepancy within five (5) business days of receipt.'' Concerning an appropriate tracking system to prevent drug diversion, another provision states, ``prior to the pharmacy providing pharmacy services pursuant to this agreement, the (covered entity) will have the opportunity, upon reasonable notice and during business hours, to examine the tracking system and may require (the pharmacy) to make any modifications to such system as the (covered entity) may, in its sole discretion, require. Such a system may include sample quarterly comparisons of eligible patient prescriptions to the dispensing records and a six (6) month comparison of 340B drug purchasing and dispensing records. The (pharmacy) will permit the (covered entity) or its duly authorized representatives to have reasonable access to (pharmacy's) facilities and records during the term of this agreement in order to make periodic checks regarding the efficacy of such tracking systems. (Pharmacy) agrees to

**Add.62**

make any and all adjustments to the tracking system which (covered entity) advises are reasonably necessary to prevent diversion of covered drugs to individuals who are not patients of the (covered entity).''

*Comment:* There should be a process for excluding from the 340B Program those contractors that are in violation of the statute and the guidelines should explicitly note that the pharmacy contractor will be subject to additional civil or criminal penalties if violation of the guideline involves a violation of State or Federal law.

*Response:* Covered entities which are found to have violated the prohibitions of section 340B(a)(5) can be excluded from the 340B Program, after an appropriate opportunity to be heard. See Dispute Resolution Guidelines in 59 FR 30023, June 10, 1994. However, if the program finds that the pharmacy contractor has violated these statutory prohibitions, it cannot bar this pharmacy from dispensing 340B drugs for a covered entity. Nevertheless, the program intends to alert any entity which submits a certification with this particular pharmacy listed as the contractor as to this pharmacy's past activities. If the covered entity insists upon using this pharmacy, the Department will carefully scrutinize its activities. An additional provision was added to address the potential for civil or criminal penalties if the contractor violates Federal or State law.

*Comment:* The agreement should appoint the pharmacy contractor to be the agent of the covered entity and discuss the duties to be performed by the agent on behalf of the covered entity and the agent's rights.

*Response:* We believe that the relationship between the covered entity and the contract pharmacy is one of agency. However, the form of the relationship will be dictated by the terms of the contract; therefore, it is not essential to characterize the relationship as meeting or not meeting the standards which would serve under applicable law to establish an agency relationship. The contract terms address the relative duties of the parties in relation to section 340B and diversion and duplicate discount concerns that have been raised by the commenters. Accordingly, we have concluded that it is unnecessary to label the relationship between the covered entity and the contract pharmacy.

*Comment:* The contract pharmacy is fully accountable for maintaining the security of the PHS inventory.

*Response:* There is no requirement for a separate (physical) inventory for drugs purchased at a 340B discount, because

a separate data system will be used to verify appropriate dispensing.

*Comment:* Contract pharmacies are most likely Medicaid pharmacy providers, while the covered entity likely is not. Because State Medicaid programs are unlikely to issue pharmacy numbers to anyone other than licensed pharmacies, covered entities that are not licensed pharmacies will not be able to bill Medicaid for prescriptions dispensed by the contract pharmacies. This task will be completed by the contract pharmacy. The mechanism excludes Medicaid drugs; therefore, the contract pharmacy must have two Medicaid numbers (i.e., 340B exclusion package and one to bill Medicaid for its regular customers). However, PHS has not required the contract pharmacy to do so. Moreover, neither the pharmacy nor the State has any incentive to ``make arrangements'' to carry out the statute, since both may gain from inadequate enforcement.

*Response:* The mechanism requires the parties to comply with the prohibition on filling Medicaid prescriptions with drugs purchased at 340B pricing. Neither the covered entity nor the contract pharmacy will bill Medicaid for 340B drug reimbursement; therefore, there will be no need for two Medicaid numbers. The 340B drugs will not generate Medicaid rebates.

*Comment:* As the owner of the drug, the covered entity should be responsible for establishing the price for each drug sold to a patient of the entity (effectively preventing the contractor from charging whatever price it chooses) and assuming full responsibility for such prices under the terms of the PHS grant and any applicable consumer protection laws.

*Response:* Even though it is clearly stated in the guidelines that the covered entity must purchase the drug (not the contractor), which would give to the covered entity title to and responsibility for the drug, we have added the following clarifying language to provision (a): ``* * * will purchase the drug and will assume full responsibility for establishing its price, pursuant to terms of a PHS grant (if applicable) and any applicable consumer protection laws.''

### (6) Records

*Comment:* The contractor should assure that all pertinent reimbursement accounts and dispensing records maintained by the contractor for the covered entity are separate from the contractor's own operations and are accessible to the covered entity, PHS, and the manufacturers in the event of an audit. The contractor should provide

these records to the manufacturer upon request.

*Response:* We have added the concept of separate records to provision (j) to assure the availability of these records in the case of an audit by the manufacturer. However, a manufacturer has statutory authority to access these entity records by performing an audit; therefore, to require the entity to submit records upon demand would be unduly burdensome.

*Comment:* ODP should establish standards for reporting that will ensure consistency of the information and approve whatever ``record-keeping'' system is used.

*Response:* Any reasonable system which will provide an adequate audit trail will be acceptable. However, reporting should be consistent with State pharmacy laws and other reporting mechanisms. As stated earlier in this section, sample contract provisions are suggested which describe such records and reports (e.g., prescription files, velocity reports, and records of ordering and receipt).

*Comment:* Reporting requirements should include some record or report that assures that only patients of the covered entity were served.

*Response:* Provision (f) provides that the contractor will provide the covered entity with reports as deemed appropriate using normal and customary business records.

*Comment:* The agreement should require that the pharmacy contractor maintain separate inventories and separate records for patients of the PHS entity contracting for pharmacy services.

*Response:* The guidelines have been changed to include a provision for separate dispensing records for patients of the covered entity. However, the requirement for a separate inventory of 340B drugs is unnecessary, because the covered entity is required to monitor dispensing and inventory records. In addition, these records are also subject to Department and manufacturer audits. A separate inventory is a wasteful concept with respect to time, space and money. Further, it provides little if any additional security, as a separate inventory only speaks to what is currently on the shelf and not what should be on the shelf. On the other hand, dispensing and other records will accurately indicate use of 340B drugs.

*Comment:* The covered entity is responsible for making arrangements to seek reimbursement from third parties for 340B drugs used in treating patients of the entity. If the covered entity receives a PHS grant, it would lose its

grant eligibility for failing to make appropriate arrangements.

*Response:* Since the entity purchases the drugs, it has the option of seeking reimbursement from third parties itself or contracting for this service. However, to the extent that a covered entity (or its contract pharmacy acting on its behalf) fails to comply with grant conditions, the entity may be subject to grant penalties.

*Comment:* To the extent that the covered entity makes arrangements for the pharmacy contractor to submit claims for third party reimbursement, the covered entity should assume full responsibility under State consumer protection laws, insurance, fraud, and State and Federal health care laws with respect to any false claims charges or allegations of consumer or insurance fraud.

*Response:* The ODP is not authorized to enforce or interpret such laws. If we become aware of possible violations of such laws, we will refer these cases to appropriate authorities.

(C) Contract Pharmacy Services Revised Final Mechanism

Covered entities that wish to utilize contract pharmacy services to dispense section 340B outpatient drugs are encouraged to sign and have in effect a contract pharmacy service agreement between the covered entity and the pharmacy. This mechanism is designed to facilitate program participation for those eligible covered entities that do not have access to appropriate ``in-house'' pharmacy services. *See* Appendix for suggested contract provisions.

(1) The following is a suggested model agreement format:

(a) The covered entity will purchase the drug and assume responsibility for establishing its price, pursuant to the terms of a PHS grant (if applicable) and any applicable consumer protection laws.

A ``ship to, bill to'' procedure may be used in which the covered entity purchases the drug, the manufacturer bills the entity for the drug that it purchased, but ships the drug directly to the contract pharmacy. *See* section 1 of Appendix.

(b) The contractor will provide all pharmacy services (e.g., dispensing, record keeping, drug utilization review, formulary maintenance, patient profile, counseling). Each covered entity which purchases its covered outpatient drugs has the option of individually contracting for pharmacy services with the pharmacy of its choice. The limitation of one pharmacy contractor per entity does not preclude the selection of a pharmacy contractor with multiple pharmacy sites, as long as only one site is used for the contracted services. [The ODP will be evaluating the feasibility of permitting these

covered entities to contract with more than one site and contractor.]

(c) The covered entity health care provider will inform the patient of his or her freedom to choose a pharmacy provider. If the patient does not elect to use the contracted service, the patient may obtain the prescription from the covered entity and then obtain the drug(s) from the pharmacy provider of his or her choice.

When a patient obtains a drug from a retail pharmacy other than the entity contract pharmacy, the manufacturer is not required to offer this drug at 340B pricing.

(d) The contractor may provide the covered entity services, other than pharmacy, at the option of the covered entity (e.g., home care, reimbursement services). Regardless of the services provided by the contractor, access to 340B pricing will always be restricted to only patients of the covered entity.

(e) The contractor and the covered entity will adhere to all Federal, State, and local laws and requirements. Additionally, all PHS grantees will adhere to all rules and regulations established by the grant funding office.

Both the covered entity and the contract pharmacy are aware of the potential for civil or criminal penalties if the covered entity and/or the contract pharmacy violate Federal or State law. [The Department reserves the right to take such action as may be appropriate if it determines that such a violation has occurred.]

(f) The contractor will provide the covered entity with reports consistent with customary business practices (e.g., quarterly billing statements, status reports of collections and receiving and dispensing records). See Section 2 of Appendix.

(g) The contractor, with the assistance of the covered entity, will establish and maintain a tracking system suitable to prevent diversion of section 340B discounted drugs to individuals who are not patients of the covered entity. Customary business records may be used for this purpose. The covered entity will establish a process for a periodic random (sample) comparison of its prescribing records with the contractor's dispensing records to detect potential irregularities. See Section 3 of Appendix.

(h) The covered entity and the contract pharmacy will develop a system to verify patient eligibility. [The Department's draft guidance defining covered entity ``patient'' is set forth in an August 3, l995, Federal Register notice. See 60 FR 39762.]

Both parties agree that they will not resell or transfer a drug purchased at section 340B pricing to an individual who is not a patient of the covered entity. See section 340B(a)(5)(B). The covered entity understands that it can be removed from the list of covered entities because of its participation in drug diversion, a 340B(a)(5) prohibition, and no longer be eligible for 340B pricing. See Section 4 of Appendix.

(i) Both parties will not use drugs purchased under section 340B to dispense Medicaid prescriptions, unless the contract pharmacy and the State Medicaid agency have established an arrangement to prevent duplicate discounting.

(j) Both parties understand that they are subject to audits (by the Department and

participating manufacturers) of records that directly pertain to the entity's compliance with the drug resale or transfer prohibition and the prohibition against duplicate Medicaid rebates and 340B discounts. See section 340B(a)(5).

The contractor will assure that all pertinent reimbursement accounts and dispensing records, maintained by the contractor, will be separate from the contractor's own operations and will be accessible to the covered entity, the Department, and the manufacturer in the case of a manufacturer audit.

(k) Upon request, a copy of this contract pharmacy service agreement will be provided to a participating manufacturer which sells covered outpatient drugs to the covered entity. All confidential propriety information may be deleted from the document.

*(2) Certification*

Under section 340B, we believe that if a covered entity using contract pharmacy services requests to purchase a covered drug from a participating manufacturer, the statute directs the manufacturer to sell the drug at the discounted price. If the entity directs the drug shipment to its contract pharmacy, we see no basis on which to conclude that section 340B precludes this type of transaction or otherwise exempts the manufacturer from statutory compliance. However, the entity must comply, under any distribution mechanism, with the statutory prohibition on drug diversion and duplicating discounting.

To provide ODP and manufacturers with assurance that the covered entity has acted in a manner which limits the potential for drug diversion, the covered entity is encouraged to submit to ODP a certification that it has signed and has in effect an agreement with the contract pharmacy containing the aforementioned provisions. However, ODP will review any alternative mechanism which is designed to reduce the potential for drug diversion. The names of those covered entities which submit a certification, or an alternate mechanism approved by ODP, will be placed on the EDRS for the convenience of participating drug manufacturers.

*(3) Anti-kickback Statute*

Contractors and covered entities must be aware of the potential for civil or criminal penalties if the contractor violates Federal or State law. In negotiating and executing a contracted pharmacy service agreement pursuant to these guidelines, contractors and covered entities should be aware of and take into consideration the provisions of the Medicare and Medicaid anti-kickback statute, 42 U.S.C. 1320a–7b(b). This statute makes it a felony for a person or entity to knowingly and willfully offer, pay, solicit, or receive

**Add.64**

remuneration with the intent to induce, or in return for the referral of, Medicare or a State health care program business. State health care programs are Medicaid, the Maternal and Child Health Block Grant program, and the Social Services Block Grant program. Apart from the criminal penalties, a person or entity is also subject to exclusion from participation in the Medicare and State health care programs for a knowing and willful violation of the statute pursuant to 42 U.S.C. 1320a–7(b)(7).

The anti-kickback statute is very broad. Prohibited conduct covers not only remuneration intended to induce referrals of patients, but also includes remuneration intended to induce the purchasing, leasing, ordering, or arranging for any good, facility, service, or item paid for by Medicare or a State health care program. The statute specifically identifies kickbacks, bribes, and rebates as illegal remuneration, but also covers the transferring of anything of value in any form or manner whatsoever. This illegal remuneration may be furnished directly or indirectly, overtly or covertly, in cash or in kind and covers situations where there is no direct payment at all, but merely a discount or other reduction in price or the offering of a free good(s).

Arrangements between contractors and covered entities that could violate the anti-kickback statute would include any situation where the covered entity agrees to refer patients to the contractor in return for the contractor agreeing to undertake or furnish certain activities or services to the covered entity at no charge or at a reduced or below cost charge. These activities or services would include the provision of contracted pharmacy services, home care services, money or grants for staff or service support, or medical equipment or supplies, and the remodeling of the covered entity's premises. For example, if a contractor agreed to furnish covered outpatient drugs in return for the covered entity referring its Medicaid patients to the contractor to have their prescriptions filled, the arrangement would violate the anti-kickback statute. Similarly, if the contractor agreed to provide billing services for the covered entity at no charge in return for the covered entity referring its patients to the contractor for home or durable medical equipment, the statute would be violated.

Pursuant to the authority in 42 U.S.C. 1320a–7b(b)(3), the Secretary of HHS has published regulations setting forth certain exceptions to the anti-kickback statute, commonly referred to as ``safe harbors.'' These regulations are codified at 42 CFR 1001.952. Each of the safe harbors sets forth various requirements which may be met in order for a person or entity to be immune from prosecution or exclusion.

(D) Appendix—Suggested Contract Provisions

(1) ``The covered entity will order covered drugs directly from the manufacturer, from a designated sales representative, or a drug wholesaler and arrange to be billed directly for such drugs. The covered entity will arrange for shipment of such drugs directly to the pharmacy. The pharmacy will compare all shipments received to the orders and inform the covered entity of any discrepancy within five (5) business days of receipt. The covered entity will make timely payments for such drugs delivered to the (pharmacy) pursuant to the entity's order.''

(2) ``The covered entity will verify, using the contractor's (readily retrievable) customary business records, that a tracking system exists which will ensure that drugs purchased under the Act are not diverted to individuals who are not patients of the covered entity. Such records can include: prescription files, velocity reports, and records of ordering and receipt. These records will be maintained for the period of time required by State law and regulations.''

(3) ``Prior to the pharmacy providing pharmacy services pursuant to this agreement, the covered entity will have the opportunity, upon reasonable notice and during business hours, to examine the tracking system. For example, such a tracking system may include quarterly sample comparisons of eligible patient prescriptions to the dispensing records and a six (6) month comparison of 340B drug purchasing and dispensing records as is routinely done in other reconciliation procedures. The pharmacy will permit the covered entity or its duly authorized representatives to have reasonable access to pharmacy's facilities and records during the term of this agreement in order to make periodic checks regarding the efficacy of such tracking systems. The pharmacy agrees to make any and all adjustments to the tracking system which covered entity advises are reasonably necessary to prevent diversion of covered drugs to individuals who are not patients of the covered entity.''

(4) ``The pharmacy will dispense covered drugs only in the following circumstances: (a) Upon presentation of a prescription bearing the covered entity's name, the eligible patient's name, a designation that the patient is an eligible patient, and the signature of a legally qualified health care provider affiliated with the covered entity; or (b) receipt of a prescription ordered by telephone on behalf of an eligible patient by a legally qualified health care provider affiliated with the covered entity who states that the prescription is for an eligible patient. The covered entity will furnish a list to the pharmacy of all such qualified health care providers and will update the list of providers to reflect any changes. If a contract pharmacy is found to have violated the drug diversion prohibition, the pharmacy will pay the entity the amount of the discount in question so that the entity can reimburse the manufacturer.''

Dated: August 14, 1996.

Thomas G. Morford,

*Acting Administrator, Health Resources and Services Administration.*

[FR Doc. 96–21485 Filed 8–22–96; 8:45 am]

**BILLING CODE 4160–15–P**

## National Institutes of Health

### National Heart, Lung, and Blood Institute; Proposed Collection; Comment Request the Framingham Study

**SUMMARY:** In compliance with the requirement of Section 3506(c)(2)(A) of the Paperwork Reduction Act of 1995 for opportunity for public comment on the proposed data collection projects, the National Heart, Lung, and Blood Institute (NHLBI), the National Institutes of Health (NIH) will publish periodic summaries of proposed projects to be submitted to the Office of Management and Budget (OMB) for review and approval.

**PROPOSED COLLECTION:** Title: The Framingham Study. Type of Information Collection Request: Extension of a currently approved collection (OMB No. 0925–0216). Need and Use of Information Collection: This project involves physical examination and testing of the surviving members of the original Framingham Study cohort and the surviving members of the offspring cohort. Investigators will contact doctors, hospitals, and nursing homes to ascertain participants' cardiovascular events occurring outside the study clinic. Information gathered will be used to further describe the risk factors, occurrence rates, and consequences of cardiovascular disease in middle aged and older men and women. Frequency of Response: The cohort participants respond every two years; the offspring participants respond every four years. Affected Public: Individuals or households; Businesses or other for profit; Small businesses or

emergency review because the collection of this information is needed prior to the expiration of the normal time limits under OMB's regulations at 5 C.F.R., Part 1320. Medicare must comply with all provisions of the group health plans including a plan of "timely filing requirements." The Agency cannot reasonably comply with the normal clearance procedures because public harm is likely to result if normal clearance procedures are followed. Any additional delay in this approval will result in a loss of $904 million to the trust fund.

HCFA is requesting that OMB provide a two-day review and a 90-day approval. During this 90-day period HCFA will publish a separate Federal Register notice announcing the initiation of an extensive 60-day agency review and public comment period on these requirements. Then HCFA will submit the requirements for OMB review and an extension of this emergency approval.

*Type of Information Collection Request:* Reinstatement, with change, of a previously approved collection for which approval has expired; *Title of Information Collection:* Internal Revenue Service/Social Security Administration/Health Care Financing Administration Data Match 42 CFR 411; *Form No.:* HCFA–R–137; *Use:* Employers who are identified through a match of IRS, SSA, and Medicare records will be contacted concerning group health plan coverage of identified individuals to ensure compliance with Medicare Secondary Payer provisions found at 42 U.S.C. 1395y(b). *Frequency:* Semi-annually; *Affected Public:* Individuals or Households, Business or other for profit, Not for profit institutions, Farms, Federal Government and State, Local or Tribal Government; *Number of Respondents:* 596,241; *Total Annual Responses:* 596,241; *Total Annual Hours Requested:* 2,325,449.

To request copies of the proposed paperwork collections referenced above, call the Reports Clearance Office on (410) 786–1326. Written comments and recommendations for the proposed information collections should be sent within 2 working days of this notice directly to the OMB Desk Officer designated at the following address: OMB Human Resources and Housing Branch, Attention: Allison Eydt, New Executive Office Building, Room 10235, Washington, D.C. 20503.

Dated: October 17, 1996.
Edwin J. Glatzel,
*Director, Management Analysis and Planning Staff, Office of Financial and Human Resources, Health Care Financing Administration.*
[FR Doc. 96–27262 Filed 10–23–96; 8:45 am]
BILLING CODE 4120–03–P

## Health Resources and Services Administration

[0905–ZA92]

### Notice Regarding Section 602 of the Veterans Health Care Act of 1992 Patient and Entity Eligibility

**AGENCY:** Health Resources and Services Administration, HHS.
**ACTION:** Final Notice.

**SUMMARY:** Section 602 of Public Law 102–585, the "Veterans Health Care Act of 1992," enacted section 340B of the Public Health Service Act ("PHS Act"), "Limitation on Prices of Drugs Purchased by Covered Entities." Section 340B provides that a manufacturer who sells covered outpatient drugs to eligible entities must sign a pharmaceutical pricing agreement with the Secretary of Health and Human Services in which the manufacturer agrees to charge a price for covered outpatient drugs that will not exceed an amount determined under a statutory formula.

The purpose of this notice is to inform interested parties of final guidelines regarding a definition of covered entity "patient."

**FOR FURTHER INFORMATION CONTACT:** Annette Byrne, R.Ph., Attn: Drug Pricing Program, Bureau of Primary Health Care, 4350 East-West Highway, 10th Floor, Bethesda, MD 20814, Phone (301) 594–4353.

**EFFECTIVE DATE:** October 24, 1996.

**SUPPLEMENTARY INFORMATION:**

(A) Background

Proposed guidelines were announced in the Federal Register at 60 FR 39762 on August 3, 1995. A period of 30 days was established to allow interested parties to submit comments. The Department received 15 letters including comments concerning legal authority for developing the proposed guidelines and a need for a more specific definition. Comments were received on issues not within the scope of the definition of covered entity "patient" and were not addressed.

The following section presents a summary of all major comments relevant to the definition of "patient" and a response to each comment. The guidelines are adopted as proposed.

(B) Comments and Responses

*Comment:* The Federal Register notice was not promulgated in accordance with the Administrative Procedure Act (APA) and contains procedural irregularities. The Department has issued eight Federal Register notices containing drug pricing program guidelines and has not proposed a single regulation pursuant to APA requirements. Because of this, the program guidelines are invalid.

*Response:* During the early months following enactment, it became clear that there were many gaps in the legislation and some form of program structure was necessary to move the program forward. There were approximately 11,500 eligible entities, 500 participating manufacturers, numerous wholesalers and many Federal programs affected by this legislation and all seeking guidance. It was incumbent upon the Department, acting through the Health and Resources and Services Administration, Bureau of Primary Health Care, Office of Drug Pricing (ODP), to implement this difficult congressional mandate in an expeditious manner.

Interpretive rules and statements of policy were developed to provide necessary program guidance. The Department has published these guidelines in the Federal Register, used a Federal review process (including review by the Office of Management and Budget) and provided a public comment period to obtain both Federal as well as public input into guideline development. The Department considered all comments in developing these final guidelines.

The guidelines explain how the Department intends to administer the 340B program, further explain the statutory language by clarifying the meaning given by the Department to particular words of phrases, and do not exceed the purpose of 340B or conflict with any of its provisions. We believe that these guidelines create no new law and create no new rights or duties; therefore, they are not subject to the Administrative Procedure Act's requirement of notice and comment. Nevertheless, the Department chose to solicit and respond to public comment.

*Comment:* The Federal Register notice has not complied with the 60 day comment period required by the Social Security Act, 42 U.S.C. 1395hh(b).

*Response:* Section 340B is part of the Public Health Service Act, and its implementation is not subject to the provisions of the Social Security Act.

*Comment:* The definition of a "patient" is ambiguous and difficult to

administer from a drug diversion standpoint.

*Response:* The definition of a "patient" was developed in order to identify those individuals eligible to receive 340B drugs from covered entities. Because of the large number of covered entities and the wide diversity of eligible groups (e.g., hemophilia, HIV, black lung, migrant health, and family planning services), it was essential that we work closely with each Federal program office to develop a definition flexible enough to describe accurately each covered entity's patient while at the same time not excluding eligible patients. In addition, not only comments received in response to this notice but also comments from prior Federal Register notices (59 FR 25111, May 13, 1994, and 59 FR 47886, September 19, 1994) were incorporated into the definition. By using such input, we are confident that the definition will assist covered entities and manufacturers in determining which individuals are eligible to receive 340B drugs.

*Comment:* Covered entities should be required to restrict purchases to drug products that are directly related to the provision of services for which Federal funding has been provided.

*Response:* We do not consider a limitation on which drug products a covered entity may purchase to be a reasonable component of the definition of covered entity "patient." To the extent that purchasing certain drugs would contravene a Federal or State law or certain PHS grant principles (and this information is brought to the Department's attention), the Department reserves the right to take such action as it deems appropriate.

*Comment:* The definition of a "patient" establishes a requirement that a State must register eligible individuals who may then receive services for which funding has been provided under Title II of the Ryan White Act of 1990.

*Response:* The proposed patient definition does not impose a new requirement that States register individuals as eligible for benefits under the Ryan White Act. Instead, the definition reflects the States' current practice of recording and verifying patient eligibility through a registration mechanism. An individual listed in a State Ryan White Title II drug assistance program will, for purposes of the patient definition, be considered a patient of the entity.

*Comment:* The definition would permit a patient to obtain one medical treatment from a covered entity at any time in his or her lifetime and then continue (forever) to purchase drugs

through prescription refills by using such services as mail order. The proposed patient definition should require that a covered entity patient be currently receiving care, and an additional section should be added to address the frequency of medical care.

*Response:* All covered entities must establish a relationship with their patients such that the entity will maintain records of the individuals' health care. The entity will document in the record the care provided and, when appropriate, the prescriptions written. It would be inappropriate for the Department to proceed further and dictate to health care providers guidelines regarding the appropriateness of certain prescriptions. We understand that States typically regulate the refilling of prescriptions.

*Comment:* Employees of covered entities should be either specifically precluded or included as eligible patients to receive discounted drug products.

*Response:* Any employee of a covered entity who meets the criteria of the definition of covered entity "patient" would be eligible to access 340B pricing.

*Comment:* Private patients of a physician who is under a contract to provide services to a covered entity should be considered patients of the entity.

*Response:* Entity health record documentation (section one of the patient definition) and responsibility for care provided (section two of the patient definition) must remain with the covered entity. A physician, under contract with a covered entity, may see an individual and provide care for a medical indication. However, if care is provided outside of the contractual arrangement with the covered entity, the individual would not be considered a patient of the entity.

*Comment:* The pharmacy of a covered entity should be required to have access to the records of the individual's health care maintained by the entity.

*Response:* This type of requirement deals with the professional practice of pharmacy and not with the issue of identification and clarification of who is or is not a patient.

*Comment:* The phrase in section one of the patient definition is not clear as to if "records of the individual's health care" is equivalent to the term "medical record(s)."

*Response:* The phrase "records of the individual's health care" was specifically used to avoid the term "medical record," as the latter term may have different meanings in various locations. In addition, some covered

entities may not, at the present time, use health records that comply with certain legal definitions of the term "medical record." The wording permits the use of health care documentation presently contained in a "medical record," if such is the current health record system maintained by an entity.

*Comment:* The requirement in section one of the patient definition that "the covered entity maintain records of the individual's health care" could establish a requirement that such health records be centralized at one location.

*Response:* The requirement that covered entities maintain the records of an individual's health care does not establish a requirement that such health records be centralized in one location.

*Comment:* The exclusion of individuals who receive no health care services from the covered entity other than the dispensing of a drug for subsequent self-administration or administration at home may exclude otherwise legitimate patients from receiving "refills" of prescribed medications previously authorized by the covered entity's health care provider.

*Response:* A "refill" of a medication previously prescribed by an authorized entity health care provider, as part of the health care services provided by the covered entity, would meet the requirements of the patient definition. The "refill" would be a continuation of responsibility for the health care services provided by the covered entity. The covered entity would document the initial prescription for treatment in the record of health care, and the "refill" would be part of the range of health care services provided.

(C) Definition of a Patient

An individual is a "patient" of a covered entity (with the exception of State-operated or funded AIDS drug purchasing assistance programs) only if:

1. the covered entity has established a relationship with the individual, such that the covered entity maintains records of the individual's health care; and

2. the individual receives health care services from a health care professional who is either employed by the covered entity or provides health care under contractual or other arrangements (e.g. referral for consultation) such that responsibility for the care provided remains with the covered entity; and

3. the individual receives a health care service or range of services from the covered entity which is consistent with the service or range of services for which grant funding or Federally-qualified health center look-alike status

has been provided to the entity. Disproportionate share hospitals are exempt from this requirement.

An individual will not be considered a "patient" of the entity for purposes of 340B if the only health care service received by the individual from the covered entity is the dispensing of a drug or drugs for subsequent self-administration or administration in the home setting.

An individual registered in a State operated or funded AIDS drug purchasing assistance program receiving financial assistance under title XXVI of the PHS Act will be considered a "patient" of the covered entity for purposes of this definition if so registered as eligible by the State program.

Dated: October 21, 1996.

Ciro V. Sumaya,

*Administrator, Health Resources and Services Administration.*

[FR Doc. 96–27344 Filed 10–23–96; 8:45 am]

BILLING CODE 4160–15–P

## National Institutes of Health

## National Heart, Lung, and Blood Institute; Proposed Collection; Comment Request—National Donor Research and Education Study-II

SUMMARY: In compliance with the requirement of Section 3506(c)(2)(A) of the Paperwork Reduction Act of 1995, for opportunity for public comment on proposed data collection projects, the National Heart, Lung and Blood Institute (NHLBI), the National Institutes of Health (NIH) will publish periodic summaries of proposed projects to be submitted to the Office of Management and Budget (OMB) for review and approval.

PROPOSED COLLECTION: *Title:* National Donor Research and Education Study-II. *Type of Information Collection Request:* NEW. *Need and Use of Information Collection:* This study is the second stage anonymous mail survey to be sent to a random sample of blood donors at five blood centers participating in the Retrovirus Epidemiology Donor Study (REDS). In addition to monitoring the safety of the U.S. blood supply, study results will facilitate the development, evaluation and refinement of educational, recruitment and qualification strategies for U.S. blood donors. The proposed new study will update and extend the unique findings obtained in the first blood donor survey so as to minimize the likelihood that donors with risk factors for transfusion-transmitted diseases will participate in the blood donor pool. There is a strong likelihood that, like the first survey effort, the resulting findings will be directly applied to blood banking operational practice. Specific objectives of this survey are to: (1) Evaluate donor understanding and acceptance, and the safety impact of newly-changed laboratory and donor screening procedures that have been implemented since the previous donor survey study (e.g. removal of the confidential unit exclusion "CUE" process at two REDS sites; additional questions about Creutzfeldt-Jacob and parasitic diseases; addition of HIV p24 antigen testing; increased use of donation incentives); (2) Pilot test new donor screening procedures that are anticipated to occur within the next 12–24 months in order to estimate their efficacy, safety impact and donor acceptance (e.g. improved CUE procedures, implementation of computer-assisted donor screening); (3) Provide "pre-" (baseline) and "post-" (evaluation) measures for new donor qualification procedures expected to occur operationally at blood centers within the time period of study including: deferral for intransal cocaine use in the past year; modification of the time period for sexual risk deferrals from "since 1977" to within the past 12 (or 24) months; clarification of wording regarding sexual contact with "at-risk" individuals; and addition of questions about donating primarily for the purpose of receiving the tests results for the AIDS virus; (4) Assess changes in the prevalence and characteristics of donors who report donating for therapeutic reasons (e.g., those with iron storage disease), and donors who report donating primarily to receive test results for the AIDS virus as a result of the March 1996 implementation of HIV p24 antigen testing; (5) Determine the extent to which active donors with reactive tests for anti-HBc and syphilis have increased levels of behavioral risks that should have resulted in deferral; (6) Measure the extent to which seropositivity for current syphilis screening tests predicts a recent history of diagnosed syphilis: (7) Measure blood donor knowledge of infectious disease risks and the behavioral factors that should defer them from donating, to identify weaknesses in the current donor educational process; and (8) Assess the attitudes of donors regarding establishment of stored frozen repositories from their donations, use of these samples for future research testing designed to improve transfusion safety, and the adequacy of different levels of informed consent. *Frequency of Response:* One-time data collection. *Affected Public:* Individuals.

| Type of respondents | Estimated number of respondents | Estimated number of responses per respondent | Average burden hours per responses | Estimated total annual burden hours requested |
|---|---|---|---|---|
| Blood donors | 38,500 | 1 | .3333 | 12,832 |

The annualized cost to respondents is estimated at: $128,320 (based on $10 per hour). There are no Capital Costs to report. There are no Operating or Maintenance Costs to report.

REQUEST FOR COMMENTS: Written comments and/or suggestions from the public and affected agencies are invited on one or more of the following points: (1) Whether the proposed collection of information is necessary for the proper performance of the function of the agency, including whether the information will have practical utility; (2) The accuracy of the agency's estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions used; (3) Ways to enhance the quality, utility, and clarity of the information to be collected; and (4) Ways to minimize the burden of the collection of information on those who are to respond, including the use of appropriate automated, electronic, mechanical or other technical collection techniques or other forms of information technology.

FOR FURTHER INFORMATION: To request more information on the proposed project or to obtain a copy of the data collection plans and instruments, contact Dr. George J. Nemo, Group Leader, Transfusion Medicine, Scientific Research Group, Division of Blood Diseases and Resources, NHLBI,

Management Branch (address above) for public review and comment. Interested persons may, on or before January 13, 1997, submit to the Dockets Management Branch (address above) written comments. Two copies of any comments are to be submitted, except that individuals may submit one copy. Comments are to be identified with the docket number found in brackets in the heading of this document. Received comments may be seen in the office above between 9 a.m. and 4 p.m., Monday through Friday. FDA will also place on public display any amendments to, or comments on, the petitioner's environmental assessment without further announcement in the Federal Register. If, based on its review, the agency finds that an environmental impact statement is not required and this petition results in a regulation, the notice of availability of the agency's finding of no significant impact and the evidence supporting that finding will be published with the regulation in the Federal Register in accordance with 21 CFR 25.40(c).

Dated: November 25, 1996.

George H. Pauli,

*Acting Director, Office of Premarket Approval, Center for Food Safety and Applied Nutrition.*

[FR Doc. 96–31574 Filed 12–11–96; 8:45 am]

**BILLING CODE 4160–01–F**

---

## Health Resources and Services Administration

## Manufacturer Audit Guidelines and Dispute Resolution Process 0905–ZA–19

**AGENCY:** Health Resources and Services Administration, HHS.

**ACTION:** Final notice.

**INFORMATION:** Section 602 of Public Law 102–585, the "Veterans Health Care Act of 1992," enacted section 340B of the Public Health Service Act (the "PHS Act"), "Limitation on Prices of Drugs Purchased by Covered Entities." Section 340B provides that a manufacturer who sells covered outpatient drugs to eligible (covered) entities must sign a pharmaceutical pricing agreement with the Secretary of Health and Human Services ("HHS") in which the manufacturer agrees to charge a price for covered outpatient drugs that will not exceed the amount determined under a statutory formula.

Section 340B(a)(5) of the PHS Act identifies certain requirements for covered entities concerning potential double price reductions and drug diversion. A covered entity must permit the manufacturer of a covered outpatient drug to audit the records of the covered entity directly pertaining to the entity's compliance with the requirements of section 340B(a)(5) (A) and (B) as to drugs purchased from the manufacturer. These audits must be conducted in accordance with guidelines established by the Secretary, acting through the Health Resources and Services Administration, Bureau of Primary Health Care, the Office of Drug Pricing (the "Department"). Section 340B(a)(5)(C) states that the Secretary shall establish guidelines relating to the number, scope and duration of the audits. The Department has defined these terms and provided suggested audit steps.

Further, the Department anticipates that disputes may arise between covered entities and participating manufacturers regarding implementation of the provisions of section 340B. To resolve these disputes in an expeditious manner, the Department has developed a voluntary dispute resolution process.

The purpose of this notice is to inform interested parties of final program guidelines concerning manufacturer audit guidelines and the dispute resolution process.

**FOR FURTHER INFORMATION CONTACT:** Director, Office of Drug Pricing, Bureau of Primary Health Care, Health Resources and Services Administration, 4350 East-West Highway, West Towers, 10th Floor, Bethesda, Maryland 20814, Phone: (301) 594–4353.

**EFFECTIVE DATE:** January 13, 1997.

**SUPPLEMENTARY INFORMATION:**

(A) Background

Proposed manufacturer audit guidelines and the proposed informal dispute process were announced in the Federal Register at 59 FR 30021 on June 10, 1994. A comment period of 30 days was established to allow interested parties to submit comments. The ODP received comments from 12 sources including pharmaceutical manufacturers, a covered entity, organizations representing pharmaceutical manufacturers or covered entities, and the American Institute of Certified Public Accountants.

The following section presents a summary of all major comments, grouped by subject, and a response to each comment. All comments were considered in developing this final notice. Changes were also made to increase clarity and readability.

(B) Comments and Responses— Manufacturer Audit Guidelines

*Comment:* A number of commenters addressed the requirement that a manufacturer establish reasonable cause and obtain approval from the Department before conducting an audit. While some commenters believe that the statute gives manufacturers the right to routinely conduct an audit as a normal business practice without the need for Departmental approval, other commenters indicated that manufacturers should be required to provide objective documentation that a violation has occurred before being granted permission to audit.

*Response:* Section 340B(a)(5)(C) provides that audits will be performed in accordance with procedures established by the Secretary relating to the number, duration, and scope of the audits. These audits must pertain directly to the entity's compliance with the prohibitions against drug diversion and the generation of duplicate drug rebates and discounts with respect to drugs of the manufacturer. See Section 340B(a)(5)(A) & (B). In order to ensure that the audits pertain to compliance with the prohibitions in the aforementioned subparagraphs, it is appropriate to require manufacturers to submit an audit work plan for the Department's review and to establish reasonable cause. Although the Department will not require pre-approval of the plan, this will ensure that the audits are performed where there are valid business concerns and are conducted with the least possible disruption to the covered entity. Significant changes in quantities of specific drugs ordered by a covered entity and complaints from patients/ other manufacturers about activities of a covered entity may be a basis for establishing reasonable cause.

*Comment:* Omit the requirement to submit an audit plan for the Department's approval.

*Response:* The requirement for approval of an audit plan has been dropped. The Department's review of the audit workplan is necessary to ensure that audit work performed is relevant to the audit objectives while protecting patient confidentiality and information of the covered entity which is considered proprietary. If after this review the Department has concerns regarding the audit plan it will work with the manufacturer to incorporate mutually agreed-upon revisions to the plan.

*Comment:* Commenters indicated that audits would not be meaningful without

a clear definition of a "patient of the entity."

*Response:* Because sufficient criteria must be provided by which auditors (and others) can determine if consumers of drugs purchased at the mandated prices are eligible to receive covered drugs, a definition of "patient of the entity" is necessary. ODP has addressed this issue by means of Federal Register final notice dated October 24, 1996 (61 FR 55156)

*Comment:* Establish a timeframe or deadline for the various steps in the process. The commenters are concerned that the process could be unreasonably delayed should the Department, the covered entity, or the dispute resolution committee not act in a timely manner. For example, an audit cannot begin until the Department grants permission and approves the audit workplan, while a covered entity's refusal to respond to an audit report would preclude the next step in the process from taking place. The suggestions for timeframes included to shorten from 60 to 30 days the timeframe for covered entities to respond to a manufacturer's audit findings and apply a 30-day timeframe for each step except for the act of performing the actual audit.

*Response:* There should be timeframes applicable to the actions required by the covered entities and the Department. The following timeframes have been incorporated into the guidelines:

• The Department will review an audit work plan submitted by a manufacturer within 15 days of submission;

• The requirement for covered entities to respond to audit findings and recommendations within 60 days has been reduced to 30 days;

*Comment:* Access to records should include the records of any organization employed by the covered entity to purchase or dispense drugs or file Title XIX claims on the entity's behalf.

*Response:* The auditors must have access to all records necessary for identifying and determining the eligibility of the ultimate consumer of drugs purchased at the discount price and whether Medicaid rebates were also claimed for those drugs. The guidelines have been revised to indicate that any organization purchasing or dispensing covered drugs or filing Title XIX claims on behalf of a covered entity is subject to the same audit requirements as the covered entity.

*Comment:* There were concerns with the Department's March 1994 Guideline Letter concerning the contracted pharmacy mechanism. These commenters believe that unforeseen

business relationships and activities by covered entities under these guidelines could result in new patterns of fraud and abuse.

*Response:* The Department has addressed the contracted pharmacy mechanism in a separate Federal Register final notice on August 23, 1996 at 61 FR 43549.

*Comment:* Compliance with the requirements outlined in the Government Auditing Standards will significantly increase the cost of performing audits and require the use of independent accountants rather than internal audit staff. It was suggested that manufacturers use their own internal auditing standards or those of the Institute of Internal Auditors.

*Response:* Conducting audits in accordance with the Government Auditing Standards will provide assurances that audits will be performed in accordance with generally accepted auditing standards relating to professional qualifications of the auditors, independence, due professional care, field work, and reporting of the audit findings. Compliance with these standards will also ensure audit uniformity and consistency and adequacy of documentation to permit independent review in cases where disputes arise.

*Comment:* The guidelines should stipulate the record retention requirements for covered entities (i.e., indicate how long records must be maintained for possible audit).

*Response:* Covered entities should maintain records to demonstrate the distribution and use of covered drugs for a period of not less than 3 years.

*Comment:* There should be greater audit latitude and cooperation between manufacturers and entities as allowed by the "Medicaid Agreement."

*Response:* The "Medicaid Agreement" permits manufacturers to audit the Medicaid utilization information reported by the State. In this instance, manufacturers are auditing information received by the State and are permitted to develop mutually beneficial procedures with the State. This is a very different situation from the audits permitted by section 340B. Pursuant to section 340B authority, a manufacturer may audit an entity whose only connection to the State or Federal government is in the form of a grant or reimbursement that it receives. In this instance, the manufacturer is permitted to audit only pursuant to guidelines established by the Secretary.

*Comment:* In order to maximize profits, covered entities could require patients to purchase covered drugs from

them, thus infringing on patients' rights to choose their own providers.

*Response:* Patients of covered entities have the right to fill their prescriptions at the pharmacy of their choice. Of course, if the patient chooses to have the prescription filled at a location other than with the covered entity, discount pricing cannot be guaranteed.

*Comment:* The guidelines should focus only on the number, duration, and scope of audits.

*Response:* The guidelines stipulate that (1) audits are to be performed only when there is a reasonable cause to believe that there has been a violation of section 340B(a)(5) (A) or (B); (2) audits are to be conducted with the least possible disruption to the operations of the covered entity with only one audit being permitted during the same time period; and (3) the scope of the audits must be sufficient to evaluate the covered entity's compliance with the aforementioned statutory prohibitions.

*Comment:* The guidelines are unfairly burdensome and shift the Secretary's responsibility for enforcing the statute to the manufacturers.

*Response:* In accordance with the intent of the statute, the audits should be performed only when there is reasonable cause for their performance. Further, the statute also states that the audits should be conducted at the expense of the Government or the manufacturer. We believe that the party which demonstrates a reasonable cause for the audit should commission the audit. However, in cases where more than one manufacturer has demonstrated reasonable cause for an audit, then the Government may perform the audit in order to protect the confidentiality of the manufacturers' proprietary information.

*Comment:* Some of the proposed audit steps are duplicative; therefore, the proposed audit steps at section II b, c, e, f, g should be excised or moved to streamline the proposed guidelines.

*Response:* The guidelines have been reorganized to provide a section on "Procedures To Be Followed" and a section on "Suggested Audit Steps." This clearly distinguishes the procedures to be followed by the manufacturer from the suggested procedures to be performed by the manufacturer's auditors.

*Comment:* In cases where the Government elects to perform its own audit, the resulting audit report should be made available to the manufacturers.

*Response:* Audit reports prepared by Government auditors are public documents. A copy of the audit report will be made available to the manufacturers upon request. Requests

**Add.70**

should be addressed to: Director, HRSA, Office of Drug Pricing, Bureau of Primary Health Care, 4350 East West Highway, West Towers, 10th Floor, Bethesda, MD 20814.

*Comment:* Because audits will be permitted only when the manufacturer can demonstrate that there is "reasonable cause" to believe that a violation of section 340B(a)(5) has occurred, "reasonable cause" should be defined.

*Response:* The guidelines have been revised to provide a definition of "reasonable cause."

*Comment:* A covered entity should be given an opportunity to respond to a manufacturer's request for an audit before the Department determines whether an audit may be performed and should be permitted to review and comment on the manufacturer's proposed audit workplan before it is approved by the Department.

*Response:* The guidelines provide for a 30 day period before the manufacturer submits to the Department an audit work plan in which the manufacturer and the covered entity must attempt in good faith to resolve the matter. When the manufacturer submits its audit work plan, it has already discussed the matter with the covered entity; therefore, we do not believe there is a need for the covered entity to comment on a manufacturer's submission of an audit workplan. The Department, at its discretion, may contact the covered entity as part of the review process of the proposed manufacturer's audit. Likewise, we do not believe that there is a need for the covered entity to review and comment on the manufacturer's proposed workplan once it has been reviewed by the Department.

*Comment:* The guidelines should be clarified to indicate that the manufacturer's independent public accountant should perform the audit. This is necessary to comply with the "independence standard" contained in the Government Auditing Standards.

*Response:* The guidelines have been modified to indicate that a manufacturer's auditor shall be an independent public accountant employed by a manufacturer to perform the audit.

*Comment:* Refer to reviews as "attestation engagements" rather than "audits," and perform them as agreed-upon procedures in accordance with the Statement on Standards for Attestation Engagements No. 3, Compliance Attestation. The procedures to be performed could be jointly developed and agreed upon by the Department, the covered entity, manufacturer, and the independent accountant.

*Response:* Although some of the work to be performed by the independent public accountant or government auditor may involve some attestation procedures, the statute calls for an audit of the covered entity's records. Therefore, the term audit has been used in the preparation of the guidelines. Further, we agree that the opinions and views of all interested parties should be considered in the preparation of the guidelines. This has been achieved through the publication of the proposed guidelines in the Federal Register, requesting public comment.

*Comment:* The notice should include the guidelines to be followed by Federal auditors.

*Response:* Federal auditors will perform audits in accordance with the Government Auditing Standards. The Notice has been clarified.

*Comment:* Covered entities should have the right to submit newly compiled or discovered information following the manufacturer's audit for consideration by the review committee.

*Response:* The guidelines provide that when a covered entity disagrees with the audit report's findings and recommendations, the covered entity should provide its rationale for the disagreement to the manufacturer. The manufacturer and the covered entity must make a good faith effort to resolve the issue before requesting review using the dispute resolution process. Newly compiled or discovered information can be provided to the manufacturer during this period of good faith effort. If the parties are still unable to reach agreement, the newly compiled or discovered information can be submitted to the Department along with the other information that was developed as part of the audit. The Department will consider the auditor's findings and recommendations as well as the covered entity's rationale for disagreeing during the review process.

*Comment:* All covered entity records and information identified in the audit process should be held in strict confidence by the manufacturer.

*Response:* Confidential patient information and proprietary information will be protected.

*Comment:* Manufacturers should not be required to continue to sell to a covered entity at the mandated price once an audit has been initiated, particularly since reasonable cause has already been demonstrated.

*Response:* Manufacturers must continue to sell at the statutory price during the audit process. Once the audit has been completed and the manufacturer believes that there is sufficient evidence to indicate

prohibited entity activity, then the manufacturer may bring the claim to the Department through the informal dispute process. Not until the entity is found guilty of prohibited activity and a decision is made to remove the entity from the covered entity list, will the manufacturers no longer be required to extend the discount.

*Comment:* Each manufacturer, wronged by the same business practices of the same entity, must wait its turn to audit the entity and pursue its case through the dispute process in order to recover. This could result in a failure to enforce the statute.

*Response:* The guidelines have been revised to permit the Department, if deemed necessary, to provide for corrective action as to other manufacturers wronged by prohibited entity activity.

*Comment:* Include the hospital prohibition against participation in any group purchasing arrangement as a permissible audit subject.

*Response:* The statute clearly limits the audit subjects to potential entity diversion (section 340B(a)(5)(B)) and entity activity that could generate a rebate on a drug that was discounted under the Act (section 340B(a)(5)(A)).

*Comment:* Provide for access to different records depending upon the record keeping system of the entity.

*Response:* The notice has been revised to permit access to primary records which would be included in a reasonable audit trail.

*Comment:* There is a requirement that an informational copy of the audit be provided to the Department and the Inspector General. Why cannot the entire report be provided to these offices?

*Response:* The guidelines have been revised to require that the entire report be submitted to the Department and the Office of the Inspector General.

*Comment:* The guidelines should not preclude the entity and the manufacturer from both voluntarily developing mutually beneficial audit procedures.

*Response:* The guidelines have been revised to include a statement that the guidelines do not preclude the entity and the manufacturer from both voluntarily developing mutually beneficial audit procedures.

*Comment:* The auditor should be able to confirm with the Department that the entity has provided its Medicaid provider number.

*Response:* The guidelines have been revised to permit the auditor to confirm with the Department that the entity being audited does not generate a Medicaid rebate while accepting 340B

discounts (e.g., has provided its Medicaid provider number, does not bill Medicaid, or utilizes an all-inclusive rate billing system). Manufacturers are free to challenge a hospital's eligibility as a covered entity by corresponding with the Department.

*Comment:* The Department must act independently to assure compliance.

*Response:* The Department will investigate all documentation submitted regarding both entity and manufacturer noncompliance and, when appropriate, take the necessary steps to remove the entity from "covered entity" status or terminate the Pharmaceutical Pricing Agreement which the manufacturer signed with HHS, thus preventing further participation in the program.

*Comment:* Set a specific time limit for a manufacturer to have audit personnel at the entity facility with the possibility of an extension for good cause.

*Response:* Because of the many variables (e.g., size of the covered entity and scope of the audit), it would be impossible to set specific time limits. However, if an entity believes that auditors are exceeding a reasonable time period, it may notify the Department for assistance.

*Comment:* You fail to require entities to allow audits.

*Response:* Please refer to the section entitled, "Supplemental Information, Manufacturer Audit Guidelines," where we begin the discussion with the statement, "Covered entities which choose to participate in the section 340B drug discount program must comply with the requirements of section 340B(a)(5) of the PHS Act." Section 340B(a)(5)(C) provides that a covered entity shall permit the manufacturer of a covered outpatient drug to audit the records of the entity that pertain to the entity's compliance with section 340B(a)(5).

*Comment:* Guidelines regarding scope should be expanded to include procedures to assure that manufacturers not have access to information that identifies specific patients or transaction records concerning the products of other manufacturers.

*Response:* The guidelines require that audits be performed in accordance with the *Government Auditing Standards* (GAS) developed by the Comptroller General of the United States. These standards require auditors to prepare the audit reports in a manner that protects privileged and confidential information. Confidential patient information and/or proprietary information which auditors may access in the performance of an audit will not be disclosed to the manufacturer.

*Comment:* In the new section III(b), change the word "access" to "obtain an understanding of," and in section III(e) change the word "determine" to "test."

*Response:* We have revised the notice accordingly.

(C) Revised Manufacturer Audit Guidelines

Set forth below are the final manufacturer audit guidelines, revised based upon an analysis of the comments above.

Manufacturer Audit Guidelines

Covered entities which choose to participate in the section 340B drug discount program shall comply with the requirements of section 340B(a)(5) of the PHS Act. Section 340B(a)(5)(A) prohibits a covered entity from accepting a discount for a drug that would also generate a Medicaid rebate. Further, section 340B(a)(5)(B) prohibits a covered entity from reselling or otherwise transferring a discounted drug to a person who is not a patient of the entity. The participating entity shall permit the manufacturer of a covered outpatient drug to audit its records that directly pertain to the entity's compliance with section 340B(a)(5) (A) and (B) requirements with respect to drugs of the manufacturer. Manufacturer audits shall be conducted in accordance with guidelines developed by the Secretary, as required by section 340B(a)(5)(C). Not only will the records of any organization working with a covered entity to purchase or dispense covered drugs, or to prepare Medicaid reimbursement claims for the covered entity be subject to the same audit requirement, but also any primary record that could be part of a reasonable audit trail.

This notice does not include the complete audit guidelines to be used by Government auditors in cases where the Government performs its own audit. Federal auditors shall perform audits in accordance with the Government Auditing Standards. The Government auditors' authority to audit the covered entity's compliance with the requirements of section 340B(a)(5) (A) and (B) shall not be limited by the manufacturer's audit guidelines.

The following is the "Compliance Audit Guide" concerning manufacturer audit guidelines as developed by the Secretary pursuant to section 340B(a)(5)(C): (These guidelines do not preclude the entity and the manufacturer from voluntarily developing mutually beneficial audit procedures.)

*I. General Guidelines*

The manufacturer shall submit a work plan for an audit which it plans to conduct of a covered entity to the Department. (See section III for suggested audit steps.) The manufacturer's auditor shall be an independent public accountant employed by the manufacturer to perform the audit. The auditor has an ethical and legal responsibility to perform a quality audit in accordance with Government Auditing Standards, Current Revision, developed by the Comptroller General of the United States. Patient confidentiality requirements also must be observed. At the completion of the audit, the auditors must prepare an audit report in accordance with the reporting standards for performance audits in Government Auditing Standards, Current Revision. The cost of a manufacturer audit shall be borne by the manufacturer, as provided by section 340B(a)(5)(C) of the PHS Act.

(a). Number of Audits

A manufacturer shall conduct an audit only when it has documentation which indicates that there is reasonable cause. "Reasonable cause" means that a reasonable person could believe that a covered entity may have violated a requirement of section 340B(a)(5) (A) or (B) of the PHS Act (i.e., accepting a 340B discount on a covered outpatient drug at a time when the covered entity has not submitted its Medicaid billing status to the Department or transferring or otherwise reselling section 340B discounted covered drugs to ineligible recipients).

Consistent with Government auditing standards, the organization performing the audit shall coordinate with other auditors, when appropriate, to avoid duplicating work already completed or that may be planned. Only one audit of a covered entity will be permitted at any one time. When specific allegations involving the drugs of more than one manufacturer have been made concerning an entity's compliance with section 340B(a)(5) (A) and (B), the Department will determine whether an audit should be performed by the (1) Government or (2) the manufacturer.

(b). Scope of Audits

The manufacturer shall submit an audit workplan describing the audit to the Department for review. The Department will review the workplan for reasonable purpose and scope. Only those records of the covered entity (or the records of any organization that works with the covered entity to

**Add.72**

purchase, dispense, or obtain Title XIX reimbursement for the covered drug) that directly pertain to the potential 340B violation(s) may be accessed, including those systems and processes (e.g., purchasing, distribution, dispensing, and billing) that would assist in determining whether a 340B violation has occurred.

(c). Duration of Audits

Normally, audits shall be limited to an audit period of one year and shall be performed in the minimum time necessary with the minimum intrusion on the covered entity's operations.

II. Procedures To Be Followed

(a). The manufacturer shall notify the covered entity in writing when it believes the covered entity has violated provisions of section 340B. The manufacturer and the covered entity shall have at least 30 days from the date of notification to attempt in good faith to resolve the matter.

(b). The manufacturer has the option to proceed to the dispute resolution process described later in the notice without an audit, if it believes it has sufficient evidence of a violation absent an audit. If the matter is not resolved and the manufacturer desires to perform an audit, the manufacturer must file an audit work plan with the Department. (See section **FOR FURTHER INFORMATION** for address.) The manufacturer must set forth a clear description of why it has reasonable cause to believe that a violation of section 340B(a)(5) (A) or (B) has occurred, along with sufficient facts and evidence in support of the belief. In addition, the manufacturer shall provide copies of any documents supporting its claims.

(c). The Department will review the documentation submitted to determine if reasonable cause exists. If the Department finds that there is reasonable cause to believe that a violation of section 340B(a)(5) (A) or (B) has occurred, the Department will not intervene. In cases where the Department determines that the audit shall be performed by the Government, the Department will so advise the manufacturer and the covered entity within 15 days of receipt of the audit work plan.

(d). The filing of a audit work plan does not affect the statutory obligations of the parties as defined in section 340B of the PHS Act. During the audit process, the manufacturer must continue to sell covered outpatient drugs at the section 340B ceiling price to the covered entity being audited, and the covered entity must continue to

comply with the requirements of section 340B(a)(5).

(e). Upon receipt of the manufacturer's audit work plan, the Department, in consultation with an appropriate audit component, will review the manufacturer's proposed workplan. As requested by GAS, the audit workplan shall describe in detail the following:

(1). audit objectives (what the audit is to accomplish), scope (type of data to be reviewed, systems and procedures to be examined, officials of the covered entity to be interviewed, and expected time frame for the audit), and methodology (processes used to gather and analyze data and to provide evidence to reach conclusions and recommendations);

(2). skill and knowledge of the audit organization's personnel to staff the assignment, their supervision, and the intended use of consultants, experts, and specialists;

(3). tests and procedures to be used to assess the covered entity's system of internal controls;

(4). procedures to be used to determine the amounts to be questioned should violations of section 340B(a)(5) (A) and (B) be discovered; and

(5). procedures to be used to protect patient confidentiality and proprietary information.

(f). Within 15 days of receipt of the proposed audit workplan, the Department shall review the work plan. If after this review the Department has concerns about the work plan, it will work with the manufacturer to incorporate mutually agreed-upon revisions to the plan. The covered entity will have at least 15 days to prepare for the audit.

(g). At the completion of the audit, the auditors must prepare an audit report in accordance with reporting standards for performance audits of the GAS. The manufacturer shall submit the audit report to the covered entity. The covered entity shall provide its response to the manufacturer on the audit report's findings and recommendations within 30 days from the date of receipt of the audit report. When the covered entity agrees with the audit report's findings and recommendations either in full or in part, the covered entity shall include in its response to the manufacturer a description of the actions planned or taken to address the audit findings and recommendations. When the covered entity does not agree with the audit report's findings and recommendations, the covered entity shall provide its rationale for the disagreement to the manufacturer.

(h). The manufacturer shall also submit copies of the audit report to the Department (see section **FOR FURTHER INFORMATION CONTACT** for the address)

and the Office of Inspector General, Office of Audit Services, PHS Audits Division at Room 1–30, Park Building, 12420 Parklawn Drive, Rockville, MD 20857.

(i). If a dispute concerning the audit findings and recommendations arises, the parties may file a request for dispute resolution with the Department. All dispute resolution procedures developed by the Department shall be followed.

III. Suggested Audit Steps

Suggested audit steps include the following:

(a). Review the covered entity's policies and procedures regarding the procurement, inventory, distribution, dispensing, and billing for covered outpatient drugs.

(b). Obtain an understanding of internal controls applicable to the policies and procedures identified above (step a) when necessary to satisfy the audit objectives.

(c). Review the covered entity's policies and procedures to prevent the resale or transfer of drugs to a person or persons who are not patients of the covered entity.

(d). Test compliance with the policies and procedures identified above (step c) when necessary to satisfy the audit objectives.

(e). Review the covered entity's records of drug procurement and distribution and test whether the covered entity obtained a discount only for those programs authorized to receive discounts by section 340B of the PHS Act.

(f). If a covered entity does not use an all inclusive billing system (per encounter or visit), but instead bills outpatient drugs using a cost-based billing system, determine whether the covered entity has provided its pharmacy Medicaid provider number to the Department and test whether the covered entity billed Medicaid at the actual acquisition cost. The auditor is permitted to contact the ODP (at the number in the **FOR FURTHER INFORMATION CONTACT** section) to determine if the entity—(1) has provided its pharmacy Medicaid provider number, (2) does not bill Medicaid for covered outpatient drugs, (3) uses an all-inclusive rate billing system, or (4) is an entity clinic eligible for the discount pricing but located within a larger medical facility not eligible for the drug discounts and has provided the ODP a separate pharmacy Medicaid provider number or an agreement with the State Medicaid Agency regarding an operating mechanism to prevent duplicate discounting.

(g). Where the manufacturer's auditors conclude that there has been a violation of the requirements of section 340B(a)(5)(A) or (B), identify (1) the procedures or lack of adherence to existing procedures which caused the violation, (2) the dollar amounts involved, and (3) the time period in which the violation occurred.

(h). Following completion of the audit field work, provide an oral briefing of the audit findings to the covered entity to ensure a full understanding of the facts.

(D) Comment and Responses—Informal Dispute Resolution

*Comment:* The guidelines should include a mechanism to verify or "dispute" the accuracy of the Department's list of covered entities.

*Response:* The notice has been revised to include, as a type of dispute covered by the informal dispute mechanism, the accuracy of the master list of covered entities.

*Comment:* A dispute review committee consisting of only ODP and other PHS employees could result in conflict-of-interest concerns. The dispute review committee should be an independent body (e.g., an administrative law judge), and there should be a mechanism to provide for non-PHS members in cases where the dispute involved ODP.

*Response:* The Department is overseeing the implementation of section 340B of the PHS Act, and as such, is offering a voluntary dispute resolution mechanism to expedite this process. No manufacturer or covered entity is required to avail itself of this process before resorting to other available measures. Further, parties which do participate in the dispute resolution process will have an appeal opportunity with a HRSA review official or committee.

*Comment:* The penalties for covered entities that violate section 340B(a)(5) requirements are not adequate. For entities to merely repay discounts (plus interest) which they obtained and to which they were not entitled is not an effective deterrent. It was suggested that entities that have violated statutory requirements pay the cost of the audits, pay various amounts up to 150 percent of the improperly obtained discount (plus interest) and/or be banned from continued participation in the program. Further, it was suggested that an entity's failure to respond in a timely basis to a manufacturer's audit findings should result in a "summary judgment" against the entity.

*Response:* Section 340B(a) is clear concerning entity penalties for reselling

or transferring discounted drugs, for generating duplicate discounts and rebates and who must bear the cost of auditing. Section 340B(a)(4) defines "covered entity" as one which meets the requirements of paragraph (5). This paragraph prohibits drug diversion and double price reductions. If an entity is found guilty of either of these activities, the entities may be found by the Department no longer to be covered under section 340B. Section 340B(a)(5)(D) outlines the monetary penalty for violations of these prohibitions and provides that entities must pay to the manufacturer the amount of discount received. Although section 340B provides for no other penalty, copies of the audit results will be submitted to the Office of Inspector General for review and possible further investigation. Section 340B(a)(5)(C) clearly provides that manufacturer audits are performed at the manufacturer expense. We agree that some type of penalty is necessary for an entity which does not respond in a timely fashion to a manufacturer audit results. We have revised the audit guidelines to allow for the manufacturer to submit to the Department a request for dispute resolution for entity non-response within given timeframes.

*Comment:* Please clarify the meaning of "final determination" as used in Part III of the Notice entitled, "Penalties."

*Response:* A "final determination" under the Dispute Resolution procedure is reached when review by the Administrator of the Health Resources and Services Administration (HRSA) is completed and the HRSA Administrator or appointee has made a decision on the issue(s) involved.

*Comment:* It is not clear when an administrative decision can be appealed by a covered entity to the Federal courts.

*Response:* Covered entities or manufacturers are encouraged to participate in this voluntary process for the resolution of disputes regarding section 340B. It is expected that once a covered entity or a manufacturer submits a request for informal dispute resolution, the process will be completed before pursuing other remedies which may be available under applicable principles of law. Entities may wish to seek legal advice concerning the exhaustion of administrative remedies regarding a voluntary administrative process. Section III of the Guidelines has been clarified.

*Comment:* Additional appeal procedures may be problematic for covered entities or manufacturers who must exhaust their administrative

remedies before seeking remedies in a court of law.

*Response:* The dispute resolution process is a voluntary process. Manufacturers or entities are only encouraged to participate in the process before seeking other remedies.

*Comment:* The term "PHS" is not defined. It is unclear whether this means the ODP or some other office within the PHS.

*Response:* The term "PHS" means the Public Health Service in its entirety. The guidelines have been revised to reflect that the Department will be implementing these guidelines through the ODP.

*Comment:* A party who is unable to resolve a dispute can submit a written request for a review of the dispute. Time deadlines should be included to state when that written request can be submitted.

*Response:* The guidelines have been changed to include such deadlines.

*Comment:* Time deadlines and penalties for non-response must be included for various steps in the dispute process. First, upon receipt of a request for a review, the chairperson of the review committee should send a letter to the party alleged to have committed a violation. Time deadlines should be included on when the chairperson must send this letter. Second, the activities of the review committee should also have deadlines. Third, a deadline for the submission of additional information should be included.

*Response:* The guidelines have been changed to include such deadlines.

*Comment:* The penalties do not preclude the imposition by the Government of other penalties or remedies under other statutes such as the Federal False Claims Act.

*Response:* The guidelines have been revised to clarify this issue.

(E) Revised Informal Dispute Resolution Process

Set forth below are the final informal dispute resolution guidelines, revised based upon the analysis of the comments above.

Dispute Resolution Process

The Department, acting through the Office of Drug Pricing (ODP), is proposing a voluntary process for the resolution of certain disputes between manufacturers and covered entities concerning compliance with the provisions of section 340B of the PHS Act. Covered entities or manufacturers are not required to enter this informal process for resolution of disputes regarding section 340B. However, the Department expects parties to utilize the

process before resorting to other remedies which may be available under applicable principles of law.

### I. Types of Disputes Covered

Disputes resolved by these procedures include:

(a) A manufacturer believes a covered entity is in violation of the prohibition against resale or transfer of a covered outpatient drug (section 340B(a)(5)(B) of the PHS Act), or the prohibition against duplicate discounts or rebates (section 340B(a)(5)(A) of the PHS Act).

(b) A covered entity believes that a manufacturer is charging a price for a covered outpatient drug that exceeds the ceiling price as determined by section 340B(a)(1) of the PHS Act.

(c) A manufacturer is conditioning the sale of covered outpatient drugs to a covered entity on the entity's provision of assurances or other compliance with the manufacturer's requirements that are based upon section 340B provisions.

(d) A covered entity believes that a manufacturer has refused to sell a covered outpatient drug at or below the ceiling price, as determined by section 340B(a)(1) of the PHS Act.

(e) A manufacturer believes that a covered entity is dispensing a covered outpatient drug in an unauthorized service (e.g., inpatient services or ineligible clinics within the same health system).

(f) A manufacturer believes that a covered entity has not complied with the audit requirements under section 340B(a)(5)(c) of the PHS Act or the audit guidelines as set forth in this notice.

(g) A covered entity believes that the auditors of the manufacturer have not abided by the approved workplan or audit guidelines.

(h) A covered entity is unable to obtain covered outpatient drugs through a wholesaler because the manufacturer will only sell section 340B discounted drugs directly from the manufacturer to the entity.

(i) A manufacturer or covered entity wants to verify the accuracy of the master list of covered entities.

### II. Dispute Resolution Process

Prior to the filing of a request for dispute review with the Department, the parties must attempt, in good faith, to resolve the dispute. All parties involved in the dispute must maintain written documentation as evidence of the good faith attempt to resolve the dispute. Such evidence includes documentation of meetings, letters, or telephone calls between the disputing parties that concern the dispute.

If the dispute has not been resolved after a good faith attempt, a party may submit a written request for a review of the dispute to the Director of the ODP within 30 days. [See address in **FOR FURTHER INFORMATION CONTACT** section.]

The party requesting the review may not rely only upon allegations but is required to set forth specific facts showing that there is a genuine and substantial issue of material fact in dispute that requires a review.

The request for review shall include a clear description of the dispute, shall identify all the issues in the dispute, and shall contain a full statement of the party's position with respect to such issue(s) and the pertinent facts and reasons in support of the party's position. In addition to the required statement, the party shall provide copies of any documents supporting its claim and evidence that a good faith effort was made to resolve the dispute. These materials must be tabbed and organized chronologically and accompanied by an indexed list identifying each document.

The filing of the dispute does not affect any statutory obligations of the parties, as defined in section 340B of the PHS Act. During the review process, for example, a manufacturer must continue to sell covered outpatient drugs at or below the section 340B ceiling price to all covered entities, including the covered entity involved in the dispute. Only when the entity is found guilty of prohibited activity and a decision is made to remove the entity from the list of covered entities, is the manufacturer no longer required to extend the discount.

The Director, Bureau of Primary Health Care, shall appoint a committee to review the documentation submitted by the disputing parties and to make a proposed determination. A minimum of three individuals shall be appointed (one of whom shall be designated as a chairperson) either on an ad hoc, case-by-case basis, or as regular members of the review committee. The chairperson shall be from the ODP and the committee members shall be from other sections of PHS (e.g. chief pharmacist, auditor).

Upon receipt of a request for a review, the chairperson of the review committee, within 30 days, will send a letter to the party alleged to have committed a violation. The letter will include (1) the name of the party making the allegation(s), (2) the allegation(s), (3) documentation supporting the party's position, and (4) a request for a response to or rebuttal of the allegations within 37 calendar days of the receipt of the letter (7 days from the date of the postmark of the letter being allowed for mailing and processing through the organization).

Upon receipt of the response or rebuttal, the review committee will review all documentation. The request and rebuttal information will be reviewed for (1) evidence that a good faith effort was made to resolve the dispute, (2) completeness, (3) adequacy of the documentation supporting the issues, and (4) the reasonableness of the allegations. If the documentation meets these requirements, the review committee will consider the matter.

The reviewing committee may, at its discretion, invite parties to discuss the pertinent issues with the committee and to submit such additional information as the committee deems appropriate.

The reviewing committee will propose to dismiss the dispute, if it conclusively appears from the data, information, and factual analyses contained in the request for a review and rebuttal documents that there is no genuine and substantial issue of fact in dispute. Within 30 days, a written decision of dismissal will be sent to each party and will contain the committee's findings and conclusions in detail, and, if the committee decided to dismiss, reasons why the request for a review did not raise a genuine and substantial issue of fact.

With all other proposed findings, within 30 days, the review committee will prepare a written document containing the findings and detailed reasons supporting the proposed decision. The document is to be signed by the chairperson and each of the other committee members. The committee's written decision will be sent with a transmittal letter to both parties. If the committee finds the covered entity guilty of prohibited activity and a decision is made to remove the entity from the covered entity list, then the manufacturers will no longer be required to extend the discount. If the covered entity or the manufacturer does not agree with the committee's determination, the covered entity or the manufacturer may appeal within 30 days after receiving such a determination to the Administrator of the Health Resources and Services Administration, who will appoint a review official or committee. The review official or committee will respond to appeal requests within 30 days from the receipt of the request.

### III. Penalties

If the final determination is that a manufacturer has violated the provisions of section 340B of the PHS Act or the PHS Pharmaceutical Pricing Agreement, the manufacturer's agreement with HHS could be terminated or other actions taken, as

deemed appropriate. If the final determination is that an entity has violated section 340B prohibitions against the resale or transfer of covered outpatient drugs or the prohibition against duplicate discounts and rebates (or billing Medicaid more than the actual acquisition cost of the drug), the entity shall be liable to the manufacturer of the covered outpatient drug that is the subject of the violation in an amount equal to the reduction in the price of the drug for the period of the violation, as provided by section 340B(a)(5)(D) of the PHS Act. After the dispute is resolved, any disputed amounts must be paid or credited to an account balance no later than 30 days following a final determination. The entity may also be excluded from the drug discount program, if the conduct warrants such a sanction. Such penalties do not preclude the imposition by the Government of other penalties or remedies under other statutes such as the Federal False Claims Act. A copy of the findings may be sent to the Office of the Inspector General for further action. If it is documented that several manufacturers have been wronged by the same prohibited entity behavior, corrective action will be afforded such manufacturers. (The reporting and recordkeeping requirements of this document are subject to the Paperwork Reduction Act of 1995, 44 U.S.C. 3501–3520, and have OMB clearance through 9/30/97 (OMB Control No. 0915–0176). The Paperwork Reduction Act of 1995 added disclosure requirements to the list of items needing OMB approval. The disclosure requirements in the audit guidelines include: section II(a)—the manufacturer shall notify the covered entity in writing when it believes the covered entity has violated provisions of section 340B; section II(g)—the manufacturer shall submit the audit report to the covered entity, and the covered entity shall provide its response to the manufacturer on the audit report's findings * * *; and section III(h) the manufacturer shall provide an oral briefing of the audit findings to the covered entity. The disclosure requirements in these sections will not be in force until OMB approval has been obtained.

Dated: December 6, 1996.

Ciro V. Sumaya,

*Administrator, Health Resources and Services Administration.*

[FR Doc. 96–31541 Filed 12–11–96; 8:45 am]

**BILLING CODE 4160–15–P**

## National Institutes of Health

### National Institute on Aging; Notice of Closed Meeting

Pursuant to Section 10(d) of the Federal Advisory Committee Act, as amended (5 U.S.C. Appendix 2), notice is hereby given of the following meeting:

*Name of Committee:* National Institute on Aging Special Emphasis Panel (Teleconference).

*Date of Meeting:* December 19, 1996.

*Time of Meeting:* 10:30 a.m. to adjournment.

*Place of Meeting:* Gateway Building, Room 2C212, 7201 Wisconsin Avenue, Bethesda, Maryland 20892.

*Purpose/Agenda:* To review a grant application.

*Contact Person:* Dr. James P. Harwood, Scientific Review Administrator, Gateway Building, Room 2C212, National Institutes of Health, Bethesda, Maryland 20892–9205, (301) 496–9666.

This notice is being published less than 15 days prior to the above meeting due to the urgent need to meet timing limitations imposed by the review and funding cycle.

This meeting will be closed in accordance with the provisions set forth in sections 552b(c)(4) and 552b(c)(6), Title 5, U.S.C. Applications and/or proposals and the discussions could reveal confidential trade secrets or commercial property such as patentable material and personal information concerning individuals associated with the applications and/or proposals, the disclosure of which would constitute a clearly unwarranted invasion of personal privacy.

(Catalog of Federal Domestic Assistance Program No. 93.866, Aging Research, National Institutes of Health)

Dated: December 6, 1996.

Paula N. Hayes,

*Acting Committee Management Officer, NIH.*

[FR Doc. 96–31585 Filed 12–11–96; 8:45 am]

**BILLING CODE 4140–01–M**

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

[Docket No. FR–4086–N–86]

### Notice of Proposed Information Collection for Public Comment

**AGENCY:** Office of the Assistant Secretary for Community Planning and Development, HUD.

**ACTION:** Notice

**SUMMARY:** The proposed information collection requirement described below will be submitted to the Office of Management and Budget (OMB) for review, as required by the Paperwork Reduction Act. The Department is soliciting public comments on the subject proposal.

**DATES:** Comments due: February 10, 1997.

**ADDRESSES:** Interested persons are invited to submit comments regarding this proposal. Comments should refer to the proposal by name and/or OMB Control Number and should be sent to: Reports Liaison Officer, Shelia E. Jones, Department of Housing & Urban Development, 451—7th Street, SW, Room 7230, Washington, DC 20410.

**FOR FURTHER INFORMATION CONTACT:** Frank Price, 202–708–2094 ext. 4572 (this is not a toll-free number) for copies of the proposed forms and other available documents.

**SUPPLEMENTARY INFORMATION:** The Department will submit the proposed information collection to OMB for review, as required by the Paperwork Reduction Act of 1995 (44 U.S.C. Chapter 35, as amended).

The Notice is soliciting comments from members of the public and affected agencies concerning the proposed collection of information to: (1) Evaluate whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility; (2) Evaluate the accuracy of the agency's estimate of the burden of the proposed collection of information; (3) Enhance the quality, utility, and clarity of the information to be collected; and (4) Minimize the burden of the collection of information on those who are to respond; including through the use of appropriate automated collection techniques or other forms of information technology, e.g., permitting electronic submission of responses.

This Notice also lists the following information:

*Title of Proposal:* Rental Rehabilitation Program Renewal Application.

*OMB Control Number, if applicable:* 2506–0080.

*Description of the need for the information and proposed use:* Although the Rental Rehabilitation Program was terminated October 1, 1991, Public Law 98–181 (97 Stat. 1153), Section 17, that originally authorized the Rental Rehabilitation Program still imposes data collection and reporting requirements upon HUD and grantees. The information will be used by HUD to account for program grant funds and to satisfy statutory reporting requirements.



republished in its entirety; and amended on September 28, 2009 to provide targeted liability protections for pandemic countermeasures to enhance distribution and to add provisions consistent with other declarations and republished in its entirety. This Declaration incorporates all amendments prior to the date of its publication in the **Federal Register**. Any future amendment to this Declaration will be published in the **Federal Register**, pursuant to section 319F–2(b)(4) of the Act.

## X. Definitions

For the purpose of this Declaration, including any claim for loss brought in accordance with section 319F–3 of the PHS Act against any covered persons defined in the Act or this Declaration, the following definitions will be used:

Administration of a Covered Countermeasure: As used in section 319F–3(a)(2)(B) of the Act includes, but is not limited to, public and private delivery, distribution, and dispensing activities relating to physical administration of the countermeasures to recipients, management and operation of delivery systems, and management and operation of distribution and dispensing locations.

Authority Having Jurisdiction: Means the public agency or its delegate that has legal responsibility and authority for responding to an incident, based on political or geographical (*e.g.,* city, county, Tribal, State, or Federal boundary lines) or functional (*e.g.,* law enforcement, public health) range or sphere of authority.

Covered Persons: As defined at section 319F–3(i)(2) of the Act, include the United States, manufacturers, distributors, program planners, and qualified persons. The terms "manufacturer," "distributor," "program planner," and "qualified person" are further defined at sections 319F–3(i)(3), (4), (6), and (8) of the Act.

Declaration of Emergency: A declaration by any authorized local, regional, State, or Federal official of an emergency specific to events that indicate an immediate need to administer and use pandemic countermeasures, with the exception of a Federal declaration in support of an emergency use authorization under section 564 of the FDCA unless such declaration specifies otherwise.

Pandemic influenza A viruses and those with pandemic potential: Animal and/or human influenza A viruses, except those included in seasonal influenza vaccines and/or covered under the National Vaccine Injury Compensation Program, that are

circulating in wild birds and/or domestic animals, that cause, or have significant potential to cause, sporadic or ongoing human infections, or historically have caused pandemics in humans, or have mutated to cause pandemics in humans, and for which the majority of the population is immunologically naïve.

*Pandemic Phase:* The following stages, as defined in the National Strategy for Pandemic Influenza: Implementation Plan (Homeland Security Council, May 2006): (4) First Human Case in North America; and (5) Spread Throughout United States.

*Pre-pandemic Phase:* The following stages, as defined in the National Strategy for Pandemic Influenza: Implementation Plan (Homeland Security Council, May 2006): (0) New Domestic Animal Outbreak in At-Risk Country; (1) Suspected Human Outbreak Overseas; (2) Confirmed Human Outbreak Overseas; and (3) Widespread Human Outbreaks in Multiple Locations Overseas.

Dated: February 26, 2010.

**Kathleen Sebelius,**

*Secretary.*

## APPENDIX

**I. List of U.S. Government Contracts—Covered H5N1, H2, H6, H7, H9, and 2009–H1N1 Vaccine Contracts**

1. HHSN266200400031C
2. HHSN266200400032C
3. HHSN266200300039C
4. HHSN266200400045C
5. HHSN266200205459C
6. HHSN266200205460C
7. HHSN266200205461C
8. HHSN266200205462C
9. HHSN266200205463C
10. HHSN266200205464C
11. HHSN266200205465C
12. HHSN266199905357C
13. HHSN266200300068C
14. HHSN266200005413C
15. HHSO100200600021C (formerly 200200409981)
16. HHSO100200500004C
17. HHSO100200500005I
18. HHSO100200700026I
19. HHSO100200700027I
20. HHSO100200700028I
21. HHSO100200600010C
22. HHSO100200600011C
23. HHSO100200600012C
24. HHSO100200600013C
25. HHSO100200600014C
26. HHSO100200600022C (formerly 200200511758)
27. HHSO100200600023C (formerly 200200410431)
28. CRADA No. AI–0155 NIAID/MedImmune
29. HHSO100200700029C
30. HHSO100200700030C
31. HHSO100200700031C
32. All present, completed and future Government H5N1, H2, H6, H7, H9, and 2009–H1N1 vaccine contracts not

otherwise listed.

[FR Doc. 2010–4644 Filed 3–4–10; 8:45 am]

**BILLING CODE P**

---

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Health Resources and Services Administration

### Notice Regarding 340B Drug Pricing Program—Contract Pharmacy Services

**AGENCY:** Health Resources and Services Administration, HHS.

**ACTION:** Final notice.

**SUMMARY:** Section 602 of Public Law 102–585, the "Veterans Health Care Act of 1992" enacted Section 340B of the Public Health Service Act (PHS). Section 340B implements a drug pricing program by which manufacturers who sell covered outpatient drugs to particular covered entities listed in the statute must agree to charge a price that will not exceed the amount determined under a statutory formula. The purpose of this Final Notice is to inform interested parties of final guidelines regarding the utilization of multiple contract pharmacies and suggested contract pharmacy provisions, which had been previously limited to the Alternative Methods Demonstration Project program.

**FOR FURTHER INFORMATION CONTACT:** Mr. Jimmy Mitchell, Director, Office of Pharmacy Affairs (OPA), Healthcare Systems Bureau (HSB), Health Resources and Services Administration (HRSA), 5600 Fishers Lane, Parklawn Building, Room 10C–03, Rockville, Maryland 20857 or by telephone through the Pharmacy Services Support Center at 1–800–628–6297.

**DATES:** *Effective Date:* April 5, 2010.

**SUPPLEMENTARY INFORMATION:**

### A. Background

Proposed guidelines for contract pharmacy services were announced in the **Federal Register** at 72 FR 1540 on January 12, 2007. A comment period of 60 days was established to allow interested parties to submit comments. HRSA, HSB, acting through the OPA, received 32 comments concerning the proposal.

In 1996, HRSA issued guidelines that permitted covered entities participating in the 340B Drug Pricing Program to contract with a pharmacy to provide services to the covered entity's patients (61 FR 43549, August 23, 1996). Those guidelines permitted a covered entity to use a single point for pharmacy services, either an in-house pharmacy or an

individual contract pharmacy. Since 2001, covered entities that have wanted to use other types of arrangements, or to blend the method of providing services (*e.g.* contract pharmacy to supplement an in-house pharmacy) have needed to apply to the OPA for an Alternative Methods Demonstration Project (AMDP) and secure approval in order to proceed.

It is important for all covered entities to keep in mind that use of a contract pharmacy arrangement (single, multiple or AMDP) does not lessen a covered entity's duty to ensure that the 340B program is being administered in compliance with the statute and HRSA guidelines. The covered entity has, and continues to bear, full responsibility and accountability for compliance with all requirements to prevent diversion of covered drugs to individuals other than patients of the covered entity, and to prevent situations in which a drug is subject to both the 340B discount and a Medicaid Rebate claim. Covered entities will be permitted to use multiple pharmacy arrangements as long as they comply with guidance developed to help ensure against diversion and duplicate discounts and the policies set forth regarding patient definition. Auditable records must be maintained to demonstrate compliance with those requirements. Such records must be maintained for as long as required by Federal, State and local law. Additionally, compliance with 340B requirements and guidelines does not excuse individual providers, covered entities, pharmacies, wholesale distributors or manufacturers from adherence to all other local, State or Federal requirements.

Covered entities should also be mindful that use of a contract pharmacy is voluntary. Covered entities are not required to use multiple contract pharmacies or any contract pharmacy at all. Each covered entity should conduct its own business review and patient assessment to determine what level of pharmacy services is needed, and the appropriate delivery mechanism for those services.

We received many comments in support of the proposal. Many of these came from covered entities that participate in 340B and highlighted how their delivery of patient care would be enhanced with a multiple contract pharmacy option. According to these comments, some patients currently face transportation barriers or other obstacles that limit their ability to fill their prescriptions. It would be a significant benefit to patients to allow the use of more easily accessible, multiple contract pharmacy arrangements by covered entities. This would permit covered

entities to more effectively utilize the 340B program and create wider patient access by having more inclusive arrangements in their communities which would benefit covered entities, pharmacies and patients served.

*Comments raised a number of issues:* Audits; protecting against diversion; network models; limits on the number or location of contract pharmacies; and the need for model agreement provisions and certification procedures. Also addressed was the potential impact on manufacturers, pharmacies, covered entities and patients. Additional comments challenged the sufficiency of the data used to justify the changes, and questioned whether the proposed notice was in compliance with the Administrative Procedure Act.

The following section presents a summary of all major comments, grouped by subject, and a response to each grouping. All comments were considered in developing this Final Notice, and changes were made accordingly. Other changes were made to improve clarity and readability.

**B. Comments and Responses**

*(1) Administrative Procedure Act (APA) Compliance*

*Comment:* The proposed revisions represent a substantive rulemaking under the APA because they constitute new obligations and burdens on manufacturers. They also create new rights for covered entities under the law.

*Response:* HRSA disagrees. This guidance neither imposes additional burdens upon manufacturers, nor creates any new rights for covered entities under the law. HRSA has used interpretive guidance and statements of policy to provide guidance since the inception of the program and to create a working framework for its administration. Contract pharmacy service guidelines have been considered by HRSA to be "interpretative rules and statements of policy" exempt from notice and comment rulemaking under the APA. Nonetheless, HRSA has published these guidelines in the **Federal Register** and provided a public comment period to obtain input into guideline development. The present guidelines used this same process. HRSA has considered all comments, both Federal and public, in developing the Final Guidelines.

*Comment:* Eleven demonstration projects out of a total of 12,000 covered entities do not give HRSA enough data to expand the scope of the contract pharmacy model. An additional demonstration project, with not less than 100 sites, should be the next step

to further evaluate risks and benefits of the expanded model.

*Response:* At the time of publication of the proposed guidance there had been 18 demonstration projects. HRSA realizes that only a small percentage of covered entities have gone through the AMDP process. HRSA is working with the data that exists, which was overwhelmingly supportive of the guidelines. Although there have been a limited number of AMDPs approved, some of the approved projects included a large number of health care sites and contract pharmacies. The number of participating health care sites exceeded 50 and the number of contract pharmacy sites was over 170. The results of the AMDP are not the only basis for issuing this guidance. The circumstances surrounding pharmacy practice and the resources available to track transactions have changed substantially over the past decade. The AMDP provides concrete examples of the ability of covered entities to utilize multiple contract pharmacies without sacrificing program integrity. Upon review of the evidence and current circumstances, HRSA does not find sufficient basis to continue limiting contract pharmacies to a single site. The restriction has imposed its own costs by restricting the flexibility of covered entities in meeting the needs of their patients. Furthermore, pharmacy and inventory management processes are available that make utilization of more than one pharmacy readily feasible for many covered entities without increasing the risk of diversion. The use of multiple contract pharmacies is not appropriate for all covered entities; however, we do not find a blanket restriction on all covered entities to be justified.

*(2) Audits*

Many commenters presented varying perspectives on the topic of audits. Multiple comments from drug manufacturers argued that manufacturers should be given the ability to audit covered entities that use multiple pharmacy contracting services due to the heightened risk of drug diversion and duplicate discounts. Other comments focused on HRSA audit requirements, arguing that they should be identical to the current standards required for the AMDP. Finally, some comments supported not having an audit requirement, arguing that audits would be burdensome and costly for the covered entities.

*Comment:* The audit requirements from the AMDP process should be applied to multiple contract pharmacies. There is no evidence of diversion and duplicate discounts

**Add.78**

because of the audit requirements. Their elimination may lead to increased diversion and duplicate discounts. Some commenters recommended retaining the audit requirements for at least a few years until a track record of compliance with multiple contract pharmacies can be created. Audits should include a full compliance review of all mandatory contract terms/ requirements including implementation of tracking system, patient status verification, and providing information about other pharmacy options.

*Response:* Although HRSA does not believe that precisely the same procedures are appropriate as utilized under the AMDP, HRSA agrees that independent audits can play an important role in ensuring program integrity. The guidelines have been revised to state that the covered entity must have sufficient information to meet its obligation of ensuring ongoing compliance and the recognition of any problem. Furthermore, the guidelines have been revised to indicate that it is the expectation of HRSA that covered entities will fulfill their ongoing obligation by the utilization of independent audits. However, HRSA leaves it up to covered entities to determine how to meet their compliance responsibilities. The guidelines intentionally do not specify the precise method, personnel or items for ensuring sufficient information is obtained by the covered entity. As long as covered entities comply with their obligations under the guidelines, HRSA prefers to leave the method of compliance to the judgment of the covered entities.

To the extent that any internal compliance activity or audit performed by a covered entity indicates that there has been a violation of 340B program requirements, it is HRSA's expectation that such finding be disclosed to HRSA along with the covered entity's plan to address the violation.

*Comment:* A copy of the audits conducted by covered entities should be submitted to OPA. The results of such audit should be made available to manufacturers.

*Response:* HRSA does not feel there is a need for the automatic submission of audits conducted by covered entities. HRSA believes that there are already appropriate safeguards in place. Covered entities are required to maintain auditable records sufficient to demonstrate continued compliance with 340B requirements; and, to the extent that a situation warrants, HRSA will request copies of any internal compliance documents of covered entities.

*Comment:* Covered entities should be required to conduct audits of their contract pharmacies and be required to terminate the contract with pharmacies found to be in violation.

*Response:* As noted earlier, HRSA agrees that audits can play an important role in ensuring integrity, and that covered entities are required to have sufficient information to ensure against diversion and duplicate discounts. The extent to which an audit of the contract pharmacy or other arrangement is necessary to satisfy that obligation will depend upon the individual circumstances. Covered entities have the responsibility to have agreements with contract pharmacies and procedures in place sufficient to enable the covered entity to meet its obligations under the law, including the prohibition on diversion and duplicate discounts. While an audit capability and various grounds for termination are terms that could be included in such contracts, there is no requirement in the guidelines for such terms. However, covered entities are reminded that they retain ultimate responsibility for compliance with the 340B program. Covered entities may be well-served by ensuring that compliance terms are included in their pharmacy contracts. To the extent that covered entities uncover these problems, the appropriate response is to report those problems to HRSA and ensure that they are properly addressed.

*Comment:* Manufacturers should be permitted to audit covered entities that use multiple contract pharmacy services. No reasonable cause should be required, due to heightened risk of diversion.

*Response:* We do not agree that utilization of more than one contract pharmacy creates automatic cause to suspect diversion. The issue as to whether additional audits by an outside manufacturer are permitted is addressed in the guidance published in the **Federal Register** on that issue (61 FR 65406, December 12, 1996). To the extent a manufacturer believes there is a reasonable basis to conclude that a covered entity is in breach of program requirements, it may audit a covered entity consistent with these guidelines. Additionally, HRSA has developed a dispute resolution process to provide parties with an informal mechanism to bring before the Department allegations of behavior that are in violation of 340B. For further guidance on the audit and dispute resolution process *see* 61 FR 65406 (December 12, 1996). As indicated in this guidance, covered entities and contract pharmacies must retain auditable records of 340B covered

drug transactions sufficient to demonstrate compliance with the requirements to ensure against diversion to non-patients and against duplicate discounts.

*Comment:* It would be burdensome for covered entities to provide reports and data for audits. It is unclear who would be required to construct the actual components of the audit, what would be included, and who would pay for it.

*Response:* HRSA would like to remind all 340B stakeholders that it is an option for covered entities to voluntarily enter into contract pharmacy arrangements. Each covered entity is encouraged to conduct its own analysis of the costs and benefits of implementing or expanding their pharmacy services. It is the responsibility of the covered entity to ensure against diversion and duplicate discounts. Covered entities may determine how to best meet that responsibility: By performing a separate audit, including spot audits as part of pre-existing auditing responsibilities, or via other mechanisms. HRSA believes that including these issues as part of an independent audit is the best but not necessarily the only approach to meet covered entities' ongoing responsibility to know that their covered outpatient drugs are being appropriately ordered and distributed to their patients.

*(3) Diversion*

*Comment:* The proposed guidelines do not adequately describe safeguards that will combat drug diversion and duplicate discounts. There should be more severe penalties for violations, especially duplicate discounts. Reimbursement of any inappropriate discounts is insufficient and will not deter bad behavior. A covered entity should be excluded from 340B if it continues to use a pharmacy found to be in violation of the program.

*Response:* HRSA believes that there are appropriate safeguards in place, based on the parameters of the program. HRSA has the ability to exclude covered entities that abuse the program. HRSA has no statutory authority to assess additional penalties beyond the authority provided in section 340B. However, to the extent HRSA is aware that an action by a covered entity or contract pharmacy may be a violation of the law, such cases are referred to appropriate authorities.

*Comment:* The proposed guidance appears to limit the need to segregate records for easy accessibility by auditors rather than for purposes related to ensuring there is no diversion. Is this intended, or is segregation, virtual or

otherwise, still expected to be used by the contract pharmacy as a method of showing that diversion has not occurred?

*Response:* All covered entities are required to have auditable records sufficient to fully demonstrate compliance with all 340B requirements. Any covered entity that chooses to utilize a contract pharmacy must ensure that any such contract fully addresses that requirement and has the responsibility to ensure that the contract is actually performed and administered in compliance with those requirements. Inventory and record segregation is one of many methods that can be used to ensure compliance with the program guidelines. HRSA does not intend to limit the methods covered entities may use in order to remain in compliance with the guidelines. As noted previously, covered entities and contract pharmacies must retain auditable records of 340B covered drug transactions sufficient to demonstrate compliance with the requirements to ensure against diversion to non-patients as well as duplicate discounts.

*Comment:* Covered entities should be required to maintain and provide to HRSA and manufacturers written policies and procedures for preventing diversion and duplicate discounts in their contract pharmacy services.

*Response:* The ultimate responsibility for compliance with all aspects of the 340B program lies with each covered entity. The contract arrangements between covered entities and outside pharmacies will have various terms and procedures, which are acceptable as long as there are no violations of the program. It is expected that all covered entities will have written policies and procedures for preventing diversion and duplicate discounts as part of their obligations to prevent diversion and duplicate discounts. They are also required to maintain auditable records. HRSA will not automatically require covered entities to submit such policies and procedures for HRSA review.

*(4) Contract Pharmacy Services Mechanism—Potential Alternatives to Single Location/Single Pharmacy Model*

*Comment:* HRSA should permit separate covered entity sites to enter into one comprehensive agreement between the sites and a single contract pharmacy, instead of requiring a separate agreement for each site. Additionally, HRSA should permit a covered entity to enter into one comprehensive agreement with a chain pharmacy binding on multiple locations of the chain, instead of requiring a

separate agreement for each contract pharmacy site.

*Response:* Each covered entity retains its own responsibility for compliance with the program. With respect to a covered entity with multiple sites, HRSA agrees that a single covered entity may contract for sites that are integral parts of the covered entity and for which it has legal control of so long as all of the requirements are met in the contract. This approach maintains and recognizes the central responsibility of the covered entity. In the case of agreements with "chain pharmacies," there appears to be potential for loss of accountability without a clearly established relationship between the actual pharmacy site and the covered entity. Covered entities are not precluded from entering into agreements with chain pharmacies, however, each participating pharmacy location must be listed on the contract and comply with the requirements.

*Comment:* One comment suggested that HRSA should clarify the definition of "multiple." The commenter interprets "multiple" to mean that an FQHC could contract with more than one pharmacy, including more than one site of a chain pharmacy, more than one independent pharmacy, or a combination of chain sites and independent pharmacies. Additionally, the commenter interprets "multiple" to mean that a covered entity with an in-house pharmacy could use any acceptable contract pharmacy arrangement to supplement the in-house pharmacy. The commenter encourages OPA to adopt this interpretation in the final guidance.

*Response:* HRSA agrees with the comment about the meaning of "multiple" and believes that the Final Notice is clear with respect to this meaning.

*Comment:* Does a covered entity that currently has an agreement with only one contract pharmacy need to revise its agreement with that pharmacy if the entity subsequently enters into agreements with additional pharmacies?

*Response:* The covered entity may need to revise its existing contract, depending on the terms that it contains. There is no requirement in the guidelines to revise contracts, as long as they meet the criteria outlined. All entities are encouraged to seek competent counsel to assess their needs.

*Comment:* The proposed guidelines do not provide cautionary language about possible negative results of implementing a multiple contract pharmacy model. Some small pharmacies that currently contract with covered entities may be hurt by implementation of the guidance due to

reduced business. More guidance and decision analysis tools should be provided to guide the process of deciding whether to implement.

*Response:* HRSA notes that participation in any multiple contract pharmacy models is completely voluntary. All stakeholders are encouraged to conduct a full business analysis to determine whether to implement a multiple contract pharmacy model before moving forward. HRSA also provides free technical assistance for covered entities, including assistance with business analysis, to help navigate these issues. Ultimately, the decisions and responsibility for those decisions lies with the covered entity.

*(5) Network Models*

*Comment:* Multiple commenters proposed that network arrangements (*i.e.* arrangements involving a network of more than one covered entity) should be permitted under the guidelines without prior approval from HRSA. They argued that network arrangements would decrease the burden on covered entities and contract pharmacies by simplifying the contracting process and maintaining multiple inventory records. They also made the point that networks would also encourage parties to participate in 340B and therefore, expand access to eligible patients.

*Response:* HRSA understands the comments that a network model might potentially ease the administrative burden for participants in some cases. However, due to ongoing concerns about maintaining the integrity of the program with such complex arrangements, at this time, we decline to include network models in the guidelines without the added scrutiny of the AMDP process. HRSA will reassess the appropriateness of the utilization of networks outside the AMDP process as sufficient experience with them is gained in the future.

*Comment:* Some comments urged HRSA not to permit networks of multiple covered entities outside the framework of the AMDP process and requested confirmation that under the new guidance the development of a network of 340B covered entities will remain subject to the entire process now applicable to the AMDPs.

*Response:* HRSA agrees that covered entity networks should remain under the AMDP process, as indicated in the response to the prior comment.

*Comment:* "All covered entities participating" language is unclear. Does it mean a covered entity with multiple sites, a network model, or a DSH would need to name each covered entity that

has an agreement with a pharmacy under contract with the covered entity? If so, that would be burdensome on the entity, which would need to research and identify other covered entities that may contract with a particular pharmacy. What is the justification for requiring a covered entity to specify the names and 340B ID numbers of other participating covered entities?

*Response:* If a covered entity wants to use any alternative to a single location/ single pharmacy model, it must submit its name and 340B identification number, and the names of all participating pharmacies to HRSA. Network models will still need to go through the AMDP process. The commenter is correct that the "all covered entities participating" language is unclear, because such arrangements only apply to a single covered entity. The language has been changed in response to this comment.

*Comment:* The guidelines should limit the numbers and geographical locations (not over State lines) for contract pharmacy relationships. Perhaps contract pharmacies should only be added one at a time. Monitoring various sites by the covered entity may be extremely difficult unless safeguards are in place.

*Response:* HRSA understands the commenter's concerns, but at this point, HRSA declines to limit the number of arrangements, as long as each arrangement meets our guidelines. Each covered entity retains the obligation to ensure its program remains compliant with the guidelines. HRSA does not intend to prescribe the methods covered entities use to run their programs or to ensure compliance at this time. Each covered entity and contract pharmacy is responsible for ensuring that its particular contracting arrangements and operations conform to the requirements of all applicable Federal, State and local laws and regulations.

### (6) Model Agreement Provisions/ Covered Entity Compliance Elements

In the final guidelines the phrase "Model Agreement Provisions" has been changed to "Covered Entity Compliance Elements" to better reflect the purpose of the elements and to distinguish them from model contract provisions.

*Comment:* Covered entities with multiple contract pharmacy arrangements should have written contracts with each pharmacy, including procedures to ensure against drug diversion and duplicate discounts, to maintain records available for audit, and to meet all other 340B requirements. Covered entities should

submit these contracts and procedures to HRSA.

*Response:* HRSA agrees in part, which is why the guidelines do require a covered entity to have a contract that specifies all participating pharmacy locations. Such contracts must include adequate terms to ensure compliance with all aspects of the 340B program as listed in the Covered Entity Compliance Elements. However, at this time, HRSA does not have the need, or the resources to collect and review each contract. The covered entity bears responsibility for compliance with the program and will be held accountable in the event of non-compliance.

*Comment:* HRSA should create a single list of model contract terms, add suggested language on duplicate discount prohibition, and require covered entities to certify that their contracts use these terms or apply to HRSA for approval to use alternative terms.

*Response:* The Appendix of the guidelines does include a list of suggested contract provisions. HRSA has included provisions necessary to ensure that covered entities and contract pharmacies understand and agree not to violate 340B provisions. Because of the wide diversity of covered entities, it would be impossible to include provisions that would respond to the needs of all covered entities.

*Comment:* Manufacturers should be allowed to request copies of the contracts between the covered entities and contract pharmacies.

*Response:* Manufacturers are certainly permitted to request copies of such contracts, however, HRSA declines to mandate that covered entities must provide copies of contracts upon any request. In the event a manufacturer demonstrates a reasonable need for the copy of a contract and its request for a copy of the contract has been denied, the manufacturer may ask OPA to obtain a copy. The suggested Covered Entity Compliance Elements include providing a copy of the contract pharmacy service agreement upon the request of the Office of Pharmacy Affairs.

*Comment:* The Appendix provisions impose additional requirements not discussed in Section (3) of the proposed guidance and the suggested provisions in Section (3) do not appear in the Appendix. The Appendix does not mention the 340B prohibition on duplicate discounts.

*Response:* The Suggested Contract Provisions, found in the Appendix of the Guidelines, are not meant to be comprehensive, exhaustive, or required. They offer a model format and sample provisions, but are not intended to be

used as the complete terms of the contract.

*Comment:* Covered entities should not be permitted to use alternative mechanisms other than the model agreement provisions. The use of alternatives would increase OPA's oversight responsibilities, which may lead to different standards or the potential for abuse. A commenter also cited GAO/OIG reports on lack of oversight of the program to support his/ her assertion that the model provisions should be required.

*Response:* The Covered Entity Compliance Elements are not intended to be required contract provisions. All covered entities must certify that all of the elements have been addressed; however, HRSA gives the covered entities the discretion to negotiate contract provisions suitable to their individual circumstances and jurisdictions. The various complexities of covered entities and the pharmacies with whom they will contract led HRSA to permit flexibility between the parties in designing their contract terms. HRSA does not intend to review contracts. As under the previous guidelines, the covered entity is ultimately responsible for assuring full compliance with 340B.

HRSA disagrees with the comment that recent reports by the GAO and the OIG would support the creation of a standard uniform contract. HRSA has worked diligently to implement the recommendations of both the GAO and the OIG, and HRSA does not believe that dictating to covered entities specific contract language that must be used in all contracts regardless of individual circumstances would assist in those efforts at this time.

### (7) Miscellaneous Comments

*Comment:* Anti-kickback provisions may prohibit pharmacies from offering Medication Therapy Management and Pharmacy by Mail activities that would be beneficial to 340B and patients.

*Response:* Covered entities are not exempt from anti-kickback provisions. Section 340B does not authorize HRSA to grant any exceptions whether beneficial or not. It is recommended that covered entities get competent professional legal advice when appropriate.

*Comment:* In section B(3)(c), the proposal states that the manufacturer is not required to offer the 340B drug price if the patient declines to use the contract pharmacy. If however, the manufacturer does extend the 340B price in this case, please clarify whether this extension sets a new best price for the drug.

**Add.81**

*Response:* The 340B drug pricing program does not restrict the prices that manufacturers voluntarily choose to offer to patients outside the parameters of the program. Whether such actions serve to set a new best price for a drug is beyond the scope of this guidance. We encourage anyone with specific best price questions to consult with the Centers for Medicare & Medicaid Services.

*Comment:* To prevent drug diversion, an additional contract requirement should be added that the contract pharmacy may not fill or refill a prescription using 340B medications until the covered entity confirms that the individual is a patient of the entity at the time the prescription is filled. There should also be an independent, annual audit to review the covered entity's policies and procedures for patient verification.

*Response:* The program guidelines for 340B make it clear that only individuals who are patients of the covered entity are eligible for drugs purchased under the program. Like all other program requirements, responsibility for compliance lies with the covered entity, which must structure agreements and systems appropriately to ensure that diversion does not occur. Technical assistance may be available for help with implementation and compliance for the 340B program, and maximizing the value of comprehensive pharmacy services for their patients. However, HRSA has chosen not to require time-of-services verification as suggested in the comment.

*Comment:* Pharmacy records from contract pharmacies should be made available to covered entities to ensure patient safety and continuity of care.

*Response:* HRSA agrees that this might be beneficial for patient care and encourages the parties to include such terms in their contract agreements. However, this is a decision which will be left to the contracting parties. In any case, the covered entity must have sufficient records or direct access to records for the covered entity to meet its responsibility to ensure compliance and to provide a complete audit trail to verify that there is no diversion or duplicate discounts.

*Comment:* HRSA should include in its final guidance and suggested contract provisions, language to reinforce that all savings from the 340B program should remain with the covered entity. Without written guidance, all savings will not be returned to the covered entity.

*Response:* HRSA agrees that the intent of the 340B program was to permit the covered entities to stretch scarce Federal resources, and that the benefit of the program was intended to accrue to the covered entities. However, the covered entity is free to negotiate how it chooses to use any such funds as it sees fit. For example, the covered entity is free to choose to use those dollars to pay contract pharmacies for their services or for extra services such as delivery.

## C. Contract Pharmacy Services Mechanism

These final guidelines replace all previous 340B Program guidance documents addressing non-network contract pharmacy services, including, but not limited to, the "Notice Regarding Section 602 of the Veterans Health Care Act of 1992; Contract Pharmacy Services," (61 FR 43549) and any individual correspondence issued by HRSA on the subject.

### (1) Basic Compliance Issues in Utilization of Pharmacy Services Contracts

A covered entity that wishes to utilize contract pharmacy services to dispense section 340B outpatient drugs must have a written contract in place between itself and a specified pharmacy. A single covered entity that has more than one 340B eligible site at which it provides health care may have individual contracts for each such site or include multiple sites within a single pharmacy services contract. This mechanism is designed to facilitate program participation for those covered entities that do not have access to available or appropriate "in-house" pharmacy services, those covered entities that have access to "in-house" pharmacy services but wish to supplement these services; and covered entities that wish to utilize multiple contract pharmacies to increase patient access to 340B drugs. The covered entity has the responsibility to: Ensure against illegal diversion and duplicate discounts; maintain readily auditable records; and meet all other 340B Drug Pricing Program requirements (*See: http://www.hrsa.gov/opa/introduction.htm*). HRSA has provided essential covered entity compliance elements below as guidance for the type of contractual provisions expected in such agreements. Suggested contract provisions are also in the Appendix. All covered entities utilizing a contract pharmacy must comply with the certification requirements described in (5) below.

### (2) Potential Alternatives to Single Location/Single Pharmacy Model

In addition to contracting with a single pharmacy for each clinical site, covered entities may pursue more complex arrangements that include multiple pharmacies only if: (a) There is a written agreement and procedures that meet the requirements outlined above in (1) between the covered entity and each pharmacy; (b) the written agreement includes, and fully addresses, all of the essential elements outlined in (3) and (4) below and a full listing of all pharmacy locations that may be utilized under that agreement; (c) the operation under the contract continues to meet all 340B Drug Pricing Program requirements and does not create diversion of covered drugs or duplicate discounts; (d) the arrangements are one of the two following models either individually or in combination: (i) The use of multiple contract pharmacy service sites, and/or (ii) the utilization of a contract pharmacy(ies) to supplement in-house pharmacy services (the use of multiple contract pharmacy service sites refers to any arrangement wherein a covered entity site seeks to provide drugs at 340B discounted prices for its patients at more than one pharmacy location). Supplementing in-house pharmacy services with a contract pharmacy refers to any arrangement wherein a covered entity site purchases drugs at 340B discounted prices for its patients at both an in-house pharmacy and at least one additional contract pharmacy location; and (e) the arrangement involves a single identifiable 340B covered entity and does not include a network, or other similar arrangement, of more than one covered entity unless specifically authorized in writing by HRSA through an AMDP or by other official written authorization.

### (3) Essential Covered Entity Compliance Elements

*The following are essential elements to address in contract pharmacy arrangements:* (a) The covered entity will purchase the drug, maintain title to the drug and assume responsibility for establishing its price, pursuant to the terms of an HHS grant (if applicable) and any applicable Federal, State and local laws.

A "ship to, bill to" procedure is used in which the covered entity purchases the drug; the manufacturer/wholesaler must bill the covered entity for the drug that it purchased, but ships the drug directly to the contract pharmacy. *See* Section 1 of Appendix. In cases where a covered entity has more than one site, it may choose between having each site billed individually or designating a single covered entity billing address for all 340B drug purchases.

(b) The agreement will specify the responsibility of the parties to provide comprehensive pharmacy services (*e.g.,*

**Add.82**

dispensing, recordkeeping, drug utilization review, formulary maintenance, patient profile, patient counseling, and medication therapy management services and other clinical pharmacy services). Each covered entity has the option of individually contracting for pharmacy services with a pharmacy (ies) of its choice. Covered entities are not limited to providing comprehensive pharmacy services to any particular location and may choose to provide them at multiple locations and/or "in-house."

(c) The covered entity will inform the patient of his or her freedom to choose a pharmacy provider. If the patient does not elect to use the contracted service, the patient may obtain the prescription from the covered entity and then obtain the drug(s) from the pharmacy provider of his or her choice.

When a patient obtains a drug from a pharmacy other than a covered entity's contract pharmacy or the covered entity's in-house pharmacy, the manufacturer is not required to offer this drug at the 340B price.

(d) The contract pharmacy may provide other services to the covered entity or its patients at the option of the covered entity (e.g., home care, delivery, reimbursement services). Regardless of the services provided by the contract pharmacy, access to 340B pricing will always be restricted to patients of the covered entity.

(e) The contract pharmacy and the covered entity will adhere to all Federal, State, and local laws and requirements.

Both the covered entity and the contract pharmacy are aware of the potential for civil or criminal penalties if either violates Federal or State law. [The Department reserves the right to take such action as may be appropriate if it determines that such a violation has occurred.]

(f) The contract pharmacy will provide the covered entity with reports consistent with customary business practices (e.g., quarterly billing statements, status reports of collections and receiving and dispensing records). See Section 2 of Appendix.

(g) The contract pharmacy, with the assistance of the covered entity, will establish and maintain a tracking system suitable to prevent diversion of section 340B drugs to individuals who are not patients of the covered entity. Customary business records may be used for this purpose. The covered entity will establish a process for periodic comparison of its prescribing records with the contract pharmacy's dispensing records to detect potential irregularities. See Section 3 of Appendix.

(h) The covered entity and the contract pharmacy will develop a system to verify patient eligibility, as defined by HRSA guidelines. The system should be subject to modification in the event of change in such guidelines.

Both parties agree that they will not resell or transfer a drug purchased at section 340B prices to an individual who is not a patient of the covered entity. See 42 U.S.C. 256b(a)(5)(B). The covered entity understands that it may be removed from the list of covered entities because of its participation in drug diversion and no longer be eligible for 340B pricing. See Section 4 of Appendix.

(i) Neither party will use drugs purchased under section 340B to dispense Medicaid prescriptions, unless the covered entity, the contract pharmacy and the State Medicaid agency have established an arrangement to prevent duplicate discounts. Any such arrangement shall be reported to the OPA, HRSA, by the covered entity.

(j) The covered entity and contract pharmacy will identify the necessary information for the covered entity to meet its ongoing responsibility of ensuring that the elements listed herein are being complied with and establish mechanisms to ensure availability of that information for periodic independent audits performed by the covered entity.

(k) Both parties understand that they are subject to audits by outside parties (by the Department and participating manufacturers) of records that directly pertain to the entity's compliance with the drug resale or transfer prohibition and the prohibition against duplicate discounts. See 42 U.S.C. 256b(a)(5)(c).

The contract pharmacy will assure that all pertinent reimbursement accounts and dispensing records, maintained by the pharmacy, will be accessible separately from the pharmacy's own operations and will be made available to the covered entity, HRSA, and the manufacturer in the case of an audit. Such auditable records will be maintained for a period of time that complies with all applicable Federal, State and local requirements.

(l) Upon written request to the covered entity, a copy of the contract pharmacy service agreement will be provided to the Office of Pharmacy Affairs.

*(4) Ongoing Responsibility of Covered Entity To Ensure Compliance*

Covered entities are responsible for ensuring that the system of distribution chosen fully meets statutory obligations of ensuring against diversion to non-patients or creating a situation that results in a State Medicaid Program seeking a rebate on a discounted drug. The covered entity remains responsible at all times for the disposition of covered outpatient drugs it purchases through a contract pharmacy. Annual audits performed by an independent, outside auditor with experience auditing pharmacies are expected, although the exact method of ensuring compliance is left up to the covered entity. The covered entity must have sufficient information to ensure it is meeting that responsibility. Independent audits are particularly valuable where the covered entity utilizes multiple pharmacy options. They should follow standard business practices for audits, including audit trails provided by the entity to the auditor, and use of standard reports. The precise methodology utilized to ensure compliance and obtain the necessary information is up to the covered entity given its particular circumstances and, for example, might include spot audits where the system in place permits. Drug diversion and duplicate discounts are a significant concern of HRSA and all efforts to avoid these problems should be well documented. In the event a covered entity determines that drug diversion or duplicate discounts have occurred or that it is otherwise unable to comply with its responsibility to reasonably ensure compliance, then it must take immediate remedial action to assure compliance and notify the OPA about such compliance problems and actions taken to remedy those problems.

*(5) Certification*

Under section 340B, if a covered entity using contract pharmacy services requests to purchase a covered outpatient drug from a participating manufacturer, the statute directs the manufacturer to sell the drug at a price not to exceed the statutory 340B discount price. If the covered entity directs the drug shipment to its contract pharmacy or pharmacies, the covered entity must comply, under any distribution mechanism, with the statutory prohibition on drug diversion and duplicate discounting.

To provide HRSA and manufacturers with assurance that the covered entity has acted in a manner which limits the potential for drug diversion, covered entities should submit to OPA a certification that it has signed and has in effect an agreement with the contract pharmacy or pharmacies that satisfies both (3) and (4) above (i.e. that the contract(s) fully address the issues listed in (3) and that the covered entity has a

plan to meet its ongoing responsibilities to ensure compliance). The names of those covered entities which submit a certification, or an alternate mechanism approved by OPA, will be listed on the OPA Web site for the convenience of participating drug manufacturers and wholesaler distributors.

In addition, any covered entity that has opted to utilize any pharmacy arrangement described in (2) must specify which arrangement or combination of arrangements it is utilizing and the names of any pharmacies participating when registering. Covered entities seeking to materially change this arrangement that entail changes in the covered entity database should notify OPA of any such proposed changes and be aware that some changes may require advanced notice to manufacturers and wholesalers as part of quarterly updates to the database.

In order to ensure accuracy, integrity and transparency, the OPA may conduct a recertification process periodically (most likely annually) where covered entities affirmatively certify as to their ongoing compliance with 340B requirements. It is currently expected that the annual process would include certification by a duly authorized official: (1) That all information listed on the database for that covered entity is complete, accurate, and correct; (2) that the covered entity met the 340B eligibility requirements throughout the prior year and continues to do so; (3) that any contract pharmacy arrangement was actually performed in accordance with specified requirements including, but not limited to, that the covered entity obtained sufficient information from the contractor to ensure compliance with applicable policy and legal requirements; and (4) the methodology utilized to ensure compliance (*e.g.* through independent audit or other mechanism).

*(6) Anti-Kickback Statute*

Contract pharmacies and covered entities should be aware of the potential for civil or criminal penalties if the contract pharmacy violates Federal or State law. In negotiating and executing a contract pharmacy service agreement pursuant to these guidelines, contract pharmacies and covered entities should be aware of and take into consideration the provisions of the Medicare and Medicaid anti-kickback statute, 42 U.S.C. 1320a–7b(b).

**D. Appendix—Suggested Contract Provisions**

The following suggested contract provisions are included for illustrative purposes and are not intended to be comprehensive, exhaustive or required. They offer sample provisions for consideration, but are not intended to be used as the complete terms of the contract. Given the variances among many jurisdictions and among the numerous types of covered entities, HRSA has decided at this time not to include a complete model contract in this notice.

(1) "The covered entity owns covered drugs and arranges to be billed directly for such drugs. The pharmacy will compare all shipments received to the orders and inform the covered entity of any discrepancy within five (5) business days of receipt. The covered entity will make timely payments for such drugs delivered to the pharmacy."

(2) "The covered entity will verify, using the contract pharmacy's (readily retrievable) customary business records, that a tracking system exists which will ensure that drugs purchased under the 340B Drug Pricing Program are not diverted to individuals who are not patients of the covered entity. Such records can include: Prescription files, velocity reports, and records of ordering and receipt. These records will be maintained for the period of time required by State law and regulations."

(3) "Prior to the contract pharmacy providing pharmacy services pursuant to this agreement, the covered entity will have the opportunity, upon reasonable notice and during business hours, to examine the tracking system. For example, such a tracking system may include quarterly sample comparisons of eligible patient prescriptions to the dispensing records and a six (6) month comparison of 340B drug purchasing and dispensing records as is routinely done in other reconciliation procedures. The contract pharmacy will permit the covered entity or its duly authorized representatives to have reasonable access to contract pharmacy's facilities and records during the term of this agreement in order to make periodic checks regarding the efficacy of such tracking systems. The contract pharmacy agrees to make any and all adjustments to the tracking system which the covered entity advises are reasonably necessary to prevent diversion of covered drugs to individuals who are not patients of the covered entity."

(4) "The pharmacy will dispense covered drugs only in the following circumstances: (a) Upon presentation of a prescription bearing the covered entity's name, the eligible patient's name, a designation that the patient is an eligible patient of the covered entity, and the signature of a legally qualified health care provider affiliated with the covered entity; or (b) receipt of a prescription ordered by telephone or other means of electronic transmission that is permitted by State or local law on behalf of an eligible patient by a legally qualified health care provider affiliated with the covered entity who states that the prescription is for an eligible patient. The covered entity will furnish a list to the pharmacy of all such qualified health care prescribers and will update the list of prescribers to reflect any changes. If a contract pharmacy is found to have violated the drug diversion prohibition, the contract pharmacy will pay the covered entity the amount of the discount in question so that the covered entity can reimburse the manufacturer."

Dated: March 2, 2010.

**Mary K. Wakefield,**
*Administrator.*

[FR Doc. 2010–4755 Filed 3–4–10; 8:45 am]

**BILLING CODE 4165–15–P**

---

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Centers for Medicare & Medicaid Services**

**[Document Identifier: CMS–3070 and CMS–416]**

**Agency Information Collection Activities: Submission for OMB Review; Comment Request**

**AGENCY:** Centers for Medicare & Medicaid Services, HHS.

In compliance with the requirement of section 3506(c)(2)(A) of the Paperwork Reduction Act of 1995, the Centers for Medicare & Medicaid Services (CMS), Department of Health and Human Services, is publishing the following summary of proposed collections for public comment. Interested persons are invited to send comments regarding this burden estimate or any other aspect of this collection of information, including any of the following subjects: (1) The necessity and utility of the proposed information collection for the proper performance of the Agency's function; (2) the accuracy of the estimated burden; (3) ways to enhance the quality, utility, and clarity of the information to be collected; and (4) the use of automated collection techniques or other forms of information technology to minimize the information collection burden.

1. *Type of Information Collection Request:* Extension of a currently approved collection; *Title of*


# DEPARTMENT OF HEALTH AND HUMAN SERVICES

## 42 CFR Part 10

[Docket No. 2021–0004]

RIN 0906–AB28

## 340B Drug Pricing Program; Administrative Dispute Resolution Regulation

**AGENCY:** Health Resources and Services Administration (HRSA), Department of Health and Human Services (HHS).

**ACTION:** Final rule.

**SUMMARY:** The Health Resources and Services Administration administers section 340B of the Public Health Service (PHS) Act, which is referred to as the "340B Drug Pricing Program" or the "340B Program." This final rule will apply to all drug manufacturers and covered entities that participate in the 340B Program. The final rule sets forth the requirements and procedures for the 340B Program's administrative dispute resolution (ADR) process. This final rule revises the 340B administrative dispute resolution process set forth in the Code of Federal Regulations.

**DATES:** This final rule is effective June 18, 2024.

**FOR FURTHER INFORMATION CONTACT:** Michelle Herzog, Deputy Director, Office of Pharmacy Affairs, HRSA, 5600 Fishers Lane, Mail Stop 08W12, Rockville, MD 20857; email: *340badr@ hrsa.gov;* telephone: 301–594–4353.

**SUPPLEMENTARY INFORMATION:**

## I. Background

Section 340B of the PHS Act entitled "Limitation on Prices of Drugs Purchased by Covered Entities," was created under section 602 of Public Law 102–585, the "Veterans Health Care Act of 1992," and codified at 42 U.S.C. 256b. The 340B Program is intended to enable covered entities "to stretch scarce Federal resources as far as possible, reaching more eligible patients and providing more comprehensive services." H.R. Rep. No. 102–384(II), at 12 (1992). The Secretary of Health and Human Services (Secretary) has delegated the authority to administer the 340B Program to the HRSA Administrator, who has further delegated authority to the Office of Pharmacy Affairs (OPA), within HRSA, which oversees the 340B Program. Eligible covered entity types are defined in section 340B(a)(4) of the PHS Act, as amended. Section 340B(a)(1) of the PHS Act instructs HHS to enter into pharmaceutical pricing agreements (PPAs) with manufacturers of covered

outpatient drugs. Under section 1927(a)(5)(A) of the Social Security Act, a manufacturer must enter into an agreement with the Secretary that complies with section 340B of the PHS Act "[i]n order for payment to be available under section 1903(a) or under part B of title XVIII of the Social Security Act for covered outpatient drugs of a manufacturer." When a drug manufacturer signs a PPA, it agrees that the prices charged for covered outpatient drugs to covered entities will not exceed statutorily defined 340B ceiling prices. 340B ceiling prices are based on quarterly pricing reports that manufacturers must provide to the Secretary through the Centers for Medicare & Medicaid Services (CMS) and are calculated and verified by HRSA.

Section 7102 of the Patient Protection and Affordable Care Act (Pub. L. 111–148), as amended by section 2302 of the Health Care and Education Reconciliation Act (Pub. L. 111–152), jointly referred to as the "Affordable Care Act," added section 340B(d)(3) to the PHS Act, which requires the Secretary to promulgate regulations establishing and implementing a binding 340B ADR process for certain disputes arising under the 340B Program. Under the 340B statute, the purpose of the 340B ADR process is to resolve (1) claims by covered entities that they have been overcharged for covered outpatient drugs by manufacturers and (2) claims by manufacturers, after a manufacturer has conducted an audit as authorized by section 340B(a)(5)(C) of the PHS Act, that a covered entity has violated the prohibition on diversion or duplicate discounts.

The 340B ADR process is an *administrative* process designed to assist covered entities and manufacturers in resolving disputes regarding overcharging, duplicate discounts, or diversion, as outlined in statute. This 340B ADR process is also designed to provide stakeholders the opportunity to have disputes evaluated in a timely, consistent, and fair and equitable manner.

Historically, HHS has encouraged manufacturers and covered entities to work with one another to attempt to resolve disputes in good faith. HHS recognizes that most disputes that occur between individual parties are resolved in a timely manner without HRSA's involvement. The 340B ADR process is not intended to replace these good faith efforts and should be considered only when good faith efforts to resolve disputes independently have been exhausted and failed.

In 2020, HHS issued a final rule ((85 FR 80632, Dec. 14, 2020) herein referred to as the 2020 final rule), which was codified at 42 CFR 10.20 through 10.24. HRSA began implementing the 2020 final rule when it became effective on January 13, 2021, by accepting claims through the 340B ADR process. HRSA encountered policy and operational challenges with implementation of the 2020 final rule and issued a notice of proposed rulemaking (NPRM) on November 30, 2022 (87 FR 73516), to propose a revision to the 340B ADR process.

HHS is issuing this final rule to revise the current ADR process by modifying the regulations issued under the 2020 final rule. As HHS has indicated in the 2022 NPRM, the 2020 final rule poses policy and operational challenges that are described in this section.

First, HHS is finalizing that the 340B ADR process be revised to be more accessible, administratively feasible and timely than the 2020 final rule. The 340B statute at section 340B(d)(3)(B)(ii) of the PHS Act, requires the establishment of deadlines and procedures that ensure that claims are resolved fairly, efficiently, and expeditiously. This ADR process should be an expeditious and less formal process for parties to resolve disputes than the 2020 final rule. An ADR process governed by the Federal Rules of Evidence (FRE) and Civil Procedure (FRCP), as envisioned in the 2020 final rule, does not advance these goals. For example, potential petitioners, many of whom are safety net providers in under-resourced communities, may lack the resources to undertake ADR even if it would be in their best interest to do so. In addition, reliance on the FRE and FRCP could create unnecessary delays in what is intended to be a timely decision-making process. Finally, it is challenging to assign ADR Panel members with expertise in the FRE or FRCP. In implementing the 2020 final rule, HRSA received questions from stakeholders about the formality of the ADR process and the legal requirements under the FRCP for submitting a petition and accompanying documents, *e.g.,* whether the filings submitted must conform to the FRCP, which added to the complexity and difficulty of the ADR process.

HHS is finalizing an ADR process that is designed to assist covered entities and manufacturers in resolving disputes regarding overcharging, duplicate discounts, or diversion, as set forth in the 340B statute. HHS believes that for the ADR process to be workable, it needs to be accessible. HHS recognizes that many covered entities are small,

**Add.85**

community-based organizations with limited means. These covered entities may not have the financial resources to hire an attorney to navigate the complex FRCP and FRE requirements and engage in a lengthy, trial-like process, as envisioned in the 2020 final rule. The 340B statute does not compel such a process. The 2020 final rule also institutes a minimum threshold of $25,000 or where the equitable relief sought will likely have a value of more than $25,000 to be met before the petition could be filed. Given the smaller, community-based nature of many covered entities, HHS believes that flexibility should be maintained with respect to the amount of damages and is therefore not finalizing a minimum threshold for accessing the ADR process. However, covered entities and manufacturers should carefully evaluate whether the ADR process is appropriate for minor or *de minimis* claims given the time and resource investment required of the parties involved. After deliberate consideration of these issues and review of the comments, HHS is finalizing rule provisions that create a more accessible process where stakeholders have equal access to the ADR process and can easily understand and participate in it without having legal expertise or expending significant resources.

Second, the 2020 final rule states that the Secretary of HHS shall establish a 340B ADR Board that consists of at least six members appointed by the Secretary with equal numbers from HRSA, CMS, and the HHS Office of the General Counsel (OGC). It also requires the HRSA Administrator to select three members from the ADR Board to form a 340B ADR Panel and that each 340B ADR Panel include one ex-officio, non-voting member (appointed by the Secretary) from OPA to assist the 340B ADR Panel. The 2020 final rule states that HRSA and CMS ADR Board members must have relevant expertise and experience in drug pricing or drug distribution and that the OGC ADR Board members must have expertise and experience in handling complex litigation. While the 340B Program is related to drug pricing and drug distribution, it is a distinct program that requires knowledge of the 340B statute and specific 340B Program operations. Few OGC, CMS, and HRSA employees (outside of OPA) have both the required expertise as well as the availability (in addition to their day-to-day responsibilities) to serve on such 340B ADR Panels.

Therefore, HHS is finalizing rule provisions requiring that 340B ADR Panel members should be subject matter experts from OPA to ensure Panel members have specific knowledge of the authorizing statute and the operational processes of the 340B Program (*e.g.,* registration and program integrity efforts) and the ability to dedicate a portion of their time to ADR Panel service. Moreover, decisions by subject matter experts from OPA are less likely to conflict with current 340B policy. All members on the 340B ADR Panel will undergo an additional screening prior to reviewing a specific claim to ensure that the 340B ADR Panel member was not involved in previous agency actions related to the claim (including previous 340B ADR Panel decisions).

Third, HHS is finalizing final rule provisions stating that prior to initiating the ADR process, parties must undertake good-faith efforts to resolve the disputed issues. Historically, HRSA has encouraged parties to work in good faith and covered entities, and manufacturers have not had significant numbers of disputes due to the success of these good-faith-resolution efforts. 340B Program administrative improvements have narrowed the areas where parties had, in the past, disagreed over 340B Program issues. For example, HRSA released the pricing component of the 340B Office of Pharmacy Affairs Information System (340B OPAIS) in February 2019, which, for the first time, provided 340B ceiling prices to authorized covered entity users. OPAIS implementation has provided the necessary transparency to decrease disputes specific to the 340B ceiling price and its calculation. Outside of an issue involving some manufacturers placing restrictions on certain covered entities use of contract pharmacies, OPA has only received three covered entity overcharge complaints since making 340B ceiling prices available to covered entities through 340B OPAIS. Of additional note, prior to the 2020 final rule, stakeholders were able to utilize an informal dispute resolution process to resolve disputes between covered entities and manufacturers (61 FR 65406, Dec. 12, 1996) ("1996 guidelines"). There have been only four informal dispute resolution requests since the publication of the 1996 guidelines. Of the four informal dispute resolution requests received, two were terminated by HRSA due to non-participation by one of the parties, another was dismissed due to lack of sufficient evidence, and the last was terminated because the parties disputed each other's attempts of good faith resolution. The relatively small number may also be attributed to the parties' successful attempts to resolve issues in good faith. With this very small number of past informal disputes, the increased transparency in 340B pricing data, and HRSA's encouragement that parties work to resolve issues in good faith, HHS is finalizing final rule provisions that include an ADR process more closely aligned with the process that was established in the 1996 guidelines, and less trial-like and resource-intensive—for both the participants and HHS—than that established in the 2020 final rule.

Also, in the time since Congress enacted the 340B ADR statutory provision, HRSA implemented its extensive audit program in 2012, which ensures that participating covered entities and manufacturers can demonstrate compliance with all 340B Program requirements. On average, HRSA conducts 200 covered entity audits each fiscal year including child/associate sites and contract pharmacies associated with the covered entities, and issues findings in three areas: eligibility, diversion, and duplicate discounts. These findings vary in terms of severity—from covered entities not having the correct information in the 340B OPAIS to the diversion of 340B drugs to individuals who are not patients of the covered entity. HRSA conducts approximately five manufacturer audits each year and makes findings related to manufacturers charging above the 340B statutorily required ceiling price and manufacturers not reporting the required 340B pricing data to HRSA. Since HRSA began auditing covered entities and manufacturers, HRSA has identified 340B compliance concerns that would have previously been disputed. In addition to the extensive audit program, HRSA has also developed a comprehensive program integrity strategy to ensure compliance among all stakeholders participating in the 340B Program. These activities include quarterly checks of 340B Program eligibility, a self-disclosure and allegation process, which involves communication between OPA and the stakeholders regarding the compliance issue, and spot checks of covered eligibility documentation including contracts with State and local governments and contract pharmacy agreements.

Further, manufacturers are required to audit a covered entity prior to filing an ADR claim pursuant to section 340B(d)(3)(B)(iv) of the PHS Act. Since November 2022, HRSA has received two final audit reports from the manufacturers. The infrequency of finalized manufacturer audit reports along with the requirement that

manufacturers audit covered entities prior to filing an ADR claim suggests that the number of manufacturer ADR claims will be low.

HRSA's impartial facilitation of good faith resolution efforts have allowed parties to take advantage of opportunities for open communication to better understand each other's positions and come to an agreement, without need for formal intervention by HRSA (*e.g.,* through a HRSA targeted audit).

Fourth, the ADR process should be reserved for those disputes set forth in the statutory ADR provision (overcharge, diversion, or duplicate discount). For example, a manufacturer that audited a covered entity may report its findings of alleged duplicate discounts identified by specific purchasing patterns over a period of time. The covered entity may disagree with the audit assessment of purchases. In this example, the matter would be best resolved through the ADR process as it involves an alleged duplicate discount violation.

This final rule aligns with the statutory provisions by outlining the specific types of claims that can be brought forth through the ADR process—claims for overcharge, diversion or duplicate discounts.

Fifth, HHS believes that there should be an opportunity for dissatisfied parties to seek reconsideration of the 340B ADR Panel's decision by HRSA. The 2020 final rule did not include such a process. This final rule establishes an appeals or reconsideration process option that would be made available to either party.

Therefore, based on these issues with the 2020 final rule, HHS is finalizing in this rule to (1) establish a more accessible ADR process that is reflective of an administrative process rather than a trial-like proceeding; (2) revise the structure of the 340B ADR Panel so that it is comprised of 340B Program subject-matter experts; (3) ensure that the parties have worked in good faith before proceeding through the ADR process; (4) more closely align the ADR process with the provisions set forth in the 340B statute (diversion, duplicate discounts, and overcharges); and (5) include a reconsideration process for parties dissatisfied with a 340B ADR Panel's decision.

HRSA received 112 non-duplicative comments and, after consideration of the comments received, HHS has developed this final rule.

## II. Summary of Proposed Provisions and Analysis and Responses to Public Comments

Part 10 of title 42 of the Code of Federal Regulations has been revised to incorporate changes to the 340B ADR process, which is described below in conjunction with the comments received to each such section.

### General Comments

Comments received during the comment period addressed general issues that were raised in the preamble of the NPRM. We have summarized these general comments and have provided a response below.

*Comment:* The 2020 final rule instituted a minimum threshold of $25,000 or where the equitable relief sought would likely have a value of more than $25,000 as an ADR petition prerequisite. In the NPRM, HHS did not propose a minimum threshold for accessing the 340B ADR process. Many covered entity comments favored eliminating the threshold and argued that the 340B ADR process would be more accessible and would help ensure all providers could seek relief through the 340B ADR process. Most manufacturer comments were against eliminating the minimum threshold and argued that *de minimis* claims and frivolous claims would be filed through the 340B ADR process.

*Response:* Many 340B covered entities are small, rural or health care providers in underserved areas. The 340B ADR process should be accessible and available to these and all other stakeholders regardless of their volume of purchases or sales, and that flexibility should be maintained with respect to the amount of damages demonstrated when filing a 340B ADR claim; therefore, HHS is finalizing this provision as proposed without a minimum threshold for accessing the 340B ADR process. As noted above, HHS recognizes that most disputes that occur between individual parties are resolved in a timely manner without HRSA's involvement. The 340B ADR process should be considered only when good faith efforts to resolve disputes have been exhausted and failed.

*Comment:* The 2020 final rule established the 340B ADR process as reliant on the Federal Rules of Civil Procedure (FRCP) and the Federal Rules of Evidence (FRE). These rules govern civil proceedings and the introduction of evidence at civil and criminal trials in Federal courts. In the NPRM, HHS proposed removing reliance on these rules as the statute does not compel

reliance on the FRCP and FRE and many covered entities lack the expertise in these legal rules as well as the resources to hire outside counsel to navigate them. Conflicting comments were received related to removal of reliance on the FRCP and FRE for the 340B ADR process. Some covered entity stakeholders appreciated the proposal to make the process more accessible and administrative rather than trial-like. Most manufacturer commenters raised concerns that HHS had not proposed an alternative procedural framework or evidentiary standards in the absence of the Federal Rules asserting that without standards, the ground rules would be subject to dispute in each case.

*Response:* HHS believes the new 340B ADR process will be a more accessible process, especially for covered entities with fewer resources, and will not require legal expertise during the claim resolution process. This approach will be more accessible to stakeholders and will use fewer stakeholder and government resources to resolve disputes. As such, this final rule sets up an accessible and comprehensible process without needing to invoke the more elaborate procedures available under the FRCP and FRE.

*Comment:* Some covered entity commenters approved of the proposal to automatically transfer claims under the 2020 final rule to the new process.

Other commenters disagreed that claims should be automatically transferred to the new process. These commenters specifically argued that HHS should proceed to handle the claims that are currently in the queue under the 2020 final rule as opposed to automatically transferring them to the new process. Further, one covered entity commenter generally stated that it was unclear whether HHS would be permitted under administrative law principles to transfer claims to the new process. The commenter suggested that such a transfer would conflict with the general principle that agencies must apply the law in effect at the time a decision is made, even when that law has changed during the course of a proceeding.

Most manufacturer commenters disagreed, arguing that all pending ADR claims should be dismissed upon issuance of a final rule, and claimants should be required to refile claims if they wished to initiate new ADR proceedings.

*Response:* After consideration of the comments received, HHS is finalizing this provision as proposed to provide for the automatic transfer of any pending claims to the new process. The decision to automatically transfer any

**Add.87**

claims that were submitted pursuant to the 2020 final rule and that are pending will minimize burden on all parties involved. For petitioners, it will mean that they do not have to resubmit claims under the new process. It will ensure the continuity of the 340B ADR process for the stakeholders involved in claims under the 2020 final rule, despite the new process as envisioned in this final rule.

In particular, we disagree that automatically transferring claims to the new process will run afoul of any administrative law principles. The general presumption that agencies apply the law in effect at the time a decision was made is of no moment here, because nothing in this final rule changes the substantive law governing disputes covered by the 340B ADR process. Transferring pending claims to the new process "takes away no substantive right but simply changes the tribunal that is to hear the case"; in such a situation, "[p]resent law normally governs." *Landgraf* v. *USI Film Prod.,* 511 U.S. 244, 274 (1994) (cleaned up). As the Supreme Court has explained, a law "govern[ing] the transfer of an action instituted prior to that statute's enactment" may "be applied in suits arising before their enactment without raising concerns about retroactivity." *Id.* at 275. "Because rules of procedure regulate secondary rather than primary conduct, the fact that a new procedural rule [is] instituted after the conduct giving rise to the suit does not make application of the rule at trial retroactive." *Id.*

This rule modifies procedural requirements for the 340B ADR process. It does not impair any rights possessed by parties when they acted, increase or affect their liability for past conduct, or impose new duties on the parties for already completed transactions. The changes in this final rule do not affect the substance of claims at issue for the ADR panel and accordingly could not be considered to have retroactive application that affects potential consequences understood by the parties when they began the 340B ADR process.

Claims that are automatically transferred will be first in the queue to be reviewed once this final rule becomes effective. Within a specified time period, HHS will allow petitioners of claims submitted under the 2020 final rule to submit additional information or revise their petition, as necessary, in support of their original claim. Petitioners will also be able to withdraw their pending claims. HRSA will work with affected parties to the extent that additional information is needed as part of the process outlined in this final rule.

Details concerning this automatic transfer of claims will be provided to affected parties once this final rule becomes effective.

*Comment:* Many manufacturer commenters requested that HHS revise the 1996 manufacturer audit guidelines before it issues regulations on ADR. They stated that the guidelines are problematic because they impose onerous and unnecessary barriers on a manufacturer's ability to audit a covered entity for 340B compliance.

*Response:* Revisions to the 1996 manufacturer audit guidelines are outside the scope of this final rule. The requirement for a manufacturer to conduct an audit prior to initiating the 340B ADR process is a statutory requirement (section 340B(d)(3)(B)(iv) of the PHS Act). This rule is not meant to address how a manufacturer should conduct the audit—only that a manufacturer does conduct the audit prior to initiating the ADR process. Multiple manufacturers have utilized the 1996 manufacturer audit guidelines to conduct audits of covered entities. In the last 5 years, six have followed the guidelines to request audits of covered entities. During that same time frame, HRSA has not denied a request for a manufacturer audit of a covered entity, thereby, demonstrating the guidelines are not overly burdensome or present any barriers to a manufacturer's ability to perform an audit of a covered entity. Further, the guidelines present a clear and transparent process that may decrease burden on both parties with open dialogue and present an objective review of a covered entity's compliance.

*Comment:* Several manufacturer commenters raised that HHS has failed to establish procedures for manufacturers to issue refunds to covered entities for overcharges. They explained that this is a prerequisite to the 340B ADR process in order for it to be fair, efficient, and expeditious. Relatedly, they stated that there is a need for HHS to address refund procedures that permit offsets of covered entity overpayments and underpayments to a manufacturer.

*Response:* Specific procedures for refunds are outside the scope of this final rule, as the authority for this final rule directly relates to the development of an administrative process for the resolution of claims as described in section 340B(d)(3) of the PHS Act.

*Subpart A—General Provisions*

Section 10.3   Definitions

In the NPRM, HHS sought to add or revise the following definitions: "Administrative Dispute Resolution

Panel (340B ADR Panel)," "340B Administrative Dispute Resolution Process," "claim," "consolidated claim," "joint claim," and "Office of Pharmacy Affairs." HHS did not receive substantive comments on this section, and we are finalizing this section as proposed. HHS received numerous comments on defining the types of claims that could be adjudicated through the 340B ADR process, and HHS addresses those comments in § 10.21.

*Subpart C—Administrative Dispute Resolution*

Section 10.20   340B Administrative Dispute Resolution Panel

(a) Members of the 340B ADR Panel

The 2020 final rule states that the Secretary shall establish a 340B ADR Board consisting of at least six members appointed by the Secretary with equal numbers from HRSA, CMS, and the HHS OG C. It also requires the HRSA Administrator to select three members from the ADR Board to form a 340B ADR Panel and that each 340B ADR Panel include one ex-officio, non-voting member (appointed by the Secretary) from OPA to assist the 340B ADR Panel. HHS proposed to revise the composition of the 340B ADR Panel that would review and make decisions for claims filed by covered entities and manufacturers. In the NPRM, HHS proposed that the Secretary appoint a roster of no fewer than 10 eligible individuals (Roster) consisting of OPA staff to serve on the 340B ADR Panels. Under the proposed rule, the OPA Director, or designee, selects at least three members for each 340B ADR Panel from the Roster of appointed staff; has the authority to remove an individual from the 340B ADR Panel and replace such individual; selects replacement members should a 340B Panel member be removed or resign; and screens for any potential conflicts of interests. After consideration of the comments received, HHS is finalizing this provision as proposed. HHS has addressed specific comments with respect to this section below.

*Comment:* Several covered entity commenters favored the proposal to have OPA staff serve as the 340B ADR Panel members, because the staff understand the intricacies of the 340B Program. They explained that the 340B Program is complex and it is important that individuals understand the complexities of the 340B Program to adjudicate these disputes in order to ensure a fair outcome. Some concerns were raised that the workload may be too much for a small OPA staff, and that

an insufficient number of available panelists could lead to delayed decisions. Some covered entity commenters who favored OPA staff serving on 340B ADR Panels also recommended that other staff within HRSA could serve on 340B ADR Panels, such as staff working on programs with grantees that participate in the 340B Program.

*Response:* HHS agrees with the commenters that OPA staff should serve on 340B ADR Panels given their specialized knowledge and expertise of the 340B Program. Therefore, HHS is finalizing this provision as proposed. HHS also appreciates the commenters' concerns regarding the workload of OPA staff and the suggestion to include other HRSA staff that work with grantees participating in the 340B Program. However, as stated in the preamble of the proposed rule, OPA staff are subject matter experts and have years of experience with complex 340B matters involving covered entities and manufacturers. Given this expertise, HHS continues to believe that OPA staff are best suited to serve on 340B ADR Panels to ensure that the process is efficient and that claim reviews are handled in a timely fashion. This final rule limits 340B ADR Panel participation to OPA staff who have daily exposure to the complex issues facing both covered entities and manufacturers, to ensure there will be equitable, consistent, and fair 340B ADR adjudications. In addition, the OPA Director is aware of the workload of each OPA staff member and will be able to appropriately assign 340B ADR Panel members taking into consideration existing workload demands and priorities.

*Comment:* Some manufacturer commenters opposed OPA staff serving on 340B ADR Panels. These commenters argued that all OPA staff are involved in audits of covered entities and manufacturers, and with at least 10 staff planned to be on the ADR Roster under the proposed rule, there may be too many conflicts of interests and, in turn, the possibility and perception of bias may arise. Moreover, manufacturers opposing this policy were concerned that, given OPA's regular and extensive involvement in the day-to-day administration of the 340B Program, it may be difficult for OPA staff to approach adjudications without the appearance that they may be predisposed to particular views on relevant issues. Some commenters suggested Administrative Law Judges be the adjudicators of the 340B ADR process because they have the professional background, legal training

and independence needed to resolve claims in a fair, consistent, and well-reasoned manner.

*Response:* HHS continues to believe that a Panel of OPA staff members who are steeped in 340B knowledge and experience and who can provide a consistent application of 340B policies will ensure a more efficient ADR adjudication process. As such, HHS is finalizing this provision as proposed. OPA staff members work to provide oversight of the 340B Program without bias—working with both manufacturers and covered entities in a manner that is impartial to the stakeholders involved. In addition, staff members work toward the goal of ensuring the integrity of the 340B Program and they do so without prejudice toward particular stakeholders. Those serving as 340B ADR Panel members will be fair and make consistent decisions in a well-reasoned manner using the 340B statute, applicable regulations, policies, and guidance documents. OPA staff have demonstrated their ability to follow the principles of fairness, consistency, transparency of applicable statute, regulations, policies, and guidance in their performance of covered entity and manufacturer audits. The breadth of experience, which we believe far outweighs any risks of perceived bias, among the OPA staff members serving on a 340B ADR Panel will ensure fairness, consistency, and transparency in ADR decisions. In addition, the OPA Director, in consultation with government ethics officials, will consider financial interest(s), current or former business or employment relationship(s), or other involvement of a prospective panel member or close family member who is either employed by or otherwise has a business relationship with an involved party, subsidiary of an involved party, or particular claim(s) expected to be presented to the prospective panel member.[1]

In addition, specialized legal knowledge or training is not necessary for 340B ADR Panel members to effectively function in their role as the 340B ADR process is an administrative process that is best served by having 340B subject matter experience rather than legal experience. HHS disagrees with the recommendation that Administrative Law Judges should be appointed as adjudicators of the 340B ADR process.

The 340B ADR process is different, as it is designed as a process to resolve

---

[1] "Confidential Financial Disclosure Guide: OGE 450." U.S. Office of Government Ethics. October 2023.

disputes between covered entities and manufacturers and in this final rule, HHS is establishing 340B ADR Panels comprised of OPA staff, who are uniquely suited to handle the complexities of the 340B Program, given their day-to-day administration of the Program. Processes are well established to provide staff opportunity for continuous learning and training on program implementation and oversight. OPA staff also have distinct knowledge of the 340B statute, laws, and policies as they apply that subject matter expertise throughout the work that is conducted on a daily basis to oversee the program and therefore will be able to handle such disputes effectively and efficiently.

*Comment:* Some manufacturer commenters argued that the new proposed rule has the same Appointments Clause and structural constitutional defects as the 2020 final rule. They stated that there is no mechanism for review of a 340B ADR Panel decision by a principal officer, appointed by the President with Senate confirmation, before that decision becomes "final agency decision."

*Response:* HHS disagrees. Under this final rule, the Secretary will appoint a roster of eligible individuals (Roster) consisting of staff within OPA to serve on a 340B ADR Panel. When a 340B ADR claim is presented, the OPA Director will select three members from the Roster to serve on a 340B ADR Panel to review claims and make final agency decisions that will be binding on the parties involved, unless invalidated by an order of a Federal court. As discussed further in § 10.20(c), the Secretary, who is appointed by the President and Senate-confirmed, has the authority to intervene in the 340B ADR process at any time, including the ability to remove any individual from the Roster of 340B ADR Panelists for any reason. The Secretary had inherent authority to take these same actions under the 2020 final rule, and the codified regulatory text now explicitly addresses this authority. Specifically, as outlined further below, any 340B Panel decision or reconsideration decision regarding a 340B ADR Panel's decision will be effective 30 business days from issuance and serve as the final agency decision unless within 30 business days of issuance, the Secretary makes a determination that the Secretary will review the decision.

(b) Conflicts of Interest

In the NPRM, HHS proposed that the OPA Director would ensure that each 340B ADR Panel member is screened prior to reviewing a claim and that there

are no conflicts of interest between the parties involved in the dispute and the 340B ADR Panel member. The conflict-of-interest review includes financial interest(s), current or former business or employment relationship(s), or other involvement of a prospective panel member or close family member who is either employed by or otherwise has a business relationship with an involved party, subsidiary of an involved party, or particular claim(s) expected to be presented to the prospective panel member. Under the proposed rule, members of the 340B ADR Panel will also undergo additional screening prior to reviewing a specific claim to ensure that the 340B ADR Panel member was not involved in the previous agency action, including previous 340B ADR Panel decisions, concerning the specific issue in the claim. HHS received several comments on this provision, which are summarized below. After a review and analysis of the comments, HHS is clarifying the additional conflict of interest screening as discussed in more detail below.

*Comment:* Both manufacturer and covered entity commenters agreed that HHS should evaluate conflicts of interest with regard to a 340B ADR Panel member; however, they recommended that the parties should have the ability to make objections to a proposed panelist. Some commenters mentioned the small size of the OPA staff may make having too broad of screening for conflict of interest, such as having worked on an audit, difficult to fill a panel with subject matter experts. Commenters also requested the policies and procedures for screening panel members be publicly outlined.

*Response:* HHS will inform the parties involved in the ADR of Panel members for that specific claim. The OPA Director has full knowledge of a Panel member's workload and will select Panel members for each claim, which will also be based on the OPA Director's awareness of any potential conflicts of an OPA staff member, including financial interest conflicts, current or former business relationships or other involvement. We believe that the process sufficiently addresses the need to screen for conflicts and allowing the parties to object to proposed panelists or the specific policies or procedures for screening panel members would unduly lengthen the 340B ADR process. To the extent a conflict arises regarding an assigned panelist, the OPA Director is authorized to make changes to the panel composition. The commenters also raised concern about whether the additional conflict of interest screenings would make it difficult to fill 340B ADR

Panel positions, given the small staff within OPA. In order to make this process fair, efficient and transparent, HHS is retaining the policy that a conflict of interest screening will be conducted on all 340B ADR Panel members to ensure there is no conflict of interest with respect to financial conflicts or current/former business relationships or other involvement of a prospective panel member or close family member who is either employed by or otherwise has a business relationship with an involved party, subsidiary of an involved party in an 340B ADR claim. However, based on the comments received, HHS is clarifying that the additional screening in § 10.20(b)(2) will be conducted to ensure that a 340B ADR Panel member was not directly involved in a decision concerning the specific issue of the ADR claim as it relates to the specific covered entity or manufacturer involved, including previous 340B ADR Panel decisions. This clarification responds to the concerns of the commenters and balances the fact that 340B ADR Panel members will be selected from a relatively small staff. Indirect or tangential involvement in matters affecting a specific covered entity or manufacturer will not be considered a conflict of interest.

To the extent that any significant conflict issue is raised outside of those specifically addressed in § 10.20(b), the OPA Director or the Secretary still have the discretion to remove a 340B ADR Panel member (as addressed in § 10.20(a) and (c) of this final rule, respectively).

(c) Secretarial Removal Power

The NPRM proposed to codify in regulatory text the Secretary's authority to remove any individual from the Roster of 340B ADR Panelists for any reason, including from any 340B ADR Panel to which the individual has already been assigned. After a review of the comments received, HHS is modifying this provision by clarifying the Secretary's role in the 340B ADR process.

To respond to commenter requests for transparency, HHS commits to publishing these policies and procedures for screening panel members on a HRSA public-facing website within 120 calendar days of the publication of this final rule and, likewise, in the event that these policies and procedures are modified, HHS commits to publishing these policies and procedures for screening panel members on a HRSA public-facing website within 120 calendar days of such modification.

*Comment:* Many manufacturers argued that while the preamble to the proposed rule suggests that the Secretary would have the inherent authority to review and reverse or alter the 340B ADR Panel's decision, it was not explicitly included in the proposed regulatory text. Further, they stated that the Secretary does not exercise sufficient control over ADR panelist decisions.

*Response:* There are no restrictions on the Secretary's oversight or supervision over the 340B ADR process. The Secretary has the authority to intervene in the 340B ADR process at any time, has the authority to remove Panel members from the Roster, and has the authority to review, reverse, or alter any decision made by the 340B ADR Panel or any reconsideration decision made by the HRSA Administrator as outlined in § 10.24. In consideration of the comments received, HHS is modifying this provision to make explicit that the Secretary has the authority to review, alter, reverse, or uphold any 340B ADR Panel or reconsideration decision. Specifically, as outlined further below, any 340B Panel decision or reconsideration decision regarding a 340B ADR Panel's decision will be effective 30 business days from issuance and serve as the final agency decision unless within 30 business days of issuance, the Secretary makes a determination that the Secretary will review the decision. If the Secretary reviews and reverses, alters, or upholds any 340B ADR Panel or reconsideration decision, the Secretary's decision will serve as the final agency decision and will be binding upon the parties involved in the dispute, unless invalidated by an order of a Federal court.

(d) Duties of the 340B ADR Panel

The proposed rule outlined the duties of the 340B ADR Panel, which included:

(1) reviewing and evaluating claims, including consolidated and joint claims, and documents and information submitted by covered entities and manufacturers;

(2) reviewing and possibly requesting additional documentation, information, or clarification of an issue from any or all parties to make a decision;

(3) evaluating claims based on information received, unless, at the 340B ADR Panel's discretion, the nature of the claim necessitates that a meeting with the parties be held;

(4) consulting with other Federal agencies while reviewing the claim, at the 340B ADR Panel's discretion; and

(5) making decisions on each claim.

**Add.90**

There were no substantial comments received on this provision; therefore, HHS is finalizing the provision as proposed.

Section 10.21   Claims

(a) Claims Permitted

In accordance with section 340B(d)(3) of the PHS Act, 340B ADR claims may include: (1) claims by a covered entity that it has been overcharged by a manufacturer for a covered outpatient drug; and (2) claims by a manufacturer, after it has conducted an audit of a covered entity pursuant to section 340B(a)(5)(C) of the PHS Act, that the covered entity has violated section 340B(a)(5)(A) of the PHS Act, regarding the prohibition of duplicate discounts, or section 340B(a)(5)(B) of the PHS Act, regarding the prohibition of the resale or transfer of covered outpatient drugs to a person who is not a patient of the covered entity. The NPRM proposed that all claims must be specific to the parties identified in the claims. Based on the comments received, HHS is finalizing this provision as proposed. HHS has also decided to provide an illustrative but not exhaustive list of examples of the types of overcharges, diversion, and duplicate discount claims that may be eligible for the 340B ADR process.

*Comment:* Several covered entity commenters argued that manufacturers should not be allowed to bring claims related to a covered entity's eligibility and suggested that manufacturers cannot pursue claims alleging Medicaid managed care duplicate discount violations. These commenters believe that these types of claims are outside those permitted under the ADR statute.

*Response:* Generally, HHS agrees with the exclusion of claims regarding covered entity eligibility but disagrees with the commenters on claims related to duplicate discounts in Medicaid managed care. This final rule aligns claims to those expressly set forth in section 340B(d)(3) of the PHS Act: (1) claims by covered entities that they have been overcharged by manufacturers for drugs purchased under this section and (2) claims by manufacturers, after a manufacturer has conducted an audit of a covered entity, as authorized by section 340B(a)(5)(C) of the PHS Act, that a covered entity has violated the prohibitions against duplicate discounts and diversion (sections 340B(a)(5)(A) and (B) of the PHS Act). As duplicate discounts can occur with drugs subject to rebates under both Medicaid fee-for-service and Medicaid managed care, HHS declines to exclude Medicaid managed care

claims from the 340B ADR process. In addition, although the eligibility of a covered entity is generally outside of the scope of the 340B ADR process; if resolution of a diversion claim depends in whole or in part on whether a claimant is an eligible covered entity, then that claim may proceed through the 340B ADR process, given that the 340B statute permits claims for overcharges, diversion, and duplicate discounts. In this final rule, the role of the 340B ADR Panel is to independently review and apply the 340B statute and applicable regulations, policies, and guidance documents to the case-specific factual circumstances at issue in an overcharge, diversion, or duplicate discount dispute.

*Comment:* Some covered entity commenters urged HHS to reinstate language from the 2020 final rule to make clear that covered entities may bring an overcharge claim in situations in which a manufacturer has limited the covered entity's ability to purchase a covered outpatient drug at or below the 340B ceiling price.

*Response:* HHS agrees and has modified § 10.21(a)(1) to further explain that an overcharge claim generally includes claims that a manufacturer has limited the covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price.

*Comment:* Some covered entity commenters recommended that the final rule include a definition for the term "overcharge," to mean an attempt to collect a price in excess of the 340B price for a covered outpatient drug, any attempt to cause a drug wholesaler to decline to offer 340B pricing on a covered outpatient drug to a covered entity, and any refusal by a manufacturer to sell a covered outpatient drug at 340B pricing.

*Response:* When an overcharge claim is presented before a 340B ADR Panel, the Panel will follow the 340B statute, relevant case law, all applicable regulations, and consider 340B policies and guidance documents when evaluating 340B ADR claims. One example of an overcharge claim in the 340B ADR process would be a claim that a manufacturer has limited the covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price or the manufacturer does not offer the 340B ceiling price. We do not believe that an explicit definition of the term "overcharge" is needed in light of the process discussed above for addressing an overcharge claim.

*Comment:* Many manufacturer commenters objected to the lack of an explicit definition in the proposal for the terms "patient" or "diversion."

They explained that covered entities are prohibited from selling or otherwise transferring drugs purchased under the 340B Program to a person who is not a patient of the entity in accordance with section 340B(a)(5)(B) of the PHS Act. These commenters believe that HRSA should revise and clarify its current guidance (61 FR 55156 (Oct. 24, 1996)), to strengthen administration of the 340B Program, including the 340B ADR process and the parties' ability to work together to resolve disputes in good faith as proposed in § 10.21(b).

*Response:* Revision of the 1996 patient definition guidance is outside the scope of this rule. When a diversion claim is presented before a 340B ADR Panel, the Panel will follow the 340B statute and all applicable regulations, and consider 340B policies and guidance documents when evaluating 340B ADR claims. Examples of a diversion claim that may be submitted (after a manufacturer has conducted an audit of a covered entity), include but are not limited to: (1) transferring of covered outpatient drugs to a patient where there was no record of the individual's health care or no provider relationship or (2) transferring covered outpatient drugs to an individual who is an inpatient. Similarly, examples of a duplicate discount claim include but are not limited to: (1) if it is found after an audit of a covered entity that the covered entity billed Medicaid without the site being listed on the Medicaid Exclusion File and the manufacturer paid a State rebate or (2) if it is found after an audit of a covered entity that the manufacturer paid a State rebate and the covered entity had incomplete or inaccurate information on the Medicaid Exclusion File.

(b) Requirements for Filing a Claim

As proposed in the NPRM, a covered entity or manufacturer must file a 340B ADR claim in writing to OPA within 3 years of the date of the alleged violation. HHS also proposed that any file, document, or record associated with the claim that is the subject of a dispute must be maintained by the covered entity and manufacturer until the date of the final agency decision. Before filing a claim, each stakeholder must provide appropriate documentation, including documentation of communication with the opposing party to resolve the matter in good faith. In the case of a covered entity, the covered entity must provide documentation to support that it has been overcharged by a manufacturer, in addition to any other documentation requested by OPA. Covered entities are not permitted to file a claim against multiple manufacturers.

A manufacturer must provide documents that show it audited the covered entity and that are sufficient to support its claim that a covered entity has violated the prohibition on diversion and/or duplicate discounts, in addition to any other documentation as may be requested by OPA. HHS received several comments on these provisions and considered them carefully. For the reasons detailed below, HHS is finalizing these provisions as proposed.

*Comment:* Some covered entities commenters requested clarification that the 3-year records limitation period begins on the date of sale or payment at issue except when the manufacturer issues a restatement of the average manufacturer price (AMP), best price, customary prompt pay discounts, nominal prices, or other data that affects the 340B ceiling prices. Some of these commenters recommended that HHS include an undue hardship exemption to the 3-year limitation on claims to benefit small rural covered entities. They explain that small rural providers may submit ADR claims without outside counsel. Further, they state that alongside other challenges that a covered entity could be facing, pulling together the needed documentation to file a claim could be burdensome for covered entities.

Some manufacturer commenters expressed that because of the manufacturer audit requirement, which may take significant time to complete, the final rule should "toll" the 3-year period for manufacturer ADR claims from the point when a manufacturer first seeks to conduct an audit until the audit concludes with the completion of the audit report.

*Response:* While HHS believes that the 3-year limit is sufficient, there may be times when the initial reviewer will account for extenuating circumstances. For example, the timeline for manufacturer audits of covered entities depends on a variety factors, which may affect when they are finalized. Another example is when data affecting the 340B ceiling price are revised, such as where AMP or best price are corrected or restated, an alleged violation would have not occurred until the data were revised. These examples are not exhaustive but illustrate situations that may warrant flexibilities. In addition, under the current ADR process, the 3-year time period has proved to be sufficient for the parties. Noting these flexibilities, HHS is finalizing the provision as proposed.

*Comment:* Most commenters were generally supportive of the proposal that documentation of "good faith" efforts is required before a party can initiate a claim through the 340B ADR process. However, some manufacturer commenters believe that HHS should specify the types of documents required to evidence "good faith", including, but not limited to, documentation demonstrating that the covered entity has contacted the manufacturer about the potential issue and has given the manufacturer sufficient notice of a potential claim before initiating 340B ADR process.

Some covered entity commenters recommend that HHS remove the "good faith" requirement before filing a claim. Specifically, they argue that the act of overcharging a covered entity could not be an act of good faith and engaging with the manufacturer would be futile and cause unnecessary delay. These commenters argue that a "good faith effort" prerequisite to filing a claim requires the agency to make difficult determinations regarding whether an attempt at resolution was made in "good faith."

*Response:* After consideration of the comments received, HHS is finalizing this provision as proposed. Given the resources required to pursue an ADR claim, HHS encourages covered entities and manufacturers to work in good faith to resolve disputes. Good faith attempts include for example, at least one instance of written documentation demonstrating that the initiating party has made attempts to contact the opposing party regarding the specific issues cited in the ADR claim. The requirement to engage in good faith efforts may resolve disputes before the need to file a petition in many cases. In addition, HHS has historically encouraged manufacturers and covered entities to work with each other to attempt to resolve disputes in good faith, and most disputes have been resolved in a timely manner without needing HRSA's involvement. Also, the 340B ADR process is not intended to replace these good faith efforts and should be considered only when good faith efforts to resolve disputes have been exhausted and failed.

Good faith efforts and documentation can include communication between parties to obtain clarifications or to provide explanations that may not be readily apparent and may provide perspective to either party that may help mitigate concerns. For example, HRSA currently has a process in place when a covered entity is unable to obtain a 340B price from a manufacturer. In this case, HRSA can facilitate good faith efforts between the parties, and oftentimes help them resolve disputes, which typically are as a result of an error or misunderstanding.

*Comment:* Some manufacturer commenters encouraged HHS to protect the proprietary and confidential components of all parties' information throughout the 340B ADR process. They explained that for the 340B ADR process to work efficiently, parties need assurances that the proprietary and confidential information that they disclose will not be made publicly available.

*Response:* HHS will work to protect the proprietary and confidential information of the parties to the maximum extent that it is able to pursuant to current law.

(c) Combining Claims

The NPRM proposed that two or more covered entities may jointly file claims of overcharges by the same manufacturer for the same drug. The NPRM also provided that an association or organization may file on behalf of one or more covered entities representing their interests pertaining to overcharging by a single manufacturer for the same drug(s). The proposed rule provided specific parameters for covered entities filing joint claims and for associations/organizations filing claims on behalf of one or more covered entities, including that each covered entity meets the requirements for filing the ADR claim and that there is documentation of each covered entity's consent.

The NPRM also proposes that a manufacturer or manufacturers may request to consolidate claims brought by more than one manufacturer against the same covered entity if each manufacturer could individually file a claim against the covered entity, consents to the consolidated claim, meets the requirements for filing a claim, and the 340B ADR Panel determines that such consolidation is appropriate and consistent with the goals of fairness and economy of resources. The statutory authority for implementing the 340B ADR process does not address consolidated claims on behalf of manufacturers by associations or organizations representing their interests. After a careful review and consideration of the comments received, HHS is finalizing this provision as proposed.

*Comment:* Many covered entities commenters indicated that the NPRM improperly limits claims brought by associations and organizations representing covered entities to only those covered entities that consent to the claim being asserted on their behalf. These commenters argued that the

criteria for inclusion in an organizational claim in the 340B statute is merely membership in the organization. Representation by associations, regardless of whether the entity consents, allows covered entities to access the process more easily. They argued that requiring consent from each member of an organization introduces unnecessary resource and time burden—and could significantly delay the filing of claims that are sometimes time sensitive.

*Response:* An ADR claim could substantively affect a covered entity's ability to recover for 340B overcharges, as well as a covered entity's relationship with a manufacturer. However, after consideration of the comments, HHS, will permit associations or organizations filing a claim on behalf of its members to submit an attestation, rather than submitting signatures from each individual covered entity, that they have confirmed that all of the individual covered entities have agreed to be part of the ADR claim.

As part of the initial review of the claim, OPA will review the attestation statement submitted by the organization or association. If attestation documentation is missing, OPA will follow-up to obtain the attestation.

*Comment:* A few manufacturer commenters requested that HHS prohibit covered entities or manufacturers from asserting any individual claim that overlaps with a consolidated claim or joint claim. Commenters also urged HHS to clarify that the requirement for a joint claim by covered entities must involve the "same drug or drugs," which would mean that the alleged overcharges must involve substantially the same national drug code (NDC) and quarters.

*Response:* As part of the initial claim review, OPA will evaluate whether an individual claim would overlap with a consolidated claim or joint claim. If an overlap exists, OPA will contact the parties involved and request that they resolve the discrepancy. In addition, the review will also ensure that the alleged overcharge involves the same NDCs for joint claims.

*Comment:* Several manufacturer commenters argued that HHS should recognize manufacturers' ability to pursue claims through a trade association or agent of their choice. The statute required HHS to allow the combining of claims and permit claims to be brought on behalf of covered entities by associations or organizations—however, commenters assert that the statute does not preclude HHS from extending this ability to manufacturers. Commenters also argued

that few manufacturers will utilize the 340B ADR process due to the onerous requirements of the 2020 final rule and the audit requirement placed on them. They explained that this requirement would further preclude manufacturers from accessing the 340B ADR process by requiring them to wait several years for each manufacturer to audit a covered entity before bringing a consolidated claim.

*Response:* Section 340B(d)(3)(B) of the PHS Act permits associations to file joint ADR claims on behalf of covered entities; however, it does not include similar language for associations to file consolidated claims filed on behalf of manufacturers. In addition, due to the requirement that a manufacturer must first audit a covered entity before submitting an ADR claim, it would be difficult to have each manufacturer of the association or organization conduct an audit of a covered entity before filing a claim. Therefore, HHS is finalizing this provision as proposed. Regarding the commenter's argument about the audit requirements, HHS does not have the authority to waive this statutory requirement. Section 340B(d)(3)(B)(iv) of the PHSA requires that a manufacturer conduct an audit of a covered entity pursuant to subsection (a)(5)(C) as a prerequisite to initiating the 340B ADR process against a covered entity.

(d) Deadlines and Procedures for Filing a Claim

The proposed rule set forth the deadlines and procedures for filing a claim, including that OPA would conduct an initial review to determine whether the claim meets certain requirements as set forth by the statute and regulations. HHS proposed that OPA staff reviewing the initial claim review may not be appointed to serve on the 340B ADR Panel reviewing the specific claim. Additionally, under the proposed rule, OPA could request additional information of the initiating party and the party would have 20 business days from the receipt of the request to respond and if the party does not respond (or request and receive an extension to respond during that time period), the claim would not move forward to the 340B ADR Panel for review. The proposed rule also indicates that a written response would be sent to the initiating party once the claim is complete and OPA would send that verification of completion to the opposing party with instructions regarding the 340B ADR process, including timelines and information on how to submit their response as outlined in § 10.21(e). Once OPA

receives the opposing party's response, OPA would notify both parties, either advising that the claim would move forward for the 340B ADR Panel for review or that OPA determined the claim did not meet the requirements as set forth in § 10.21(b) and the reasons why. HHS proposed that for any claim that did not proceed to review by the 340B ADR Panel, the claim could be revised and refiled if there were new information to support the alleged statutory violation and the claim meets the criteria set forth in the statute and the regulation. HHS received several comments related to this provision and is finalizing this provision as proposed.

*Comment:* Several commenters suggested that HHS clarify that OPA's initial review of the claim is limited to determining whether the claim meets all the information requirements to file a claim and does not involve a factual or legal review of the claim. They state that at this stage, OPA should only be requesting additional information to satisfy the filing requirements. The determination as to whether a claim is substantiated should be reserved exclusively for the 340B ADR Panel.

*Response:* During the initial claim review, OPA will review a claim only for completeness, and not make any determinations whether a claim is substantiated. That determination will be reserved for the 340B ADR Panel.

(e) Responding to a Submitted Claim

When responding to a submitted claim, the NPRM proposed that the opposing party would have 30 business days to submit a written response to OPA upon receipt of notification that the claim is deemed complete. The proposed rule indicated that the opposing party may request an extension of the initial 30 business days to respond. Once the opposing party's response is received, OPA would provide a copy to the initiating party as indicated in § 10.21(d). The proposed rule also explained that if the opposing party's response was not received or the party elects not to participate in the 340B ADR process, OPA would notify both parties that the claim has proceeded to 340B ADR Panel review, and the 340B ADR Panel will render its decision after review of the information submitted in the claim. HHS carefully considered the comments received, which are summarized below, and is finalizing the provision as proposed.

*Comment:* Some commenters suggested that HHS adopt a timeframe of 60 calendar days (with the possibility of extensions) for opposing parties to respond to claims. These commenters are concerned with the proposal to

allow 340B ADR Panels to draw an adverse inference if the opposing party does not respond. They argued the proposed rule does not contain any standard that would ensure that adverse inferences are drawn against a party only in narrow circumstances. Finally, commenters noted that the final rule should recognize that an "adverse inference" is an extraordinary sanction, and there should be clear standards for when such a sanction is appropriate.

*Response:* HHS is revising this rule to remove references to adverse inferences, but otherwise finalizing this rule as proposed. Consistent with the statutory goals of efficiency, fairness and timeliness, we believe a response in 30 days is an adequate amount of time. However, HHS recognizes that there may be instances that require time beyond the stated deadlines, such as availability of key personnel. Depending on the circumstances presented, the 340B ADR Panel may exercise its discretion in granting additional time if warranted.

In addition, if a non-responsive party fails to respond before the deadline, the 340B ADR Panel will render its decision based on the information available to it during the adjudication process. If a party chooses not to respond, the 340B ADR Panel will move forward with its decision and there is a possibility that the decision may not be in favor of the non-responsive party.

Section 10.22   Covered Entity Information and Document Requests

Under the proposed rule and in accordance with section 340B(d)(3)(B)(iii) of the PHS Act, covered entities may discover or obtain information and documents from manufacturers and third parties relevant to a claim that the covered entity has been overcharged by a manufacturer. The NPRM proposed that the covered entity submit a written request within 20 business days of the receipt from OPA that the claim was forwarded to the 340B ADR Panel for review. The NPRM proposed that such covered entity document requests be facilitated by the 340B ADR Panel, including a review of the information/document request and notifying the covered entity if the request is not reasonable, not relevant or beyond the scope of the claim, and would permit the covered entity to resubmit a revised request if necessary.

The manufacturer (and any affiliated third-party agents of the manufacturer— wholesalers or other third parties) must respond to the request within 20 business days of receiving the request. The manufacturer must fully respond,

in writing, to an information/document request from the 340B ADR Panel by the response deadline. An extension will be granted by notifying the 340B ADR Panel in writing within 15 business days of receipt of the request. The NPRM proposed that if a manufacturer fails to fully respond to an information request, the 340B ADR Panel shall draw an adverse inference and proceed with the facts that the 340B ADR Panel has determined have been established in the proceeding.

Many commenters recommended changes to the proposed provision allowing parties to request and receive information during the 340B ADR process, including allowing a manufacturer to submit an information request—which was not contemplated by the statute. HHS carefully reviewed the comments received, which are summarized below, and is finalizing this provision as proposed.

*Comment:* Commenters argued HHS should establish a process for manufacturers to directly request additional information from covered entities during an ADR proceeding. These commenters requested that HHS extend the timeframe for manufacturers to respond to additional information and document requests from 20 business days to 60 calendar days (with the possibility of reasonable extensions).

*Response:* Section 340B(d)(3)(B)(iii) of the PHS Act requires a process whereby a covered entity may discover or obtain information and documents from manufacturers and third parties relevant to a claim that the covered entity has been overcharged by a manufacturer. The statute does not have a similar provision for manufacturers and manufacturers have the ability to gather needed information through the audits they are required to conduct prior to filing ADR claims. As such, the provision will be finalized as proposed.

In addition, HHS believes a response from manufacturers for additional information and document requests in 20 business days is an adequate amount of time. Any such additional time will unduly delay the 340B ADR process and run counter to the goals of fairness, efficiency, and timeliness. This final rule also contains a provision through which manufacturers may request an extension of this deadline.

Section 10.23   340B ADR Panel Decision Process

Aligned with section 340B(d)(3)(B)(ii) of the PHS Act, HHS has sought to ensure that the 340B ADR decision process would ensure that its review and decision of the claim is conducted in a fair, efficient, and expeditious

manner. HHS proposed that the 340B ADR Panel would conduct an initial review of the claim to determine if the specific issue that would be brought forth in a claim is the same as or similar to an issue that is pending in Federal court. If this determination is made, the 340B ADR Panel would suspend review of the claim until such time as the issue is no longer pending in Federal court. If no such issue exists, the proposed rule explained that the 340B ADR Panel would review the documents submitted by the parties and determine if there is adequate support to conclude that an overcharge, diversion, or a duplicate discount has occurred in the specific case at issue. As discussed in more detail below and after consideration of the comments received on this proposal, HHS is removing this proposed provision from this final rule to allow claims on issues pending in Federal court to proceed through the 340B ADR process.

In addition, the NPRM proposed that the 340B ADR Panel would prepare a decision that would represent the determination of a majority of the 340B ADR Panel members' findings and include an explanation regarding each finding. Once the letter has been transmitted to the OPA Director and the parties involved, either party may request that the HRSA Administrator reconsider the 340B ADR Panel decision or the HRSA Administrator may decide to initiate a reconsideration without such a request as outlined in § 10.24. Under the NPRM, after 20 business days of the issuance of the 340B ADR Panel decision, there is no request for reconsideration from either party and the HRSA Administrator has not initiated a reconsideration, the 340B ADR Panel's decision letter will serve as the final agency decision and will be binding upon the parties involved in the dispute, unless invalidated by an order of a Federal court. The NPRM proposed that the OPA Director would then determine any necessary corrective action or consider whether to take enforcement action, and the form of that action, based on the final agency decision. Based on comments received and as discussed in detail below, HHS is modifying this proposal in this final rule by including a timeframe by which the 340B ADR Panel decisions will be issued to ensure that 340B ADR claims are resolved in a timely manner. Finally, HHS will address the OPA Director's role in making determinations for corrective action in future guidance and other clarifications as discussed below.

*Comment:* The NPRM proposed that if the ADR Panel determines that a specific issue in a claim is the same as,

or similar to an issue pending in Federal court, the ADR Panel would suspend review of the claim until such time the issue is no longer pending in Federal court. The NPRM expressly solicited comments from stakeholders on this issue and HHS received significant comments. Some commenters favor suspending claims until they are resolved in Federal court as it would limit the risk of using limited ADR resources on complex legal questions that would also be considered by the courts. Without a suspension of claims, they argue there could be a risk that the ADR Panel decision would be superseded by a Federal court ruling.

In contrast, other commenters strongly oppose the proposal and argue why the provision should not be finalized. In general, the commenters raised the following arguments:

• Commenters opposing the policy expressed that an issue relevant to an ADR proceeding may be pending in several district courts and the court decisions may diverge and not achieve a final consistent resolution on the issue. They stated it is unclear how an ADR Panel would decide after the rulings and whether the ruling would be based on the outcome of the Federal court decision, and if so, which court decision would control in the case of conflicts.

• Commenters also argued that Congress created the 340B ADR process since covered entities have limited options for bringing legal claims against manufacturers. They asserted that suspending claims is a divergence from the statute, as the statute vests the ADR Panel with authority to issue final agency decisions that are binding on the parties involved through adjudication of 340B disputes. They argued that the provision violates the 340B statute and the Administrative Procedure Act (APA) as it prevents the 340B ADR Panel from resolving a claim for an indefinite period of time based solely on the determination that a Federal lawsuit is addressing an issue that is the same or similar to the one included in an ADR claim.

• Commenters also expressed that the NPRM did not include rules that would govern the 340B ADR Panel's determination that it would not review a claim nor is there any mechanism for a covered entity or manufacturer to contest a 340B ADR Panel's determination to suspend review.

• Commenters cited the 2011 U.S. Supreme Court ruling in *Astra* (*Astra USA, Inc.* v. *Santa Clara County,* 563 U.S. 110 (2011)) that determined that covered entities do not have a cause of action to sue manufacturers for 340B

violations, but noted that covered entities do have the option of pursuing recourse through the 340B ADR process.

• Finally, commenters opposing the policy explain that the suspension of the 340B ADR Panel review may lead a 340B ADR Panel to defer to a Federal court's decision on a 340B compliance issue, thereby abrogating the 340B ADR Panel's duty to interpret 340B statutory requirements. These commenters stated that this is contradictory to the role of the 340B ADR Panel envisioned by the NPRM, which is to independently review and apply 340B law and policy to the case-specific factual circumstances at issue.

*Response:* After review of the comments received, HHS is removing the provision at § 10.23 in the NPRM that would suspend review of ADR claims if the issue is the same as or similar to an issue that is pending in Federal court. By allowing claims that are the same as or similar to those pending in Federal court to move through the 340B ADR process, HHS is proceeding consistent with the *Astra* decision and meeting its statutory mandate to establish and implement a 340B ADR process including the establishment of such deadlines and procedures to ensure that claims involving certain 340B disputes are resolved fairly, efficiently, and expeditiously. Therefore, this final rule will remove the proposed § 10.23(a) and revise § 10.23(b) to allow for a claim to proceed through the 340B ADR process, regardless of whether it is the same as or similar to one that is pending in Federal court.

*Comment:* Many commenters argued that HHS should impose a timeframe for ADR Panel decisions to ensure that 340B ADR claims are resolved in a timely manner. Some suggested 45, 90, 120, or 180 days. Some explained that 120 days is longer than the 90-day timeframe that Medicare administrative law judges are subject to for Medicare claims appeals and would be a sufficient amount of time. Commenters assert that HHS should clarify that if an ADR panel has not issued a decision within 120 days, a claimant should be able to bypass the 340B ADR process and proceed to Federal court. Most commenters agreed that the decision should be rendered no later than within one year.

*Response:* Based on the comments received, HHS is clarifying that the expectation is that the 340B ADR Panel will make a decision on a claim within one year of receiving the claim for review. However, HHS recognizes that this general timeframe may not be suitable in every situation, as there may

be complexities that warrant additional time beyond the one year timeframe. Additional time may be necessary, for example, if a claim is submitted and the 340B ADR Panel requires additional material, must determine whether there are overlapping claims, must determine whether a covered entity consented to an organizational claim, or seeks to consult with, as appropriate or necessary, other staff within OPA, other HHS offices, other Federal agencies, or with outside parties. Depending on the complexity of the issue, this timeframe may exceed the one year timeframe set forth in this final rule.

HHS does not believe it possible to list out every possible exception in this final rule as there may be situations that are beyond the control of the 340B ADR Panel and cannot be anticipated or predicted in this final rule; however, these examples serve to illustrate circumstances when it may take longer than one year for a 340B ADR Panel to render a decision. In any event, HHS does not believe that many claims that are submitted under this final rule will take longer than a year to resolve. As such, HHS is clarifying that the expectation is the 340B ADR Panel decisions will be issued within a one year time period; however, the 340B ADR Panel will inform the parties, no later than 1 year from the date a claim is deemed complete, if the forthcoming decision will exceed that one year timeframe and provide an explanation as to why the decision on the claim will exceed one year.

*Comment:* Many commenters requested there be the option for an in-person hearing before the 340B ADR Panel, if requested by either party. The commenters explain that ADR claims may often involve factual questions and the 340B ADR Panel may benefit from the "adversarial input" of the parties involved.

*Response:* The NPRM did not contemplate in-person hearings as part of the 340B ADR process, as HHS proposed a process that would be more accessible than the 2020 final rule, by making it more expeditious and less trial-like for all parties to resolve disputes. HHS believes adding in-person hearings to the process could be arduous, could create disadvantages to under-resourced parties, and could create unnecessary delays. For example, smaller or rural covered entities, including those with limited resources, could have significant difficulties complying with such a requirement compared to larger and better resourced parties.

*Comment:* Some commenters appreciated HHS' proposed removal of

language indicating that 340B ADR Panel decisions are precedential. They argued that the 2020 final rule gave the 340B ADR Panel the ability to set and change policy on fundamental program issues, such as who qualifies as a 340B-eligbile patient—and they argued that such language was inconsistent with the 340B statute, which does not support making 340B ADR Panel decisions precedential.

Conversely, other commenters disagreed and believed that ADR decisions should be precedential because, otherwise, it would be difficult to adequately assess the viability of a claim prior to submitting it to the 340B ADR Panel. They explained that by ensuring that decisions are precedential, it would impact how well entities are able to evaluate whether the 340B ADR process is appropriate for a given claim based on the time and resource investment required of the parties involved.

*Response:* Section 340B(d)(3)(C) of the PHS Act states that the administrative resolution of a claim shall constitute final agency decision and will be binding on the parties involved, unless invalidated by an order of a court of competent jurisdiction. The 340B statute does not expressly state that the 340B ADR Panel decision or a subsequent reconsideration decision be precedential. As set forth in §§ 10.21 and 10.23, the 340B ADR Panel will follow the 340B statute, regulations, and all policies governing the 340B Program when reviewing and evaluating 340B ADR claims and HHS is finalizing as proposed.

*Comment:* Most commenters urged wider transparency and requested that HHS publish 340B ADR Panel decisions on HRSA's website and require 340B ADR Panel decisions to include the 340B ADR Panel's factual and legal conclusions, including the HRSA policy on which the decision is based. They reasoned that this would ensure ADR decisions are consistent with current 340B policies and that 340B stakeholders are able to understand and apply HRSA's rule and compliance expectations.

*Response:* HHS values and supports transparency in the outcome of any 340B ADR Panel decision. For HRSA audits of covered entities and manufactuers, HRSA publishes its audit findings in summary format as full audit reports may include proprietary and/or sensitive business information (for example, under the statute, 340B ceiling prices themselves cannot be publicly disclosed). Consistent with this approach, HRSA will publish 340B ADR final agency decisions on a HRSA

public-facing website within 120 calendar days of issuance.

*Comment:* Some commenters suggest that HHS revise this section to require the 340B ADR Panel or OPA to inform the parties of their reconsideration rights when the 340B ADR Panel's decision is communicated to the parties.

*Response:* HHS agrees and is finalizing this rule to include a provision that would ensure that parties are informed of their reconsideration rights at the time the 340B ADR Panel's decision is communicated to the parties.

*Comment:* HHS received several comments recommending that HHS revise this section to require manufacturers or covered entities to repay the other party within a specified time-period (*e.g.,* 60 days) of the date 340B ADR Panel's decision letter or the HRSA Administrator's reconsideration decision.

*Response:* The NPRM explained that once the parties have been notified of the final agency decision and no request for reconsideration has been made in accordance with § 10.24, the OPA Director will consider whether to take enforcement action to ensure corrective action to the extent allowed under the 340B statute. For example, based on the final agency decision, the OPA Director may require a covered entity to repay an affected manufacturer in a timely manner. In addition, in the case of a 340B ADR Panel decision involving an overcharge, the OPA Director may require that the manufacturer refund or issue a credit to the impacted covered entity. Such an enforcement decision may include the time frame and manner of such remedies.

Section 10.24    340B ADR Panel Decision Reconsideration Process

The NPRM proposed a process for either party to initiate a reconsideration request within 20 business days of the date of the 340B ADR Panel's decision letter. The HRSA Administrator, or their designee, may initiate the process without such a request. The NPRM also proposed that a reconsideration process may only be granted when a party demonstrates that the 340B ADR Panel decision may have been inaccurate or flawed. As proposed, the reconsideration process would involve the HRSA Administrator, or designee, reviewing the record and the 340B ADR Panel's decision, and either issuing a revised decision to be effective 20 business days from issuance or declining to issue a revised decision. Finally, the NPRM proposed that the reconsideration decision or the 340B ADR Panel decision (in the event of a declination) will serve as the final

agency decision and will be binding upon the parties involved in the dispute, unless invalidated by an order of a Federal court. The proposed rule indicates that the OPA Director will determine any necessary corrective action, or consider whether to take enforcement action, and the form of any such action, based on the final agency decision. There were several comments received on the reconsideration process, and HHS is finalizing this provision with some clarifications as discussed below.

*Comment:* The majority of comments received support a reconsideration process by the HRSA Administrator. Some suggest that HHS clarify the timeline for a reconsideration decision.

*Response:* HHS appreciates the comments received in support of a reconsideration process conducted by the HRSA Administrator. Regarding a timeline for the HRSA Administrator's reconsideration and after review of the comments, the HRSA Administrator will make efforts to issue a reconsideration decision within 180 calendar days from the initiation of the reconsideration process. HHS is finalizing, as proposed, that if a reconsideration decision is rendered, the reconsideration decision, unless altered or reversed (after review) by the Secretary, will serve as the final agency decision and will be binding on the parties involved in the dispute, unless invalidated by an order of a Federal court.

*Comment:* Some commenters recommend that HHS lengthen the amount of time for parties to request a reconsideration. The NPRM contemplates that a request for reconsideration must be made within 20 business days of the date of the 340B ADR Panel's decision letter. Commenters urged HHS to revise this timeline to either 30 or 60 business days to allow for more time to (1) determine that they believe the reconsideration is necessary and (2) file the request in a timely manner.

*Response:* HHS agrees with the commenters and is finalizing § 10.24(b) to lengthen the time that a request for reconsideration can be made from the proposed 20 business days to 30 business days. This will allow a requestor additional time to obtain consent in the case of a joint or consolidated claim for a reconsideration request as indicated in § 10.24(b)(3). In the event that no request for reconsideration is received by either party after the 30-day period, the 340B ADR Panel decision or any such alteration or reversal by the Secretary (after review) will serve as the final

agency decision and will be binding on the parties involved in the dispute, unless invalidated by an order of a Federal court.

*Comment:* Some commenters request that HHS clarify that new facts or information may not be submitted as part of the reconsideration process. They argue that new legal or policy arguments may be warranted in light of the 340B ADR Panel's decision and should not be prohibited.

*Response:* HHS has clarified in § 10.24 to state that no new "facts," information, or legal or policy arguments may be submitted as part of the reconsideration process in order to remain consistent with the content reviewed by the 340B ADR Panel in reaching their decision.

*Comment:* Several commenters request that HHS remove the proposed provision at § 10.24(b)(3), which would require that in the case of joint or consolidated claims, the requestor for reconsideration submit documentation showing consent to the reconsideration process, including signatures of the individuals representing each covered entity or manufacturer. They state that it is unclear why consent should be required for a reconsideration request when the covered entity or manufacturer previously consented to joint/consolidated representation as part of the 340B ADR process as outlined in § 10.21(c).

*Response:* After consideration of the comments, HHS will permit associations or organizations filing a claim on behalf of its members to submit an attestation that they have confirmed that all covered entities have agreed to be part of the reconsideration process. Also, as discussed above, HHS is modifying the proposal to lengthen the time for a party to initiate a reconsideration request from 20 business days to 30 business days.

*Comment:* A few commenters recommended that HHS clarify the HRSA Administrator's standard of review used when analyzing the 340B ADR Panel's decision and further clarify that the 340B ADR Panel's decision is held in abeyance until the HRSA Administrator issues a decision on reconsideration.

*Response:* The standard that the HRSA Administrator will use in reviewing any reconsideration request will be the same for each request. The HRSA Administrator will review the record, including the 340B ADR Panel decision, and determine whether there was an error in the 340B ADR Panel's decision, including any deviation from policy, guidance or statute. HHS has made this clear in this final rule. HHS

will also clarify in § 10.24 that in the event of a reconsideration request, the 340B ADR Panel's decision is held in abeyance until the HRSA Administrator modifies or sustains the 340B ADR Panel's decision. Any such reconsideration decision letter will be effective 30 business days from issuance and serve as the final agency decision unless within 30 business days of issuance, the Secretary makes a determination that the Secretary will review the decision. The final agency decision will be binding upon the parties involved in the dispute unless invalidated by an order of a Federal court.

### Section 10.25 Severability

In this final rule, we adopt modifications to 42 CFR part 10 that support a unified scheme for review of 340B ADR claims. While the unity and comprehensiveness of this scheme maximizes its utility, we clarify that its constituent elements operate independently of each other. Were a provision of this regulation stayed or invalidated by a reviewing court, the provisions that remain in effect would continue to provide a process for review of 340B claims. For example, this final rule contains a number of requirements to be fulfilled prior to review by the 340 ADR Panel, such as providing evidence of good faith efforts and evidence that each covered entity consents to the combining of the claims for a joint claim. To the extent that these provisions were no longer in effect, the remainder of the final rule could still function without these provisions.

To best serve these purposes, we have addressed severability in the regulations to make clear that the provisions of 42 CFR part 10 are designed to operate independently of each other and to convey the Department's intent that the potential invalidity of one provision or any of its subparts should not affect the remainder of the provisions.

## III. Regulatory Impact Analysis

### A. Regulatory Impact Analysis

HHS has examined the effects of this final rule as required by Executive Order 12866 on Regulatory Planning and Review (September 30, 1993), Executive Order 13563 on Improving Regulation and Regulatory Review (January 18, 2011), Executive Order 14094 on Modernizing Regulatory Review (April 6, 2023), the Regulatory Flexibility Act (September 19, 1980, Pub. L. 96–354), the Unfunded Mandates Reform Act of 1995 (UMRA; Pub. L. 104–4), and Executive Order 13132 on Federalism (August 4, 1999).

HHS did not receive any substantive comments on this section of the proposed rule and is therefore finalizing this section as proposed.

### B. Overall Impact

Executive Orders 12866 and 13563 direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563 is supplemental to and reaffirms the principles, structures, and definitions governing regulatory review as established in Executive Order 12866, emphasizing the importance of quantifying both costs and benefits, of reducing costs, harmonizing rules, and promoting flexibility.

Under E.O. 12866, OMB's Office of Information and Regulatory Affairs (OIRA) determines whether a regulatory action is significant and, therefore, subject to the requirements of the E.O. and review by OMB. *See* 58 FR 51735 (Oct. 4, 1993). Section 1(b) of E.O. 14094 amended sec. 3(f) of E.O. 12866 to define a "significant regulatory action" as an action that is likely to result in a rule that may: (1) have an annual effect on the economy of $200 million or more (adjusted every 3 years by the Administrator of OIRA for changes in gross domestic product) or adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, territorial, or Tribal governments or communities; (2) create a serious inconsistency or otherwise interfere with an action taken or planned by another agency; (3) materially alter the budgetary impact of entitlements, grants, user fees, or loan programs, or the rights and obligations of recipients thereof; or (4) raise legal or policy issues for which centralized review would meaningfully further the President's priorities or the principles set forth in the E.O. *See* 88 FR 21879 (Apr. 11, 2023). OIRA has determined that this final rule is a significant regulatory action, although not a significant regulatory action under sec. 3(f)(1) of E.O. 12866. Accordingly, OMB has reviewed this final rule.

This final rule would modify the framework for HHS to resolve certain disputed claims regarding manufacturers overcharging covered entities and disputed claims of diversion and duplicate discounts by covered entities audited by

manufacturers under the 340B Program. HHS does not anticipate the modification of the 340B ADR process to result in significant economic impact. Because this rule only updates an existing process, there is no additional economic impact. In addition, the parties involved already have the information that will reported through the 340B ADR process; therefore, we do not anticipate any additional impact. This is also consistent with a similar determination in the 2020 final rule that "HHS does not anticipate the introduction of an ADR process to result in significant economic impacts." Pursuant to Subtitle E of the Small Business Regulatory Enforcement Fairness Act of 1996, also known as the Congressional Review Act (5 U.S.C. 801 *et seq.*), OIRA has determined that this rule does not meet the criteria set forth in 5 U.S.C. 804(2).

*C. The Regulatory Flexibility Act*

The Regulatory Flexibility Act (RFA; 5 U.S.C. 601 *et seq.*) and the Small Business Regulatory Enforcement and Fairness Act of 1996 (SBREFA), which amended the RFA, requires HHS to analyze options for regulatory relief of small businesses. If a rule has a significant economic effect on a substantial number of small entities, HHS must specifically consider the economic effect of this rule on small entities and analyze regulatory options that could lessen the impact of this rule. HHS will use a RFA threshold of at least a 3 percent impact on at least 5 percent of small entities.

This final rule's requirements would affect drug manufacturers (North American Industry Classification System code 325412: Pharmaceutical Preparation Manufacturing). The small business size standard for drug manufacturers is 750 employees. Approximately 700 drug manufacturers participate in the 340B Program. While it is possible to estimate the impact of this final rule on the industry as a whole, the data necessary to project the impact of changes on specific manufacturers or groups of manufacturers is not available, as HRSA does not collect the information necessary to assess the size of an individual manufacturer that participates in the 340B Program. This final rule would also affect health care providers. For purposes of the RFA, HHS considers all health care providers to be small entities either by virtue of meeting the Small Business Administration (SBA) size standard for a small business, or for being a nonprofit organization that is not dominant in its market. The current

SBA size standard for health care providers ranges from annual receipts of $8 million to $41.5 million. As of April 1, 2023, 14,134 covered entities participate in the 340B Program.

This final rule would modify the ADR mechanism for reviewing claims by manufacturers that covered entities have violated certain statutory obligations and claims by covered entities alleging overcharges for 340B covered outpatient drugs by manufacturers. This 340B ADR process would require submission of documents that manufacturers and covered entities are already required to maintain as part of their participation in the 340B Program. HHS expects that this documentation would be readily available prior to submitting a claim. Therefore, the collection of this information would not result in an economic impact or create additional administrative burden on these businesses.

By design of this final rule, the 340B ADR process will resolve claims in a fair, efficient, and expeditious manner in accordance with section 340B(d)(3)(B)(ii) of the PHS Act. This final rule provides an option to join or consolidate claims by similar situated entities, and covered entities may have claims asserted on their behalf by associations or organizations which could reduce costs. HHS has determined, and the Secretary certifies, that this final rule would not have a significant economic impact on a substantial number of small health care providers or a significant impact on the operations of a substantial number of small manufacturers; therefore, HHS is not preparing an analysis of impact for the purposes of the RFA. HHS estimates that the economic impact on the less than 5 percent of small entities and small manufacturers participating in the 340B Program would be minimal and less than a 3 percent economic burden and therefore does not meet the RFA threshold of 3 percent.

*D. Unfunded Mandates Reform Act of 1995*

Section 202(a) of the Unfunded Mandates Reform Act of 1995 UMRA requires that agencies prepare a written statement, which includes an assessment of anticipated costs and benefits, before proposing "any rule that includes any Federal mandate that may result in the expenditure by State, local, and Tribal governments, in the aggregate, or by the private sector, of $100 million or more (adjusted annually for inflation) in any one year." In 2023, that threshold is approximately $177 million. HHS does not expect this rule to exceed the threshold.

*E. Executive Order 13132—Federalism*

HHS has reviewed this final rule in accordance with Executive Order 13132 regarding federalism and has determined that it does not have federalism implications. This final rule would not "have substantial direct effects on the States, or on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government." The final rule would also not adversely affect the following family elements: family safety, family stability, marital commitment; parental rights in the education, nurture, and supervision of their children; family functioning, disposable income, or poverty; or the behavior and personal responsibility of youth, as determined under section 654(c) of the Treasury and General Government Appropriations Act of 1999.

*F. Collection of Information*

The Paperwork Reduction Act of 1995 (44 U.S.C. 3507(d)) requires that OMB approve all collections of information by a Federal agency from the public before they can be implemented. This final rule would not impact the current reporting and recordkeeping burden for manufacturers or covered entities under the 340B Program. Because the 340B ADR process provides the mechanism and procedures for an administrative action or investigation involving an agency against specific individuals or entities, pursuant to 44 U.S.C. 3518(c), the 340B ADR process is exempt from Paperwork Reduction Act requirements. In addition, participants in the 340B Program are already required to maintain the necessary records to submit an ADR claim.

**List of Subjects in 42 CFR Part 10**

Biologics, Business and industry, Diseases, Drugs, Health, Health care, Health facilities, Hospitals, 340B Drug Pricing Program.

Dated: April 12, 2024.

**Xavier Becerra,**

*Secretary, Department of Health and Human Services.*

For the reasons set forth in the preamble, the Department of Health and Human Services amends 42 CFR part 10 as follows:

**PART 10—340B DRUG PRICING PROGRAM**

■ 1. The authority citation for part 10 continues to read as follows:

**Authority:** Sec. 340B of the Public Health Service Act (42 U.S.C. 256b) (PHSA), as amended.

■ 2. Amend § 10.3 by:

■ a. Removing the definition for *Administrative Dispute Resolution (ADR) Process* and dding the definition *340B Administrative Dispute Resolution (ADR) process* in its place;

■ b. Revising the definitions for *Administrative Dispute Resolution Panel (340B ADR Panel), Claim, Consolidated claim,* and *Joint claim;* and

■ c. Adding in alphabetical order the definition for *Office of Pharmacy Affairs (OPA).*

The revisions and additions read as follows:

### § 10.3 Definitions.

\* \* \* \* \*

*340B Administrative Dispute Resolution (ADR) process* means a process used to resolve the following types of claims, including any issues that assist the 340B ADR Panel in resolving such claims:

(1) Claims by covered entities that may have been overcharged for covered outpatient drugs purchased from manufacturers; and

(2) Claims by manufacturers of 340B drugs, after a manufacturer has conducted an audit of a covered entity (pursuant to section 340B(a)(5)(C) of the Public Health Service Act (PHS Act)), that a covered entity may have violated the prohibitions against duplicate discounts or diversion.

*Administrative Dispute Resolution Panel (340B ADR Panel)* means a decision-making body within the Health Resources and Services Administration's Office of Pharmacy Affairs that reviews and makes decisions for claims filed through the 340B ADR process.

\* \* \* \* \*

*Claim* means a written allegation filed by or on behalf of a covered entity or by a manufacturer for resolution under the 340B ADR process.

\* \* \* \* \*

*Consolidated claim* means a claim resulting from combining multiple manufacturers' claims against the same covered entity.

\* \* \* \* \*

*Joint claim* means a claim resulting from combining multiple covered entities' claims (or claims from their membership organizations or associations) against the same manufacturer for the same drug or drugs.

\* \* \* \* \*

*Office of Pharmacy Affairs (OPA)* means the office, or any successor office assigned to administer the 340B Program, within the Health Resources and Services Administration, or any successor agency, that oversees the 340B Program.

\* \* \* \* \*

■ 3. Revise subpart C to read as follows:

### Subpart C—Administrative Dispute Resolution

Sec.
10.20  340B Administrative Dispute Resolution Panel.
10.21  Claims.
10.22  Covered entity information and document requests.
10.23  340B ADR Panel decision process.
10.24  340B ADR Panel decision reconsideration process.
10.25  Severability.

### Subpart C—Administrative Dispute Resolution

### § 10.20  340B Administrative Dispute Resolution Panel.

The Secretary shall appoint a roster of eligible individuals (Roster) consisting of staff within OPA, to serve on a 340B ADR Panel, as defined in § 10.3. The OPA Director, or the OPA Director's designee, shall select at least three members from the Roster to form a 340B ADR Panel to review and make decisions regarding one or more claims filed by covered entities or manufacturers.

(a) *Members of the 340B ADR Panel.* (1) The OPA Director shall:

(i) Select at least three members for each 340B ADR Panel from the Roster of appointed staff;

(ii) Have the authority to remove an individual from the 340B ADR Panel and replace such individual; and

(iii) Select replacement 340B ADR Panel members should an individual resign from the panel or otherwise be unable to complete their duties.

(2) No member of the 340B ADR Panel may have a conflict of interest, as set forth in paragraph (b) of this section.

(b) *Conflicts of interest.* (1) All members appointed by the Secretary to the Roster of individuals eligible to be selected for a 340B ADR Panel will be screened for conflicts of interest prior to reviewing a claim. In determining whether a conflict exists, the OPA Director, in consultation with government ethics officials, will consider financial interest(s), current or former business or employment relationship(s), or other involvement of a prospective panel member or close family member who is either employed by or otherwise has a business relationship with an involved party, subsidiary of an involved party, or particular claim(s) expected to be presented to the prospective panel member.

(2) All members of the 340B ADR Panel will undergo an additional screening prior to reviewing a specific claim to ensure that the 340B ADR Panel member was not directly involved in a decision concerning the specific issue of the ADR claim as it relates to the specific covered entity or manufacturer involved, including previous 340B ADR Panel decisions.

(c) *Secretarial authority in the 340B ADR process.* The Secretary may remove any individual from the Roster of 340B ADR Panelists for any reason, including from any 340B ADR Panel to which the individual has already been assigned. The Secretary has the authority to review and reverse, alter, or uphold any 340B ADR Panel or reconsideration decision as outlined in §§ 10.23 and 10.24. Any such decision of the Secretary will serve as the final agency decision and will be binding upon the parties involved in the dispute, unless invalidated by an order of a Federal court.

(d) *Duties of the 340B ADR Panel.* The 340B ADR Panel will:

(1) Review and evaluate claims, including consolidated and joint claims, and documents and information submitted by (or on behalf of) covered entities and manufacturers;

(2) Review and may request additional documentation, information, or clarification of an issue from any or all parties to make a decision (if the 340B ADR Panel finds that a party has failed to respond or fully respond to an information request, the 340B ADR Panel may proceed with facts that the 340B ADR Panel determines have been established in the proceeding);

(3) Evaluate claims based on information received, unless, at the 340B ADR Panel's discretion, the nature of the claim necessitates that a meeting with the parties be held;

(4) At its discretion, consult with others, including staff within OPA, other HHS offices, and other Federal agencies while reviewing a claim; and

(5) Make decisions on each claim.

### § 10.21  Claims.

(a) *Claims permitted.* All claims must be specific to the parties identified in the claims and are limited to the following:

(1) Claims by a covered entity that it has been overcharged by a manufacturer for a covered outpatient drug, including claims that a manufacturer has limited the covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price; and

(2) Claims by a manufacturer, after it has conducted an audit of a covered entity pursuant to section 340B(a)(5)(C) of the PHS Act, that the covered entity has violated section 340B(a)(5)(A) of the PHS Act, regarding the prohibition of duplicate discounts, or section 340B(a)(5)(B) of the PHS Act, regarding the prohibition of the resale or transfer of covered outpatient drugs to a person who is not a patient of the covered entity.

(b) *Requirements for filing a claim.* (1) Absent extenuating circumstances, a covered entity or manufacturer must file a claim under this section in writing to OPA within 3 years of the date of the alleged violation. Any file, document, or record associated with the claim that is the subject of a dispute must be maintained by the covered entity and manufacturer until the date of the final agency decision.

(2) A covered entity filing a claim described in paragraph (a)(1) of this section must provide the basis, including all available supporting documentation, for its belief that it has been overcharged by a manufacturer, in addition to any other documentation as may be requested by OPA. A covered entity claim against multiple manufacturers is not permitted.

(3) A manufacturer filing a claim under paragraph (a)(2) of this section must provide documents sufficient to support its claim that a covered entity has violated the prohibition on diversion and/or duplicate discounts, in addition to any other documentation as may be requested by OPA.

(4) A covered entity or manufacturer filing a claim must provide documentation of good faith efforts, including for example, documentation demonstrating that the initiating party has made attempts to contact the opposing party regarding the specific issues cited in the ADR claim.

(c) *Combining claims.* (1) Two or more covered entities may jointly file claims of overcharges by the same manufacturer for the same drug or drugs if each covered entity consents to the jointly filed claim and meets the filing requirements.

(i) For covered entity joint claims, the claim must list each covered entity, its 340B ID and include documentation as described in paragraph (b) of this section, which demonstrates that each covered entity meets all of the requirements for filing the ADR claim.

(ii) For covered entity joint claims, a letter requesting the combining of claims must accompany the claim at the time of filing and must document that each covered entity consents to the combining of the claims, including

signatures of individuals representing each covered entity and a point of contact for each covered entity.

(2) An association or organization may file on behalf of one or more covered entities representing their interests if:

(i) Each covered entity is a member of the association or the organization representing it and each covered entity meets the requirements for filing a claim;

(ii) The joint claim filed by the association or organization must assert overcharging by a single manufacturer for the same drug(s); and

(iii) The claim includes a letter from the association or organization attesting that each covered entity agrees to the organization or association asserting a claim on its behalf, including a point of contact for each covered entity.

(3) A manufacturer or manufacturers may request to consolidate claims brought by more than one manufacturer against the same covered entity if each manufacturer could individually file a claim against the covered entity, consents to the consolidated claim, meets the requirements for filing a claim, and the 340B ADR Panel determines that such consolidation is appropriate and consistent with the goals of fairness and economy of resources. Consolidated claims filed on behalf of manufacturers by associations or organizations representing their interests are not permitted.

(d) *Deadlines and procedures for filing a claim.* (1) Covered entities and manufacturers must file claims in writing with OPA, in the manner set forth by OPA.

(2) OPA will conduct an initial review of all information submitted by the party filing the claim and will make a determination as to whether the requirements in paragraph (b) of this section are met. The OPA staff conducting the initial review of a claim may not be appointed to serve on the 340B ADR Panel reviewing that specific claim.

(3) Additional information to substantiate a claim may be submitted by the initiating party and may be requested by OPA. If additional information is requested, the initiating party will have 20 business days from the receipt of OPA's request to respond. If the initiating party does not respond to a request for additional information within the specified time frame or request and receive an extension, the claim will not move forward to the 340B ADR Panel for review.

(4) OPA will provide written notification to the initiating party that the claim is complete. Once the claim is

complete, OPA will also provide written notification to the opposing party that the claim was submitted. This written notification will provide a copy of the initiating party's claim, and additional instructions regarding the 340B ADR process, including timelines and information on how to submit their response in accordance with the procedures for responding to a claim as outlined in paragraph (e) of this section.

(5) If OPA finds that the claim meets the requirements described in paragraph (b) of this section, and once OPA receives the opposing party's response in accordance with the procedures outlined in paragraph (e) of this section, additional written notification will be sent to both parties advising that the claim will be forwarded to the 340B ADR Panel for review.

(6) If OPA finds that the claim does not meet the requirements described in paragraph (b) of this section, written notification will be sent to both parties stating the reasons that the claim did not move forward.

(7) For any claim that does not move forward for review by the 340B ADR Panel, the claim may be revised and refiled if there is new information to support the alleged statutory violation and the claim meets the criteria set forth in this section.

(e) *Responding to a submitted claim.* (1) Upon receipt of notification by OPA that a claim is deemed complete and has met the requirements in paragraph (b) of this section, the opposing party in alleged violation will have 30 business days to submit a written response to OPA.

(2) A party may submit a request for an extension of the initial 30 business days response period and OPA will make a determination to approve or disapprove such request and notify both parties.

(3) OPA will provide a copy of the opposing party's response to the initiating party and will notify both parties that the claim has moved forward for review by the 340B ADR Panel.

(4) If an opposing party does not respond or elects not to participate in the 340B ADR process, OPA will notify both parties that the claim has moved forward for review by the 340B ADR Panel and the 340B ADR Panel will render its decision after review of the information submitted in the claim.

§ 10.22 **Covered entity information and document requests.**

(a) To request information necessary to support its claim from an opposing party, a covered entity must submit a written request for additional

information or documents to the 340B ADR Panel within 20 business days of the receipt from OPA that the claim was forwarded to the 340B ADR Panel for review. The 340B ADR Panel will review the information/document request and notify the covered entity if the request is not reasonable, not relevant or beyond the scope of the claim, and will permit the covered entity to resubmit a revised request if necessary.

(b) The 340B ADR Panel will transmit the covered entity's information/document request to the manufacturer who must respond to the request within 20 business days of receipt of the request.

(c) The manufacturer must fully respond, in writing, to an information/document request from the 340B ADR Panel by the response deadline.

(1) A manufacturer is responsible for obtaining relevant information or documents from any wholesaler or other third party that may facilitate the sale or distribution of its drugs to covered entities.

(2) If a manufacturer anticipates that it will not be able to respond to the information/document request by the deadline, it can request one extension by notifying the 340B ADR Panel in writing within 15 business days of receipt of the request.

(3) A request to extend the deadline must include the reason why the specific deadline is not feasible and must outline the proposed timeline for fully responding to the information/document request.

(4) The 340B ADR Panel may approve or disapprove the request for an extension of time and will notify all parties in writing of its decision.

(5) If the 340B ADR Panel finds that a manufacturer has failed to fully respond to an information/document request, the 340B ADR Panel will proceed with the facts that the 340B ADR Panel has determined have been established in the proceeding.

(6) If a manufacturer believes an information request to a covered entity is necessary for the 340B ADR Panel's review, it may make a request to the 340B ADR Panel to make the request to the covered entity.

### § 10.23   340B ADR Panel decision process.

(a) The 340B ADR Panel will conduct a review of the claims. The 340B ADR Panel will review all documents gathered during the 340B ADR process to determine if a violation as described in § 10.21(a)(1) or (2) has occurred.

(b) The 340B ADR Panel will prepare a decision letter based on its review. The 340B ADR Panel's decision letter

will be completed within one year of receiving a complete claim for review, except to the extent that there are situations beyond the control of the 340B ADR Panel that may affect the ability to issue a decision on a claim within one year. If the issuance of a 340B ADR Panel decision will exceed one year, the 340B ADR Panel must provide notice to the parties involved. The 340B ADR Panel decision letter will represent the determination of a majority of the 340B ADR Panel members' findings regarding the claim and include an explanation regarding each finding. The 340B ADR Panel will transmit its decision letter to all parties and to the OPA Director.

(c) The 340B ADR Panel decision letter will inform the parties involved of their rights for reconsideration as described in § 10.24. Either party may request reconsideration of the 340B ADR Panel decision or the Health Resources and Service Administration (HRSA) Administrator may decide to initiate a reconsideration without such a request. The final agency decision will be binding upon the parties involved in the dispute unless invalidated by an order of a Federal court. The 340B ADR Panel's decision letter will be effective 30 business days from issuance and serve as the final agency decision unless:

(1) Within 30 business days of issuance, reconsideration occurs under § 10.24; or

(2) Within 30 business days of issuance, the Secretary makes a determination that the Secretary will review the decision.

(d) The OPA Director will determine any necessary corrective action or consider whether to take enforcement action, and the form of any such action, based on the final agency decision.

### § 10.24   340B ADR Panel decision reconsideration process.

(a) Either party may initiate a reconsideration request, or the HRSA Administrator may decide to initiate the process without such a request. In the event of a reconsideration request, the 340B ADR Panel's decision is held in abeyance until such time the HRSA Administrator makes a reconsideration decision of the 340B ADR Panel decision (or in the event of a declination). A reconsideration decision will affirm or supersede a 340B ADR Panel decision.

(b) The request for a reconsideration of the 340B ADR Panel's decision must be made to the HRSA Administrator within 30 business days of the date of the 340B ADR Panel's decision letter.

(1) The request for reconsideration must include a copy of the 340B ADR Panel decision letter, and documentation indicating why a reconsideration is warranted.

(2) New facts, information, legal arguments, or policy arguments may not be submitted as part of the reconsideration process in order to remain consistent with the facts that were reviewed by the 340B ADR Panel in determining their decision.

(3) In the case of joint or consolidated claims, the reconsideration request must include an attestation confirming that all of the entities have agreed to be part of the reconsideration process.

(c) The standard for review of the reconsideration request by the HRSA Administrator, or their designee, will include a review of the record, including the 340B ADR Panel decision, and a determination of whether there was an error in the 340B ADR Panel's decision. The HRSA Administrator, or designee, may consult with other HHS officials, as necessary.

(d) The HRSA Administrator, or their designee, will make a determination based on the reconsideration request by either issuing a revised decision or declining to issue a revised decision.

(e) The reconsideration decision letter will be effective 30 business days from issuance and serve as the final agency decision unless within 30 business days of issuance, the Secretary makes a determination that the Secretary will review the decision. The final agency decision will be binding upon the parties involved in the dispute unless invalidated by an order of a Federal court.

(f) The OPA Director will determine any necessary corrective action, or consider whether to take enforcement action, and the form of any such action, based on the final agency decision.

### § 10.25   Severability.

If any provision of this subpart is held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, or stayed pending further agency action, the provision shall be construed so as to continue to give the maximum effect to the provision permitted by law, unless such holding shall be one of utter invalidity or unenforceability, in which event the provision shall be severable from this part and shall not affect the remainder thereof.

[FR Doc. 2024–08262 Filed 4–18–24; 8:45 am]

**BILLING CODE 4165–15–P**